UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 14-2257 JGB (SPx)** | | Date | May 9, 2023 |
|---|---|---|---|---|
| Title | ***Lamya Brewster, et al. v. City of Los Angeles, et al.*** | | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

Proceedings:     **Order (1) GRANTING IN PART and DENYING IN PART Defendants'
Motion for Summary Judgment (Dkt. No. 281); (2) GRANTING
Plaintiffs' Motion for Partial Summary Judgment (Dkt. No. 282); and
STRIKING Defendants' Compendium of Evidence (Dkt. No. 281-3) (IN
CHAMBERS)**

Before the Court are two matters: (1) a motion for summary judgment filed by Defendants
City of Los Angeles ("the City"), Los Angeles Police Department ("LAPD") and Charlie Beck
("Chief Beck") (collectively, "Defendants") ("MSJ," Dkt. No. 281); and (2) a motion for
partial summary judgment filed by Plaintiffs Lamya Brewster, Elias Arizmendi and Julian Vigil,
individually and as class representatives ("MPSJ," Dkt. No. 282) (collectively, "the Motions").
The Court determines the matters are appropriate for resolution without a hearing.  See Fed. R.
Civ. P. 78; L.R. 7-15.  After considering the papers filed in support of and in opposition to the
Motions, the Court **GRANTS IN PART** and **DENIES IN PART** the MSJ and **GRANTS** the
MPSJ.

## I.    BACKGROUND

### A.  Procedural History

On November 2, 2014, Ms. Brewster[1] filed a class action complaint against Defendants
seeking injunctive relief and damages under 42 U.S.C. § 1983.  ("Complaint," Dkt. No. 1.)  The
Complaint alleged Defendants violated Ms. Brewster's Fourth Amendment rights by

---

[1] At the time, Ms. Brewster was the only named Plaintiff.

impounding her vehicle pursuant to a policy under which LAPD officers could cause a vehicle to be seized and then impounded for thirty days under certain conditions ("Impound Policy"). (See id. ¶¶ 8, 41, 44.)

On November 24, 2014, Ms. Brewster filed a motion for class certification (Dkt No. 26) and a motion for preliminary injunction ("PI Motion," Dkt. No. 28). On December 26, 2014, Defendants filed a motion to dismiss based on (1) Ms. Brewster's lack of standing and (2) Ms. Brewster's failure to state a claim. ("MTD Complaint," Dkt. No. 33.) On January 12, 2015, Defendants filed an opposition to the motion for class certification. (Dkt. No. 34.) The same day, Defendants filed an opposition to the motion for preliminary injunction. ("Opposition to PI Motion," Dkt. No. 35.)

On February 27, 2015, the Court granted Defendants' MTD Complaint and denied Ms. Brewster's motions for class certification and preliminary injunction because it held Ms. Brewster failed to state a claim. ("MTD Complaint Order," Dkt. No. 54.) The Court found Ms. Brewster failed to state a claim for a violation of the Fourth Amendment because the thirty-day impoundment of her car was a valid administrative policy. (Id.) The Court's judgment was entered on March 19, 2015. (Dkt. No. 55.)

On March 27, 2015, Ms. Brewster filed a notice of appeal. (Dkt. No. 56.) On June 21, 2017, the Ninth Circuit reversed the Court's dismissal and found that the thirty-day impound of Brewster's vehicle constituted a seizure that required compliance with the Fourth Amendment. Brewster v. Beck, 859 F.3d 1194, 1197 (9th Cir. 2017). It "express[ed] no view as to whether the 30-day impound [was] a valid administrative penalty under the Fifth and Fourteenth Amendments" and directed that, "[o]n remand, Brewster shall be given leave to amend the complaint to include additional claims she may choose to bring." Id. at 1196 n.2.

On October 24, 2017, Ms. Brewster and Defendants filed a stipulation for leave to file a First Amended Complaint. (Dkt. No. 73.) They further stipulated to add state law claims and two new federal claims alleging violations of Ms. Brewster's Fifth Amendment rights. (Id.) On October 26, 2017, Ms. Brewster filed a First Amended Complaint. ("FAC," Dkt. No. 75.) On March 27, 2018, Defendants filed an answer to the FAC. ("Answer," Dkt. No. 81.)

On June 7, 2018, Ms. Brewster and Defendants filed a stipulation for leave to file a Second Amended Complaint. ("SAC Stipulation," Dkt. No. 99.) The parties stipulated to add (1) a second named plaintiff, (2) allegations and damages classes in support of Rule 23 class-based claims for relief, and (3) allegations asserting procedural and substantive violations of Fifth Amendment rights, as well as parallel claims under the California constitution. (Id.) On June 12, 2018, Ms. Brewster and a second named plaintiff, Elias Arizmendi, filed a Second Amended Complaint. ("SAC," Dkt. No. 103.) On July 10, 2018, Defendants filed an amended answer to the SAC. ("Amended Answer," Dkt. No. 110.)

On May 15, 2019, the parties stipulated to add Julian Vigil as a third named plaintiff and class representative. ("TAC Stipulation," Dkt. No. 137.) On May 22, 2019, Plaintiffs filed a

Third Amended Complaint.  ("TAC," Dkt. No. 139.)  On June 5, 2019, Defendants filed a motion to dismiss Plaintiffs' TAC.  ("MTD TAC," Dkt. No. 141.)  Plaintiffs opposed the MTD TAC on June 24, 2019.  (Dkt. No. 146.)  On July 1, 2019, Defendants replied.  (Dkt. No. 150.)  The Court granted in part and denied in part Defendants' MTD TAC.  ("MTD TAC Order," Dkt. No. 171.)

On August 14, 2019, Plaintiffs filed a Fourth Amended Complaint.  ("4AC," Dkt. No. 175.)  On August 28, 2019, Defendants filed a motion to dismiss the 4AC.  ("MTD 4AC," Dkt. No. 178.)  On September 16, 2019, Plaintiffs opposed the MTD 4AC.  (Dkt. No. 180.)  On September 23, 2019, Defendants replied.  (Dkt. No. 181.)  On July 14, 2020, the Court granted in part and denied in part Defendants' MTD 4AC.  ("MTD 4AC Order," Dkt. No. 197.)

On July 10, 2020, Plaintiffs filed a motion for class certification.  ("MCC," Dkt. No. 190.)  On August 10, 2020, Defendants opposed the MCC.  (Dkt. No. 199.)  On September 4, 2020, Plaintiffs replied in support of the MCC.  (Dkt. No. 205.)

On August 3, 2020, Plaintiffs filed a Fifth Amended Complaint.  ("5AC," Dkt. No. 198.)  The 5AC alleged six causes of action: (1) 42 U.S.C. § 1983 injunctive relief, also brought under Article I § 13 of the California Constitution; (2) Fourth Amendment violation under 42 U.S.C. § 1983 seeking damages; (3) Fourteenth Amendment (substantive and procedural due process) violation under 42 U.S.C. § 1983; (4) Fifth Amendment (takings clause) under 42 U.S.C. § 1983; (5) breach of mandatory duty pursuant to Cal. Civ. Code § 851.6; and (6) violation of Cal. Const. Art. I § 13.  (See id.)

On August 17, 2020, Defendants filed a motion to dismiss the 5AC.  ("MTD 5AC," Dkt. No. 204.)  On August 31, 2020, Plaintiffs opposed the MTD 5AC.  (Dkt. No. 206.)  On September 4, 2020, Defendants replied in support of the MTD 5AC.  (Dkt. No. 207.)

On September 21, 2020, the Court held a hearing on the MCC and MTD 5AC.  (Dkt. No. 209.)  On August 5, 2021, the Court issued an order granting in part and denying in part the MTD 5AC and granting in part and denying in part the MCC.  ("MTD 5AC and MCC Order," Dkt. No. 220.)[2]  The Court certified the LO and Lien Classes and denied certification of the OPG Class.  (Id.)

On August 17, 2021, Plaintiffs filed a motion for reconsideration of the MTD 5AC and MCC Order.  ("Motion for Reconsideration," Dkt. No. 221.)  On September 3, 2021, Defendants opposed the Motion for Reconsideration.  (Dkt. No. 222.)  On September 13, 2021, Plaintiffs replied in support of the Motion for Reconsideration.  (Dkt. No. 223.)  On September 24, 2021, the Court denied the Motion for Reconsideration but invited Plaintiffs to amend their motion for class certification as to the OPG class in line with the Court's Order.  (Dkt. No. 224.)

---

[2] The MTD 5AC and MCC Order was erroneously dated September 11, 2020.  It was docketed late due to a clerk's error.

**CIVIL MINUTES—GENERAL**          Initials of Deputy Clerk mg

On October 21, 2021, Plaintiffs filed a renewed motion for class certification. ("Renewed MCC," Dkt. No. 277.) On November 22, 2021, Defendants opposed the Renewed MCC . (Dkt. No. 230.) Plaintiffs replied in support of the Renewed MCC on December 8, 2021. (Dkt. No. 232.) On November 22, 2021, Defendants filed a motion for decertification of classes. ("MD," Dkt. No. 231.) Plaintiffs opposed on December 13, 2021 (Dkt. No. 233). Defendants replied in support of the MD on December 20, 2021. (Dkt. No. 234). By stipulation of the parties and on motion of the Court, the hearing on the Renewed MCC and MD was continued 15 times. (See Dkt. Nos. 237-263.) On July 27, 2022, the Court denied the MCC and denied the MD. ("Order Denying MCC and MD," Dkt. No. 264.)

On August 10, 2022, Defendants filed a motion to certify the Court's Order Denying MCC and MD to the Ninth Circuit for interlocutory review. ("Motion for Interlocutory Appeal," Dkt. No. 266.) Plaintiffs opposed on August 22, 2022. (Dkt. No. 268.) Defendants replied in support of the Motion for Interlocutory Appeal on August 29, 2022. (Dkt. No. 269.) On October 11, 2022, the Court denied the Motion for Interlocutory Appeal. (Dkt. No. 273.)

On December 29, 2022, the parties filed a stipulation to extend the page limitation of the opening memoranda of (partial) motions for summary judgement to 30 pages and to vacate pretrial and trial dates pending resolution of the pending dispositive motions. (Dkt. No. 278.) The same day, the Court approved the stipulation. (Dkt. No. 280.)

## B. Motions

On January 13, 2023, Defendants filed the MSJ. (MSJ.) In support of the MSJ, Defendants filed:

- Defendants' Separate Statement of Undisputed Material Facts and Conclusions of Law ("DSSUF," Dkt. No. 281-2);
- Defendants' Compendium of Evidence, to which 22 exhibits are attached ("DCOE," Dkt. No. 281-3); and
- Notice of Lodging of Nonpaper Physical Exhibit (Dkt. No. 281-4).

Also on January 13, 2023, Plaintiffs filed the MPSJ. (MPSJ.) The same day, in support of the MPSJ, Plaintiffs also filed:

- Plaintiffs' Separate Statement of Uncontroverted Facts and Conclusions of Law ("PSSUF," Dkt. No. 282-1);
- Declaration of Donald Cook ("Donald Cook Declaration," Dkt. No. 283);
- Declaration of Dwight Cook ("Dwight Cook Declaration," Dkt. No. 283);
- Declaration of Cynthia Anderson-Barker ("Anderson-Barker Declaration," Dkt. No. 283);
- Declaration of Lamya Brewster ("Brewster Declaration," Dkt. No. 283); and
- Declaration of Tishon Johnson ("Johnson Declaration," Dkt. No. 283).

On January 14, 2023, Plaintiffs filed a notice of errata correcting Dkt. No. 283.  (Dkt. No. 284.) Plaintiffs filed the following with the notice of errata:

- Declaration of Michael Meyer (Dkt. No. 284-1); and
- Declaration of Chris Mitrision ("Mitrision Declaration," Dkt. No. 284-2).

On January 16, 2023, Plaintiffs filed a notice of errata correcting the PSSUF.  (Dkt. No. 285.) Plaintiffs filed the following with the notice of errata:

- Plaintiffs' Corrected Separate Statement of Uncontroverted Facts and Conclusions of Law ("PCSSUF," Dkt. No. 285-1).

On July 17, 2023, Defendants filed a notice of errata correcting the DCOE.  (Dkt. No. 287.) Defendants report that they failed to fully redact current pages that contain personal information, such as driver's license numbers and dates of birth.  (Id.)[3]  Defendants filed the following attached to the notice of errata:

- Defendants' Corrected Compendium of Evidence ("DCCOE," Dkt. No. 287-1.)

On February 3, 2023, Defendants filed an opposition to the MPSJ.  ("MPSJ Opposition," Dkt. No. 289.)  In support of the MPSJ Opposition, Defendants filed:

- Defendants' Statement of Genuine Disputes of Material Fact and Undisputed Material Facts ("DSGMF," Dkt. No. 289-1);
- Defendants' Evidentiary Objections ("Defendants' Evidentiary Objections," Dkt. No. 289-2); and
- Defendants' Opposition Compendium of Evidence ("DOCE," Dkt. No. 289-3).

On February 3, 2023, Plaintiffs filed an opposition to the MSJ.  ("MSJ Opposition," Dkt. No. 290.)  In support of the MSJ Opposition, Plaintiffs filed:

- Plaintiffs' Separate Statement of Genuine Disputes in Opposition to Defendants' MSJ ("PSSGD," Dkt. No. 290-1); and
- Plaintiffs' Additional Material Facts ("PAMF," Dkt. No. 290-1).

On February 4, 2023, Plaintiffs filed the following:

- Supplemental Declaration of Donald Cook ("Donald Cook Supplemental Declaration," Dkt. No. 291);

---

[3] Defendants request that the Court strike the DCOE from its docket.  The Court GRANTS the request and STRIKES the DCOE (Dkt. No. 281-3) from its docket.

- Supplemental Declaration of Dwight Cook ("Dwight Cook Supplemental Declaration," Dkt. No. 291); and
- Declaration of Cynthia Anderson-Barker ("Anderson-Barker Supplemental Declaration," Dkt. No. 291).[4]

On February 21, 2023, Defendants replied in support of the MSJ. ("MSJ Reply," Dkt. No. 292.) In support of the MSJ Reply, Defendants filed the following:

- Defendants' Evidentiary Objections ("Defendants' MSJ Reply Evidentiary Objections," Dkt. No. 292-1); and
- Defendants' Compendium of Rebuttal Evidence ("DCRE," Dkt. No. 292-2).

On February 21, 2023, Plaintiffs replied in support of the MPSJ. ("MPSJ Reply," Dkt. No. 293.) In support of the MPSJ Reply, Plaintiffs filed the following:

- Plaintiffs' Reply to Defendants' Statement of Genuine and Undisputed Facts ("PRDSGMF," Dkt. No. 293-1); and
- Reply Declaration of Donald Cook ("Donald Cook Reply Declaration," Dkt. No. 293-2).

On February 22, 2023, Defendants filed evidentiary objections to Plaintiffs' reply evidence. ("Defendants' Objections to Plaintiffs' Reply Evidence," Dkt. No. 294.)

On February 22, 2023, Defendants filed a notice of supplemental authority. (Dkt. No. 295.) The same day, Defendants filed a notice of errata correcting the notice of supplemental authority. (Dkt. No. 296.) Also on February 22, 2023, Plaintiffs filed a response to Defendants' notice of supplemental authority. (Dkt. No. 297.)[5]

---

[4] The Court labels this as a supplemental declaration so as to differentiate it from the earlier-filed Anderson-Barker Declaration.

[5] Except as otherwise noted in the opinion below, the Court does not find Untalan v. Stanley, 2023 WL 2158371 (9th Cir. Feb. 22, 2023) material to the analysis. Defendants appear to argue that Untalan supports their proximate causation / foreseeability argument assessed, and rejected, below. But Untalan has no bearing on the analysis: in Untalan, there were no municipal defendants and no Monell claim, which is the context in which that issue is raised here. See 2023 WL 2158371. The panel's discussion of the proximate causation issue arose with regard to a California Highway Patrol officer who made the initial decision to impound a vehicle, and had no role in the decision whether or not to release the vehicle *later*; here, it is the Impound Policy itself that caused all relevant vehicles to be held for 30 days and that makes the City liable under Monell. And the Untalan panel also faulted the plaintiff for failing to identify the CHP officer who presided over a storage hearing and thereafter refused to release the vehicle, or naming that officer as a defendant. Id. at *2. That issue is also not present here, for all relevant officials have been identified in discovery and Plaintiffs have sued the proper defendants. Finally, Defendants (continued . . . )

On March 9, 2023, the Court continued the hearing on the Motions from March 13, 2023, to March 20, 2023.  (Dkt. No. 299.)

On March 10, 2023, Plaintiffs filed an ex parte application for leave to file a supplemental memorandum of points and authorities in support of the MSJ Opposition.  ("Application," Dkt. No. 300.)  The same day, Defendants opposed the Application.  (Dkt. No. 301.)  On March 13, 2023, the Court granted the Application.  (Dkt. No. 302.)  On March 13, 2023, Plaintiffs filed a submission of supplemental authority regarding issues raised in Defendants' MSJ Reply.  ("Plaintiffs' Supplemental," Dkt. No. 303.)  On March 15, 2023, Defendants filed a response to Plaintiffs' Supplemental.  ("Response to Plaintiffs' Supplemental," Dkt. No. 304.)

On March 16, 2023, the Court continued the hearing on the Motions from March 20, 2023 to March 27, 2023.  (Dkt. No. 305.)  On March 23, 2023, the Court continued the hearing on the Motions from March 27, 2023 to April 10, 2023.  (Dkt. No. 306.)  On March 27, 2023, the parties filed a stipulation to continue the hearing on the Motions from April 10, 2023 to April 17, 2023.  (Dkt. No. 308.)  On March 31, 2023, the Court approved the stipulation.  (Dkt. No. 309.)  On April 14, 2023, the Court continued the hearing on the Motions from April 17, 2023 to May 1, 2023.  (Dkt. No. 310.)  On April 21, 2023, the parties filed a stipulation to continue the hearing on the Motions from May 1, 2023 to May 8, 2023.  (Dkt. No. 311.)  On April 27, 2023, the Court approved the stipulation.  (Dkt. No. 312.)  On May 5, 2023, the Court vacated the hearing on the Motions and took the matter under submission.  (Dkt. No. 313.)

## II.    FACTS

### A. Evidentiary Objections

"A trial court can only consider admissible evidence in ruling on a motion for summary judgment."  Orr v. Bank of America, NT & SA, 285 F.3d 764, 773 (9th Cir. 2002); see Fed. R. Civ. Proc. 56(e).  At the summary judgment stage, district courts consider evidence with content that would be admissible at trial, even if the form of the evidence would not be admissible at trial.  See, e.g., Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003).  The Court considers the parties' objections only where necessary and all other objections are OVERRULED AS MOOT.  "[O]bjections to evidence on the ground that it is irrelevant, speculative, and/or argumentative, or that it constitutes an improper legal conclusion are all duplicative of the summary judgment standard itself" and are thus "redundant" and unnecessary to consider here.  Burch v. Regents of Univ. of California, 433 F. Supp. 2d 1110, 1119 (E.D. Cal. 2006); see also Anderson, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted.")  At the summary judgment stage, the Court focuses on the admissibility of the evidence's contents, not the admissibility of the evidence's form.  Fed. Deposit Ins. Corp. v. N.H. Ins. Co., 953 F.2d

---

cite Judge Ikuta's dissent for its "clarification" of the holding in Brewster, 859 F.3d 1194: if anything, citation to the dissent is a tacit acknowledgement that Defendants' position is wrong, for the majority opinion reads Brewster and other relevant precedent in the same way that the Court does here.

478, 485 (9th Cir. 1991) ("[T]he nonmoving party need not produce evidence in a form that would be admissible at trial in order to avoid summary judgment.").  The Court denies some of the parties' objections as "boilerplate recitations of evidentiary principles or blanket objections without analysis applied to specific items of evidence." Doe v. Starbucks, Inc., 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009); Amaretto Ranch Breedables v. Ozimals Inc., 907 F. Supp. 2d 1080, 1081 (N.D. Cal. 2012) ("This Court need not address boilerplate evidentiary objections that the parties themselves deem unworthy of development"); Communities Actively Living Indep. & Free v. City of Los Angeles, 2011 WL 4595993, at *8 (C.D. Cal. Feb. 10, 2011) (summarily overruling boilerplate evidentiary objections when the grounds for the objections were unduly vague and overbroad).  The Court overrules virtually all of the parties' personal knowledge and foundation objections; except where otherwise noted, the evidence relied upon in the order below has a sufficient basis in personal knowledge and foundation to be considered. Most of the parties' hearsay objections are likewise overruled.  Declarations which contain hearsay are admissible for summary judgment purposes if they can be presented in admissible form at trial.  Fonseca v. Sysco Food Servs. of Arizona, Inc., 374 F.3d 840, 846 (9th Cir. 2004). Furthermore, "[i]f the significance of an out-of-court statement lies in the fact that the statement was made and not in the truth of the matter asserted, then the statement is not hearsay." Calmat Co. v. U.S. Dep't of Labor, 364 F.3d 1117, 1124 (9th Cir. 2004).  At this stage, the Court does not find the parties' hearsay objections to be preclusive of the evidence submitted.  The Court also finds the parties' evidence timely filed and/or that neither party suffered prejudice from the filing of evidence shortly after a deadline, or filing of notices of errata correctly earlier-filed evidence, rendering all such evidence admissible.

The Court considers Defendants' objections to Plaintiffs' expert reports and damages evidence below.

## B.  Undisputed Facts

Except as noted, the following material facts are sufficiently supported by admissible evidence and are uncontroverted.  They are "admitted to exist without controversy" for purposes of the Motions.  See Fed. R. Civ. P. 56(e)(2); L.R. 56-3.

### 1.  Applicable Statutes

California Vehicle Code § 14602.6(a)(1), the statutory authority used to impound Plaintiffs' vehicles, provides:

> Whenever a peace officer determines that a person was driving a vehicle while his or her driving privilege was suspended or revoked, driving a vehicle while his or her driving privilege is restricted pursuant to Section 13352 or 23575 [i.e., the driver can only drive a vehicle with an interlock device] and the vehicle is not equipped with a functioning, certified interlock device, or driving a vehicle

> without ever having been issued a driver's license, the
> peace officer may either immediately arrest that person and
> cause the removal and seizure of that vehicle or, if the
> vehicle is involved in a traffic collision, cause the removal
> and seizure of the vehicle without the necessity of arresting
> the person. . . .   A vehicle so impounded shall be
> impounded for 30 days.

Cal. Veh. Code § 14602.6(a)(1).  Within two working days of an impoundment pursuant to § 14602.6(a)(1), the impounding agency must notify the vehicle's owner of the impoundment.  Cal. Veh. Code § 14602.6(a)(2).  The vehicle's owner "shall be provided the opportunity for a storage hearing to determine the validity of, or consider any mitigating circumstances attendant to, the storage, in accordance with Section 22852."  Cal. Veh. Code § 14602.6(b).  Section 22852 sets out the procedure for hearings to "determine the validity of the storage" and provides, among other things, that a "public agency may authorize its own officer or employee to conduct the hearing if the hearing officer is not the same person who directed the storage of the vehicle." Cal. Veh. Code § 22852(c).  Section 14602.6(d) enumerates several exceptions to the 30-day hold requirement of § 14602.6(a)(1).  It provides that "[a]n impounding agency shall release a vehicle to the registered owner or his or her agent prior to the end of 30 days impoundment" under five circumstances: (1) when the vehicle is a stolen vehicle; (2) when the vehicle is subject to bailment and is driven by an unlicensed employee of an establishment (such as a parking service); (3) when the license of the driver was suspended or revoked for certain offenses; (4) when the vehicle was seized for an offense that does not authorize the seizure of the vehicle; or (5) when the driver reinstates his driver's license or acquires a driver's license and proper insurance.  See Cal. Veh. Code § 14602.6(d)(1)(A-E).

Section 22651(p) of the Vehicle Code provides a separate basis for impound authority. "Section 22651(p) - which was enacted prior to § 14602.6 and was amended by the bill in which § 14602.6 was enacted - permits a peace officer to 'remove' a vehicle 'when the peace officer issues the driver of the vehicle a notice to appear for a violation of'" § 12500 (driving without a valid California driver's license); §§ 14601, 14601.1, and 14601.2 (driving with a suspended or revoked license); and § 14601.5 (driving with a suspended, revoked, or restricted license), among other sections of the Vehicle Code.  Mateos-Sandoval v. Cty. of Sonoma, 942 F. Supp. 2d 890, 907 (N.D. Cal. 2013) (quoting 1994 Stat., ch. 1221, § 16); Cal. Veh. Code § 22651(p).  Unlike § 14602.6(a)(1), § 22651(p) does not require that an impounded vehicle be held for any particular period of time.  See Cal. Veh. Code § 22651.

### 2.  LAPD's Impound Policy

Between April 22, 2012 and June 27, 2017, at least three LAPD policies set forth the Department's procedures for impounding vehicles from unlicensed drivers, those with suspended or revoked licenses, or individuals arrested for DUIs, and thereafter deciding whether or not to release the vehicles: Special Order No. 7 ("SO7"); Operations Order #16 (dated December 12, 2005) ("Order #16"); and "LAPD's Post Storage Probable Cause Impound

Hearing Guidelines." (PCSSUF ¶ 3; Jones Declaration Ex. 9.)[6][7][8][9] S07, effective April 22,
2012, outlines the LAPD's interpretation and enforcement of §§ 14602.6(a)(1) and 22651(p).
(See DSSUF ¶¶ 39-40; MSJ Ex. 3, "S07".) S07 added a new section, 4/222.05, *Community
Caretaking Doctrine and Vehicle Impound Procedures*, to the LAPD Department Manual; it
contained no statement that it superseded previous policies, such as Order #16. (See S07.) S07
did not change LAPD Order #16, which remained in effect with the introduction of S07. (PAMF
¶¶ 37-39; Karmody Dep. 50: 7-11; Fesperson Dep. 91:18-92:4.)[10] S07 states, in relevant part:

> Various sections of the California Vehicle Code authorize the
> impoundment of a motor vehicle driven by an unlicensed driver or

---

[6] Defendants claim this is disputed because "during the relevant time period, procedures
were also set forth via various" California Vehicle Code sections. (DSGMF ¶ 3.) It is obviously
true that LAPD, like all government agencies, was guided *both* by statute and its own policies.
This fact is not disputed.

[7] Defendants themselves provide these Guidelines for review, even though, as noted
below, they are unhelpful to their position.

[8] Taken together, Plaintiffs refer to these policies as Defendants' "Impound Policy." For
the sake of readability, the Court does the same. Though it makes no difference to the legal
outcome here, the Court acknowledges that it is technically true that the "Impound Policy" is
written down in multiple places, not one.

[9] The operative complaint, the 5AC, does not allege that the Impound Policy is entirely
synonymous with just S07, while Plaintiffs have clearly asserted in litigation of the Motions that
the Impound Policy is not limited to S07. (See 5AC; MPSJ; MPSJ Reply; MSJ Opposition.)

[10] Defendants have objected to certain aspects of the Karmody and Fesperson deposition
testimony and the conclusions that might be drawn from them because they were taken "before
the filing of this lawsuit." The Court overrules the objections. First, both individuals testified as
Defendants' designated agents on LAPD policy regarding Section 14602.6, and Defendants are
bound by their testimony as admissions of a party-opponent. Fed. R. Evid. 801(d)(2)(A), (C).
Second, the fact that the depositions were taken in related lawsuits does not render them
inadmissible. Gulf USA Corp. v. Fed. Ins. Co., 259 F.3d 1049, 1056 (9th Cir. 2001). Third,
Defendants have offered no evidence to rebut Plaintiffs' evidence and no evidence that, at some
point from 2012 through 2017, Defendants' policies changed such that older policies or practices
no longer applied. As such, the evidence is undisputed. See Larez v. City of Los Angeles, 946
F.2d 630, 635-36, 647 (9th Cir. 1991) (where plaintiffs relied on a two-year comparative study
regarding LAPD complaints for a time period that preceded the subject incident of the lawsuit,
observing that the defendants did not "introduce[] any evidence to suggest that such trends had
changed" and finding that the study was "unrebutted by defendants"). Moreover, as noted
elsewhere, all the evidence in the record demonstrates that S07 did not supersede all existing
policies and guidance. For example, Defendants themselves provide evidence of a policy
document, the Guidelines, that predates S07 and yet, according to their own evidence, was in
effect throughout the relevant period for this lawsuit.

---

**CIVIL MINUTES—GENERAL**          Initials of Deputy Clerk mg

a driver with a suspended or revoked driver's license.  However, State and federal court decisions have held that the statutory authority to impound, alone, does not determine the constitutional reasonableness of the seizure under the Fourth Amendment of the United States Constitution.  In evaluating the reasonableness of warrantless vehicle impounds, courts have focused on whether the impoundment was in accordance with the Community Caretaking Doctrine.  Consequently, this Order clarifies the application of the Community Caretaking Doctrine and establishes the Department's impound procedures.

I.  **COMMUNITY CARETAKING DOCTRINE OVERVIEW.**  Officers shall be guided by the Community Caretaking Doctrine and the procedures set forth in this Order when deciding whether to impound a vehicle driven by an unlicensed driver, or a driver with a suspended or revoked license.  The courts have ruled that this doctrine allows officers to impound a vehicle when doing so serves a community caretaking function.  An impoundment based on the Community Caretaking Doctrine is likely warranted:

- When the vehicle is impeding traffic or jeopardizing public safety and convenience, such as when a vehicle is disabled following a traffic collision;
- When the vehicle is blocking a driveway or crosswalk or otherwise preventing the efficient movement of traffic (e.g., vehicle, pedestrian, bicycle);
- When the location of the stopped vehicle may create a public safety hazard (e.g. vehicle, pedestrian, bicyclist);
- When the location of the vehicle, if left at the location, may make it a target for vandalism or theft; or,
- To prevent the immediate and continued unlawful operation of the vehicle (e.g., licensed driver not immediately available).

The totality of the circumstances, including the factors listed above, should be considered when deciding whether impoundment is reasonable under the Community Caretaking Doctrine and the Fourth Amendment.  The decision to impound and vehicle must be reasonable and in furtherance of public safety.

(S07, "Procedure," § I.)  The Impound Policy does not contain any additional bases for the thirty-day impoundment of a vehicle beyond those set forth in California Vehicle Code § 14602.6(a)(1).  (See id.)  However, it directs officers to use the impound authority provided by § 14602.6 under certain circumstances and that provided by § 22651(p) under other circumstances.

Which statutory basis to use depends on the combination of the current infraction and a driver's "priors," meaning prior unlicensed-driving related offenses.  See SO7 § II(A) (Unlicensed Driver – No Priors) ("Section 22651(p) VC shall be used as the impound authority for all vehicles being impounded when it has been determined that the driver was involved in the following and the officer issues a Traffic Notice to Appear citation . . . : Driving without a valid California Driver's License . . . ; or, Driving with an expired, withheld, or out-of-class California's Driver's License."; id. ("If it is determined that the vehicle will be impounded, use impound authority Section 14602.6(a)(1) VC (30-Day Hold) if all of the following conditions are met: The driver has never been issued a driver's license by any jurisdiction (foreign or domestic); and the driver is unable to show proof of insurance or at-fault in the traffic collision or lacks proof of identification."); id. § II(B) (Unlicensed Driver – With Prior(s)) ("Section 14602.6(a)(1) VC (30-Day Hold) shall be used as the impound authority when it has been determined that the driver has never been issued a driver's license by any jurisdiction (foreign or domestic) and has a prior misdemeanor conviction, failure to appear, or warrant for Section 12500(a) VC."; id. ("Section 22651(p) VC shall always be used as the impound authority if it has been determined that the driver has an expired, withheld or out of class driver's license and has a prior misdemeanor conviction, failure to appear, or warrant for 12500(a), 14601, 14601.1, 14601.2, 14601.3, 14601.4, or 14601.5 VC."); id. § II(C) (Driver with Suspended/Revoked License – No Priors) ("Section 14602.6(a)(1) VC (30-Day Hold) shall be used as the impound authority for all vehicles being impounded when it has been determined that the driver was involved in any of the following: Driving with a suspended or revoked license; or Driving with a restricted license pursuant to Sections 13352 or 23575 VC, and the vehicle is not equipped with a functioning, certified interlock device."); id. § II(D) (Driver with Suspended/Revoked License – With Prior(s) ("Section 14602.6(a)(1) VC (30-Day Hold) shall be used as the impound authority for all vehicles being impounded when it has been determined that the suspended / revoked / restricted violator has a prior misdemeanor conviction, failure to appear, or warrant for Sections 12500(a), 14601, 14601.1, 14601.2, 14601.3, 14601.4, or 14601.5 VC.").  (See PCSSUF ¶¶ 6-9.)  S07 directed that if the driver who did not hold a valid license had "no priors" the officer "shall release the vehicle in lieu of [an] impound" if (a) the vehicle's registered owner or his or her designee had a valid license; (b) the registered owner and licensed driver are "immediately available"; (c) the registered owner authorized the licensed driver to drive the vehicle; and (d) the vehicle's registration was not expired over six months.  (PCSSUF ¶ 6.)

S07 was developed over the course of two years, with the involvement and contributions from numerous LAPD officials, including then-Chief Charlie Beck, in consultation with attorneys from the City Attorney's Office.  It was adopted as official policy by the Board of Police Commissioners of the LAPD.  (PAMF ¶ 12.)

According to former LAPD Assistant Chief Michel Moore[11], S07 "establishes that officers will use different enforcement options, depending on the driver's history, to encourage safe driving habits and protect public safety." (Id. ¶ 13.)  "By providing for a lesser penalty in circumstances where the driver is insured and has not been previously convicted, [S07] encourages drivers to obtain insurance, with potentially harsher consequences for those who continue to drive after being cited."  (Id. ¶ 16.)

At his deposition, former Assistant Chief Moore was asked, "what community caretaking function is served by keeping the car in impound for 30 days?"  (Donald Cook Declaration Ex. Q, Moore Dep. 129:12-13.)  He replied, "it's not my understanding that the Community Caretaking Doctrine extends through the length of the storage."  (Id. 129:17-19.)

During the relevant period, S07 did not provide specific guidance to detectives conducting storage hearings on how to conduct them.  A separate policy, Operations Order #16 (dated 12/15/05), provided guidance to hearing officers on how to conduct storage hearings and whether to release vehicles.  (DSSUF ¶¶ 10-11, 40; PSSGD ¶¶ 10-11, 40.)  S07 states that vehicles impounded pursuant to Section 14602.6(a)(1) "shall be impounded for 30 days, unless earlier release is authorized by the Area Auto detectives in accordance with Section 14602.6." (DSSUF ¶ 44.)  When LAPD officers seized a vehicle pursuant to Section 14602.6 in accordance with the Impound Policy, the 30-day impound was mandatory subject only to the express exceptions specified in Section 14602.6.  (PCSSUF ¶ 4.)

All vehicles LAPD seized and removed from the street and impounded for 30 days under the authority of Section 14602.6 were effectuated without warrants or other judicial review.  (Id. ¶ 5.)

Order #16 states that (1) officers may use Section 22651(p) as the primary authority to impound a vehicle driven by an unlicensed driver; (2) if an unlicensed driver's vehicle is impounded and the impound meets the 30-day hold criteria, the officer may use Section 14602.6(a) as the primary authority for the impound; and (3) "the decision to place a 30-day hold on a vehicle is discretionary."  (MPSJ Ex. F, Order #16) (emphasis in the original).  Order #16 instructed Area Auto Detective Unit supervisors that they could release vehicles prior to the termination of the 30-day hold period under the following limited circumstances:

- The registered owner can establish the vehicle was driven by an unlicensed driver without the registered owner's knowledge or permission;
- The vehicle was seized or a 30-day hold and it is not authorized by Section 14602.6;
- There is sufficient proof the vehicle was stolen;

---

[11] Mr. Moore has been Chief of LAPD since 2018.  Nonetheless, so as not to confuse him with then-Chief Beck, the Court refers to him by his then-title, Assistant Chief.

- The concerned driver acquires a valid driver's license or has the driver's license reinstated and obtains proper insurance and the registered owner can provide a valid driver's license and proof of current vehicle registration;
- There is sufficient proof the driver of the vehicle was in fact a licensed driver with a valid license issued prior to the time of impound or the driver had an expired driver's license; or,
- The registered owner presents a court order to release the vehicle.

(PCCSUF ¶ 70; Order #16.)[12]  As set forth in Order #16, LAPD policy made these the exclusive reasons for early release of a vehicle impounded pursuant to Section 14602.6; detectives reviewing an impound decision after one was initially made by an officer, or during a storage hearing, were bound by this exclusive list.  (PAMF ¶ 38; Order #16; Fesperson Dep. 90:19-91:17.) Order #16 does not authorize a vehicle's early release from a Section 14602.6 30-day impound on grounds that there is no Fourth Amendment justification for the continued impound of a vehicle for 30 days.  (PAMF ¶ 39.)  For vehicles impounded under Section 14602.6, Order #16 does not permit early release merely because (a) the registered owner tenders accrued towing and storage fees and (b) presents a licensed driver, other than the driver when the vehicle was impounded, to take possession.  (Id. ¶ 40.)

During the relevant period, S07 provided that officers should be guided by the community caretaking doctrine when determining whether to impound a vehicle.  (DSGMF ¶ 11.)  However, the Impound Policy never justified the decision to implement a 30-day hold on the vehicle through a community caretaking rationale.  The LAPD's justification for imposing a 30-day hold (pursuant to Section 14602.6) as distinguished from removing the vehicle from the street (pursuant to Section 22651(p)) was twofold: (1) Section 14602.6 mandated a 30-day impound; and (2) LAPD sought to deter future unlawful driving of the impounded vehicle by the unlicensed driver.  (PCSSUF ¶ 11.)[13]

Former LAPD Assistant Chief Michel Moore testified that by imposing Section 14602.6 impounds via S07 on "more serious situations," the LAPD "[a]bsolutely was" "trying to deter owners from letting unlicensed drivers drive their cars."  (PAMF ¶ 41.)

---

[12] Defendants dispute Plaintiffs' characterization of this fact as "LAPD policy barred . . ." the hearing officer from authorizing release except under these circumstances.  (See DSGMF ¶ 70.)  They do not dispute that this is what Order #16 says or that Order #16 was official LAPD policy.  Defendants simply note that S07 provides that impounds must be consistent with the Fourth Amendment and community caretaking and that a vehicle must be released if it is not authorized by Section 14602.6.  (See id.)  Those are additional, undisputed facts; they do not render Plaintiffs' citation to Order #16 disputed.  Further, the legal argument Defendants raise from this purported dispute is wrong, as noted below.

[13] The Court explains in greater detail below why this fact is not disputed.

**CIVIL MINUTES—GENERAL**

Throughout the relevant period, LAPD trained the detectives who would conduct storage hearings that they should follow the LAPD Post Storage Probable Cause Impound Hearing Guidelines (the "Guidelines"). (Jones Declaration ¶ 2.)  The Guidelines were prepared by the LAPD Commission Investigation Division.  (Id. Ex. 9.)  Though updated in September 2009, Detective Benjamin Jones trained detectives conducting storage hearings on the Guidelines from 2012 through 2020.  (Jones Declaration ¶ 2.)  The Guidelines contained a brief history of past litigation that had led to changes in impound hearing procedures.  (Jones Declaration Ex. 9.)  As its title suggests, the Guidelines stated that the purpose of an impound hearing was to determine whether there was probable cause to justify the impound of a vehicle, by providing a means to "test the factual basis of the tow and storage" and to provide a "procedure to assure reliability of the determination that the seizure and detention was justified."  (Id. at 28.)  The Guidelines instruct an impound hearing officer to conduct certain administrative investigative steps, such as obtaining copies of the impounding officer's reports and the cited impound authority.  (Id. at 31-32.)  "Based upon the above administrative steps and the additional evidence provided by the grievant, the Impound Hearing Officer shall determine if probable cause existed to impound the vehicle in question.  The burden of proof rests with the impounding agency and the determination of whether probable cause existed is to be based upon clear and convincing evidence."  (Id. at 32.)  When the hearing officer determines that "probable cause did not exist" and the owner has already paid for the release fees of the vehicle, the vehicle is released and the owner is informed that she will be reimbursed by LAPD.  (Id.)  When probable cause did not exist and the owner has yet to pay the fees, the hearing officer provides instructions to the owner and the relevant OPG as to how to release the vehicle.  (Id. at 33.)  When the hearing officer determines that "probable cause did exist to impound the vehicle," the hearing officer informs the owner of the determination, explains the reason for the impound, and informs her that she must pay all towing and storage (lien) fees in order to obtain the release of the vehicle.  (Id.)  She is also to be advised of the right to submit a claim for damages with the City Clerk's Office if she disagrees with the decision.  (Id.)  A flowchart contained in the Guidelines indicates that when probable cause is *not* established, processes may lead to the release of the vehicle; when probable cause *is* established, however, the individual is liable for towing and storage fees and the vehicle is not released.  (See id. at 34.)  The Guidelines do not mention "mitigating circumstances" or any other factor to be taken into account when deciding whether to release a vehicle except for the absence of probable cause.  (See id.)  The Guidelines make no distinction between a justification for the initial impound and the decision to continue to store the vehicle for a longer period.  (See id.)

### 3.  LAPD's Contracts with Official Police Garages

The City contracts with 18 privately-owned towing and vehicle storage companies to provide towing and vehicle storage services at the direction of LAPD officers.  Each towing company is known as an OPG ("Official Police Garage"), and performs services for the City per terms specified in contracts with the City.  Although the City contracts separately with each individual OPG, on all material terms the contracts are identical.  (PCSSUF ¶ 1.)  Official Police Garage Association - Los Angeles ("OPG-LA") is a separate non-profit corporation (28 U.S.C. § 501(c)(4)) whose members are the 18 OPGs under contract with the City.  OPG-LA handles

reporting and recordkeeping duties on behalf of its member OPGs that the City requires per the OPGs' contracts.  (Id. ¶ 2.)

### 4. LAPD's Notice to Individuals with Impounded Vehicles

According to the California Commission on Peace Officer Standards and Training ("POST"), an entity that provides materials adopted by LAPD, the terms "to store" and "impound" a vehicle have different meanings.  "To store" a vehicle means the vehicle is subject to immediate release to the owner, or authorized agent with proper identification, pending any fees (e.g. fines, towing fees, etc.)  An example of a stored vehicle is one seized under Vehicle Code Section 22651(a) (such as an unattended vehicle on a bridge, viaduct or tunnel causing an obstruction of traffic.)  (PCSSUF ¶ 57.)[14]  If a vehicle is "impounded," then an agency like LAPD "can decide when and to whom the car is released."  An example of an impounded vehicle is one seized under Vehicle Code Section 14602.6.  (Id. ¶ 58.)

During all relevant times for purposes of this lawsuit, the LAPD website provided notice to the public concerning its policies in a section of the website entitled, "How can I get my car out of impound?"  That section stated:

> If a person's vehicle is impounded under a 30-day hold, they must wait until the 30-day period is over prior to requesting a release. After the 30-day period has passed, the registered owner must go to the Area auto detectives to obtain a release for the vehicle (releases are only given to the registered owner/s).  If the registered owner does not have a valid California driver's license, he/she must bring along a person who possesses a valid California driver's license.
>
> However, vehicles may be released by an Area Auto Detective Unit supervisor, prior to the termination of the 30-Day Hold period, under any one of the following circumstances:

---

[14] Defendants dispute Plaintiffs' characterization of this fact and the one that follows as "LAPD policy," rather than originating from POST.  (See DSGMF ¶¶ 57-58.)  The Court clarifies that the document cited by Plaintiffs is a POST document.  It is undisputed that, like virtually all law enforcement agencies in California, LAPD relies upon certain documents and standards from statewide agencies, such as POST materials for officer training and notice forms written by the California Highway Patrol ("CHP") (CHP-180 forms).  Defendants cite no contrary evidence that they have adopted meanings inconsistent with the POST document cited here, and all evidence in the record is consistent with POST's distinction between these terms. Thus, it is undisputed that LAPD has adopted these terms, even though the distinction stems from POST materials.

---

**CIVIL MINUTES—GENERAL**          Initials of Deputy Clerk mg

- The registered owner can establish the vehicle was driven by an unlicensed driver without the registered owner's knowledge or permission
- The vehicle was seized for a 30-Day Hold and it is not authorized under Section 14602.6(a) VC
- There is sufficient proof the vehicle was stolen
- The concerned driver acquires a valid driver license or has the driver license reinstated and obtains proper insurance and the registered owner can provide a valid driver license and proof of current vehicle registration
- There is sufficient proof the driver of the vehicle was in fact a licensed driver with a valid license issued prior to the time of impound or the driver had an expired license or,
- The registered owner presents a court order to release the vehicle.

(Id. ¶ 59.)  To this day, LAPD's website contains a substantively identical section.  See *How can I get my car out of impound?*  Los Angeles Police Department (2023), https://www.lapdonline.org/how-can-i-get-my-car-out-of-impound/.  (MPSJ Ex. G.)

When LAPD impounded a vehicle for 30 days pursuant to Section 14602.6, the LAPD gave written notice to the vehicle's registered owner and legal owner (if any) by mailing the owner(s) a CHP-180 form half-sheet.  (PCSSUF ¶ 60.)[15]  The CHP-180 form half-sheet is the only written notice the LAPD provided individual vehicle owners on a right to a hearing with regard to the Section 14602.6 impound.  (Id. ¶ 61.)  Because the CHP-180 form is provided by the California Highway Patrol, LAPD relies on CHP policy for determining when the boxes labeled "stored" and "impounded" on the CHP-180 form's front side should be checked.  (Id. ¶ 62.)  For vehicles removed from the street, the officer checks either the "stored" box or "impounded" box but not both, depending on the statutory authority for removing the vehicle from the street.  (Id. ¶ 63.)[16]  For vehicles seized under Section 14602.6, the CHP-180 form half-sheet states that the vehicle was "impounded" and not "stored," lists Section 14602.6 as the "storage authority / reason," and informs the owner by a handwritten notation on the form's top

---

[15] Defendants dispute this fact and those that follow because the evidence cited in support of it was taken from before the filing of this lawsuit.  (See DSGMF ¶¶ 60-62.)  Defendants cite no contrary evidence to Plaintiffs' evidence establishing that the practice continued during the relevant periods for purposes of this case; everything in the record demonstrates it did.

[16] As noted above, this fact is not disputed simply because some of the materials cited originate from CHP, not LAPD; the undisputed evidence in the record demonstrates that LAPD follows this CHP guidance.

that the vehicle is subject to a "30-day hold."  (Id. ¶ 64.)[17]  The backside of the CHP-180 form
half-sheet is entitled "Notice of Stored Vehicle (22852 VC)" and informs the vehicle owner of
her right to request a Section 22852 "hearing to determine the validity of this storage."  The
form states the hearing "is an informal process to determine whether or not a vehicle was
lawfully stored."  The form states "[i]f the hearing determines the storage to be unlawful," the
LAPD (as the "storing agency") "will be responsible for the towing and storage charges."  (Id. ¶
65.)  The form does not provide any information to the owner on what basis she may contest the
impound of her vehicle.  It does not provide any information to the owner that she may contest
the decision to impound her vehicle for 30 days, or the justification for imposing a 30-day
impound as distinguished from justification for having the vehicle towed and removed from the
street.  (Id. ¶ 66.)[18]  Other than the check-off box "impounded" on the CHP-180 form half-sheet
front side, the form does not otherwise mention the word "impound."  (Id. ¶ 67.)

Before the 1979 amendments to Vehicle Code Section 22852, the CHP-180 notice did not
advise an individual of a right to a hearing to contest a vehicle's seizure and removal.  (Id. ¶ 72.)
After the 1979 amendment to Vehicle Code Section 22852, the CHP-180 notice was revised to
advise vehicle owners of their right to a Section 22852 storage hearing.  (Id. ¶ 73.)  Other than
adding a Spanish language advisory of a right to advise vehicle owners of their right to a Section
22852 storage hearing, the CHP-180 notice vehicle owners are given has remained essentially
unchanged post-1979.  (Id. ¶ 74.)  The CHP-180 notice was never revised or updated to inform
vehicle owners of a right to challenge a 30-day impound pursuant to Vehicle Code Section
14602.6, as distinguished from the storage of a vehicle pursuant to Section 22651.  (Id. ¶ 75.)[19]

---

[17] Defendants do not dispute that this is true for all the named Plaintiffs and cite no
contrary evidence that this would not be true for any other individual.  (See DSGMF ¶ 64.)
Defendants dispute that this would be true for every individual because "reviewing all
approximately 45,000 vehicle impounds during the relevant time period would require unduly
burdensome individualized inquiry not proper in a class action lawsuit."  (Id.)  That is obviously
true, and surely Plaintiffs agree.  But it is also beside the point.  The undisputed evidence in the
record demonstrates that this is true for every individual and that LAPD had a policy or practice
of doing so for every impounded vehicle.  It might be the case that, if someone were to review
every impound individually, some of them might not follow this practice.  But for purposes of this
class action lawsuit, it is undisputed that LAPD's policy and/or practice is that cited here and
that policy and/or practice was followed in the case of the named Plaintiffs.

[18] Defendants claim this is disputed by offering a legal conclusion as to what a statute may
or may not allow a vehicle owner to do.  (See DSGMF ¶ 66.)  Defendants' legal argument does
not render the facts asserted by Plaintiffs disputed.  The argument is also wrong, as explained
below.

[19] The Court clarifies Plaintiffs' characterization of this fact so that it cannot be disputed.
(See DSGMF ¶ 75.)  The CHP-180 form obviously contains no reference to 30-day impounds or
a vehicle owner's right to contest not only the validity of the initial impound, but the continued
impound of the vehicle, at such a storage hearing.

---

**CIVIL MINUTES—GENERAL**                   Initials of Deputy Clerk mg

Other than the CHP-180 form half-sheet, the LAPD does not provide anything in writing to registered owners informing registered owners of the circumstances under which LAPD will release a vehicle seized for 30 days under Section 14602.6 in less than 30 days.  (PAMF ¶ 43.)

### 5.  Storage Hearing Policies & Training

During the relevant period, and to this day, the hearing officer for a Section 22852 storage hearing offered by LAPD was always an LAPD detective, and never the same officer who directed the vehicle's impound. (PCSSUF ¶ 68; DSGMF ¶ 68.)  The primary purpose of an LAPD-conducted Section 22852 storage hearing for a Section 14602.6 30-day impound is to "determine the validity of the storage," and also possibly to consider mitigating circumstances related to the storage of the vehicle, at least as those are defined by the Impound Policy. (PCSSUF ¶ 69.)

Benjamin Jones, a former detective employed by LAPD who retired in 2020, taught a class for LAPD detectives between 2005 and 2020 on how to conduct storage hearings.  (Jones Declaration ¶ 2.)  Detective Jones created a PowerPoint presentation in January 2012 and used that presentation in his trainings from January 2012 until his retirement in 2020.  (Id.)  The PowerPoint did not substantively change throughout this period.  (Id.)  Mr. Jones developed the PowerPoint based on the California Vehicle code and LAPD's Post Storage Probable Cause Impound Hearing" Guidelines.  (Id.)  The PowerPoint and the Guidelines reflect the "main points" that Detective Jones taught detectives on how to conduct storage hearings.  (Id.)

Detective Jones trained hearing officers that "post impound hearings are LIMITED in scope and held to determine: if reasonable grounds or mitigating circumstances existed to impound a particular vehicle and; to determine who is responsible for the payment of impound and storage fees." (Jones Declaration Ex. 8) (emphasis in original).  He trained them that "the hearing should afford the grievant the opportunity to be heard at a meaningful time and in a meaningful manner" and that "the hearing should present a method to test the factual basis of the tow." (Id.)  LAPD detectives who conducted vehicle storage hearings were instructed to be unbiased when conducting the storage hearings. (DSSUF ¶ 28.)  In Detective Jones' training presentation, LAPD declared that "the officer hearing the case should be impartial and consider the evidence" and that "[t]he hearing should be conducted in an orderly manner (No Kangaroo courts"). (Jones Declaration Ex. 8.)  The training presentation reiterates the Guidelines' framework for what happens where there is "probable cause" and "no probable cause," including that in the former, the "owner is responsible for all fees."  (Id.)

During this period, LAPD detectives who conducted vehicle storage hearings were trained to conduct them in accordance with California Vehicle Code §§ 22650 and 22852. (DSSUF ¶ 30.)  During this period, LAPD detectives who conducted vehicle storage hearings were trained to place the burden of proof on LAPD by clear and convincing evidence that the officer who impounded the vehicle had probable cause to do so, or put another way, that the decision to impound the vehicle was lawful.  (Id. ¶ 31; PSSGD ¶ 31.)  However, LAPD placed the burden of proof of establishing "mitigating circumstances" to the extent allowed under the

Impound Policy upon the vehicle's owner.  (PCSSUF ¶ 71; PSSGD ¶ 30; Fesperson Dep. 90:10-91:4, 93:17-25; Order #16.)[20]  During this period, LAPD detectives who conducted storage hearings were trained that drivers were entitled to receive a vehicle storage hearing within 48 hours of a request.  (DSSUF ¶ 32.)  During this period, the decision to impound a vehicle and place a 30-day hold was reviewed by an impounding officer's supervisor.  (<u>Id.</u> ¶¶ 33-34.)  During this period, an LAPD detective conducting a vehicle storage hearing would write down the detective's reasoning for his or her ruling on a form.  (<u>Id.</u> ¶ 37.)  That form was available for a vehicle owner to review.  (<u>Id.</u> ¶ 38.)  That form was reviewed by a detective's supervisor.  (<u>Id.</u> ¶ 39.)

### 6. Relevant Litigation

In <u>Los Angeles Protective League v. City of Los Angeles et al.</u>, L.A. S.C. No. BC3052 ("LAPPL"), the plaintiffs sued to enjoin enforcement of S07.  The trial court granted summary judgment for the plaintiffs, ruling, *inter alia*, that S07 was preempted by California Vehicle Code Section 21 and conflicted with Section 14602.6.  Defendants, the City and Chief Charlie Beck, appealed.  (PAMF ¶ 21.)[21]  The Court of Appeal reversed and remanded with instructions to grant Defendants' motion for summary judgment.  <u>Los Angeles Police Protective League v. City of Los Angeles</u>, 181 Cal. Rptr. 3d 712 (Ct. App. 2014).

In <u>LAPPL</u>, the City and Chief Beck argued, in sum, that LAPD exercised its discretion when to apply Section 14602.6 and when to apply Section 22651 to impounds.  In their opening brief, the City and Chief Beck argued,

> Two Vehicle Code sections provide California peace officers
> discretionary authority to impound the vehicles of unlicensed
> drivers, and those with a suspended license or revoked driver's

---

[20] Defendants claim this fact is disputed because detectives conducting storage hearings were "trained that the burden of proof at storage hearings was on the department by clear and convincing evidence to justify the impound."  (DSGMF ¶ 71.)  Defendants' cited authorities, including the Post Storage Probable Cause Impound Hearing Guidelines, establish that, "the Impound Hearing Officer shall determine *if probable cause existed to impound the vehicle in question.* The burden of proof rests with the impounding agency *and the determination of whether probable cause existed is to be based upon clear and convincing evidence.*"  (Jones Declaration Ex. 9, "Post Storage Probable Cause Impound Hearings" (emphasis added).  In other words, Defendants' cited authorities reveal that (1) the LAPD characterized the storage hearings as synonymous with "probable cause" determinations for the decision to impound the vehicle and placed the burden on itself only as to that determination.  (<u>See</u> <u>id.</u>)  The separate issue of whether a vehicle could be released, notwithstanding a finding of probable cause to justify the initial impound, due to "mitigating circumstances" is not addressed in Defendants' cited evidence.  Thus, Defendants fail to offer any contrary evidence on this issue.

[21] The trial court's opinion is available at <u>Los Angeles Police Protective League v. City of Los Angeles</u>, 2013 WL 12146161 (Cal. Super. Aug. 12, 2013).

license, when specified conditions are met.  Section 14602.6
provides that vehicles impounded under its provisions "shall be
impounded for 30 days" absent narrow exceptions; section 22651,
subdivision (p) also authorizes impoundment of such vehicles, but
does not mandate a fixed impoundment period.  Neither section
covers how an officer should exercise his discretion in making a
determination of which provision to use when either is applicable.

(PAMF ¶ 22.)[22]  They argued that S07 "directs officers to apply Section 22651(p) in less serious
circumstances . . . [and] [i]n more serious situations . . . Section 14602.6(a)(12) is to be used."
(Id. ¶ 23.)  They also argued that "neither provision 'covers' how an officer should exercise his
or her discretion in making a determination of which provision to use when both are applicable.
In other words, both of these statutory authorities provide discretionary authority for an officer to
impound a vehicle[.]"  (Id. ¶ 24.)  In their reply brief, they contended that "section 14602.6(a)(1)
and 22651(p) are *equally available* options for impoundments of vehicles operated by unlicensed
drivers."  (Id. ¶ 27) (emphasis in original).  They acknowledged that Section 22651(p) "is
undisputedly a less severe statute than Section 14602.6, which imposes a 30-day hold, in that it
has no fixed length of impoundment."  (Id. ¶ 28.)  In their reply brief, they stated, "[a]ll parties
agree that Section 14602.6 is a discretionary impound statute, meaning that impoundment is not
required even if criteria for impoundment can be satisfied."  (Id. ¶ 30.)

On June 26, 2017, in response to the Ninth Circuit's decision in Brewster, 859 F.3d 1194,
the LAPD issued a legal update directing officers to cease impounding vehicles under Section
14602.6 and instead use Section 22561(p) as the impound authority.  (PAMF ¶ 42.)

### 7.  Lamya Brewster

In October and November 2014, Lamya Brewster was the registered owner of a 2010
Chevrolet Impala, license number 7EAT501 ("the Impala").  (PCSSUF ¶ 13.)  On October 27,
2014, Ms. Brewster drove into Los Angeles to overnight for a medical procedure for her daughter
scheduled the next day.  Ms. Brewster's daughter's father, Tishon Johnson, and other family
members and acquaintances were in Los Angeles in connection with Ms. Brewster's daughter's
surgery.  (Id. ¶ 14.)  In the early afternoon of October 18, 2014, with Ms. Brewster's implicit

---

[22] To the extent it is necessary, the Court takes judicial notice on its own motion of the
filings from related litigation; Defendants do not object to this evidence or dispute its
authenticity.  Proceedings of other courts, including orders and filings, are the proper subject of
judicial notice when directly related to the case.  See United States ex. Rel. Robinson Rancheria
Citizens Council v. Borneo, Inc., 917 F.2d 244, 248 (9th Cir. 1992) (courts "may take notice of
proceedings in other courts, both within and without the federal judicial system, if those
proceedings have a direct relation to matters at issue."); Neilson v. Union Bank of California,
N.A., 290 F. Supp. 2d 1101, 1113 (C.D. Cal. 2003) ("court orders and filings are the type of
documents that are properly noticed under [Fed. R. Evid. 201(b).]"); Reyn's Pasta Bella, LLC v.
Visa USA, Inc., 442 F.3d 741, 746 n.6 (9th Cir. 2006).

permission, Yonnie Percy was driving the Impala in the vicinity of Sunset Boulevard and Spaulding Avenue in the City of Los Angeles.  (<u>Id.</u> ¶ 15.)  There were two passengers with Mr. Percy in the Impala: Mr. Johnson and Johnny Bayone Jr.  (<u>Id.</u> ¶ 16.)  LAPD officers effected a traffic stop of the Impala and determined that Mr. Percy's driver's license was suspended pursuant to California Vehicle Code § 13365.  (<u>Id.</u> ¶ 17; DSGMF ¶ 17.)  The officers elected to impound the Impala for a 30-day hold pursuant to Section 14602.6.  (PCSSUF ¶ 18.)  When the officers elected to impound the Impala, the Impala was lawfully parked at a legal location on Spaulding Avenue, and was not a traffic hazard.  (PCSSUF ¶ 19.)[23]  When Mr. Johnson heard the officers were going to impound the Impala because Mr. Percy had a suspended license, Mr. Johnson asked the officers to allow him to take possession because he was a licensed driver (a fact the officers verified), and asked the officers to contact Ms. Brewster who was a few minutes away and reachable by phone.  (<u>Id.</u> ¶ 20.)  Mr. Percy told the officers impounding the vehicles was not necessary because there were two licensed drivers, Mr. Johnson and Mr. Bayone, and Ms. Brewster was just down the street at Kaiser hospital who could come to the scene to get the Impala.  (<u>Id.</u> ¶ 21.)  While Defendants claim that Mr. Percy spoke with Ms. Brewster at least twice between when the Impala was pulled over and impounded, it is undisputed that the officers refused to allow him, or any other individual to take possession of the Impala, and impounded the Impala despite the pleas of those driving in it.  (<u>Id.</u> ¶¶ 20-21; DSGMF ¶ 20.)  Had the officers contacted Ms. Brewster, she would have authorized release of the Impala to either Mr. Bayone or Mr. Johnson.  (PCSSUF ¶ 22.)  When Ms. Brewster learned the LAPD was impounding the vehicle, she got in a taxi to go to the scene of the vehicle stop, but by the time she arrived (approximately 20 minutes later), the Impala had already been towed.  (<u>Id.</u> ¶¶ 23-24.)  When Ms. Brewster arrived, she spoke to LAPD Officer Garcia; she told him she was the registered owner of the car and asked if she could get the car.  (<u>Id.</u> ¶ 25.)  Officer Garcia told her that it was a mandatory 30-day hold and she would not be able to get the car back until the 30 days were up. (<u>Id.</u>)  Ms. Brewster asked if there was anything she could do, and he replied that she could call and speak to the detective the next morning to see if there was anything the detective would be able to do.  (Brewster Dep. 40:16-25.)  Officer Garcia did not say anything about the early release of the vehicle or the right to have a hearing.  (<u>Id.</u> 41:1-3.)  At the suggestion of Officer Garcia, the next morning, October 29, Ms. Brewster spoke with an LAPD detective to obtain a release of the Impala.  Ms. Brewster stated that she was unaware that Mr. Percy's driver's license was suspended, that there were two licensed drivers available to take possession of the Impala on October 28, and that she could not afford to pay for a 30-day impound.  The detective responded by stating there was nothing that could be done and never mentioned that Ms. Brewster could request, or had a right to, a storage hearing.  (PCSSUF ¶ 26; Brewster Dep. 43:13-17.)

---

[23] Defendants object to the legal argument that can be drawn from this assertion but cite no contrary evidence.  As noted below, the Court agrees with Defendants that the lawfulness of the initial impound is not a central issue as to the class claims, which have proceeded on the premise that a class member may recover even if the initial impound was lawful.  The lawfulness of the initial seizure as to Ms. Brewster is briefly addressed below, but it is also not essential to her claim.

On October 31, 2014, attorney Cynthia Anderson-Barker, representing Ms. Brewster, appeared at a California Vehicle Code § 22852 storage hearing conducted by LAPD Detective Frus. (PCSSUF ¶ 27; DSSUF ¶ 7.) Lamya Brewster did not personally attend the storage hearing challenging the impound and storage of the Impala on October 31, 2014; her attorney attended it instead. (DSSUF ¶ 5; PSSGD ¶ 8.) At the storage hearing, Ms. Anderson-Barker told Detective Frus that the initial seizure of the Impala was unlawful because of the on-scene presence of two licensed drivers. (PCSSUF ¶ 28.) Ms. Anderson-Barker also stated that Ms. Brewster, a licensed driver, was immediately available, located nearby at Kaiser Hospital. (Id.) (Ms. Brewster's driver's license was, in fact, suspended during the period of August 22, 2013 through at least December 30, 2014, though that fact was unbeknownst to Ms. Brewster (who said she had never received notice of her license suspension) or her attorney at the time of the impound or storage hearing.) (DSSUF ¶ 12; PSSGD ¶ 12.)[24] Ms. Anderson-Barked also argued to Detective Frus that, in addition the unlawfulness of the initial decision to impound, the 30-day impound could not be justified and that the Impala should immediately be released to Ms. Brewster, who would pay the accrued storage and tow charges, since LAPD had seized the Impala without a warrant. (PCSSUF ¶ 28.) Ms. Anderson-Barker gave Detective Frus color copies of the driver's licenses for Ms. Brewster and Tishon Johnson. (Id.) Ms. Anderson-Barker stressed the importance of an immediate release of the vehicle, because Ms. Brewster was "poor" and the daily fees would impose a financial hardship on her. (See Donald Cook Declaration Ex. T, Transcription of Audio Recording of October 31, 2014 Impound Hearing.) Detective Frus stated at the impound hearing, "an impound hearing is strictly a probable cause hearing – whether or not the officers had probable cause." (Id.) Detective Frus ultimately responded to the request for the Impala's release by stating the LAPD would not release the Impala before expiration of the 30-day impound. Beyond citing to the statutory language of California Vehicle Code Section 14602.6, Detective Frus offered no justification for the LAPD continuing to hold the Impala. (PCSSUF ¶ 29.) The case activity log prepared by Detective Frus documenting his actions in conducting the storage hearing and the events that followed had no notation or record that Ms. Brewster's driver's license was suspended. (PAMF ¶ 5.)

On November 4, 2014, through her attorney, Ms. Brewster made a written complaint to then-LAPD Chief Charlie Beck regarding the October 28, 2014 impound and 30-day hold. (PAMF ¶ 1.) The LAPD Internal Affairs Division investigated the complaint and determined that the impound of the vehicle, the impound hearing and 30-day hold were justified and within departmental policy and procedure. (Id. ¶ 2.) The Internal Affairs report did not mention that Ms. Brewster's license was suspended or assert that as a justification for the Department's decisions; it also did not indicate that Ms. Brewster had received any notice that her licensed was suspended. (Id. ¶ 3.) The report states that the justification for the imposition of the 30-day impound was that the Impala's driver, Mr. Percy, was driving on a suspended license and had a prior failure to appear on a charge of violating Section 14601.1. (Id. ¶ 4.) The Internal Affairs file

---

[24] As noted below, there is no evidence in the record that LAPD knew that Ms. Brewster's license was suspended at the time of the storage hearing or initial decision to deny release of the vehicle, and every fact in the record and inference from them establish that it did not.

indicate that LAPD received notice on November 6, 2014, about 4:58 p.m., from the California DMV that Ms. Brewster's license had been suspended. (Id. ¶ 6.) Notwithstanding the conclusions reached in the Internal Affairs investigation, on November 7, 2014, after consultation with the Los Angeles City Attorney's Office, Defendants elected to "reconvene an Impound hearing . . . and release Brewster's vehicle for special circumstances (child's medical treatment) to a licensed driver." (Id. ¶ 7.) At the time of that decision, LAPD officials were aware that Ms. Brewster's driver's license was suspended. (Id. ¶ 9.) Before the LAPD could release Ms. Brewster's Impala, however, an agent for Superior Auto Center, the Impala's legal owner, took possession of the vehicle pursuant to California Vehicle Code Section 14602.6(f) and (g) on November 7, 2024. (Id. ¶ 10.)[25] It was thereafter returned to the possession of Ms. Brewster's sister on November 29, 2014. (DSGMF ¶ 33; Brewster Dep. 87:18-25.)

At no time did LAPD inform Ms. Brewster or her attorney that Ms. Brewster's driver's license was suspended. (PCSSUF ¶ 30.) LAPD did not note the fact that Ms. Brewster's license was suspended or cite it as a reason for LAPD's refusal to release the Impala from the 30-day impound. (Id. ¶ 31.) Had Ms. Brewster been informed that LAPD would not be released to her because her driver's license was suspended, Ms. Brewster would have made arrangements for a family member or friend who was licensed to take possession of the Impala. (Id. ¶ 32.) If the LAPD Officers had impounded the Impala under Cal. Veh. Code § 22651(p), upon Ms. Brewster's initial demand the LAPD would have been required to release the Impala to Ms. Brewster or her designated agent who had a valid driver's license and upon payment of then-accrued towing and storage charges. (Id. ¶ 34.)

At the time the Impala was impounded on October 28, 2014, Ms. Brewster had not driven it for approximately three months. (DSSUF ¶ 13.) Though Ms. Brewster was the registered owner of the vehicle, and pursuant to LAPD policy only a lawful owner of a vehicle could reclaim the vehicle, at the time of the impound, Ms. Brewster considered the Impala to be her sister's car. (DSSUF ¶ 14; PSSGD ¶ 14.) Ms. Brewster did not personally pay anything to retrieve the Impala following its impound on October 28, 2014. (DSSUF ¶ 15.)

//
//
//

---

[25] Section 14602.6(f) allows for a vehicle to be released before the 30-day impoundment is over to an entity that owns a "security interest" in the vehicle, such as Superior Auto Center. Cal. Veh. Code § 14602.6(f)(1). Pursuant to Section 14602.6(g), the entity that recovers the vehicle under Section 14602.6(f) "shall not release the vehicle to the registered owner" or her agent "until after the termination of the 30-day impound." Cal. Veh. Code § 14602.6(g). By statute, Superior Auto Center was thus only able to return the vehicle to Ms. Brewster's sister on November 29, 2014, 30 days after the initial impound. Even if Defendants claim that they did not impose additional conditions on what Superior Auto Center could do with the vehicle, the statutory provisions cannot be disputed. Nor is it disputed that the vehicle was only returned to the Brewster family on November 29, 2014.

### 8. Elias Arizmendi

On August 3, 2014, Elias Arizmendi was the owner, though not the registered owner, of a 1998 Toyota Sienna, license no. 5YBV3431 (the "Sienna"). (DSSUF ¶ 1; PCSSUF ¶ 35.) On that day, in the vicinity of President Avenue and Lomita Boulevard in Los Angeles, LAPD officers effected a traffic stop of the Sienna for an expired vehicle registration. Officers concluded that the Sienna's driver and sole occupant, Mr. Arizmendi, was unlicensed. Pursuant to the Impound Policy, the officers seized the Sienna for a 30-day § 14602.6 impound. (PCSSUF ¶ 36.) The next day, Mr. Arizmendi became the Sienna's registered owner and obtained current registration for the vehicle. (Id. ¶ 37.) Mr. Arizmendi did not have a valid driver's license for at least the 30 days following August 3, 2014. (DSSUF ¶ 2.)

After registering the Sienna in his name, on August 4, 2014, Mr. Arizmendi went to the LAPD's San Pedro station and asked that the LAPD release the Sienna to Carlos Husman, Mr. Arizmendi's friend, who was a licensed driver. The LAPD refused to release the Sienna from the 30-day impound. (PCSSUF ¶ 38.) On August 7, 2014, Ms. Anderson-Barker, Mr. Arizmendi's attorney, spoke with LAPD Detective Helen Papietro about the seizure and impound of the Sienna. (Id. ¶ 39.) Ms. Anderson-Barker stated there was no lawful basis to refuse to release the Sienna to Mr. Arizmendi because the vehicle was now registered to him, had current valid registration, and that Mr. Arizmendi had a licensed driver available, Mr. Husman, who would drive the car from the impound storage lot. Further, Mr. Arizmendi would pay all towing and storage charges owed as of that date. Detective Papietro refused to release the vehicle. She stated that, under LAPD policy, the car must be impounded for 30 days unless and until Mr. Arizmendi obtained a valid California driver's license. (Id.) Representing Mr. Arizmendi, on August 11, 2014, Ms. Anderson-Barker appeared at a storage hearing. (Id. ¶ 40; DSSUF ¶ 3.) Ms. Anderson-Barker reiterated what she had told Detective Papietro a few days earlier and sought the release of the Sienna. (PCSSUF ¶ 40.) Detective Papietro refused to release the Sienna from the 30-day impound. (Id.) Detective Papietro's justification for the refusal was that 30-day impound was procedurally proper and that she believed Mr. Arizmendi may drive the Sienna as an unlicensed driver in the future. (Id. ¶ 41.)[26] At the storage hearing, even if Mr. Arizmendi did not affirmatively "present" a licensed driver entitled to drive the Sienna, that is because the hearing officer, Detective Papietro, never inquired if one existed because she considered it immaterial to her decision; in fact, a validly licensed driver and friend of Mr. Arizmendi, Carlos Husman, accompanied Mr. Arizmendi to the LAPD station and was waiting outside of it during the storage hearing. (DSSUF ¶ 18; PSSGD ¶ 18.)[27]

---

[26] As noted below, the Court finds the evidence underlying this latter contention inadmissible, but the Court includes it here for the sake of completeness. The specific facts of precisely what Mr. Arizmendi may have said to lead to this conclusion are also disputed.

[27] As noted below, there is one additional, arguably disputed, fact: Mr. Arizmendi's lawyer declares that she told Detective Papietro that a licensed driver was available to take possession of the car during the storage hearing.

**CIVIL MINUTES—GENERAL**     Initials of Deputy Clerk mg

Upon the conclusion of the 30-day impound period, Mr. Arizmendi could not afford to pay the accumulated towing and storage charges. Consequently, the OPG that was storing the Sienna sold it at a statutory lien sale on September 19, 2014. (PCSSUF ¶ 42.)

If the LAPD Officers had impounded the Sienna under Cal. Veh. Code § 22651(p), upon Mr. Arizmendi's initial demand the LAPD would have been required to release the Sienna to Mr. Arizmendi or his designated agent who had a valid driver's license and upon payment of then-accrued towing and storage charges. (Id. ¶ 43.)

The LAPD detective who conducted Mr. Arizmendi's storage hearing ruled in favor of the driver seeking release of a vehicle prior to the expiration of the 30-day hold more than 50% of the time following a storage hearing. (DSSUF ¶ 29.)

Mr. Arizmendi joined this lawsuit as a named plaintiff on June 12, 2018. (DSSUF ¶ 4.)

### 9. Julian Vigil

In May and June 2017, Julian Vigil was the registered owner of a 2014 Mercedes C25, license no. 7XVK166 (the "Mercedes"). (PCSSUF ¶ 44.) On May 30, 2017, at or near 12555 Ventura Boulevard, Los Angeles, LAPD officers effected a traffic stop of the Mercedes; Mr. Vigil was the driver and sole occupant. (Id. ¶ 45.) Though it is disputed whether the vehicle was parked when officers effectuated the traffic stop, it is undisputed that by the time of the impound, the Mercedes was lawfully and safely parked in a shopping center's private parking lot between a Bed Bath & Beyond retail outlet and Aaron Brothers store, off of Ventura Boulevard. (Id. ¶ 46; DSGMF ¶ 46.) At the time of the stop (and during the period of May 30, 2017 through June 30, 2017), Mr. Vigil's driver's license was suspended pursuant to California Vehicle Code Section 14601.1. (PCSSUF ¶ 47; DSGMF ¶ 47; DSSUF ¶ 21.) Officers seized the Mercedes and subjected it to a 30-day impound pursuant to Section 14602.6. (PCSSUF ¶ 47.)

After the LAPD officers impounded the Mercedes, the same day, Mr. Vigil called the LAPD seeking the return of his vehicle. The LAPD told him to come to the police station. (Id. ¶ 48.) The next day, May 31, 2017, Mr. Vigil went to the LAPD police station. LAPD personnel directed him to an "investigator." After visits to the LAPD station three days in a row, Mr. Vigil asked an investigator how he could challenge the impound; the investigator told him, "It's up to me, and I'm keeping your car" for 30 days. (Id. ¶ 49; Vigil Dep. 32:16-25.) Mr. Vigil requested that his Mercedes be released within 24 hours to seven days after the Mercedes was towed. (PCSSUF ¶ 50.) Mr. Vigil made four trips to the LAPD station unsuccessfully seeking the release of his Mercedes, only to be finally told by the investigator that the Mercedes would be impounded for 30 days. (Id. ¶ 51.) An LAPD officer told Mr. Vigil his Mercedes was being held for 30 days because Mr. Vigil was driving it on a suspended driver's license. (Id. ¶ 52.) Mr. Vigil did not formally request a storage hearing to seek the release of his Mercedes during the 30-day hold period and never attended one. (DSSUF ¶¶ 22-23.) While Defendants claim that an officer told Mr. Vigil of his right to a storage hearing on the day his vehicle was seized, it is undisputed

that, during any of Mr. Vigil's four trips to the station or any other time, no LAPD personnel informed him of the right to have a storage hearing. (PSSGD ¶¶ 22-23; Vigil Dep. 44:13-23.)[28]

At the conclusion of the 30-day impound period, on June 29, 2017, Mr. Vigil went to the OPG storage lot accompanied by his friend, Rene Baca, a licensed driver. (Id. ¶ 53; DSSUF ¶ 25.) Mr. Vigil's friend drove the Mercedes out of the impound lot, but then had to go to school; after dropping the friend off at school, Mr. Vigil got into the driver's seat and drove himself home. (DSSUF ¶ 26; Vigil Dep. 38:14-25.) Mr. Vigil sought a restricted license but was rejected because they were only issued to drive to work, and Mr. Vigil was unemployed at the time and seeking work. (Vigil Dep. 18:1-8.) During the period when his license was suspended, Mr. Vigil drove the Mercedes "rarely, to get food[.]" (Id. 18:9-11.)

OPG Archer's Vineland charged $1,633.90 for the release of Mr. Vigil's vehicle. (PCSSUF ¶ 54.)

If the LAPD Officers had impounded the Mercedes under Cal. Veh. Code § 22651(p), upon Mr. Vigil's initial demand the LAPD would have been required to release the Mercedes to Mr. Vigil or his designated agent who had a valid driver's license and upon payment of then-accrued towing and storage charges. (Id. ¶ 55.) Had Mr. Vigil requested a storage hearing, the Impound Policy would have barred LAPD's early release of the Mercedes from the 30-day impound because (a) the Mercedes was seized in compliance with S07 and (b) Mr. Vigil's driver's license was suspended within the meaning of the Impound Policy and Vehicle Code Section 14602.6(a)(1). (Id. ¶ 56.)[29]

### 10. Plaintiffs' Damages Calculations[30]

By using "VIIC" data, it is feasible to determine the historical, fair market rate to rent a vehicle of comparable size and utility to the LAPD-directed impounded vehicles that VIIC data identifies. (PCSSUF ¶ 76.) "SIPP" codes are the rental car industry standard for classifying vehicles based on vehicle features, including size, number of doors, transmission type, air conditioning, type of fuel, etc. A vehicle's specific make and model combination typically determines the corresponding SIPP code. (Id. ¶ 77.) As a general matter, car rental costs are determined primarily by SIPP codes because the SIPP codes reflect the combination of factors

---

[28] This is not disputed because Defendants have produced no contrary evidence that any individual so informed Mr. Vigil on his four trips to the LAPD station.

[29] Defendants claim this fact is disputed but cite no contrary evidence. It does not constitute an improper legal conclusion. It is clear from the policy documents in the record that LAPD would not have released the Mercedes from the 30-day hold if it had followed its own policies. (See DSGMF ¶ 56.)

[30] As noted above, the Court considers Defendants' objections to these proffered facts together in the discussion section below, except the limited ones addressed in this section. Because the Court overrules all Defendants' objections, the facts cited here are undisputed.

that drive rental car prices and allow for uniformity of charges for vehicles considered to be in the same class. (Id. ¶ 78.) Regarding the vehicles impounded by Defendants pursuant to Section 14602.6, the VIIC data, or "Master Impound List," contains 2,303 unique make / model / car-type combinations. (Id. ¶ 79.)

Using the 2,303 unique make / model / car-type combinations reflected in the VIIC data, along with the accompanying VIN for each vehicle, Plaintiffs' expert matched all but 187 of the unique make / model / car-type combinations to a corresponding SIPP code. (Id. ¶ 80.) Of the 187 unmatched combinations, 109 referred to motorcycles which do not have SIPP codes; 14 referred to heavy equipment; 53 were VINs that produced no match in the VIN decoder; and six had no VIN and hence could not be matched. (Id. ¶ 81.) The matched make / model / car-type combinations correspond to 64 different SIPP codes. (Id. ¶ 82.) Of the 45,501 impounded vehicles reflected in the VIIC data, 97%, or 44,168 vehicles, match to one of the 64 different SIPP codes. (Id. ¶ 83.) Of the 109 make / model car-type combinations that are motorcycles (which do not have SIPP codes), Plaintiffs' expert assigned the SIPP code ECAR, the code with the lowest cost rental value. (Id. ¶ 84.) For heavy machinery for which there was no corresponding SIPP code, but which Plaintiffs' expert identified can be used for transportation (such as work trucks), Plaintiffs' expert assigned the SIPP code ECAR, the code with the lowest cost rental value. (Id. ¶ 85.)

After identifying relevant SIPP codes, Plaintiffs' expert used RateHighway data to determine what the fair market value would have been to rent a vehicle of the same SIPP code during the same month as the impound for that particular vehicle. (Id. ¶ 86.) Historical rental car rates are not maintained for all SIPP codes in the Los Angeles market. However, historical rates in the Los Angeles market are maintained for the SIPP code ICAR. ICAR is also the only SIPP code for which there is historical data covering the entire class period. (Id. ¶ 87.) For most SIPP codes, Plaintiffs' expert determined the percentage difference between the current rental rate for that SIPP code and the current rental rate for the ICAR. This percentage difference represents a "conversion rate" between the SIPP code corresponding to the particular vehicle at issue and ICAR, which is then applied to historical ICAR rental rates to determine the historical rental rate for the specific SIPP code. (Id. ¶ 88.) The parties have identified no reason to suspect significant discrepancies in the relative difference between SIPP codes over the duration of the class period; Defendants have not suggested any. (Id. ¶ 89.)[31]

There were seven SIPP codes for which Plaintiffs' expert could not determine a conversion rate based on the ICAR. This is because SIPP codes correspond to vehicles that cannot be rented from major airport car rental agencies (and therefore there is no data corresponding to these SIPP codes from LAX car rental agencies). For each of these SIPP codes, Plaintiffs' expert substituted a replacement SIPP code available for rent at LAX. All of the replacement SIPP codes replace the unavailable SIPP code with vehicles that would be less

---

[31] If Defendants wanted to dispute this assertion, surely the burden was on them to offer at least one reason why this would *not* be the case. Defendants have not offered any, and the Court does not find any either. (See DSGMF ¶ 89.)

expensive to rent than the impounded vehicle.  (Id. ¶ 90.)  Regarding the seven SIPP codes for
which Plaintiffs' expert could not determine a conversion rate based on the ICAR code,
Plaintiffs' expert substituted the codes with replacement SIPP codes / vehicles that would be less
expensive to rent.  The original codes were CCMR, ECMR, CPAR, ECAH, ETAR, USAR, and
WTAR, replaced with, respectively, ECAR, ECAR, ECAR, ECAR, CTAR, PCAR, and LTAR.
(Id. ¶ 91.)

Plaintiffs' expert provided a list of 64 SIPP codes corresponding to the 97% matched
make/model/car-type combinations and their conversion rates.  (Id. ¶ 92.)[32]  Plaintiffs' expert
provided the historical, "blended rate" rental rates for the ICAR for all months in the class
period.  (Id. ¶ 93.)  Based on VIIC data generated and maintained pursuant to contracts between
the City and individual OPGs, Plaintiffs have identified every LAPD-directed impound of a
vehicle seized for a 30-day Section 14602.6 impound, where the seizure occurred at any time
from November 2, 2012, to July 11, 2018.  (Id. ¶ 94.)  For each LAPD-directed impound of a
vehicle seized for a 30-day Section 14602.6 impound from November 2, 2012 to July 11, 2018,
Plaintiffs have identified (a) the date the vehicle was seized; (b) the date the vehicle was released
to either its registered owner, legal owner or sold at a lien sale; (c) to whom the vehicle was
released (registered owner vs. legal owner vs. sold at lien sale); (d) the total days the vehicle was
impounded; (e) the total of all charges for the towing and storage of the vehicle and payable by
the vehicle's registered or legal owner; and (f) the reasonable rental value of the vehicle for each
day the vehicle was withheld from its owner.  (Id. ¶ 95.)  Plaintiffs' computer database expert
incorporated the relevant ICAR and SIPP offset codes into a VIIC data set for Section 14602.6
impounds in the form of an Excel spreadsheet file, matching the ICAR and SIPP offset codes to
the corresponding vehicles.  (Id. ¶ 96.)  The Excel spreadsheet file containing data for each §
14602.6 impounded vehicle released to its legal owner, reflects (a) storage and related charges for
which Plaintiffs seek reimbursement based on actual days stored (vehicle release date minus
vehicle tow date); (b) rental value for class members' loss of use of vehicles for the 30-day period
(beginning the date the vehicle was towed); and (c) interest calculated on storage charges and
rental value (calculated at 7% simple annual interest and 7% compounded annually).  (Id. ¶ 97.)
The Excel spreadsheet file containing data on each § 14602.6 impounded vehicle sold at a lien
sale, reflects (a) storage and related charges for which Plaintiffs seek reimbursement (fixed at 30
days except for those vehicles sold at lien sale in less than 30 days in which instance actual days
stored was used); (b) rental value for loss of use of vehicle for a 30 day period (beginning the date
the vehicle was towed); and (c) interest calculated on storage charges and rental value (calculated
at 7% simple annual interest and 7% compounded annually).  (Id. ¶ 98.)  For members of the
"Legal Owner" ("LO") class, Plaintiffs' Exhibit HH reflects (a) total number of class members;
(b) total reimbursable OPG charges; (c) for the reimbursable OPG charges, annual interest
calculated at both 7% simple interest and 7% compounded annually; (d) total rental value; and (e)
for the total rental value, annual interest calculated at both 7% simple interest and 7%

---

[32] This fact and the one that follows is not disputed; the underlying exhibit was attached
to an earlier filing.  Defendants cite no contrary evidence.  (See PRDSGMF ¶¶ 92-93.)

compounded annually.  (Id. ¶ 99.) [33]  For members of the "Lien Sale" (Lien) class, Plaintiffs' Exhibit II reflects (a) total number of class members; (b) total of reimbursable OPG charges; (c) for the reimbursable OPG charges, annual interest calculated at both 7% simple interest and 7% compounded annually; (d) total rental value; and (e) for the total rental value, annual interest calculated at both 7% simple interest and 7% compounded annually.  (Id. ¶ 100.)

Using California DMV data in conjunction with VIIC data, Plaintiffs can identify by name and address the registered owner and legal owner of members of the LO and Lien Classes.  (Id. ¶ 101.)  Using California DMV data, Plaintiffs can determine, as of a particular date, if a registered owner who is a member of either class had a valid, current California driver's license.  (Id. ¶ 102.)  Using VIIC data from November 2, 2012 for the class periods, the average number of days vehicles were impounded pursuant to Section 14602.6 were held before being reclaimed by the either the legal or registered owner was 34 days on average.  (Id. ¶ 103.)  Using VIIC data after June 30, 2017, for vehicles impounded under Section 22651(p), 85.68% of registered owners reclaimed their vehicles impounded pursuant to Section 22651(p) within three days (mean and average 2.17 days).  95.35% of registered owners reclaimed their vehicles impounded pursuant to Section 22651(p) within seven days.  (Id. ¶ 104.)

**C.  Disputed Facts**

According to Defendants, an LAPD officer told Mr. Vigil on the day his vehicle was impounded that he could request a vehicle storage hearing to seek the release of his Mercedes.  (DSSUF ¶ 24.)  According to Plaintiffs, no individual ever informed Mr. Vigil that he could seek a storage hearing or offered him one.  (PSSGD ¶¶ 22-23; Vigil Dep. 44:13-23.)

According to Defendants, at the storage hearing on August 11, 2014, Mr. Arizmendi said in a statement translated by "Joel Hernandez" that he would continue to drive the Sienna without having a valid driver's license.  (DSSUF ¶ 17; MPSJ Ex. Y.) [34]  Plaintiffs, through a declaration of Ms. Anderson-Barker, who represented Mr. Arizmendi at the hearing, dispute that characterization.  Ms. Anderson-Barker is a licensed attorney and bilingual; she speaks Spanish

---

[33] Defendants object to this fact and the one that follows as a "legal conclusion" and Defendants "dispute that members of the [classes] are entitled to anything and that the purported 'rental value is 'reasonable.'"  (See DSGMF ¶¶ 99-100.)  It is not clear that Defendants actually read the proffered facts based on their objection.  First of all, the cited facts do not ask the Court to declare that the rates are "reasonable."  That is, of course, a legal conclusion reached later, based on the parties' briefing.  Second of all, Defendants obviously dispute that members of the classes are "entitled to anything."  That is why the parties have filed the instant Motions.  Defendants' legal argument does not render Plaintiffs' cited evidence disputed.

[34] As noted below, the Court finds Defendants' evidence regarding Mr. Arizmendi's statements inadmissible.  Defendants, the proponent of the evidence, have submitted nothing to explain who Joel Hernandez is or whether he speaks Spanish fluently, and thus fail to authenticate his translation.

fluently, and Mr. Arizmendi only spoke Spanish.  (Anderson-Barker Supplemental Declaration
¶¶ 1-3.)  As is her general practice at storage hearings, Ms. Anderson-Barker did almost all of the
speaking on behalf of her client, Mr. Arizmendi.  She denies that Mr. Arizmendi made any
statements that he would continue to drive the vehicle without a valid driver's license.  (Id. ¶ 5.)
According to Ms. Anderson-Barker, "[h]e did acknowledge he did not have a driver's license and
that he did not know when he would be able to get one.  He also said, however, that he doesn't
generally drive the car because he knows he has no license; that his wife does.  He mentioned that
on infrequent occasions he will drive the car but only because his wife is unavailable, such as to
take their children to school when his wife was not available to drive."  (Id. ¶ 4.)

Further, Ms. Anderson-Barker has represented many clients in LAPD storage hearings.
(Anderson-Barker Supplemental Declaration ¶ 2.)  In her experience, "at these storage hearings
the hearing officers seem to only care if the officers were correct in having the car towed from the
street because the driver was unlicensed within the meaning of § 14602.6.  Nothing else really
matters to them.  That was also the case with Det. Papietro," who presided over Mr.
Arizmendi's hearing.  (Id. ¶ 5.)  According to Ms. Anderson-Barker, she told Detective Papietro
that they had a licensed driver available to take possession of the car (Carlos Husman) during the
storage hearing itself, though she does not recall that Mr. Husman's name came up.  (Id.)  That
was because "Detective Papietro made it plain that she didn't care if we had a licensed driver.
All that mattered to Detective Papietro is that Mr. Arizmendi was unlicensed with it unlikely that
he would be licensed in the near future."  (Id.)

## III.   LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue as to any material fact
and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The
moving party has the initial burden of identifying the portions of the pleadings and record that it
believes demonstrate the absence of an issue of material fact.  See Celotex Corp. v. Catrett, 477
U.S. 317, 323 (1986).  Where the non-moving party bears the burden of proof at trial, the moving
party need not produce evidence negating or disproving every essential element of the non-
moving party's case.  Id. at 325.  Instead, the moving party need only prove there is an absence of
evidence to support the nonmoving party's case.  Id.; In re Oracle Corp. Sec. Litig., 627 F.3d 376,
387 (9th Cir. 2010).  The moving party must show that "under the governing law, there can be
but one reasonable conclusion as to the verdict."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
250 (1986).

If the moving party has sustained its burden, the non-moving party must then show that
there is a genuine issue of material fact that must be resolved at trial.  Celotex, 477 U.S. at
324.  The non-moving party must make an affirmative showing on all matters placed at issue by
the motion as to which it has the burden of proof at trial.  Celotex, 477 U.S. at 322; Anderson,
477 U.S. at 252.  A genuine issue of material fact exists "if the evidence is such that a reasonable
jury could return a verdict for the non-moving party."  Anderson, 477 U.S. at 248.  "This burden
is not a light one.  The non-moving party must show more than the mere existence of a scintilla of

evidence." In re Oracle, 627 F.3d at 387 (citing Anderson, 477 U.S. at 252). Facts are material when, under the substantive law, they could affect the outcome. Anderson, 477 U.S. at 248.

When deciding a motion for summary judgment, the court construes the evidence in the light most favorable to the non-moving party. Barlow v. Ground, 943 F.2d 1132, 1135 (9th Cir. 1991). Thus, summary judgment for the moving party is proper when a "rational trier of fact" would not be able to find for the non-moving party based on the record taken as a whole. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Cross-motions for summary judgment "must be considered on [their] own merits." Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two, 249 F.3d 1132, 1136 (9th Cir. 2001); Acosta v. City Nat'l Corp., 922 F.3d 880, 885 (9th Cir. 2019). Courts must review the evidence submitted in support of each cross-motion, and "give the nonmoving party in each instance the benefit of all reasonable inferences." American Civil Liberties Union of Nevada v. City of Las Vegas, 466 F.3d 784, 791 (9th Cir. 2006); Tulalip Tribes of Wash. V. Washington, 783 F.3d 1151, 1156 (9th Cir. 2015).

Plaintiffs "seeking summary judgment on a claim must offer evidence sufficient to support a finding upon every element of [their] claim other than elements admitted by the defendants." Barnes v. Sea Hawaii Rafting, LLC, 889 F.3d 517, 537 (9th Cir. 2018). "It is ordinarily a heavy burden." Id. at 538.

## IV.   DISCUSSION

The Motions are the culmination of over eight years of litigation concerning the City's policy of impounding the vehicles of unlicensed drivers for 30 days without warrants, judicial review, or a valid justification under the Fourth Amendment. Plaintiffs, and the Court, refer to this as the "Impound Policy." The Court holds that Defendants, through the Impound Policy, violated the constitutional rights of Plaintiffs in multiple respects. As such, and for the reasons set forth below, the Court **GRANTS** Plaintiffs' MPSJ and **GRANTS IN PART** and **DENIES IN PART** Defendants' MSJ.

## A.  Timeliness of Mr. Arizmendi's Claims

The first argument Defendants raise in the MSJ is that Mr. Arizmendi's claims fail as a matter of law because they are barred by the applicable statute of limitations. (MSJ at 7.) It is undisputed that Mr. Arizmendi's vehicle was impounded on August 3, 2014; his impound hearing was on August 11, 2014; his vehicle was sold at a lien sale on September 19, 2014; and he joined this lawsuit on June 12, 2018. (PCSSUF ¶¶ 36, 42; DSSUF ¶¶ 3-4.) The statute of limitations for a claim brought under 42 U.S.C. § 1983 in California is ordinarily two years. See Action Apartment Ass'n, Inc. v. Santa Monica Rent Control Bd., 509 F.3d 1020, 1026 (9th Cir. 2007). The statute of limitations for a claim brought under California Government Code § 815.6 for breach of a mandatory duty is three years. See Holman v. Cnty. of Butte, 68 Cal. App. 5th

189, 194 (2021).  According to Defendants, all of Mr. Arizmendi's claims are time-barred.  (See MSJ at 7.)  The Court disagrees.

First, Defendants have waived the argument.  On June 7, 2018, Defendants stipulated to the filing of a Second Amended Complaint including the addition of a second named plaintiff.  (SAC Stipulation.)  On June 12, 2018, Plaintiffs filed the SAC, with Mr. Arizmendi added as the second named plaintiff.  (See SAC.)  Assuming Defendants had not already waived the statute of limitations argument through stipulation (assuming, in turn, they were not aware of the timing of Mr. Arizmendi's factual contentions), Defendants did not file a motion to dismiss the SAC, which would have been the obvious vehicle to raise a statute of limitations argument.  Instead, Defendants filed an amended answer to the SAC.  (See Amended Answer.)  In the Amended Answer, despite raising numerous defenses to Mr. Arizmendi's claims, Defendants never raised a statute of limitations defense.  (See id.)[35]  Defendants did not raise the statute of limitations in their Answer either.  (See Answer.)  Defendants have not filed any additional answers since the filing of the Amended Answer or moved to amend the Amended Answer to raise a statute of limitations defense.  In some circuits, Defendants' failure to raise the statute of limitations in a Rule 12 motion or an answer would almost certainly have waived the defense.  However, the Ninth Circuit has allowed a defendant to raise the statute of limitations as an affirmative defense for the first time in a motion for summary judgment absent a showing of prejudice to the plaintiff.  See Rivera v. Anaya, 726 F.2d 564, 566 (9th Cir. 1984).  Allowing Defendants to raise the defense now would cause irreparable prejudice to Plaintiffs.  Defendants raised this issue for the first time in seeking decertification of the classes; the Court observed that Defendants "fail to acknowledge" that this issue should have been apparent to Defendants for over four years and rejected the contention that it made Mr. Arizmendi atypical of the Lien Class.  (See Order Denying MCC and MD at 9-10.)  Since then, the potential prejudice to Plaintiffs has only compounded.  In reliance on Defendants' decision not to raise the statute of limitations issue, Plaintiffs have proceeded for nearly five years on the assumption that Mr. Arizmendi's claims would be litigated on the merits.  They have built a substantial component of this class action lawsuit around him, including naming him as the sole proposed representative of the Lien Class.  (See MCC at 3.)  The Court relied on Defendants' waiver of the issue when it named Mr. Arizmendi the sole representative of the Lien Class.  (See MTD 5AC and MCC Order.)  Over the course of the past five years or so, the parties have expended hundreds of hours and tens of

---

[35] Defendants did note that they "reserve the right to assert additional defenses, if and to the extent that such defenses are applicable."  (Id. at 8.)  The right to reserve additional defenses is not itself an affirmative defense, and if Defendants wanted to raise a statute of limitations affirmative defense, they would have had to file a motion to amend their Amended Answer, which they did not do.  See Scott v. Fed. Bond & Collection Serv., Inc., 2011 WL 176846, at *7 (N.D. Cal. Jan. 19, 2011) ("[R]eserving the right to assert additional defenses based on discovery[] is not itself an affirmative defense"); Solis v. Couturier, 2009 WL 2022343, at *3 (E.D. Cal. July 8, 2009) (finding reservation of additional defenses to be redundant, and noting that, "[a]lthough this redundant defense is relatively harmless, it serves no real purpose in the litigation and should be stricken"); Fed. R. Civ. P. 12(h) (noting when defenses have been waived and directing parties to add affirmative defenses through the Rule 15 amendment procedure).

**CIVIL MINUTES—GENERAL**

thousands of dollars in fees and costs litigating this case and discovered thousands of pages of documents. Many, if not most, of those resources were expended on issues relevant to Mr. Arizmendi's claims, and some of them were devoted to issues solely relevant to Mr. Arizmendi's claims. Defendants' decision to raise the statute of limitations at the 11th hour smacks of gamesmanship: ignoring the issue at the outset so that Plaintiffs and the Court rely upon Defendants' waiver of it, and then claiming at the last minute that the issues that have been central to the litigation for five years are moot because of the statute of limitations. If Defendants had wanted to rely upon the statute of limitations, they should have raised that issue at the pleadings stage or at the very least preserved it through an answer; even if the Court had found Mr. Arizmendi's claims time-barred and dismissed them, it would have afforded Plaintiffs an opportunity to file an amended complaint with a second named plaintiff whose claims were not barred. Then, the parties could have proceeded to discovery on that understanding, and the second named plaintiff would have been added before evidence was destroyed or memories faded. The timing of Defendants' decision to raise the issue raises an inference of bad faith, for it came after Defendants had already lost at the Ninth Circuit, the Court had rejected numerous arguments in successive motions to dismiss and held that Plaintiffs had stated claims for relief, and certified multiple classes. Without displaying any interest in incorporating the statute of limitations into their litigation strategy for four years, Defendants suddenly decided to raise the issue once they realized they might lose the case on the merits. And even if Defendants' failure to raise the issue for over four years was due to incompetence rather than strategic calculus, that does not provide a reason for the Court to excuse Defendants' waiver of the issue, either. Defendants are sophisticated litigants with considerable resources and a robust staff of qualified attorneys to represent them. If this was an oversight, Defendants can punish the attorneys responsible for it. The Court will not allow them to punish Plaintiffs.

Second, even if Defendants had not waived the argument, it lacks merit. Since <u>American Pipe & Constr. Co. v. Utah</u>, 414 U.S. 538 (1974), "the timely filing of a class action tolls the applicable statute of limitations for all persons encompassed by the class complaint." <u>China Agritech, Inc. v. Resh</u>, 138 S. Ct. 1800, 1804 (2018). That is, "<u>American Pipe</u> tolls the statute of limitations during the pendency of a putative class action, allowing unnamed class members to join the action individually or file individual claims if the class fails. But <u>American Pipe</u> does not permit the maintenance of a follow-on class action past expiration of the statute of limitations." <u>Id.</u> "An amendment adding a party plaintiff relates back to the date of the original pleading only when: 1) the original complaint gave the defendant adequate notice of the claims of the newly proposed plaintiff; 2) the relation back does not unfairly prejudice the defendant; and 3) there is an identity of interests between the original and newly proposed plaintiff." <u>In re Syntex Corp. Sec. Litig.</u>, 95 F.3d 922, 935 (9th Cir. 1996). "In deciding whether an amendment relates back to the original claim, notice to the opposing party of the existence and involvement of the new plaintiff is the critical element." <u>Avila v. I.N.S.</u>, 731 F.2d 616, 620 (9th Cir. 1984). In evaluating whether the defendant had adequate notice, "courts examine whether the original complaint clearly stated that the plaintiff sought to represent others." <u>Allen v. Similasan Corp.</u>, 96 F. Supp. 3d 1063, 1069 (S.D. Cal. 2015). "Where the new plaintiffs had always been a part of the putative class, notice is satisfied because Defendants had always known that all putative class members were potential plaintiffs." <u>Id.</u> (internal quotations and citations omitted). The original

Complaint defined a single proposed damages class that encompassed all Plaintiffs, including Mr. Arizmendi: "those vehicle owners whose vehicles were seized and impounded for 30 days pursuant to the LAPD Impound Policy and held for 30 days without warrants" beginning two years before the Complaint's filing. (Complaint ¶ 23.) Plaintiffs' original class certification motion defined the class the same way, which the Court denied as moot when it originally dismissed the Complaint for failure to state a claim. (See Dkt. No. 26; MTD Complaint Order.) Thus, Defendants clearly had adequate notice, and they do not appear to directly argue otherwise. (See MSJ at 7.) Defendants do claim, however, that Ms. Brewster and Mr. Arizmendi lack an identity of interests because Plaintiffs have proposed Ms. Brewster, Mr. Arizmendi and Mr. Vigil as separate class representatives. (Id.) Defendants do not cite a single case in support of the proposition that representatives of separate classes lack an identity of interests. (See id.) To be sure, there are factual differences in Ms. Brewster and Mr. Arizmendi's claims, but those differences are only legally relevant to the extent they affect the issue of damages, which is why they represent separate classes: Mr. Arizmendi's vehicle was sold off at a lien sale after Defendants impounded it and unlawfully held it, while Ms. Brewster was more fortunate. The Court has already explained why, in all other respects, Mr. Arizmendi and Ms. Brewster share the same identity of interests. "Critically, Brewster and Arizmendi's constitutional claims arise from the same course of conduct pursuant to the same policy carried out by the same party as compared to fellow potential class members; for each class member, the source of constitutional harm is the City's use of the Impound Policy to impound vehicles driven by class members and Plaintiffs." (MTD 5AC and MCC Order at 12.) In other words, Ms. Brewster and Mr. Arizmendi easily could have been members of the same class had it been defined slightly differently, as they were under the original class definition.

Defendants raise various arguments about why the Court's initial dismissal of the Complaint and subsequent reversal on appeal means Mr. Arizmendi's claims do not relate back to the original filing, but all of them deliberately overlook their choice to allow this litigation to proceed on remand, and for nearly five years thereafter, with an express understanding of the nature of Mr. Arizmendi's claims. Among other things, Defendants *stipulated* to the filing of the SAC with "additional allegations and damages classes" on June 7, 2018. (SAC Stipulation.) The SAC clearly stated that Mr. Arizmendi was the sole proposed representative for a class of individuals whose vehicles were "sold at auction," with that class definition the same in every material respect to the one that Plaintiffs later sought to certify and the Court approved. (See SAC ¶ 33(D).) Defendants' argument that the procedural posture of the case renders it somehow unfair to allow Mr. Arizmendi's case to proceed is wholly belied by the fact that it is raised well over four years after any unfairness would have materialized. It is not a sincere appeal to equitable considerations; it is a pretextual, last-ditch effort to avoid liability, and an unpersuasive one at that.

Defendants' argument also relies upon a misreading of China Agritech, which held that "American Pipe does not permit the maintenance of a follow-on class action past expiration of the statute of limitations." 138 S. Ct. at 1804. Defendants appear to claim that the SAC would count as a "follow-on class action." (See MSJ Reply at 2.) China Agritech clearly involved (three) separate lawsuits. See 138 S. Ct. at 1804. The instant action is a single case with

amended pleadings.  It is different in every material respect from a "follow-on class action." Faced with analogous procedural postures, other courts have recognized this fundamental distinction.  For example, in Walker v. Life Ins. Co. of Sw., 2018 WL 3816716, (C.D. Cal. July 31, 2018), aff'd sub nom. Walker v. Life Ins. Co. of the Sw., 953 F.3d 624 (9th Cir. 2020), the district court dismissed certain claims and thereafter certified two classes and decertified one subclass; the case proceeded to a trial on the merits on the claims that had not been dismissed.  Id. at *1. On appeal, the Ninth Circuit reversed the district court's order dismissing certain claims.  Id. On remand, the plaintiffs sought certification of a class, and the defendant argued that the statute of limitations precluded certification, contending that "once the claims were dismissed, the statute of limitations was no longer tolled and that tolling did not restart until March 3, 2017, when the Ninth Circuit reversed the dismissal of the remaining claims."  Id. at *4.  The district court rejected the argument that the "absent class members' claims are now time-barred despite the Ninth Circuit's revival of the remaining claims because absent class members did not attempt to assert the claims post-dismissal."  Id. at *5.  Its reasoning squarely refutes the analogous argument made by Defendants:

> In China Agritech, the Supreme Court merely clarified that the American Pipe rule only tolls a putative class member's individual claims—it does not allow a putative class member to file a new class action lawsuit after the statute of limitations has expired.  138 S. Ct. at 1806–09.  Unlike the circumstances in both American Pipe and China Agritech, which followed denials of class certification, here the Court never determined whether the remaining claims could be asserted on a class-wide basis because the Court dismissed the claims on the merits.  While LSW contends that tolling stops upon denial of class certification or dismissal, notwithstanding the possibility of appeal, the cases LSW cites are inapposite because *none of them involve the assertion of revived claims in the same action in which they were originally brought.*

Id. (emphasis added).  In Lambert v. Nutraceutical Corp., 2020 WL 12012559, (C.D. Cal. Jan. 8, 2020), Judge Birotte adopted Judge Selna's reasoning in Walker when faced with an analogous argument, finding that the putative class members' claims "have been preserved throughout the pendency of this action while Plaintiff has represented the putative class on appeal."  Id. at *4. Judge Birotte also found inapposite authorities that did not "involve class claims within the same action," as was the situation in Lambert.  Id.  Other authorities lend support for Plaintiffs' position.  See, e.g., Hall v. Variable Annuity Life Ins. Co., 727 F.3d 372, 377 (5th Cir. 2013) (where the district court dismisses on the merits, "American Pipe tolling would have continued until the dismissal was affirmed on appeal"); Gelman v. Westinghouse Elec. Corp., 556 F.2d 699, 701 (3d Cir. 1977) ("[W]hen an appellate court reverses a district court denial of class certification the status of the class members is to be determined by relation back to the date of the initiation of the suit."); Satterwhite v. City of Greenville, Tex., 578 F.2d 987, 997 (5th Cir. 1978) (en banc), cert. granted, judgment vacated on other grounds, 445 U.S. 940 (1980) ("[I]f a trial court's decision that the class may not be maintained is reversed on appeal, the status of class

members is to be determined from the time that suit was instituted."); In re Vertrue Inc. Mktg. &
Sales Pracs. Litig., 719 F.3d 474, 479–80 (6th Cir. 2013) ("Here, no court has definitively ruled
on class certification, as the district court dismissed the plaintiffs' actions in Sanford before
ruling on the plaintiffs' motion for class certification. . . . Because the risk motivating our decision
in Andrews—namely, repetitive and indefinite class action lawsuits addressing the same claims—
is simply not present here, we hold that the commencement of the original Sanford class action
tolled the statute of limitations under American Pipe.")[36]; cf. Burnett v. New York Cent. R. Co.,
380 U.S. 424, 435 (1965) ("We further hold, under familiar principles which have been applied to
statutes of limitations, that the limitation provision is tolled until the state court order dismissing
the state action becomes final by the running of the time during which an appeal may be taken or
the entry of a final judgment on appeal.").

        The reasoning of the Supreme Court in United Airlines, Inc. v. McDonald, 432 U.S. 385
(1977) is also helpful to Plaintiffs.  There, a former putative class member sought to intervene to
challenge the district court's denial of class certification after the district court had entered a final
judgment against the named plaintiffs, who chose not to appeal.  See id. at 390.  The Supreme
Court found that the defendant, United Airlines, was "put on notice by the filing of the [initial]
complaint of the possibility of classwide liability" and that the intervenor's "pursuit of that
claim" should be considered timely.  See id. at 395.  Here, Defendants were once again on notice
of the possibility of classwide liability by the filing of the Complaint, Mr. Arizmendi was always
an "unnamed member" of that putative class, id. at 394, and Defendants are unlikely to have
been "unfairly prejudiced," id., as a result, since he was always a proper party to the action and
the substantive issues he has sought to litigate have been the same since the filing of the
Complaint.  The Ninth Circuit's decision in Cath. Soc. Servs., Inc. v. I.N.S., 232 F.3d 1139 (9th
Cir. 2000) is also informative.  The case had a "long and unhappy history," id. at 1141, but in
sum, a group of immigrant plaintiffs filed a class action regarding the government's advance
parole policy; the district court certified a class and ruled for the class on the merits; the Ninth
Circuit affirmed on appeal; the Supreme Court reversed; the case was remanded back to the
district court; an amended complaint was filed; the district court certified a new class and ruled
again for the plaintiffs; while an appeal was pending, Congress amended the underlying statute;
and on appeal, the Ninth Circuit reversed and remanded with instructions to dismiss the case
with prejudice.  See id. at 1141-45.  Thereafter, plaintiffs filed a new class action and the district
court certified a new class; the Government appealed; and a Ninth Circuit panel reversed,
dismissing the new class action as time-barred.  See id. at 1145.  The Ninth Circuit, sitting en
banc, reversed, holding that the earlier-filed action was tolled during its long pendency, which
meant that the subsequent action was also timely filed.  Id.  After reviewing American Pipe,
Crown, Cork & Seal Co. v. Parker, 462 U.S. 345 (1983), and other precedents, the Court found

---

[36] The district court's order affirmed on appeal contains a lengthier discussion of tolling
principles and precedents.  See In re Vertrue Mktg. & Sales Pracs. Litig., 712 F. Supp. 2d 703,
716-17 (N.D. Ohio 2010), aff'd sub nom. In re Vertrue Inc., 719 F.3d 474 (holding that, where
district court did not address merits of class treatment and dismissal of action was reversed on
appeal, "subsequent class treatment is not precluded").

tolling appropriate, in large part because "Plaintiffs in this case are not attempting to relitigate an earlier denial of class certification, or to correct a procedural deficiency in an earlier would-be class." Id. at 1149.  While the facts at hand are different because the Court did not rule for Plaintiffs and did not have occasion to rule on the merits of class certification before the Ninth Circuit's reversal on appeal, the underlying purposes of tolling doctrines and classwide litigation support the application of American Pipe to the instant context, for Plaintiffs are not attempting to get an improper second bite at the apple regarding class certification.  Moreover, class members like Mr. Arizmendi hardly slept on their rights, but rather relied upon Ms. Brewster's vigorous representation of the putative class on appeal.

Defendants' cited authorities from within the Ninth Circuit are inapposite, for they all concern whether a limitations period was tolled by the filing of a *different* or *parallel* putative class action, not an unnamed class member who joined the case as a *named* class member on remand from an appellate court following a reversal.  See In re Wellpoint, Inc., Out of Network "UCR" Rates Litig., 2016 WL 6645789, at *11 (C.D. Cal. July 19, 2016) ("Plaintiffs argue that any limitations period was tolled by the filing of a similar class action in the Southern District of Florida."); Henson v. Fid. Nat. Fin. Inc., 2014 WL 1246222, at *3 (C.D. Cal. Mar. 21, 2014) (Plaintiffs argued that a different action filed in state court, "Bergman," tolled the statute of limitations); In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig., 2012 WL 1097244, at *3 (C.D. Cal. Mar. 9, 2012) ("Western and Southern also argues that its claims continued to toll even after Luther was dismissed because the California Court of Appeals later reinstated it.").  These cases are also all distinguishable in multiple respects.  For example, in In Re Wellpoint, the plaintiffs' claims accrued sometime in 2004 or 2005 and a class certification motion for the parallel action in Florida was denied in 2002, while the plaintiffs did not establish that they were or would have been putative class members in that action.  See 2016 WL 6645789, at *11.  It is also not clear that Defendants read the entirety of a recent Sixth Circuit case they cite, Potter v. Comm'r of Soc. Sec., 9 F.4th 369 (6th Cir. 2021), for it mostly helps Plaintiffs, not them.  In Potter, the Sixth Circuit first reviewed its own case law, summarizing, and affirming, this rule: "American Pipe tolling applie[s] to subsequent class actions when there was not a definitive denial of class certification in the predicate class action.  Put differently, if the prior district court had denied class certification on the merits, a subsequent class action could not invoke American Pipe tolling.  But if there had been no merits adjudication of class status, there was no harm in allowing American Pipe to apply to a successive class action." Id. at 376.  This Court clearly did not adjudicate the merits of class status in the MTD Complaint Order, holding that Ms. Brewster failed to state a claim, which rendered moot any motion for class certification; when it finally *did* adjudicate the merits class certification on remand, the Court certified classes.  But the central issue in Potter was different, for it concerned "subsequent *individual* filings," not a "subsequent class action[.]" Id. (emphasis in original).  The Sixth Circuit then reaffirmed that the "reasonable reliance interests" of putative class members "favor[ed] applying American Pipe tolling" to the facts at hand, and that tolling would be consistent with the purposes served by statutes of limitations under the circumstances.  See id. at 377-379.  After distinguishing and disagreeing with other Circuit Court of Appeals opinions which may "seem[] at odds" with its

**CIVIL MINUTES—GENERAL**

conclusions, see id. at 378-80,[37] the Sixth Circuit addressed whether tolling applied to the plaintiff's *individual* action, holding it did not: "[O]nce an uncertified class action is dismissed, American Pipe tolling ceases, and the class members' *individual* statute-of-limitations clocks begin running. This means that the pendency of the Martin appeal did not suspend Messer's time to file an *individual* action." Id. at 381 (emphasis added).

Finally, Defendants argue they were prejudiced because the recording of Mr. Arizmendi's storage hearing was destroyed pursuant to a three-year retention policy. (See MSJ at 7-8; MSJ Reply at 5.) It is undisputed that the hearing recording is the sole piece of evidence that has been lost; every other piece of evidence, including the paper records of Mr. Arizmendi's impound and the officers' video recordings of the August 3, 2014 vehicle stop, were preserved. (See MSJ Opposition at 15.)[38] As Plaintiffs note, *Defendants*, not Plaintiffs, destroyed the hearing recording, even though Defendants were on notice of this lawsuit from the Complaint and Mr. Arizmendi indisputably was a member of the proposed class defined in the Complaint. While Defendants claim that the destruction of the recording was reasonable because the Court initially dismissed the Complaint only for the Ninth Circuit to reverse, that argument defies credulity when one actually considers the relevant timeline. The Court dismissed the Complaint on February 27, 2015 and the Ninth Circuit reversed on June 21, 2017, less than three years after the August 3, 2014 impound of Mr. Arizmendi's vehicle, the August 11, 2014 hearing and September 19, 2014 lien sale. Thus, Defendants themselves willfully destroyed the only piece of missing evidence purportedly according to a three-year retention policy, even though they were on notice that Mr. Arizmendi's records were the subject of this litigation, the Ninth Circuit thought the lawsuit had merit, and explicitly instructed this Court to allow Ms. Brewster to amend the pleadings to add new elements to it. Defendants' decision to destroy the hearing recording was reckless and they are wholly at fault for it. A party obviously cannot shoot itself in the foot and thereafter claim prejudice.[39] And even if none of the above were true, the Court would still hold that Defendants are not prejudiced by the absence of the recording because it is not material to the outcome. Defendants have submitted paper records roughly contemporaneous with the hearing that summarize the proceedings and a declaration from an examiner who purports to

---

[37] The cases discussed by Potter all appear to assess whether tolling applies where the district court ruled on the propriety of class treatment on the *merits*, and are thus inapposite for many of the same reasons noted by the Potter panel. See id.; see also In re Vertrue Inc., 719 F.3d at 480 n.2 (6th Cir. 2013) ("Even those circuits that apply a categorical ban against tolling for the benefit of subsequent class actions have addressed situations in which class certification has been affirmatively denied.").

[38] Plaintiffs suggest that "one might wonder why LAPD chose to preserve the 8/3/2014 video recordings but not the 8/11/14 audio recording." (Id.) According to Defendants, that is because they had different policies relating to the retention of different kinds of records. (See MSJ Reply at 5.) The Court will take Defendants at their word, though it makes little difference to the outcome here.

[39] There is perhaps an argument that Defendants could have been subject to sanctions for destroying relevant evidence in the midst of litigation, as noted below. Plaintiffs did not file a motion for sanctions, so the Court does not address the argument.

recall the hearing "well." (See MSJ Opposition at 15.) Plaintiffs have submitted their own evidence of what transpired at the hearing. (See id.) Although the parties' accounts differ with respect to some details, and it would have been preferable to have the recording, the Court explains below why nothing turns on the difference of precisely what Mr. Arizmendi may have said during the hearing. Even if Defendants were right that they had a legitimate basis to believe that Mr. Arizmendi may drive again in the future without a license, that would not change the outcome.

For these reasons, the Court DENIES the MSJ as to the timeliness of Mr. Arizmendi's claims.

## B. Fourth Amendment—Second Cause of Action

Plaintiffs move for summary judgment on their Fourth Amendment cause of action; Defendants move for summary judgment on the same. (See MPSJ at 20-22; MSJ at 8-10.) The Court first turns to the central issue raised by this case: whether the 30-day impounds violated the Fourth Amendment because Defendants effectuated warrantless seizures without a valid justification. Because the only possible justification was the community caretaking exception, and Defendants had no community caretaking rationale to justify the 30-day impounds (as distinguished from the initial seizures of the vehicles), the Court holds that Defendants violated Plaintiffs' Fourth Amendment rights. The Court then turns to the defenses Defendants have raised against the named Plaintiffs and finds that they do not preclude liability.

### 1. Defendants Violated Plaintiffs' Fourth Amendment Rights

Plaintiffs' primary contention in this case is that Defendants' decision to impound and hold their vehicles for 30 days violated the Fourth Amendment, regardless of whether the *initial* decision to impound the vehicles was valid.[40] Controlling Fourth Amendment precedent,

---

[40] As Plaintiffs explain, when Ms. Brewster was the sole named Plaintiff, the initial Complaint did allege that the officers lacked justification for the Impala's initial seizure, but Plaintiff's Counsel "did make the limited concession that, for the 2015 dismissal and class certification motions, the critical issue was the constitutionality of the 30 day impound separate from any community caretaking justification for the initial tow. For the sole purpose of determining that issue, Brewster's counsel told the Court to assume any initial seizure did not violate the Fourth Amendment." (MPSJ Reply at 13.) Plaintiffs argue that "because Brewster has always contended defendants lacked justification for the initial tow, Plaintiffs' individual claims can contend that towing their vehicles was not justified." (Id.) This Court, and the Ninth Circuit, have proceeded on the understanding that the classes' claims would rise and fall on the basis of the 30-day impound issue, not the legality of the initial seizure. See Brewster, 859 F.3d at 1196 ("The parties agree that the LAPD could impound—and, therefore, seize—Brewster's vehicle under section 14602.6(a)(1) pursuant to the community caretaking exception to the Fourth Amendment.") The Court briefly addresses the legality of the initial impound of Ms. (continued . . . )

---

including Brewster, 895 F.3d 1194, clearly establishes that Plaintiffs are correct: because
Defendants' rationale for the 30-day vehicle holds was punishment and deterrence, not a
community caretaking interest, the warrantless 30-day impounds were unreasonable under the
Fourth Amendment.

The Fourth Amendment protects against unreasonable searches and seizures.  U.S.
Const. amend. IV.  "A seizure is a 'meaningful interference with an individual's possessory
interests in [his] property.'"  Brewster, 859 F.3d at 1196 (quoting Soldal v. Cook County, 506
U.S. 56, 61 (1992)).  "The impoundment of an automobile is a seizure within the meaning of the
Fourth Amendment."  Miranda v. City of Cornelius, 429 F.3d 858, 862 (9th Cir. 2005).  A
seizure conducted without a warrant is "per se unreasonable under the Fourth Amendment –
subject only to a few specifically established and well delineated exceptions." Minnesota v.
Dickerson, 508 U.S. 366, 372 (1993) (internal quotation marks and citations omitted); United
States v. Hawkins, 249 F.3d 867, 872 (9th Cir. 2001).  "The burden is on the Government to
persuade the district court that a seizure comes 'under one of a few specifically established
exceptions to the warrant requirement.'"  Hawkins, 294 F.3d at 872 (citation omitted).

Long before Brewster, 895 F.3d 1194, the Ninth Circuit had recognized the only applicable
exception in the context of vehicle impoundment is the "community caretaking doctrine," which
allows the police to "impound where necessary to ensure that the location or operation of
vehicles does not jeopardize the public safety."  Miranda, 429 F.3d at 860; see also United States
v. Caseres, 533 F.3d 1064, 1074 (9th Cir. 2008) (holding that a "a vehicle can be impounded
under § 22651(h)(1) only if impoundment serves some 'community caretaking function.'")
(citation omitted).  Brewster, 859 F.3d 1194 clarified the law with regard to the application of
these principles to lengthy seizures of vehicles (e.g., the 30-day holds imposed here), but its
decision did not come out of nowhere.  Indeed, the Ninth Circuit found in Brewster that it was
"well established that a 'seizure lawful at its inception can nevertheless violate the Fourth
Amendment because its manner of execution unreasonably infringes possessory interests.'"  859
F.3d at 1196 (quoting United States v. Jacobsen, 466 U.S. 109, 124 & n.25 (1984)).  "For
example, in United States v. Dass, officers validly seized packages that they suspected contained
marijuana.  But we held that the length of the warrantless seizures—in that case, between seven
to twenty-three days—violated the Fourth Amendment."  Id. (citing Dass, 895 F.2d 414, 414-15
(9th Cir. 1988)).  It is worth quoting the next portion of Brewster, 895 F.3d 1194 at length, for the
parties debate its import:

> The parties agree that the LAPD could impound—and, therefore,
> seize—Brewster's vehicle under section 14602.6(a)(1) pursuant to
> the community caretaking exception to the Fourth Amendment.
> See United States v. Cervantes, 703 F.3d 1135, 1141 (9th Cir. 2012)
> (discussing the community caretaking exception).  But this
> exception is available only to "impound vehicles that jeopardize

_____

Brewster's vehicle, but that issue is not critical to this case either for her individual claim or any
of the classes' claims.

public safety and the efficient movement of vehicular traffic." Id.
(internal quotation marks and citation omitted). The exigency that
justified the seizure vanished once the vehicle arrived in impound
and Brewster showed up with proof of ownership and a valid
driver's license. The question we must consider is whether the
Fourth Amendment required further authorization for the LAPD
to hold the vehicle for 30 days. . . .

Because a 30-day impound is a "meaningful interference with an
individual's possessory interests in [his] property," Soldal, 506
U.S. at 61 (internal quotation marks and citation omitted), the
Fourth Amendment is implicated when a vehicle is impounded
under section 14602.6(a). The district court found that such a
seizure doesn't present a Fourth Amendment problem because
"the state has an important interest in . . . keeping unlicensed
drivers from driving illegally." But that is beside the point. The
Fourth Amendment "is implicated by a delay in returning the
property, whether the property was seized for a criminal
investigation, to protect the public, or to punish the individual." [
Sandoval v. County of Sonoma, 72 F.Supp.3d 997, 1004 (N.D. Cal.
2014).]

The Fourth Amendment doesn't become irrelevant once an initial
seizure has run its course. See Jacobsen, 466 U.S. at 124 & n.25;
Lavan v. City of Los Angeles, 693 F.3d 1022, 1030 (9th Cir. 2012);
see also Manuel v. City of Joliet, --- U.S. ----, 137 S. Ct. 911, 914,
920 (2017) (holding that the Fourth Amendment governed the
entirety of plaintiff's 48-day detention). A seizure is justified
under the Fourth Amendment only to the extent that the
government's justification holds force. Thereafter, the
government must cease the seizure or secure a new justification.
Appellees have provided no justification here. . . .

The 30-day impound of Brewster's vehicle constituted a seizure
that required compliance with the Fourth Amendment. Appellees
argue that this result frustrates the state legislature's intent to
impose a penalty on unlicensed drivers. We have no occasion to
decide whether this objective is lawful. See supra p. 1196 n.2. The
police could impound a vehicle under section 22651(p), which
authorizes impoundment when the driver doesn't have a valid
license. See Cal. Veh. Code § 22651(p). Section 22651(p) doesn't
have a mandatory 30-day hold period, thus avoiding the Fourth
Amendment problem presented by section 14602.6(a).

Id. at 1196-98.  In reaching this conclusion, the Brewster panel adopted the "thorough and well-reasoned opinion" of Judge Henderson in Sandoval, 72 F. Supp. 3d 997.  Id. at 1196.  In Sandoval, 72 F. Supp. 3d 997, the question presented was, "[a]ssuming that the initial seizure and towing of Plaintiffs' vehicles was lawful under both state and federal law, can Defendants justify, under the Fourth Amendment, the warrantless seizures of Plaintiffs' vehicles for the 30–day time period provided in California Vehicle Code § 14602.6?"  Id. at 1001.  Judge Henderson held that the answer was no, rejecting the defendants' arguments that the community caretaking rationale justified the 30-day impounds and that the seizures were otherwise reasonable.  Id. at 1006-11.  The primary authority on which Judge Henderson relied in his community caretaking analysis was Miranda, 429 F.3d 858.  See id. at 1007-09.  After the Ninth Circuit decided Brewster, 859 F.3d 1194, the Ninth Circuit affirmed Judge Henderson's opinion in Sandoval, 72 F. Supp. 3d 997 in its entirety.  See Sandoval v. Cnty. of Sonoma, 912 F.3d 509 (9th Cir. 2018).  In this Court's view, the line of cases beginning with Miranda and ending in the Ninth Circuit's affirmance in Sandoval, 912 F.3d 509 is dispositive of the outcome here.  The Court turns to a distillation of the essential reasoning of those opinions below, in conjunction with the parties' arguments.

In Sandoval, 72 F. Supp. 3d 997, the defendants argued that the thirty-day impoundment was sufficiently justified under the Fourth Amendment because Section 14602.6 allowed for it.  Id. at 1007.  That argument was, of course, squarely foreclosed by Supreme Court and Ninth Circuit caselaw.  See Miranda, 429 F.3d at 864 ("We begin with the premise, apparently not recognized by the Defendants, that the decision to impound pursuant to the authority of a city ordinance and state statute does not, in and of itself, determine the reasonableness of the seizure under the Fourth Amendment, as applied to the states by the Fourteenth Amendment."); Sibron v. New York, 392 U.S. 40, 61 (1968) ("The question in this Court upon review of a state-approved search or seizure is not whether the search (or seizure) was authorized by state law.  The question is rather whether the search was reasonable under the Fourth Amendment.").  As such, "[t]he mere fact that a state has authorized a search or seizure does not render it reasonable under the Fourth Amendment."  Sandoval, 72 F. Supp. 3d at 1007.  Judge Henderson then turned to the question of whether the 30-day seizures were reasonable because the community caretaking exception applied.  See id.

"In their 'community caretaking' function, police officers may impound vehicles that 'jeopardize public safety and the efficient movement of vehicular traffic.'"  Miranda, 429 F.3d at 864 (quoting S. Dakota v. Opperman, 428 U.S. 364, 368-69 (1976)).  "Whether an impoundment is warranted under this community caretaking doctrine depends on the location of the vehicle and the police officers' duty to prevent it from creating a hazard to other drivers or being a target for vandalism or theft."  Id.; see also United States v. Jensen, 425 F.3d 698, 706 (9th Cir. 2005) ("Once the arrest was made, the doctrine allowed law enforcement officers to seize and remove any vehicle which may impede traffic, threaten public safety, or be subject to vandalism."); Brewster, 859 F.3d at 1196 (holding that the community caretaking exception "is available only to 'impound vehicles that jeopardize public safety and the efficient movement of vehicular traffic'") (citation omitted).  "An impoundment may be proper under the community caretaking doctrine if the driver's violation of a vehicle regulation prevents the driver from lawfully

operating the vehicle, and also if it is necessary to remove the vehicle from an exposed or public location." Miranda, 429 F.3d at 865. "The violation of a traffic regulation justifies impoundment of a vehicle if the driver is unable to remove the vehicle from a public location without continuing its illegal operation." Id.

Under longstanding precedent, officers may impound a vehicle where the vehicle presents a traffic or public safety problem and the driver cannot lawfully operate the vehicle to move it to a safe location, but a driver's lack of a valid license is not sufficient by itself to justify impoundment absent traffic or public safety concerns:

> There was no community caretaking rationale for the impoundment of Caseres's car. The car was legally parked at the curb of a residential street two houses away from Caseres's home. The possibility that the vehicle would be stolen, broken into, or vandalized was no greater than if the police had not arrested Caseres as he returned home. The government has not presented any evidence that the car was blocking a driveway or crosswalk, or that it posed a hazard or impediment to other traffic. Accordingly, we conclude that there was no lawful basis to impound the vehicle and therefore the subsequent inventory search was unconstitutional.
>
> Finally, the government notes that Caseres was driving on a suspended license . . . [and argues] . . . that impounding an unlicensed driver's car to prevent its continued lawful operation is itself a sufficient community caretaking function. . . . Moreover, even if preventing future unlawful operation were a sufficient community caretaking function in and of itself, it would obviously not apply to cases like this one, where the unlicensed driver was taken into custody.

Caseres, 533 F.3d at 1075; see also Miranda, 429 F.3d at 865-66; United States v. Duguay, 93 F.3d 346, 353 (7th Cir. 1996) ("Furthermore, impoundment based solely on an arrestee's status as a driver, owner, or passenger is irrational and inconsistent with 'caretaking' functions. Under either Detective Waldrup or Detective Adams' policies, towing is required any time the arrestee is carted off to jail, regardless of whether another person could have removed the car and readily eliminated any traffic congestion, parking violation, or road hazard."); United States v. Squires, 456 F.2d 967, 970 (2d Cir. 1972) (where individual was arrested while sitting in vehicle, and "since the Cadillac was parked in the parking lot behind the apartment house in which appellant lived, which was an appropriate place for it to be, and appellant did not consent to its removal, the officers did not have a reasonable basis for concluding that it was necessary to take the Cadillac to the police station in order to protect it."); People v. Williams, 145 Cal. App. 4th 756, 763 (2006) (no community caretaking justification when the officer "admitted he decided to impound the car simply because he was arresting appellant and almost always impounded the

cars of drivers he arrested" and the car was lawfully parked in a residential neighborhood, not
blocking traffic and posed no risk of vandalism).

With this precedential background in mind, Sandoval, 72 F. Supp. 2d 997 found that the
"community caretaking exception allows the police to remove a vehicle from the streets, without
a warrant, when the vehicle poses an obstacle to the flow of traffic or otherwise jeopardizes public
safety." Id. at 1007. Moreover, "courts are unwilling to expand the community caretaking
exception beyond those narrow circumstances, and the government has the burden of proving
that the exception actually applied in the case at hand." Id. It followed from these observations
that, "[o]nce the vehicle has been removed from the street, or the threat to public safety has been
removed, the community caretaking exception no longer justifies the warrantless seizure of
property, so long as a licensed driver can take possession of the car." Id. Judge Henderson then
applied Miranda, 429 F.3d at 866 in holding that "the community caretaking exception cannot be
used to deter unlawful driving." Id. at 1008. Miranda reasoned,

> Defendants have argued that the impoundment satisfied the
> "caretaking" function by deterring the Mirandas from repeating
> this illegal activity in the future. Such a rationale would expand the
> authority of the police to impound regardless of the violation,
> instead of limiting officers' discretion to ensure that they act
> consistently with their role of "caretaker of the streets." See
> Duguay, 93 F.3d at 352. The decision to impound must be guided
> by conditions which "circumscribe the discretion of individual
> officers" in a way that furthers the caretaking purpose. [Colorado
> v. Bertine, 479 U.S. 367, 376 n.7 (1987)].
>
> While the Supreme Court has accepted a deterrence rationale for
> civil forfeitures of vehicles that were used for criminal activity, see
> Bennis v. Michigan, 516 U.S. 442, 452 (1996), the deterrence
> rationale is incompatible with the principles of the community
> caretaking doctrine. Unlike in civil forfeitures, where the seizure of
> property penalizes someone who has been convicted of a crime, the
> purpose of the community caretaking function is to remove
> vehicles that are presently impeding traffic or creating a hazard.
> The need to deter a driver's unlawful conduct is by itself
> insufficient to justify a tow under the "caretaker" rationale.

429 F.3d at 866. Judge Henderson applied this reasoning in finding that the community
caretaking exception "cannot justify the *ongoing* seizure of the vehicle after it has been removed,
much less for an arbitrary period of thirty days." Sandoval, 72 F. Supp. 3d at 1008. While
Miranda "primarily concerned the initial decision to impound, whereas this motion assumes that
the initial seizure was valid and only considered the prolonged, thirty-day period of
impoundment," its "reasoning is powerful and instructive: the deterrence rationale cannot

support the application of the community caretaking doctrine, because doing so would expand what is supposed to be a narrow exception to the warrant requirement." Id.

As noted above, the Ninth Circuit endorsed this view in Brewster, 859 F.3d 1194. And it did so again when succinctly affirming Judge Henderson's analysis on appeal:

> The County argues that [an exception to the warrant requirement] exists because we should categorically balance California's interest in deterring unlicensed drivers against drivers' interests in maintaining possession of their vehicles. But as explained in Brewster, the state's interest in keeping unlicensed drivers off the road is governed by the "community caretaking" exception, which permits government officials to remove vehicles from the streets when they "jeopardize public safety and the efficient movement of vehicular traffic." Id. (quoting Cervantes, 703 F.3d at 1141). Whether this exception applies turns on the facts and circumstances of each case. [Miranda, 429 F.3d at 864.] Accordingly, the community caretaking exception does not categorically permit government officials to impound private property simply because state law does. See id. ("[T]he decision to impound pursuant to authority of a city ordinance and state statute does not, in and of itself, determine the reasonableness of the seizure under the Fourth Amendment").

> Moreover, the County's framing of the issue is incorrect. Even if we were to balance California's interest against all California driver's interests, as is sometimes appropriate, see Hudson v. Palmer, 468 U.S. 517, 538 (1984) (O'Connor, J., concurring), the County would still be wrong to rely on a deterrence or administrative penalty rationale to support California's interests. See Brewster, 859 F.3d at 1196 ("The exigency that justified the seizure vanished once the vehicle arrived in impound and Brewster showed up with proof of ownership and a valid driver's license"); Miranda, 429 F.3d at 866 ("The need to deter a driver's unlawful conduct is by itself insufficient to justify a tow under the 'caretaker' rationale"). Whatever force those rationales may have in the forfeiture context, where a court approves the deprivation, see [Bennis, 516 U.S. at 452], they do not permit the continued warrantless seizure of a vehicle once the community caretaking function is discharged. Miranda, 429 F.3d at 866. The County having failed to raise any other reason why the warrantless impound of Sandoval's vehicle might satisfy the Fourth Amendment, we hold that the district court did not err in granting summary judgment to Sandoval on this issue.

The City relies on similar arguments, which we likewise reject as
foreclosed by our case law. . . . The City comes closer to the mark
with its argument that, even if section 14602.6 impounds are not
per se reasonable, the impound of Ruiz's truck in particular did not
violate the Fourth Amendment.  As we intimated in <u>Brewster</u>, a
prolonged seizure may not violate the Fourth Amendment if the
government retains justification for the seizure after the initial
justification dissipates.  <u>See</u> 859 F.3d at 1197 ("A seizure is justified
under the Fourth Amendment only to the extent that the
government's justification holds force.  Thereafter, the
government must cease the seizure or secure a new justification");
<u>see also</u> <u>United States v. Sullivan</u>, 797 F.3d 623, 634–35 (9th Cir.
2015) (concluding that 21-day warrantless seizure was reasonable
under the totality of the circumstances).  Thus, the impoundment
of Ruiz's vehicle might nonetheless be reasonable if the City had a
justification for continuing to seize the vehicle once it was safely
towed.

The City's argument fails, however, because no such justification
exists.  Once Ruiz was able to provide a licensed driver who could
take possession of the truck, the City's community caretaking
function was discharged.  <u>Cf.</u> <u>Brewster</u>, 859 F.3d at 1196 ("The
exigency that justified the seizure vanished once the vehicle arrived
in impound and Brewster showed up with proof of ownership and a
valid driver's license").  The City argues that its continued
possession was necessary because Ruiz did not have a valid driver's
license.  But, even if Ruiz could not have driven his vehicle on
California's roads, he could have lent the truck to a friend, sold the
truck, used it for storage, or taken any other innumerable possible
actions that a property owner can lawfully take with his or her
property.  The City has not provided us with any reason that a
government may warrantlessly interfere with private possessory
interests in this way, beyond its general argument that such
impounds are justified as a deterrent or penalty.  Because we reject
those arguments, at least on the facts of this case, the district court
did not err by entering summary judgment in favor of Ruiz.

<u>Sandoval</u>, 912 F.3d at 515–17.

California courts have recognized the same principles:

What is not present is an adequate community caretaking function
served by the impound here.  There was no evidence petitioner's

---

> car blocked traffic or was at risk of theft or vandalism; the Impala
> was legally parked in a parking space in a public parking lot.
> Although the detectives testified it was common (and thus part of
> the policy) to tow when the driver had a suspended license, to
> prevent more driving under a suspended license, this policy does
> not provide a community caretaking function for the tow. The
> detectives did not afford petitioner the opportunity to call someone
> to drive his car to another location.

Blakes v. Superior Ct., 72 Cal. App. 5th 904, 914 (2021), reh'g denied (Jan. 3, 2022).

Applying these authorities to the facts at hand is a relatively simple exercise. It is undisputed that the 30-day impounds of Plaintiffs' vehicles were warrantless seizures and that they were thus presumptively or *per se* unreasonable unless an exception to the warrant requirement applies. See Sandoval, 912 F.3d at 515 ("The parties do not dispute that neither the County nor City officials who impounded the plaintiffs' vehicles had warrants authorizing the impound, so we begin from the premise that the impounds were unreasonable."); Dickerson, 508 U.S. at 372; United States v. Place, 462 U.S. 696, 701 (1983) ("In the ordinary case, the Court has viewed a seizure of personal property as *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause"). It is Defendants' burden to demonstrate that the seizures come within one of the "few specifically established exceptions to the warrant requirement." Hawkins, 294 F.3d at 872 (citation omitted). Defendants needed a justification not just to impound the vehicles initially, but to retain the vehicles for 30 days. See Sandoval, 912 F.3d at 516; Brewster, 859 F.3d at 1197 ("A seizure is justified under the Fourth Amendment only to the extent that the government's justification holds force. Thereafter, the government must cease the seizure or secure a new justification.").

The Motions are dispositive of the legal claims in this longstanding case, in which the central issue is whether Defendants had a valid justification under the Fourth Amendment to retain the vehicles for 30 days. And though this is the single most important issue in the case, Defendants' response is telling: they merely argue that they did not need a new "justification" for the impounds (a contention addressed, and rejected, below), and in a half-sentence framed in the alternative in connection to *one* of the three named Plaintiffs, claim in the most conclusory fashion that "community caretaking interests justified the continued impound of the vehicle." (MSJ at 9.) It is Defendants' choice not to expressly concede the dispositive issue in briefing the Motions, but even so, the conclusion is inescapable: Defendants do not have, and never have had, a community caretaking rationale to justify the *30-day* impounds of Plaintiffs' or class members' vehicles. Rather, the justification for the continued impounds of the vehicles has always been to punish and deter unlicensed driving. Indeed, Defendants have admitted as much, at least before they realized that this was fatal to their case when the argument was rejected in Brewster, 859 F.3d 1194. Before the Ninth Circuit weighed in, Defendants argued that their enforcement of Section 14602.6 was designed to "deter future wrongdoing" and that the 30-day impounds are a "valid administrative penalty." (Opposition to PI Motion at 14.) At the Ninth Circuit,

Defendants made the same argument, noting that if they were not allowed to impose the 30-day impounds, it would "frustrate the legislature's intent to impose a penalty on unlicensed drivers." Brewster, 859 F.3d at 1197.  As the parties and the Court now all understand from binding Ninth Circuit precedent, it is "wrong to rely on a deterrence or administrative penalty rationale" to advance governmental interests in protecting the public from unlicensed drivers by imposing warrantless seizures.  Sandoval, 912 F.3d at 516.  And, of course, a "penalty" is by definition "*punishment* imposed on a wrongdoer[.]"  *Penalty*, Black's Law Dictionary 1313 (10th ed. 2014) (emphasis added); cf. Austin v. United States, 509 U.S. 602, 622 (1993) (adopting Court of Appeals' statement as to whether the government was "exacting too high a penalty in relation to the offense committed" in its Eighth Amendment Excessive Fines Clause analysis).

The only possible exception to the warrant requirement that could justify the 30-day seizures of the vehicles of Plaintiffs' and members of the classes was the community caretaking exception.  Defendants did not have a community caretaking rationale to justify continued impoundment of the vehicles for 30 days.  As set out below, the Court rejects Defendants' other arguments regarding the claims of the named Plaintiffs.  As such, the seizures of Plaintiffs' vehicles were unreasonable under the Fourth Amendment.

### 2.  None of Defendants' Arguments as to the Named Plaintiffs Have Merit

Almost certainly because they have no argument as to the central Fourth Amendment issue in this case—the need for a justification for the 30-day impounds distinct from that which justified the *initial* decisions to impound the vehicles—Defendants raise various arguments why the named Plaintiffs' claims fail.  The overriding contention as to all three relies on a misguided and excessively literal reading of Brewster, 859 F.3d 1194.  Defendants begin with the contention that it is undisputed that the named Plaintiffs' vehicles were lawfully impounded in the first place.  As briefly noted below, that is likely wrong as to at least Ms. Brewster, but it is almost certainly an accurate observation as to many, if not most, of the members of the certified classes. It is the next move in Defendants' argument that is deeply problematic.  Defendants rely upon a single sentence in Brewster, "[t]he exigency that justified the seizure vanished once the vehicle arrived in impound and Brewster showed up with proof of ownership and a valid driver's license," id. at 1196, in service of an argument that this precise set of facts was the only possible way the Ninth Circuit stated an individual could require "the government [to] cease the seizure or secure a new justification."  Id. at 1197.  That is, of course, not true: the Brewster panel was simply summarizing what it believed to be the undisputed facts *as they related to Ms. Brewster's case individually* and explained why they required the release of her vehicle absent a continued or new justification.  In other words, this sentence in Brewster was not intended to define the elements of a Fourth Amendment claim for all people in all circumstances; it simply explained that, once Ms. Brewster indicated she was the registered owner of the vehicle and presented a validly licensed driver (as stated in the opinion, herself, though a validly licensed friend or family member acting as her agent would be equally permissible), Defendants were obligated to release the Impala.

The Ninth Circuit expanded upon, and clarified, this point in <u>Sandoval</u>, 912 F.3d 509.
There, the panel reasoned,

> As we intimated in <u>Brewster</u>, a prolonged seizure may not violate
> the Fourth Amendment if the government retains justification for
> the seizure after the initial justification dissipates.  <u>See</u> 859 F.3d at
> 1197 ("A seizure is justified under the Fourth Amendment only to
> the extent that the government's justification holds force.
> Thereafter, the government must cease the seizure or secure a new
> justification"); <u>see also</u> <u>United States v. Sullivan</u>, 797 F.3d 623,
> 634–35 (9th Cir. 2015) (concluding that 21-day warrantless seizure
> was reasonable under the totality of the circumstances).  Thus, the
> impoundment of Ruiz's vehicle might nonetheless be reasonable if
> the City had a justification for continuing to seize the vehicle once
> it was safely towed.
>
> The City's argument fails, however, because no such justification
> exists.  Once Ruiz was able to provide a licensed driver who could
> take possession of the truck, the City's community caretaking
> function was discharged.  <u>Cf.</u> <u>Brewster</u>, 859 F.3d at 1196 ("The
> exigency that justified the seizure vanished once the vehicle arrived
> in impound and Brewster showed up with proof of ownership and a
> valid driver's license").

<u>Id.</u> at 516-17.  Reading <u>Brewster</u> and <u>Sandoval</u> together, the Ninth Circuit has clearly stated that
once a registered owner is "able to provide a licensed driver who could take possession" of the
vehicle, <u>Sandoval</u>, 912 F.3d at 516, the initial justification for the seizure dissipates or vanishes.
<u>See</u> <u>Untalan v. Stanley</u>, 2023 WL 2158371, at *2 (9th Cir. Feb. 22, 2023) (unpublished) ("In both
cases, we concluded that the government's community-caretaking justification for impounding a
vehicle no longer held force once a licensed driver was available to take possession of the car.").

Defendants have raised the curious argument that <u>Sandoval</u> supports their position
because a "30-day impound is not necessarily unconstitutional," as the Ninth Circuit recognized
in that decision.  (MSJ at 21; MPSJ Opposition at 8.)  Neither Plaintiffs nor the Court questions
this.  But as noted already, if one reads the part of <u>Sandoval</u> that Defendants cite to, it is
abundantly clear that the Impound Policy *is* unconstitutional in the way that it authorized 30-day
impounds:

> The plaintiffs argue that because warrantless seizures are per se
> unreasonable, every member of their proposed classes could
> establish liability solely because their vehicles were impounded for
> 30 days. . . .  But, as this opinion makes clear, a 30-day impound
> does not necessarily violate the Fourth Amendment.  Instead, such
> a prolonged seizure is only unconstitutional when it continues in

the absence of a warrant or any exception to the warrant
requirement.  See Brewster, 859 F.3d at 1197.

Id. at 518-19.  The Impound Policy is unconstitutional because it authorizes 30-day impounds "in
the absence of a warrant or any exception to the warrant requirement," because Defendants have
no community caretaking rationale for the 30-day impounds.  Defendants also know this to be
true, notwithstanding the meekest of arguments advanced here, because they immediately halted
30-day impounds once they lost in Brewster, 859 F.3d 1194.

Moreover, though debating this is somewhat beside the point because it is not decisive for
class relief, Defendants are likely wrong that the initial impound of Ms. Brewster's vehicle was
indisputably justified by the community caretaking doctrine.  In summary, the undisputed facts
show that the car was being driven by an unlicensed driver; when officers elected to impound the
Impala, it was lawfully parked at a legal location and was not a traffic hazard; there were two
licensed drivers available in the car to drive it away; the officers verified the validity of at least
Mr. Johnson's driver's license; Ms. Brewster was nearby as well and arrived within 20 minutes;
the individuals on scene either had Ms. Brewster's explicit permission to drive the car away or
would have had it; and all parties pleaded with the officers not to impound the vehicle and
instead release it to the care of a licensed driver.  (See PCSSUF ¶¶ 16-24.)  Officers ignored all
these factors and decided to impound the vehicle because it was being driven by an unlicensed
driver, apparently one with a prior conviction.  (See id.)  Because the undisputed evidence shows
that the car was legally parked; there is no suggestion that it posed a risk of being stolen or
vandalized; it was not blocking a road or crosswalk and posed no hazard or impediment to traffic;
and there was no risk that the vehicle would be immediately driven away by an unlicensed driver,
the initial impound was likely not justified by a community caretaking rationale.  See Caseres, 533
F.3d at 1075; Duguay, 93 F.3d at 353.  The Court declines to weigh in on whether the initial
impounds of Mr. Arizmendi's or Mr. Vigil's vehicles were justified by the Fourth Amendment.
In any event, Defendants are wrong to claim that any of the named Plaintiffs "never rebutted the
undisputedly legitimate impound" of their vehicles.  (MSJ at 8.)  At its core, the argument rests
on impermissible burden-shifting, for the government always retains the burden of justifying a
warrantless seizure.  Hawkins, 294 F.3d at 872.  The Court addresses the individual arguments
Defendants make against each named Plaintiff below.

### a. Ms. Brewster

As to Ms. Brewster, Defendants' argument that they did not need to secure a new
justification for the 30-day impound is absurd.  As already noted, the Ninth Circuit stated that
"the exigency that justified the seizure vanished once the vehicle arrived in impound and
Brewster showed up with proof of ownership and a valid driver's license."  Brewster, 859 F.3d at
1196.  Defendants claim that "Brewster never showed up to request the release of her vehicle, as
she did not attend the vehicle storage hearing."  (MSJ at 8.)  As Defendants are well aware, Ms.
Brewster was dealing with her daughter's hospitalization at the time of this unfortunate series of
events—almost certainly why she sent her attorney to represent her at the storage hearing, Ms.
Anderson-Barker.  (PCSSUF ¶ 27; DSSUF ¶¶ 5, 7; PSSGD ¶ 8.)  The statute expressly allows

for such representation.  See Cal. Veh. Code § 22852(a) ("the agency or person directing the storage shall provide the vehicle's registered and legal owners of record, or their *agents*, with the opportunity for a poststorage hearing to determine the validity of the storage.").  It defies credulity to think that the Ninth Circuit suggested it was impermissible for Ms. Brewster to retain a lawyer to represent her at the storage hearing to seek its release.  It is also undisputed that Ms. Anderson-Barker presented every factual and legal prerequisite to the release of the vehicles and that the car had a valid registration, and that she provided copies of the driver's licenses of Ms. Brewster and Mr. Johnson to the hearing examiner in service of an argument that a licensed driver could take possession of the vehicle.  (See PCSSUF ¶¶ 27-29; DSSUF ¶ 12; PSSGD ¶ 12; PAMF ¶ 5.)

Defendants also argue that, at the time of the storage hearing and through the entirety of the storage of the vehicle, Ms. Brewster (unknowingly) lacked a valid driver's license.  (MSJ at 8.)  This is an irrelevant and misleading post-hoc rationalization of Defendants' refusal to release the vehicle.  The Court has outlined in rather painstaking detail above the exact sequence of events regarding Defendants' refusal to release the vehicle and its eventual release, including who knew what when about Ms. Brewster's license being suspended and why LAPD denied the release of the vehicle at the conclusion of the storage hearing.  (See Section II.B.7; DSSUF ¶ 12; PSSGD ¶ 12; PCSSUF ¶¶ 27-34; DSGMF ¶ 33; PAMF ¶¶ 1-10; Brewster Dep. 87:18-25.)  In sum, the fact that Ms. Brewster's license was, in fact, suspended at the time had nothing to do with anything: the storage hearing examiner (and LAPD) did not know the license was suspended when Defendants initially refused to release the vehicle; as Ms. Anderson-Barker made clear, multiple licensed drivers were available to drive away the vehicle from the impound lot (including Mr. Johnson); even though Ms. Anderson-Barker made all the correct legal and equitable arguments about the illegality of the ongoing impound and the mitigating circumstances surrounding it, Defendants ignored them and refused to release the vehicle because, in their view, Section 14602.6 stated they could; Defendants never once informed Ms. Brewster that her license was suspended; had they let her know, Ms. Brewster would have made arrangements for a family member or friend to take the car (as she states in her sworn declaration); only after Ms. Brewster's attorney made a written complaint to Chief Beck and the Internal Affairs Division did LAPD contemplate the release of the vehicle; Internal Affairs learned Ms. Brewster's license was suspended; and even though at that point Defendants knew of the license suspension, due to "special circumstances" involving the medical treatment of Ms. Brewster's daughter (while denying any wrongdoing) Defendants authorized the release of the vehicle "to a licensed driver." (See id.)  Defendants' own course of conduct proves the irrelevance of Ms. Brewster's license suspension: it had nothing to do with the initial denial of release because Defendants did not know about it at that time, and when they later learned of it, they decided to release the vehicle *anyway* because a licensed driver was available to pick it up.  It is also of no moment that the vehicle ended up being released to Superior Auto Center, for as noted above, Defendants authorized the release of the vehicle to a licensed driver before Superior Auto Center intervened to reclaim possession of it, and Ms. Brewster's family was not allowed to take possession of the vehicle until the 30 days had run.

**CIVIL MINUTES—GENERAL**

Defendants finally argue that Ms. Brewster's Fourth Amendment claim "fails because she cannot establish that she suffered any damages." (MSJ at 9.) That is because, according to Defendants, at the time of the impound Ms. Brewster was not using the vehicle and did not consider it "her" vehicle, and after the legal owner repossessed the vehicle, she did not personally pay anything to retrieve it from the legal owner. (Id. at 10.) "Therefore, Brewster suffered no actual injury from the impound and storage of the vehicle." (Id.) The undisputed facts simply show that Ms. Brewster had not driven the Impala for approximately three months before it was impounded and that she primarily considered it her sister's vehicle. (DSSUF ¶¶ 13-14; PSSGD ¶ 14.) But these contentions simply go to the *extent* of any damages flowing from Ms. Brewster's injuries; they do not establish that she suffered *no injury at all*. As a purely legal matter, Ms. Brewster was the registered owner of the vehicle, and the Vehicle Code contemplates a rather common arrangement that appears to have been used by the Brewster family: multiple individuals shared a kind of joint ownership over the vehicle and used it at various times. See Cal. Veh. Code § 460 ("An 'owner' is a person having all the incidents of ownership. . . ."); McClary v. Concord Ave. Motors, 202 Cal. App. 2d 564 (1964) ("There may be several 'owners' at any one time [under the Vehicle Code]."); Everly v. Creech, 139 Cal. App. 2d 651 (1956) ("The definition of an owner [under the Vehicle Code] does not apply in all circumstances and one may be an owner of a car although he has not transferred the title in the manner required by the Vehicle Code.") (citation omitted). The Court explains in much greater detail below why Plaintiffs' general damages methodology is reasonable, but it suffices to say now that, regardless of whether she would or could have lawfully driven the vehicle during the 30 days, Defendants' constitutional violations deprived Ms. Brewster of the "right to possess [her] vehicle, the right to rent it, the right to ride as a passenger, the right to lend it to lawful drivers (including family members, spouses, and friends), and the right to sell the vehicle," among other rights. (MTD TAC Order at 7.) See Sandoval, 912 F.3d at 517 ("The City argues that its continued possession was necessary because Ruiz did not have a valid driver's license. But, even if Ruiz could not have driven his vehicle on California's roads, he could have lent the truck to a friend, sold the truck, used it for storage, or taken any other innumerable possible actions that a property owner can lawfully take with his or her property."). And, as explained below, courts have held that vehicle owners deprived of their cars are entitled to the rental value of the chattel during the period of the deprivation even when they arguably suffered no "harm" because they were not using the subject matter at the time or had a substitute. See, e.g., Ferrari v. Cnty. of Suffolk, 2015 WL 3853489, at *4-6 *E.D.N.Y. Feb. 25, 2015); PurCo Fleet Servs., Inc. v. Koenig, 240 P.3d 435, 440 (Colo. App. 2010), aff'd on other grounds, 285 P.3d 979 (Colo. 2012); Restatement (Second) of Torts § 931. In the alternative, if a plaintiff provides insufficient proof of an entitlement to such compensatory damages, she is nonetheless entitled to nominal damages. See id. The Court finds that Ms. Brewster is entitled to compensatory damages, but even if she were not, she, like other Section 1983 plaintiffs, would be entitled to nominal damages for a violation of her constitutional rights and her claims can proceed on that basis. See Uzuegbunam v. Preczewski, 141 S. Ct. 792 (2021); Farrar v. Hobby, 506 U.S. 103, 113 (1992). Ms. Brewster suffered an actual injury when Defendants violated her Fourth Amendment rights; as such, she prevails on that cause of action.

//

### b. Mr. Arizmendi

Defendants acknowledge that Mr. Arizmendi attended a storage hearing, but claim that he did not "present" a licensed driver to the detective conducting the storage hearing. (MSJ at 8.) This is a misleading characterization of the facts in the record and comes close to an outright misrepresentation. First, it is undisputed that Mr. Arizmendi was the registered owner of the vehicle and the vehicle's registration was current by the time of the storage hearing. (PCSSUF ¶ 37.) Second, it is undisputed that, on all *three days* Mr. Arizemendi sought the release of his vehicle, including the day of the storage hearing, Mr. Arizmendi had a licensed driver available at the station to take the vehicle. (Id. ¶¶ 37-40.) Moreover, Mr. Arizmendi's lawyer, Ms. Anderson-Barker, spoke with LAPD Detective Helen Papietro on August 7, 2014, and told her that there was no lawful basis to refuse to release the Sienna because the vehicle was now registered to him, had current valid registration, and Mr. Arizmendi had a licensed driver available (Mr. Husman) to take the vehicle; she reiterated those points at the August 11 storage hearing. (Id. ¶¶ 38-40.) Indeed, on the day of the storage hearing, Mr. Husman accompanied Mr. Arizmendi to the station and was waiting outside of it during the storage hearing. (DSSUF ¶ 18; PSSGD ¶ 18.) It is disputed whether Ms. Anderson-Barker referenced the presence of Mr. Husman during the storage hearing itself; she claims she did, and regardless, it is undisputed that Detective Papietro knew about the availability of a licensed driver from the earlier phone conversation. But even to the extent Defendants can claim that Mr. Arizmendi did not "present" Mr. Husman at the storage hearing itself, that is only based on a wholly unpersuasive willful ignorance rationale: Detective Papietro did not directly inquire into the existence of a licensed driver at the storage hearing because she considered it immaterial to her decision. (See DSSUF ¶ 18; PSSGD ¶ 18.) As explained elsewhere in this order, that viewpoint was wrong: the continued impound of Mr. Arizmendi's vehicle was illegal, in part because he had done everything necessary to obtain its release.

Defendants' other argument is that the refusal to release Mr. Arizmendi's vehicle was justified because he "represented that he would continue to drive the vehicle without a valid driver's license." (MSJ at 9.) As noted above, what exactly Mr. Arizmendi did or did not say at that storage hearing is disputed because Defendants destroyed the audio recording of the hearing pursuant to a three-year retention policy, even though Mr. Arizmendi was a member of the putative class in the original Complaint and the Ninth Circuit had reversed this Court's dismissal of the Complaint *before* the three years had run. It hardly needs to be said that Defendants' destruction of relevant evidence should not inure to their benefit, and it would be especially inappropriate to accept Defendants' contested version of the facts in ruling on their motion for summary judgment. Had Plaintiffs filed a motion for sanctions for Defendants' spoliation of evidence, the Court would have given it serious consideration, because Defendants appear to bear the minimum level of culpability for such a sanction, even if there was no bad faith. See Fed. R. Civ. P. 37(e); West v. Goodyear Tire & Rubber Co., 167 F.3d 776, 779 (9th Cir. 1999); Leon v. IDX Sys. Corp., 464 F.3d 951, 958 (9th Cir. 2006); Glover v. BIC Corp., 6 F.3d 1318, 1329 (9th Cir. 1993); Akiona v. United States, 938 F.2d 158, 161 (9th Cir. 1991); In re Napster, 462 F. Supp. 2d 1060, 1067 (N.D. Cal. 2006). But there is another, arguably more fundamental, reason why the Court cannot rely upon Defendants' evidence concerning what Mr. Arizmendi said at the

hearing: it is based on a Spanish-to-English translation without any underlying evidence to
explain why the translator is qualified.  Defendants provide declaration testimony from the
hearing officer, Detective Papietro, as well as her contemporaneous records from the hearing.
The latter makes clear that she does not speak Spanish, and that she therefore could not
determine herself what Mr. Arizmendi said.  That is why "Joel Hernandez" was "present for
translation" at the hearing, and why Mr. Arizmendi "made a statement to Hernandez."  (MSJ
Ex. 7.)  In her declaration, Detective Papietro simply declares, "[p]resent at Mr. Arizmendi's
storage hearing on August 11, 2014 were Mr. Arizmendi, his attorney Cynthia Anderson-Barker,
a translator for Mr. Arizmendi, the impounding officers, Officer Woodard and Officer Grant, and
myself."  (Papietro Declaration ¶ 6.)  But Defendants have not offered a single fact as to who Joel
Hernandez is, whether he speaks Spanish fluently, whether was qualified to translate, or whether
he speaks Spanish at all.   "Witness testimony translated from a foreign language must be
properly authenticated and any interpretation must be shown to be an accurate translation done
by a competent translator."  Jack v. Trans World Airlines, Inc., 854 F. Supp. 654, 659 (N.D. Cal.
1994) (citing Fed. R. Evid. 604 and 901).  Jack excluded translations for lack of foundation
because the proponent of the evidence provided an unsworn statement from an individual who
declared them to be "true and correct" which did not "describe the maker's qualification or
expertise regarding language translation" and did not state that the declarant made the
translation himself or herself.  Id. at 659.  Courts in the Central District regularly exclude such
translations that lack authentication.  See, e.g., Fonseca v. Hall, 568 F. Supp. 2d 1110, 1125 n.10
(C.D. Cal. 2008) ("The purported declarations are in Spanish with English 'translations'
attached.  However, the translations are not by certified interpreters, or any identified person;
thus, they are not properly authenticated and, as such, are inadmissible in this proceeding.");
The Sunrider Corp. v. Bountiful Biotech Corp., 2010 WL 4590766, at *16 (C.D. Cal. Oct. 8,
2010), report and recommendation adopted, 2010 WL 4589156 (C.D. Cal. Nov. 3, 2010) (finding
Chinese-to-English translations inadmissible where there was "no evidence that either Hsueh or
the office assistant whom he said prepared a Chinese-language translation of the declarations are
competent translators" and that the translations were done "accurately and completely").  In
contrast, Plaintiffs have submitted a sworn declaration that Ms. Anderson-Barker is bilingual and
speaks Spanish fluently, from which the Court has sufficient basis to conclude that she can
accurately understand and relate Mr. Arizmendi's Spanish-language statements at the hearing.
(Anderson-Barker Supplemental Declaration ¶¶ 1-3.)  See, e.g., Quezada v. Schneider Logistics
Transloading & Distribution, 2013 WL 1296761, at *3 (C.D. Cal. Mar. 25, 2013) (finding
translations admissible when the translator, plaintiff's counsel, provided a sworn declaration that
she is "fluent in both the English and Spanish languages" and overruling defendant's objections
that "the translator is biased because she is acting as plaintiffs' counsel" and that the translation
needed to have been done by a court-certified translator); Rosario-Guerrro v. Orange Blossom
Harvesting, 265 F.R.D. 619, 624 (M.D. Fla. 2010) (finding translations admissible when the
proponent submitted a declaration stating that he is bilingual in Spanish and English and had
been used an official interpreter in informal legal processes).  As such, the Court finds
Defendants' evidence regarding what Mr. Arizmendi said at the hearing inadmissible and does
not rely upon it.

Even if the Court considered the parties' disputed evidence (including Defendants' version of the facts), it would be unnecessary to resolve the precise question of what Mr. Arizmendi said at the hearing. For purposes of the legal analysis presented by the Motions, the Court could assume what does not appear to be in dispute: that Mr. Arizmendi acknowledged he had driven without a license in the past; that he did not currently have a driver's license and did not know when he would be able to get one; that he has driven the car in the past on an infrequent basis when his wife was unavailable, such as to take their children to school; that he never said he would *immediately* drive the car again if the vehicle were to be released to him; and he never said he had any specific plans to drive the car on any given day, inside or outside the 30-day hold period. (See DSSUF ¶ 17; MPSJ Ex. Y; Anderson-Barker Supplemental Declaration ¶¶ 1-5.) And though it excludes the evidence upon which the argument relies, the Court will even assume the general inference that Defendants ask the Court to draw from this evidence and reject it as an alternative holding: that the hearing officer believed that Mr. Arizmendi may have driven the vehicle again without a license at some point in the future, including possibly during the 30-day impound period, and that she reasonably believed the 30-day impound was necessary to deter future unlawful driving. As set out below, that does not preclude Mr. Arizmendi's entitlement to relief, or that of other members of the certified classes.

Defendants essentially make the argument that if they believe an individual will drive the vehicle again without a license, they are entitled to hold the vehicle for the full 30 days authorized by statute, even if the vehicle is lawfully registered and a licensed driver was available to drive the car from the impound lot. Defendants cite no authority for this proposition, almost certainly because there is none. Of course, that does not necessarily mean that Defendants are wrong, and it must be said that there is an intuitive appeal to the argument. But a deeper analysis of the roots of the argument, and the potential consequences if it were adopted, reveal why the Court must reject it.

The Court begins with the assumption, even though it is not directly at issue here, that Defendants had the right to refuse to release a vehicle to an individual who posed an *immediate* threat of unlawfully operating the vehicle. Case law suggests that, for example, where an unlicensed driver is the sole occupant of the vehicle, no one else is available to drive it, and there are legitimate concerns that the vehicle poses an obstacle to the efficient movement of traffic or a threat to public safety such that the vehicle could be stolen or vandalized, an impound may be justified. Indeed, S07 itself states that an (initial) impound may be justified on community caretaking grounds when it is necessary "[t]o prevent the *immediate* and continued unlawful operation of the vehicle (e.g., licensed driver not immediately available)." (S07) (emphasis added). This statement of law appears to have its origins in opinions of the California Court of Appeals. The first such case is likely People v. Burch, 188 Cal. App. 3d 172 (Ct. App. 1986), which upheld an impound in part because "[t]he officer testified it was his regular procedure upon citing a driver for a violation of Vehicle Code section 14601 to have the car towed so as to prevent the driver from simply getting back into his vehicle and driving away." Id. at 180. People v. Benites, 9 Cal. App. 4th 309 (1992) upheld an impound where a driver's suspended license was part of the totality of the circumstances:

In the instant case, appellant was pulled over on a valid traffic stop and acknowledged he had a suspended license. Deputy Holland cited him pursuant to Vehicle Code section 14601, and then decided to impound the van after learning that the passenger also lacked a valid license. Holland testified that he felt impoundment was his only option based on the circumstances: the van and trailer were parked off the highway approximately three miles from Jamestown and any public phones; it was a dark, lonely and isolated stretch of road; there was the possibility that appellant would simply drive off once Holland left; it was very late at night; and the van and trailer could be vandalized if left on the highway. The impoundment decision was reasonable under the circumstances.

Id. at 326. Williams, 145 Cal. App. 4th 756 cited Benites and Burch in the following analysis:

No community caretaking function was served by impounding appellant's car. The car was legally parked at the curb in front of appellant's home. The possibility that the vehicle would be stolen, broken into, or vandalized was no greater than if Morton had not stopped and arrested appellant as he returned home. In this regard, it is significant that other cars were parked on the street and that it was a residential area. The prosecution made no showing that the car was blocking a driveway or crosswalk, or that it posed a hazard or impediment to other traffic. Because appellant had a valid driver's license and the car was properly registered, it was not necessary to impound it to prevent immediate and continued unlawful operation. (Cf. People v. Benites (1992) 9 Cal. App. 4th 309 [impoundment proper where neither driver nor passenger had valid driver's license]; People v. Burch (1986) 188 Cal. App. 3d 172, [impoundment proper where car's registration tag was expired and driver's license was suspended].) No other justification that would further a community caretaking function was offered or supported by evidence. Indeed, Morton admitted he decided to impound the car simply because he was arresting appellant and almost always impounded the cars of drivers he arrested. The prosecution simply did not establish that impounding appellant's car served any community caretaking function. It therefore failed to establish the constitutional reasonableness of the seizure and subsequent inventory search.

Id. at 762-63. Following Benites but before Brewster, 859 F.3d 1194 and Sandoval, 912 F.3d 509, the Ninth Circuit limited the reach of these cases in Caseres, 533 F.3d 1064:

Finally, the government notes that Caseres was driving on
a suspended license and cites People v. Benites, 9 Cal. App. 4th 309
(1992) for the proposition that impounding an unlicensed driver's
car to prevent its continued unlawful operation is itself a sufficient
community caretaking function.  First, we doubt that Benites
stands for such a proposition—in that case, the vehicle was five
miles from any town on "a dark, lonely and isolated stretch of
road" where it "could be vandalized," so other community
caretaking factors applied.  Id. at 523; see also Miranda v. City of
Cornelius, 429 F.3d 858, 866 (9th Cir.2005) (noting that the
rationale of impounding vehicles merely to deter future illegal
activity "is incompatible with the principles of the community
caretaking doctrine").  Moreover, even if preventing future
unlawful operation were a sufficient community caretaking
function in and of itself, it would obviously not apply to cases like
this one, where the unlicensed driver was taken into custody.
Here, unlike in Benites, there was no fear that Caseres "would
simply drive off once [the police officer] left." 11 Cal. Rptr. 2d at
523.

Id. at 1075.  Notwithstanding the limitations imposed on impound authority raised in Caseres and
the other cases cited heretofore, the cases may stand for the following proposition: that it is a
valid component of the community caretaking analysis for the on-scene officer to fear that, if the
unlicensed driver is cited and released (and the car is not driven away by a licensed friend or
family member), the driver can simply drive the car away once the officer leaves, and to attempt
to avoid that result with an impound.  By analogy, once an unlicensed driver's vehicle has *already*
been impounded and she thereafter shows up at the police station seeking the release of her
vehicle, and tells the police agency that she remains unlicensed, has no licensed driver to take the
car, and simply wants to drive the car off the impound lot without a valid license, a police agency
can refuse to let her do that.  Cf. Cal. Veh. Code § 22651(f) (impounded vehicles "shall not be
released to the registered owner or his or her agent, except upon presentation of the registered
owner's or his or her agent's currently valid driver's license to operate the vehicle and proof of
current vehicle registration, to the impounding law enforcement agency, or upon order of a
court.").  But it is another matter entirely for a police agency like LAPD to retain the authority,
at its sole discretion, to refuse to release vehicles based on the *subjective belief* that there is a
*possibility* that an individual may drive the vehicle at some point within the 30-day window
unlawfully.

For one, Defendants' position is divorced from any firm rooting in the community
caretaking doctrine.  It is essentially just recycling the deterrence rationale, which the Court has
already discussed at considerable length and rejected, as it must under binding Ninth Circuit
precedent.  Lest there be any doubt about the prior reasoning, the Ninth Circuit has
unequivocally stated, "[u]nlike in civil forfeitures, where the seizure of property penalizes
someone who has been convicted of a crime, the purpose of the community caretaking function is

to remove vehicles that are *presently impeding traffic or creating a hazard*."  Miranda, 429 F.3d at 866 (emphasis added).  This distills Supreme Court precedent on the community caretaking doctrine, which does not create some generalized "public safety" exception to the warrant requirement.  As S07 itself appears to acknowledge with its emphasis on stopping the *immediate* threat of unlawful operation of a vehicle, the Supreme Court has discussed "public safety" concerns in conjunction with the community caretaking doctrine only in the context of a narrow and immediate threat to roadway safety.  The two primary pronouncements from the high court on the subject are as follows:

> Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office.  Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature.  Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.

Cady v. Dombrowski, 413 U.S. 433, 441 (1973).  Three years later, the Supreme Court taught the following:

> In the interests of public safety and as part of what the Court has called "community caretaking functions," [Cady, 413 U.S. at 441] automobiles are frequently taken into police custody. Vehicle accidents present one such occasion.  To permit the uninterrupted flow of traffic and in some circumstances to preserve evidence, disabled or damaged vehicles will often be removed from the highways or streets at the behest of police engaged solely in caretaking and traffic-control activities.  Police will also frequently remove and impound automobiles which violate parking ordinances and which thereby jeopardize both the public safety and the efficient movement of vehicular traffic.   The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge.

S. Dakota v. Opperman, 428 U.S. 364, 368–69 (1976).  If there were some kind of freestanding public safety rationale underpinning the community caretaking doctrine, that carefully delimited exception to the warrant requirement would completely eviscerate the Fourth Amendment, for

virtually every warrantless search or seizure used to effectuate criminal enforcement could be characterized as somehow for the benefit of the "community." Cf. Caniglia v. Strom, 141 S. Ct. 1596, 1598 (2021) (rejecting First Circuit's "freestanding community-caretaking exception that applies to both cars and homes" that would justify an entry into a home to seize two handguns belonging to a man taken to the hospital for a psychiatric evaluation after he had asked his wife to shoot him, based on the officers' belief that the man posed a risk to himself and others).

Defendants appear to be under the impression that, if an unlicensed individual might drive the car to get groceries in three weeks, then that could justify the continued 30-day impound. A simple example proves why Defendants' position is untenable in light of broader Fourth Amendment principles. Assume that Defendants think there is, say, a 30 percent, or 50 percent, or *some* percent chance that an unlicensed driver will drive again within 30 days. Defendants refuse to release the vehicle on the basis that his potential future conduct may pose a safety risk to others, apparently under the assumption that unlicensed drivers are more dangerous drivers than others. (The Court addresses this assumption below.) This may or may not be empirically true, but that is irrelevant to the Fourth Amendment question, for it is unequivocally true that Defendants have effectuated a continuing seizure of property by holding the vehicles for 30 days. An arrest is obviously also a seizure under the Fourth Amendment; it is probably the quintessential one. But nobody thinks that an officer is allowed to arrest someone because he poses some kind of vague risk of harming others, e.g., a 30 percent, 50 percent or whatever chance of harming someone in the future. An officer can only arrest him under the Fourth Amendment on the basis of past wrongdoing, i.e., that he has committed a crime. This is a basic principle of criminal law: incapacitation and deterrence have a role to play, but nobody thinks there is a freestanding right to act simply based on future probabilities of public safety risk.

Defendants' position is further undermined by the fact that the 30-day impounds are a creature of statute, not tethered to a reasonableness analysis under the Fourth Amendment. While no one questions the authority of the legislature to draw (arbitrary) lines to address public policy issues, it remains true that the decision to impound vehicles for 30 days, as opposed to any other amount of time, is arbitrary. See Sandoval, 72. F. Supp. 3d at 1008 ("Here, even assuming that Ruiz's vehicle was lawfully impounded pursuant to the community caretaking exception, that exception cannot justify the ongoing seizure of the vehicle after it has been removed, much less for an arbitrary period of thirty days."). What if Defendants think the unlicensed driver will drive again on the 31st day? Or 200th? In that case, it is obvious that they lack any authority to continue to hold the vehicle because even the statute, Section 14602.6, says they cannot. But since the Fourth Amendment analysis is completely independent of statutory authority, there is no logical basis whatsoever to hold that it is reasonable to permit a police agency to justify a continued seizure if it thinks the unlicensed driver will drive again in 29 days but not 31 days. Judge Henderson has already explained why this makes no sense:

> Defendants' argument is essentially that Ruiz should be deterred from driving without a license, but the Miranda court held that deterrence is not an appropriate reason to apply the community caretaking exception. . . . Defendants' argument makes little sense

> when they admit that, after the thirty-day period was over, Ruiz was able to obtain his car by merely paying a storage fee; he did not need to take any steps to prove that he was a licensed driver, or that he was no longer "unsafe."

Sandoval, 72 F. Supp. 3d at 1009.  The Court can discern no basis in precedent or reason to tie a Fourth Amendment reasonableness analysis to an arbitrary temporal limitation imposed by statute, one in turn based on an impermissible deterrence rationale.

But Defendants' position only goes downhill from there.  How much, if any, evidence is a police agency supposed to have that an unlicensed driver will drive away in the future?  What is the likelihood of future unlawful driving?  Is it reasonable to hold the vehicle if there is a 20 percent chance the unlicensed driver will drive again within 30 days?  Or should it be 50 percent or more?  It is impossible to say.  Existing standards like probable cause would be of no use.  There may be, for example, an anticipatory search warrant predicated on a finding "(1) that it is *now probable* that (2) contraband, evidence of a crime, or a fugitive will be on the described premises (3) when the warrant is executed," United States v. Grubbs, 547 U.S. 90, 96 (2006) (emphasis in original), but without actual evidence, it is nonsensical to speak of "probable cause" that a *future* offense may be committed based on a vague, generalized statement of an individual of possibly unlicensed driving on an unspecified future date, rather than a concrete plan to immediately drive without a license.  (This is especially true because no unlicensed driver would be guilty of attempted unlicensed driving or conspiracy to commit unlicensed driving simply because he may drive again in the future without a license.)  Because there is no basis in history or precedent to make the requisite determination of what standard would apply, any court asked to do so would be forced to simply make up rules that seem logical or "reasonable" according to normative policy views, an obviously discredited mode of constitutional analysis.  And even if a court could come up with such a formulation, it is almost impossible to imagine that it could be devised in a way that lent necessary predictability to police officers and citizens alike.  As the Supreme Court has often emphasized in its Fourth Amendment jurisprudence, *per se* rules are important to allow police officers to know whether their actions are lawful or not.  But it is difficult to imagine what such a rule could look like, other than inviting a broad standard of discretion (or, worse, standardless discretion) to retain a vehicle based on some future probability of unlicensed driving.  That would invite confusion, inconsistency, and potentially a flood of future litigation, including future Section 1983 lawsuits where individuals' vehicles were held for 30 days because the police claimed the unlicensed driver might drive again.

It gets worse.  An even more fundamental problem with allowing police agencies like LAPD to make some kind of probabilistic analysis of future unlawful driving is that it violates basic notions of fundamental fairness and the separation of powers to place standardless and unreviewable discretion in the hands of the *police* to decide whether an individual is a sufficient future threat to public safety that he is not allowed to get his car back.  It presents, in other words, a "classic . . . instance of *quis custodiet ipsos custodes*," Brooks v. Grundmann, 748 F.3d 1273, 1274 (D.C. Cir. 2014): who will guard the guards themselves?  There is no analog in our criminal or civil justice systems that would allow law enforcement officers to impose such serious

constitutional deprivations without obtaining the authority of a neutral arbiter of the law, e.g., a judge, and without some recourse through an adversarial system.  Allowing the police to police themselves, and to sanction a lengthy seizure on the basis of a police officer's subjective belief that an unlicensed driver will drive again, is antithetical to our system of checks and balances.  By analogy, the police may arrest individuals without a warrant provided they have probable cause, but the police are not allowed to detain individuals pending trial on the basis of *their* opinion of future dangerousness: because pretrial liberty is an important constitutional norm, the decision to detain an individual pending trial is made by a *judge* after rigorous testing through the adversarial process.  Reasonable minds can disagree about how to properly balance constitutional values; to apply the bail analogy once again, police officers and prosecutors are frequently disappointed when judges release individuals before trial because they fear the public safety consequences.  But hardly any question the authority of a *judge* to make that call within the confines of a *judicial system*.  The Court does not question the good intentions of the many upstanding LAPD officers who want to keep the streets safe from bad drivers and fear that releasing an unlicensed driver's vehicle would harm the public.  But just as police officers cannot determine whether criminal defendants are too dangerous to be released pending trial (and our jails would likely be far fuller if they could), our system of checks and balances does not allow police officers to make such public safety determinations in the impound context.

Just as important constitutional values are balanced in the American *judicial system*, our system of criminal and civil justice also affords governmental actors ample alternative means to advance public safety interests.  Indeed, the problem is not that Defendants' punishment and deterrence rationales are entirely misplaced—the problem is that they have channeled them through inappropriate means, not the systems in which those are accepted purposes of governmental action.  Cf. Clement v. City of Glendale, 518 F.3d 1090, 1094 (9th Cir. 2008) (holding that imposing the "burdens and costs" associated with towing a vehicle "cannot be justified as a means of deterring illegal parking," because "the punishment for illegal parking is a fine").  Unlicensed driving is a crime, and the City, like any other, can punish it through the criminal legal system.  And since virtually all judges consider recidivism when weighing the appropriate punishment, the City's police officers can direct resources towards arresting repeat offenders and its prosecutors can seek harsher punishments for recidivists.  Of course, the point is, again, that a *judge*, not law enforcement, makes the determination of how harsh the punishment should be.  And the City can also initiate forfeiture proceedings against unlicensed drivers' vehicles.  See Cal. Veh. Code § 14607.6.  But once again, that is a *judicial process* in which a *judge* has to sign off on any forfeiture.

Sandoval explains why the City's public safety argument must fail, for much the same reasons as outlined here.  Judge Henderson stated the following:

> It is also important to note that the City had alternative means
> available under state law to protect the public, if it truly believed
> that Ruiz was an unsafe driver.  Specifically, the City could initiate
> forfeiture proceedings under California Vehicle Code section
> 14607.6.  Or, the City could pursue a criminal prosecution under

sections 12500 and 40000.11.  The City could have used these
methods of enforcement, but it did not.  While the City argues that
its greater power to initiate these proceedings implies the lesser
power of seizing the vehicle for thirty days, that argument misses
the crucial distinction that the forfeiture and criminal processes are
conducted in the courts.  See Cal. Veh. Code § 14607.6(e)(1)–(5)
(owner of vehicle subject to forfeiture may challenge forfeiture in
court, where "[t]he burden of proof in the civil case shall be on the
prosecuting agency").  Here, by contrast, the thirty day
impoundment was warrantless, and therefore without judicial
review.  The mere fact that other sources of authority could have
applied does not make reasonable the process that actually was
applied, especially when the government has the burden of
justifying a warrantless seizure.

Sandoval, 72 F. Supp. 3d at 1011.  The Ninth Circuit made the same point on
appeal:

Even if we were to balance California's interest against all
California driver's interests, as is sometimes appropriate . . . the
County would still be wrong to rely on a deterrence or
administrative penalty rationale to support California's interests. . .
. Whatever force those rationales may have in the forfeiture
context, *where a court approves the deprivation*, see Bennis v.
Michigan, 516 U.S. 442, 452 (1996), they do not permit the
continued warrantless seizure of a vehicle once the community
caretaking function is discharged.  Miranda, 429 F.3d at 866.

Sandoval, 912 F.3d at 516 (emphasis added).

    Even though the Court does not understand them to make this argument directly,
perhaps the Court should construe Defendants' position as a narrow Fourth Amendment
exception in which the police can keep the vehicle for the full 30 days if and only if the unlicensed
driver *directly admits* he will drive again, seemingly within the 30-day window.  However, this has
all of the same problems as those diagnosed above, not least: where would such a rule come from,
except Defendants' invitation for this Court to make it up?  But the rule poses additional
problems as well.  Surely many unlicensed drivers would answer "no" if asked if they will drive
again, even if the answer is "yes."  If Defendants' position is that the people who have lied get
away with it because the police must take them at their word, then they have created a Fourth
Amendment principle rooted in a fundamentally perverse incentive.  The touchstone of the
Fourth Amendment is reasonableness; a rule where all one has to do is lie to the police to cease a
seizure is not "reasonable," but pure madness, in which the honest are punished and the
dishonest are rewarded.  And then there is the tricky issue of whether procedural protections tied
to the Fifth Amendment are appropriate, because the police are asking obviously incriminating

questions ("do you intend to commit a crime in the next 30 days?") that people might wish to refuse. And so what happens if an individual refuses to answer the question? Does she still get her car back? If yes, law enforcement has achieved no assurances whatsoever regarding future public safety risk, so it is in the same position if it has never been entitled to ask at all. If no, now the rule is once again incentivizing people to lie, with the added potentiality of future criminal prosecution for lying to the police, *and* it is subverting individuals' Fifth Amendment rights to allow them to advance those under the Fourth Amendment. And if the police are not forced to take people at their word, and can instead claim they do not *believe* a person when he says he will not drive without a license again, then where is the truth or falsity of this position to be tested? Surely the only fair answer would be some kind of court, where a neutral and detached judge makes the credibility determination. But what court is that? There is, of course, no freestanding Fourth Amendment court, with judges on call to decide whether *warrantless* searches or seizures are reasonable. That is because the bedrock principle of the Fourth Amendment is the *warrant* requirement, in which judges are asked to sign off on warrants to facilitate searches and seizures by the police. No one disputes that the City could have sought warrants to justify the impounds in the first instance, which would have changed the entire reasonableness analysis engaged in here. But the City did not want to get warrants to authorize its impounds (and presumably still does not wish to do so), so the analysis is back at square one. Yet again, no one disputes that the City also could have initiated forfeiture proceedings, perhaps trying to convince a *judge* that forfeiture is proper in part based on the risk of future unlicensed driving and that a driver cannot be trusted when he promises to abide by the law in the future, but the City has not done that either. See Cal. Veh. Code § 14607.6. If the police instead get to decide for *themselves* whether an unlicensed driver is lying or not, then that presents the fundamental problem raised above: that this very idea offends our basic sense of justice, because no rational system of law, civil or criminal, allows an enforcement entity to be the unilateral arbiter of truth. The bottom line is that a Fourth Amendment carveout in which the seizures are upheld for 30 days because the unlicensed driver would drive again within that window has no basis in history, reason or precedent, is completely unadministrable, and would lead to profoundly undesirable consequences.[41]

The Court addresses the availability and adequacy of a storage hearing in the due process analysis below. It is enough to say here that storage hearings do not change any of the analysis

---

[41] As if all this were not enough, there is this problem: future unlicensed driving is not *strictly* illegal because the necessity defense allows such conduct in narrow circumstances. In California, it even allows drivers to drive drunk, provided the elements of necessity are met. See, e.g., People v. Slack, 210 Cal. App. 3d 937, 940 (Ct. App. 1989). An unlicensed driver may be lawfully permitted to drive in a true emergency where there is no adequate alternative. So if an unlicensed driver tells the police that she will not drive for the next 30 days unless it is strictly necessary to do so ("I won't drive unless it is necessary to save someone's life"), and thus legally justified, how is that position to be adjudicated or litigated? The obvious answer is that there is no way to do so without recourse to a judicial system, for the police are in no position to decide for themselves whether future unlicensed driving may nonetheless be lawful.

above, for they are wholly inadequate forums to address Defendants' public safety or deterrence argument:

> It must be acknowledged that Ruiz's seizure was not completely without review.  Ruiz challenged his vehicle's impoundment at a tow hearing on September 6, 2011, five days after its initial seizure.  Although no Defendant argues that this hearing satisfies the warrant requirement, they do argue that this process is sufficient to render the ongoing seizure reasonable.  However, the availability of a tow hearing here is not sufficient to render the seizure reasonable, where the Defendants' stated reason of protecting public safety does not stand up to scrutiny.

Sandoval, 72 F. Supp. 3d at 1011.  As discussed further below in the Court's due process analysis, it makes no difference that the person potentially deciding whether there is sufficient evidence of a likelihood of future unlicensed driving, or making a credibility determination as to whether the driver can be taken at his word that he will not drive the vehicle for the next 30 days, is arguably a "hearing officer" employed by Defendants.  At the end of the day, that person is still an LAPD employee (a police detective), and it is still the police deciding whether the police have sufficient evidence to impose a 30-day impound rooted in an impermissible deterrence rationale.  That is an unconstitutional arrangement for many reasons, as set forth above and below.

For all these reasons, the Court rejects Defendants' argument that some future likelihood of unlicensed driving constitutes a "new" justification for the impound of the vehicles sufficient to impound the vehicles for 30 days.  At its core, the argument is just a thinly recycled "deterrence rationale [that] is incompatible with the principles of the community caretaking doctrine."  Miranda, 429 F.3d at 866.  The Court therefore categorically rejects the notion that the public safety argument regarding future unlicensed driving plays a role in the Fourth Amendment analysis of any of the claims of Plaintiffs or class members, because even though whether the community caretaking rationale "applies turns on the facts and circumstances of each case," Sandoval, 912 F.3d at 516, the public safety or deterrence inquiry is fundamentally *incompatible* with and therefore *irrelevant to* the community caretaking analysis.  This is true regardless of any kind of individualized showing as to the future likelihood of unlicensed driving, and certainly not one based in Defendants' subjective position untested by an adversarial process and sanctioned by a court.

But even if all of the above were not true, and the Court thus accepted Defendants' invitation to scrutinize their public safety argument with regard to Mr. Arizmendi in particular, the Court would still reject the argument.  As such, as another alternative basis for this Court's holding with regard to Mr. Arizmendi's Fourth Amendment claim, the particular facts and circumstances arising from his claim render the seizure of his vehicle unreasonable even when considering Defendants' argument that he would drive the vehicle again.  That is because there is not a single fact proffered by Defendants (or any other fact in the record cited by the parties) that demonstrates that Mr. Arizmendi was a dangerous driver *apart* from the fact that he was

unlicensed.  The only fact in the record regarding Mr. Arizmendi's driving is that he was stopped for an expired registration, which is among the offenses *least* probative of actual public safety risk to others, unlike, say, speeding, reckless driving, driving under the influence or causing an accident.  (PCSSUF ¶ 36.)  As such, all Defendants can point to is that he was an unlicensed driver, and unlicensed drivers tend to be bad drivers, or at least so thought the Legislature when it enacted Section 14602.6.  In <u>Sandoval</u>, 72 F. Supp. 3d 997, one of the named plaintiffs, Simeon Avenando Ruiz, had repeatedly pled guilty to misdemeanor charges of driving without a license under Vehicle Code Section 12500 and had been cited for driving with a child without a seat belt, driving without current registration tags, and for not stopping at a stop sign, though the latter two citations were dismissed in court.  <u>Id.</u> at 1000-01.  Yet again, Judge Henderson has explained why the parallel argument made by Defendants fails:

> Defendants [argue] that the thirty-day impoundment of Ruiz's vehicle was reasonable because it was authorized by California Vehicle Code section 14602.6. . . . In support of this provision, the Legislature found that unlicensed drivers "are involved in a disproportionate number of traffic incidents" and that "seizing the vehicles used by unlicensed drivers serves a significant governmental and public interest, namely the protection of the health, safety, and welfare of Californians from the harm of unlicensed drivers."  Cal. Veh. Code § 14607.4. . . .

> Defendants argue that, even after the initial seizure of the vehicle, the community caretaking exception should apply because Ruiz was an unsafe driver, and keeping him off the road for thirty days will make the public safer.  Defendants point to the California Legislature's determination that unlicensed drivers are more likely to be unsafe drivers. This argument is unpersuasive, for several reasons.

> First, Defendants cannot rely on the generalized legislative findings of section 14607.4 to show that Ruiz was unsafe. . . .

> Second, Defendants offer virtually no evidence that Ruiz himself was unsafe.  The mere fact that Ruiz had prior convictions for driving without a license is not relevant to whether or not he was a safe driver.  And while Ruiz had previously been cited for driving with a child outside of a seatbelt and for failing to stop at a stop sign, the circumstances of those citations do not suggest that Ruiz was unsafe.  For the former citation, Ruiz's young son was taken out of his car seat by Ruiz's wife because he was crying—hardly suggestive of Ruiz's own unsafe driving.  Regarding the latter, while such a citation is probative, the Court does not believe that a

> single citation for failing to come to a complete stop at a stop sign is
> persuasive evidence that a driver is unsafe. . . .
>
> Ruiz's interest in possession outweighs the government's interest
> in the warrantless impoundment of his vehicle for thirty days.  The
> City's primary stated reason for withholding the car for thirty days
> was to protect the public from an unsafe driver.  As noted above,
> however, the City has provided only limited evidence that Ruiz was
> an "unsafe" driver, as opposed to merely a driver unlicensed by
> the State of California.  The City's concern about public safety is
> belied by the fact that, after thirty days, it was willing to release the
> vehicle to Ruiz without him taking any steps to prove that he was
> safe, or had been licensed by the state.

Id. at 1006-07, 08-09, 10-11.  This analysis is especially salient here, where Defendants have
provided *no* evidence, not just "limited evidence," that Mr. Arizmendi was an "'unsafe' driver,
as opposed to merely a driver unlicensed by the State of California." Id. at 1010.

The Court does not suggest by any of the analysis above that there are not important
public policy considerations involving preventing unlicensed drivers from future unlicensed
driving.  The Court also does not doubt that many unlicensed drivers are bad drivers who pose a
risk to others.  But that has nothing to do with the constitutional analysis, for there are many
things law enforcement officers could do to protect public safety that are nonetheless
unconstitutional.  Another court made this point well:

> This Court's mandate is solely to judge the constitutionality of
> police behavior, not its effectiveness as a law enforcement tool.
> Many police practices may be useful for fighting crime—
> preventive detention or coerced confessions, for example—but
> because they are unconstitutional they cannot be used, no matter
> how effective. "The enshrinement of constitutional rights
> necessarily takes certain policy choices off the table." District of
> Columbia v. Heller, 554 U.S. 570, 636 (2008).

Floyd v. City of New York, 959 F. Supp. 2d 540, 556 (S.D.N.Y. 2013).

### c.   Mr. Vigil

Defendants' sole contention with regard to Mr. Vigil is that he "never attended a storage
hearing to retrieve his vehicle during the 30-day hold" and thus never rebutted the "legitimate
impound of his vehicle."  (MSJ at 9.)  The Court addresses the constitutionally deficient notice
Defendants provided with regard to storage hearings below, and thereafter explains why it finds
that attendance at a storage hearing is not a prerequisite to recovery for Mr. Vigil or any class
members.  For now, it suffices to observe the undisputed facts: even if he did not attend a storage

hearing, Mr. Vigil went to the LAPD police station at least *three* times to attempt to get his vehicle out; no LAPD personnel told him he had the right to attend a storage hearing (or that one would be necessary for the release of his vehicle) during any of those station visits; after the 30 days expired, Mr. Vigil was accompanied by a friend and licensed driver to have the vehicle released, while Defendants do not suggest that Mr. Vigil would have been unable to do the same had the vehicle been authorized to be released earlier; and there is no evidence in the record that Mr. Vigil's car lacked a valid registration. (See Section II.B.9.) There is no requirement under the Fourth Amendment that an individual attend a statutory storage hearing pursuant to Section 22852 for the continued seizure of his vehicle to be unreasonable, and there is no precedent to the contrary. Indeed, since the Fourth Amendment and statutory inquiries are separate, it makes little sense to tie the merits of a constitutional claim to a particular provision of the Vehicle Code. See Miranda, 859 F.3d at 864. The Court has explained above why Defendants' reading of Brewster, 859 F.3d 1194 and Sandoval, 912 F.3d 509 is wrong with regard to if and when a seizure ceases to be lawful under the Fourth Amendment. It is also useful to note that neither opinion once states that requesting a Section 22852 storage hearing is a prerequisite to recovery, and indeed neither (majority) opinion even *mentions* Section 22852. See Brewster, 859 F.3d 1194; Sandoval, 912 F.3d 509. True, the plaintiffs in those cases did attend storage hearings, but neither panel stated or suggested that requesting or attending a formal storage hearing was a *requirement* for relief. The Court's reading of those opinions indicates that the Ninth Circuit would find Mr. Vigil's alternate means of seeking the release of his vehicle acceptable, for he clearly demonstrated that (1) he (desperately) wanted his vehicle back before the 30 days had run and (2) it is undisputed that he could have satisfied all the elements necessary for release, i.e., he was "able to provide a licensed driver who could take possession" of his vehicle. Sandoval, 912 F.3d at 516.

Mr. Vigil diligently sought to obtain the release of his vehicle; the fact that he was unsuccessful was solely due to Defendants' unlawful conduct. Moreover, as explained below, it almost certainly would have been pointless for Mr. Vigil to attend a storage hearing anyway, because Defendants' own policies and practices would have barred the release of the vehicle prior to the expiry of the 30-day hold even if he had presented a licensed driver and paid the fees. As such, like the other named Plaintiffs, Mr. Vigil's vehicle was unlawfully seized because Defendants had no community caretaking justification to impose a 30-day impound.

For the reasons above, the Court DENIES the MSJ and GRANTS the MPSJ as to Plaintiffs' Fourth Amendment claim.

## C. Procedural Due Process—Third Cause of Action

Plaintiffs argue that Defendants provided constitutionally deficient notice with regard to their right to contest the 30-day impounds imposed on their vehicles and that they were not provided a meaningful opportunity to be heard before and subsequent to the seizures of their vehicles. (See MPSJ at 22-25.) The Court agrees with both of these arguments. In sum, Plaintiffs' due process claim is that the notice and hearings afforded them were *structurally* inadequate: both the notice documents and the hearings pursuant to Vehicle Code Section 22852

were designed to "address a different issue, namely enabling vehicle owners to contest payment of towing and storage charges *before* their vehicles were subjected to a [Vehicle Code Section] 22851 lien sale by the OPG." (MSJ Opposition at 18.)

Before turning to the specifics of the notice and process issues, it is useful to briefly restate the important changes in the Vehicle Code over the preceding decades, some of them arising from Ninth Circuit precedents. The first and most important such case is <u>Stypmann v. City & County of San Francisco</u>, 557 F.2d 1338 (9th Cir. 1977), which Plaintiffs correctly identify as the "genesis for the present versions of both the CHP-180 notice and [Vehicle Code Section] 22852." (MPSJ at 22.)

<u>Stypmann</u> was a Section 1983 class action that initially "challenged the constitutionality of the provisions of the California Vehicle Code authorizing removal of privately owned vehicles from streets and highways without prior notice or opportunity for hearing, and of section 22851 establishing a possessory lien for towage and storage fees without a hearing before or after the lien attaches." 557 F.2d at 1340. Importantly, in the course of litigation, the plaintiffs "abandoned their attack upon those provisions of the Vehicle Code authorizing the initial seizure and tow without a prior hearing, and confined their objection to the provision of section 22851 creating a possessory lien for towing and storage charges." <u>Id.</u> at 1340-41. Because the plaintiffs "elected not to contest the right of the state to seize vehicles summarily and tow them to a garage," <u>id.</u> at 1342, the case proceeded on the basis that the vehicles were lawfully "taken under tow on the street" to a garage, and therefore the "towkeeper is in lawful possession." <u>Id.</u> It appears that most, or all, of the vehicles were removed from the street pursuant to Vehicle Code Section 22650 under circumstances that would fall within the community caretaking doctrine, such as when vehicles are obstructing traffic, reported stolen, blocking a private entrance, blocking a fire hydrant, or left four hours on a freeway, or where the driver is incapacitated by injury or illness, arrest, or the vehicle has foreign licenses and has been issued five or more notices of parking violations within five or more days, or the vehicle is unlicensed and illegally parked." <u>Id.</u> at 1430 n.2.[42] Unlike the case at bar, a vehicle owner could *immediately* reclaim her vehicle "by paying the towing and storage fees[.]" <u>Id.</u> at 1343. As such, the central issue in <u>Stypmann</u> was whether the vehicle owners were entitled to a post-seizure hearing to contest the payment of towing and storage fees before their vehicles were subjected to a lien sale pursuant to Vehicle Code Section 22851. <u>See id.</u> at 1340, 1343 ("No hearing is afforded and no judicial intervention is provided by section 22851 at any stage before or after seizure unless and until the vehicle is sold to satisfy the lien"). <u>Stypmann</u> held that vehicle owners were entitled to a prompt hearing for challenging the "factual basis of the tow" of their vehicles to "protect them against erroneous deprivation of the use of their vehicles" before the vehicle was subject to a lien sale, that the five-day delay in conducting a hearing was "excessive" (and deferred the question of how promptly to provide one to the government), and strongly suggested (if not expressly holding) that it was

---

[42] The possible exception to this is the "five or more" parking violations issue not relevant here, which is the subject of the related case assigned to this Court, <u>Breonnah Fitzpatrick, et al. v. City of Los Angeles, et al.</u>, Central District of California Case. No. EDCV-21-6841-JGB.

**CIVIL MINUTES—GENERAL**                    Initials of Deputy Clerk <u>mg</u>

inappropriate to place the burden of proof on the vehicle owner, not "upon those who seized it." See id. at 1343-45. Stypmann had no occasion to address, and therefore said nothing about, the separate issue relevant here: the validity of a vehicle *impound*, particularly one of 30-day duration, imposed to punish or penalize a vehicle owner for driving unlicensed and to deter future unlawful driving.

Before 1979, Vehicle Code Section 22852 only required that a vehicle owner be provided notice of a tow, but had no requirement for any kind of hearing; later in 1979, in response to Stypmann, the California Legislature enacted the current version of Vehicle Code Section 22852. See S.B. 848, 1979 Leg., Reg. Sess. (Cal. 1979) ("It is the intent of the Legislature, in enacting this act, to ensure that a person whose unattended vehicle has been ordered by an authorized member of a public agency is provided opportunity for a hearing to satisfy due process as mandated in a recent Appellate Court Decision, Stypmann vs. City and County of San Francisco."); Scofield v. City of Hillsborough, 862 F.2d 759, 764 n.3 (9th Cir. 1988) ("Section 22852 was enacted following our decision in [Stypmann] that due process requires a prompt post-tow hearing."). Before the 1979 amendments to Vehicle Code Section 22852, the CHP-180 notice did not advise an individual of a right to a hearing to contest a vehicle's seizure and removal, because no such right existed. (PCSSUF ¶ 72.) In compliance with this 1979 amendment to Section 22852, the California Highway Patrol revised the CHP-180 form to advise vehicle owners of the right to a Section 22852 "storage hearing." (Id. ¶ 73.)

In 1994, the Legislature enacted the 30-day impound statute relevant here, Section 14602.6, along with its subsection (b), which provides that the owner of the impounded vehicle must be given notice of a storage hearing pursuant to Section 22852. See Stats. 1994, 1994 Cal. Legis. Serv. Ch. 1221 (S.B. 1758). But California did not revise Section 22852, which was enacted to create storage hearings involving Stypmann-type tows, so that a storage hearing would also address the justification for Section 14602.6's mandatory 30-day impound. (PCSSUF ¶¶ 74-75.) As to the notice issue raised here, other than adding a Spanish language advisory of a right to advise vehicle owners of their right to a Section 22852 storage hearing, the CHP-180 notice vehicle owners are given has remained essentially unchanged post-1979. (Id. ¶ 74.) The CHP-180 notice was never revised or updated to inform vehicle owners of a right to challenge a 30-day impound pursuant to Vehicle Code Section 14602.6, as distinguished from the storage of a vehicle pursuant to Section 22651. (Id. ¶ 75.)

The Court addresses the holdings and reasoning of these cases below, but it is worth mentioning at the outset that two other Ninth Circuit cases, both from the 1980s, affected the development of the law in California with regard to the due process afforded vehicle owners: Scofield, 862 F.2d 759 and Goichman v. Rheuban Motors, Inc., 682 F.2d 1320 (9th Cir. 1982). With this background in mind, the Court turns to the notice Defendants afforded Plaintiffs and class members when they seized their vehicles.

//
//
//

1.   **Defendants Provided Constitutionally Deficient Notice**

The Due Process Clause of the Fourteenth Amendment states, in pertinent part, that
"[n]o state shall . . . deprive any person of . . . property, without due process of law."  U.S.
Const. Amend. XIV.  "The base requirement of the Due Process Clause is that a person deprived
of property be given an opportunity to be heard 'at a meaningful time and in a meaningful
manner.'"  Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist., 149 F.3d 971, 984 (9th Cir.
1998) (quoting Armstrong v. Manzo, 380 U.S. 545, 552).  "The fundamental requisite of due
process of law is the opportunity to be heard.  And it is to this end, of course, that summons or
equivalent notice is employed."  Grannis v. Ordean, 234 U.S. 385, 394 (1914) (citation omitted).

The parties do not brief the legal test that applies to Plaintiffs' notice claim.  Applying the
reasoning of Grimm v. City of Portland, 971 F.3d 1060 (9th Cir. 2020), the Court finds that the
"reasonably calculated" standard set forth in Mullane v. Cent. Hanover Bank & Tr. Co., 339
U.S. 306 (1950), not the Mathews v. Eldridge, 424 U.S. 319 (1976) balancing test, applies.  In
Grimm, a vehicle owner challenged the City of Portland's notice procedures when his car was
illegally parked for seven days, the City then left a tow slip on his windshield, and thereafter his
car was towed.  Id. at 1062.  The plaintiff argued that the pre-towing notice was inadequate under
the Fourteenth Amendment.  Id.  The district court applied Mathews, not Mullane, in finding
that the citations left on the windshield were constitutionally sufficient.  Id.  The Ninth Circuit
reversed, holding that Mullane, not Mathews, governed the adequacy of notice issue.  Id.  As
summarized in Grimm, the central teaching of Mullane was that "[a]n elementary and
fundamental requirement of due process . . . is notice reasonably calculated, under all the
circumstances, to apprise interested parties of the pendency of the action and afford them an
opportunity to present their objections . . . with due regard for the practicalities and peculiarities
of the case."  971 F.3d at 1065 (quoting Mullane, 339 U.S. at 314-15).  Subsequent Supreme
Court precedent, Dusenbery v. United States, 534 U.S. 161, 167–68 (2002), clarified that
"Mathews and Mullane coexist, and that Mullane's 'reasonably calculated' standard continues
to apply, without any balancing test, when courts are determining whether a *method* of notice
satisfied due process."  Grimm, 971 F.3d at 1066.  In sum, "Mathews governs the question of
whether and when due process requirements, including notice, is required, but Mullane governs
[an] adequacy of notice claim."  Id. at 1067.  Because the parties agree that Defendants were
required to provide some kind of notice to Plaintiffs of the tows and impounds, as Ninth Circuit
precedent makes clear, Plaintiffs' challenge concerns only whether the notice given was
adequate.  The question is thus whether the notice was "reasonably calculated to apprise
[Plaintiffs] of the pendency of the action" and to "afford them an opportunity to present their
objections," and in turn whether the notice was of "such nature as reasonably to convey the
required information[.]"  Mullane, 339 U.S. at 314.

According to the California Commission on Peace Officer Standards and Training
("POST"), an entity that provides materials adopted by LAPD, the terms "to store" and
"impound" a vehicle have different meanings.  "To store" a vehicle means the vehicle is subject
to immediate release to the owner, or authorized agent with proper identification, pending any
fees (e.g. fines, towing fees, etc.)  An example of a stored vehicle is one seized under Vehicle

Code Section 22651(a) (such as in the case of an unattended vehicle on a bridge, viaduct or tunnel causing an obstruction of traffic.)  (PCSSUF ¶ 57.)  If a vehicle is "impounded," then an agency like LAPD "can decide when and to whom the car is released."  An example of an impounded vehicle is one seized under Vehicle Code Section 14602.6.  (Id. ¶ 58.)  See California Highway Patrol, 162 Cal. App. 4th at 1149 (officer marked driver's car as "stored" "as opposed to impounded" and allowed the driver's mother to retrieve the vehicle the same day).

When LAPD impounded a vehicle for 30 days pursuant to Section 14602.6, the LAPD gave written notice to the vehicle's registered owner and legal owner (if any) by mailing the owner(s) a CHP-180 form half-sheet.  (PCSSUF ¶ 60.)  The CHP-180 form half-sheet is the only written notice the LAPD provided individual vehicle owners on a right to a hearing with regard to the Section 14602.6 impound.  (Id. ¶ 61.)  Because the CHP-180 form is provided by the California Highway Patrol, LAPD relies on CHP policy for determining when the boxes labeled "stored" and "impounded" on the CHP-180 form's front side should be checked.  (Id. ¶ 62.) For vehicles removed from the street, the officer checks either the "stored" box or "impounded" box but not both, depending on the statutory authority for removing the vehicle from the street.  (Id. ¶ 63.)  For vehicles seized under Section 14602.6, the CHP-180 form half-sheet states that the vehicle was "impounded" and not "stored," lists Section 14602.6 as the "storage authority / reason," and informs the owner by a handwritten notation on the form's top that the vehicle is subject to a "30-day hold."  (Id. ¶ 64.)  The backside of the CHP-180 form half-sheet is entitled "Notice of Stored Vehicle (22852 VC)" and informs the vehicle owner of her right to request a Section 22852 "hearing to determine the validity of this storage."  The form states the hearing "is an informal process to determine whether or not a vehicle was lawfully stored."  The form states "[i]f the hearing determines the storage to be unlawful," the LAPD (as the "storing agency") "will be responsible for the towing and storage charges."  (Id. ¶ 65.)  The form does not provide any information to the owner on what basis she may contest the impound of her vehicle.  It does not provide any information to the owner that she may contest the decision to impound her vehicle for 30 days, or the justification for imposing a 30-day impound as distinguished from justification for having the vehicle towed and removed from the street.  (Id. ¶ 66.)  Other than the check-off box "impounded" the CHP-180 form half-sheet front side, the form does not otherwise mention the word "impound."  (Id. ¶ 67.)  Other than the CHP-180 form half-sheet, the LAPD does not provide anything in writing to registered owners informing them of the circumstances under which LAPD will release a vehicle seized for 30 days under Section 14602.6 in less than 30 days.  (PAMF ¶ 43.)

In sum, the CHP-180 notice Defendants gave Plaintiffs and class members told them their vehicle was "impounded" and not "stored," a distinction with an important legal ramification discussed above.  At the same time, the CHP-180 notice told the vehicle owner that the Section 22852 hearing which she could request was limited to the issue of determining the "validity of this storage," which reflects the nature of a Stypmann-type hearing: to "test the factual basis of the tow."  557 F.2d at 1344.  The Court has detailed at length elsewhere in this order what this meant under the Impound Policy: LAPD deliberately limited the extent of any storage hearings to the issue of whether there was "probable cause" to justify the initial decision to impound the vehicle, or put another way, to "test the factual basis of the tow."  And the Guidelines

themselves reflect the history of the Vehicle Code sections, including how they were shaped by precedents like <u>Stypmann</u>.  The CHP-180 notice also only cites Section 14602.6 as the "authority" for the impound.  Though surely some class members paid little attention to the details of this notice form, others likely analyzed it quite rigorously, perhaps even looking up Section 14602.6 and finding that it really does authorize a 30-day impound.  But the nuances of the individual vehicle owners matter little in this class action, for one of the central legal fictions is that ordinary citizens are chargeable with notice of the law, even though they lack formal legal training, do not scrutinize legal documents, and so forth.  <u>See, e.g.</u>, <u>Bryan v. United States</u>, 524 U.S. 184, 193 (1998) ("the background presumption [is] that every citizen knows the law"); <u>Davis v. Wakelee</u>, 156 U.S. 680, 691 (1895) (one "is conclusively presumed to know the law").  The bottom line is that the CHP-180 form sends a message to the sophisticated and unsophisticated vehicle owner alike: until the 30 days are up, your vehicle will not be released to you even though you are a licensed driver, or you are unlicensed but you have a licensed driver available to take the vehicle away prior to the expiry of the 30 days, the vehicle is lawfully registered and you can pay the towing and storage fees.  This is, of course, directly contrary to <u>Brewster</u>, 859 F.3d 1194 and <u>Sandoval</u>, 912 F.3d 509, which is in turn explained by the obvious fact that those cases had yet to be decided and Defendants did not believe the Fourth Amendment had anything to do with the 30-day impounds provided the initial seizures were lawful; as noted above, they have never had a community caretaking rationale for the 30-day impounds, and carried on with their practice because they did not think they needed one.  <u>See Sandoval</u>, 912 F.3d at 516 ("Once Ruiz was able to provide a licensed driver who could take possession of the truck, the City's community caretaking function was discharged.").

The import of Defendants' mistaken interpretation of the law is addressed below with regard to <u>Monell</u> liability, but the important thing to note now is that the timing of <u>Brewster</u> and <u>Sandoval</u> has no bearing on the notice question: those cases clearly and unequivocally, albeit belatedly, render the notice provided on the CHP-180 forms structurally inadequate.  Put another way, the CHP-180 forms Defendants gave vehicle owners told them they could ask for a <u>Stypmann</u> hearing.  They provided no such notice of what now might be called a <u>Brewster</u> or <u>Sandoval</u> hearing.

Defendants, and perhaps others, may protest that the CHP-180 notice is somewhat ambiguous; perhaps it is more accurate to say it is *silent* on the question of whether an owner can try to get her vehicle out prior to the expiry of the 30-day hold rather than affirmatively telling her she cannot.  Fair enough.  To clear up any ambiguity, LAPD made sure to post on its official website an article titled and written in such a way that it would be sure to make it to the top of a Google search for any unfortunate Angeleno whose vehicle was impounded.  During all relevant times, the LAPD provided notice to the public concerning its impound policies in a section of its website helpfully entitled, "How can I get my car out of impound?"  The full section is quoted below, but the one-sentence answer to the question posed by the title is this: if LAPD impounded your vehicle for 30 days, you *can't* get your car out of impound until the 30 days are up, at least not by presenting a validly licensed driver.

That section stated:

**CIVIL MINUTES—GENERAL**

If a person's vehicle is impounded under a 30-day hold, they must
wait until the 30-day period is over prior to requesting a release.
After the 30-day period has passed, the registered owner must go
to the Area auto detectives to obtain a release for the vehicle
(releases are only given to the registered owner/s).  If the
registered owner does not have a valid California driver's license,
he/she must bring along a person who possesses a valid California
driver's license.

However, vehicles may be released by an Area Auto Detective Unit
supervisor, prior to the termination of the 30-Day Hold period,
under any one of the following circumstances:

- The registered owner can establish the vehicle was
  driven by an unlicensed driver without the
  registered owner's knowledge or permission
- The vehicle was seized for 30-Day Hold and it is not
  authorized under Section 14602.6(a) VC
- There is sufficient proof the vehicle was stolen
- The concerned driver acquires a valid driver license
  or has the driver license reinstated and obtains
  proper insurance and the registered owner can
  provide a valid driver license and proof of current
  vehicle registration
- There is sufficient proof the driver of the vehicle
  was in fact a licensed driver with a valid license
  issued prior to the time of impound or the driver
  had an expired license or,
- The registered owner presents a court order to
  release the vehicle.

(PCSSUF ¶ 59.)  To this day, LAPD's website contains a substantively identical section.  _See_
_How can I get my car out of impound?_ Los Angeles Police Department (2023),
https://www.lapdonline.org/how-can-i-get-my-car-out-of-impound/.  (MPSJ Ex. G.)  These
circumstances track the exceptions codified at Section 14602.6(d).  _See_ Cal. Veh. Code §
14602.6(d).

The notice Defendants provided individuals thus expressly told them, "If a person's
vehicle is impounded under a 30-day hold, they must wait until the 30-day period is over prior to
requesting a release."  That was subject to certain narrow exceptions, but those exceptions did
not include far and away the most common and important exception recognized by Brewster and
Sandoval: that the owner can obtain release of the vehicle simply by providing a licensed driver
who could take possession of the impounded vehicle.  _See_ Sandoval, 912 F.3d at 516 ("Once Ruiz

was able to provide a licensed driver who could take possession of the truck, the City's community caretaking function was discharged"); Brewster, 859 F.3d 15 1196 ("The exigency that justified the seizure vanished once the vehicle arrived in impound and Brewster showed up with proof of ownership and a valid driver's license.")  Just as, in the context of a procedural due process challenge, individuals "should not be penalized for taking [a] statutory scheme at its word," Platt v. Moore, 15 F.4th 895, 906 (9th Cir. 2021), Plaintiffs and class members should not be penalized for taking Defendants at theirs.

There is another problem with this notice that a careful reader will observe: what about "mitigating circumstances?"  Section 14602.6(b) expressly provides that a vehicle owner is entitled a storage hearing, in which "mitigating circumstances attendant to" the storage must be considered "in accordance with Section 22852."  See Cal. Veh. Code § 14602.6(b).  The Court explains more fully the meaning of "mitigating circumstances" and why Defendants have all but ignored them under the Impound Policy in its discussion of Monell liability, but it is enough to say here that the California courts appear to have construed "mitigating circumstances" quite broadly, finding that the term "encompasses equitable considerations such as the good faith of the actor or circumstances lessening his or her culpability."  Smith v. Santa Rosa Police Dept, 97 Cal. App. 4th 546, 556 (2002).  As noted below, Defendants were authorized by statute to release any vehicles impounded for 30 days if "mitigating circumstances" applied.  But Defendants appear to have *ignored* the availability of this option, at best limiting "mitigating circumstances" to a single, extremely narrow exception: when "the registered owner can establish the vehicle was driven by an unlicensed driver without the registered owner's knowledge or permission." (PCSSUF ¶ 59) (emphasis added).  Note as well that Defendants clearly put the burden on the owner to establish even this incredibly narrow circumstance.  ("The registered owner can establish . . .)  The bottom line is this: the statutory scheme says people can get their cars out of impound before the 30 days are up where there are "mitigating circumstances," which courts have construed as anything that might lessen the culpability of an individual.  But Defendants explicitly told people that they could *not* get their cars out of impound even by requesting a Section 22852 hearing and arguing the "mitigating circumstances" that that statute allows for.

Plaintiffs argue that the notice Defendants thus provided is "therefore as bad if not worse than the constitutionally defective notice given to vehicle owners at issue in Gete v. INS, 121 F.3d 1285 (9th Cir. 1997)." (MPSJ at 24.)  In Gete, the Immigration and Naturalization Service (INS) initiated forfeiture proceedings and sent vehicle owners a form letter stating their property had been seized, along with copies of various regulations. 121 F.3d at 1289.  The form letter told vehicle owners they had two options: they could "commence" judicial forfeiture proceedings in federal district court or could proceed administratively by attending a personal interview with an immigration officer.  Id. at 1290.  The plaintiffs argued that the form violated due process because they were not informed of the factual and statutory bases for the government's decisions to seize their vehicles, did not receive copies of the adverse evidence in connection with forfeiture proceedings, and did not receive an explanation of the basis for adverse decisions.  Id. at 1295.  The Ninth Circuit agreed with these arguments, even though "many owners are present when their vehicles are seized . . . and those owners will frequently have at least a general idea of the factual basis for the seizure."  Id. at 1297.  The panel held that the plaintiffs had thus "set

forth substantial claims" on the due process issue and reversed the district court's order granting motions for dismissal and summary judgment. Id. at 1299. Although distinguishable in many ways, Gete's reasoning is persuasive in that the notice provided by Defendants suffers from similar defects: individuals were likely to have been at best confused, and at worst misled, by the information provided regarding the statutory and factual grounds for the impound. As discussed above, Defendants told vehicle owners through the CHP-180 notice form that the justification for the 30-day *impound* of their vehicles would not be addressed at the Section 22852 *storage* hearing (an unsurprising reality because Defendants had no lawful justification for the 30-day impounds). And Defendants also told vehicle owners their vehicles would not be released except under the narrow circumstances listed above and in Section 14602.6(d), in direct contradiction to the circumstances of authorized early release set forth in Brewster and Sandoval. They told people not even to bother with their right to present evidence of "mitigating circumstances" as broadly construed by the California courts, because the website clearly said that was not grounds for early release even though it *was* by statute.

At least one other court has already recognized the notice problem arising out of the CHP-180 form:

> Regarding notice, the Ninth Circuit held in [Gete, 121 F.3d at 1287-91, 1297] that the owners of vehicles seized by the INS were entitled to "sufficient notice concerning the factual and legal bases for [the] seizures." Here, Plaintiff alleges "[t]he notices sent pursuant to the [CHP] Impound Policy . . . communicate . . . that the vehicle will be kept for a minimum of 30 days, and misleads the owner to believe that any attempt to seek the return of the vehicle in less than 30 days is effectively meaningless." Nor do the notices "inform someone of their right to claim the vehicle with their own license or a licensed driver at a time they could afford to pay the [one-day] initial impound fee or a few days of storage fees." . . . The Court finds the allegations are sufficient to support a claim for violation of the Due Process Clause.

Ordonez v. Stanley, 495 F. Supp. 3d 855, 864 (C.D. Cal. 2020). For the reasons stated above, the notice Defendants provided was even more defective than that in Ordonez because the LAPD website compounded the issues with the CHP-180 form.

Perhaps LAPD could have been absolved all of the infirmities above if it had a pattern or practice of carefully explaining to ordinary citizens their rights to Section 22852 hearings, and the scope of them, had a vehicle owner walked into a police station and asked how to get her car out of the impound. But the only evidence on the record as to this point suggests exactly the opposite: as to Mr. Vigil, LAPD personnel appear to have gone out of their way *not* to have informed Mr. Vigil as to his right to a hearing when he visited the police station. As noted above, Mr. Vigil went to the LAPD police station at least three times seeking the release of his car, and it is undisputed that no LAPD employee informed him of his right to a hearing during any of those

in-person visits.  And finally, after all those trips, an LAPD employee simply told him, "It's up to me, and I'm keeping your car" for 30 days, without telling him that he could challenge this position at a storage hearing.  (See PCSSUF ¶¶ 48-52; Vigil Dep. 32:16-25.)  In Ms. Brewster's case, when she asked the impounding officer how she could obtain release of the Impala, the impounding officer never mentioned a storage hearing or her right to one.  The morning after the vehicle was impounded, when Ms. Brewster spoke to an Area Auto Unit *detective*, an LAPD employee who surely can be charged with knowledge of statutory and Department guidance on impound hearings, the detective said there was nothing that could be done, and did not once mention that Ms. Brewster could request, or had the right to, a storage hearing.  (See Brewster Dep. 40:16-25, 43:13-17; PCSSUF ¶ 26.)  The only reason Ms. Brewster was able to secure a storage hearing was that she hired a lawyer, Ms. Anderson-Barker, who knew better.  (See PCSSUF ¶ 27; DSSUF ¶ 7.)  There is an obvious inference to be drawn from both this conduct and the notice provisions Defendants afforded vehicle owners: LAPD did not *want* to hold storage hearings at all, because they cost the agency time and money, at best upheld the agency's decision, and at worst required reversal of it, along with reimbursement of certain charges and fees to the registered owner.

A body of case law holds that the government violates due process when the notice it affords individuals misrepresents or misleads the individuals affected by it.  See, e.g., Gates v. City of Chicago, 623 F.3d 389, 401 (7th Cir. 2010) ("Although the City was not obliged to inform arrestees about publicly published state law remedies, the City may not mislead arrestees about the necessary procedures for the return of their money or lull them into passively waiting for official notification.  On this record, it appears that the City's instructions were a model of misdirection."); Day v. Shalala, 23 F.3d 1052, 1065-66 (6th Cir. 1994) (notice that could have misled Social Security claimants into believing that filing a new application had the same effect as appealing a negative decision was inadequate); Gonzalez v. Sullivan, 914 F.2d 1197, 1203 (9th Cir. 1990) (holding earlier notice provision to that discussed in Day violated due process because it was "sufficiently misleading," in part because "the notice given in this case does not clearly indicate that if no request for reconsideration is made, the determination is final").  The Court holds that the notice Defendants provided Plaintiffs and class members was constitutionally defective because it misled them into the belief that any potentially meritorious attempt to obtain the release of the vehicles prior to the expiry of the 30-day hold, cognizable under now-applicable Ninth Circuit precedent and always cognizable by statute (mitigating circumstances), would be rejected.

Defendants' primary response to Plaintiffs' notice argument is that Ms. Brewster and Mr. Arizmendi *did* request storage hearings, "defeating their claim for lack of notice."  (MPSJ Opposition at 12.)  The obvious explanation for Ms. Brewster and Mr. Arizmendi's decisions to secure a storage hearing is that they were represented by Ms. Anderson-Barker, an able attorney who was deeply familiar with the rights available under the Vehicle Code and who, as noted elsewhere, made all the correct arguments at the hearings, ones that would have prevailed today because she was correct about the community caretaking issue, back when Defendants were wrong.  In other words, an attorney like Ms. Anderson-Barker was able to overcome the constitutionally defective notice given to unrepresented individuals because her knowledge of the

law was *not* based on the notice provided, but from additional sources.  But in an environment when the vast majority of those afforded "process" were unrepresented nonlawyers, the unrepresented nonlawyers had no additional knowledge to go by; they were forced to rely on the inadequate notice.  Defendants have consistently raised the argument that various claims of Mr. Vigil fail because he did not request a storage hearing, but the obvious conclusion that can be drawn from that fact is that he, unlike the other named Plaintiffs, did not have an attorney representing him.  The only evidence in the record on this point demonstrates that Mr. Vigil's situation was overwhelmingly the norm; Detective Papietro recalls that, of the more than 50 storage hearings she presided over, a single one had an attorney present.  (Papietro Declaration ¶ 2.)  Mr. Vigil and Plaintiffs properly raise the notice issue in this class action.  The Court holds that they prevail on it, because the notice Defendants provided falls below the "reasonably calculated" standard governing an adequacy of notice claim.  Defendants wholly failed to inform Plaintiffs and class members of the fundamental nature of the hearing to which they were entitled: a hearing that would allow them to seek the release of their vehicles prior to the expiry of the 30-day period if certain conditions applied or the individuals satisfied certain prerequisites.  The notice Defendants provide was not reasonably calculated to allow Plaintiffs and class members "an opportunity to present their objections . . . with due regard for the practicalities and peculiarities of the case."  See Grimm, 971 F.3d at 1065.

### 2.  Defendants Deprived Plaintiffs of a Meaningful Opportunity to be Heard

Plaintiffs argue that the "storage hearing" afforded Ms. Brewster and Mr. Arizmendi and members of the classes violated their due process rights; Defendants contend that the procedures afforded them were adequate.  (See MPSJ at 25-26; MPSJ Opposition at 12-17.)  The Court agrees with Plaintiffs.  As the analysis below shows, the process afforded by the LAPD did not merely heighten the risk of an erroneous deprivation of the vehicles.  It practically guaranteed it.

"The first inquiry in every due process challenge is whether the plaintiff has been deprived of a protected interest in property."  Am. Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 59 (1999) (internal quotation marks omitted).  If a court answers the first inquiry affirmatively, the second inquiry requires it to "examine[] whether the procedures attendant upon that deprivation were constitutionally sufficient."  Vasquez v. Rackauckas, 734 F.3d 1025, 1042 (9th Cir. 2013).  "[A]lthough the Supreme Court has held that an individual should normally be given notice and an opportunity to be heard *before* he is deprived of his property . . . that rule is assuredly not hard and fast."  Lynwood Unified Sch. Dist., 149 F.3d at 984 (citations omitted); see also United States v. James Daniel Good Real Prop., 510 U.S. 43, 48 (1993) ("Our precedents establish the general rule that individuals must receive notice and an opportunity to be heard before the Government deprives them of property.").  "Loss of the use and enjoyment of a car deprives the owner of a property interest that may be taken from him only in accordance with the Due Process Clause.  Due process strictures must be met though the deprivation be temporary."  Stypmann, 557 F.2d at 1342.  It is undisputed that Defendants deprived Plaintiffs and class members of their property in the form of their vehicles.

---

Determining what process is due under the Fourteenth Amendment is a flexible analysis that varies depending on the given circumstances and the deprivation at issue in a case. Morrissey v. Brewer, 408 U.S. 471, 481 (1972). "The determination of what procedures satisfy due process depends upon an analysis of the particular case in accordance with the three-part balancing test outlined in Mathews v. Eldridge, 424 U.S. 319[] (1976)." Orloff v. Cleland, 708 F.2d 372, 378–79 (9th Cir. 1983).

When assessing a procedural due process violation, a court must weigh and balance three separate factors: (1) "the private interest that will be affected by the official action;" (2) "the risk of an erroneous deprivation of such interest through the procedures used, and probable value, if any of additional or substitute procedural safeguards;" and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." Mathews, 424 U.S. at 335. When balancing the Mathews factors, courts must remain cognizant of the Fourteenth Amendment's most fundamental requirement of "the opportunity to be heard at a meaningful time and in a meaningful manner." Mathews, 424 U.S. at 333 (internal quotations and citation omitted).

The Ninth Circuit has previously assessed the due process sufficiency of a hearing under California Vehicle Code section 22852 and held that both the 48-hour wait for a post-seizure hearing and the 48-hour post-towing notice provision comply with the Due Process Clause. See Goichman, 682 F.2d at 1324 (upholding the 48-hour wait for a post-deprivation hearing as sufficiently prompt); Scofield, 862 F.2d at 764 (upholding the 48-hour post-towing notice provision as sufficiently prompt). However, the Ninth Circuit has never addressed in a published opinion the sufficiency of process afforded in a hearing under section 22852, let alone the sufficiency of a hearing with respect to the 30-day impound imposed by section 14602.6(a)(1) and the Impound Policy.[43] Therefore, absent binding authority, the Court must conduct a Mathews analysis to determine whether the post-deprivation hearing violates the Due Process Clause.

//
//
//

---

[43] The Ninth Circuit has upheld the process afforded in a hearing under section 22852 for a 30-day impoundment in one unpublished opinion. See Salazar v. City of Maywood, 414 F. App'x 73 (9th Cir. 2011). However, Salazar did not conduct a Mathews analysis or assess the constitutional implications of the 30-day impound provision. Instead, the opinion merely cited the holdings in Scofield and Goichman and reiterated the sufficiency of notice and adequate promptness of a post-deprivation hearing under the statute. Id. at 75. Further, unpublished opinions are not precedent. See Ninth Circuit Rule 36–3(a). "Designedly lacking, because of their limited function, the nuance and breadth of precedential opinions, [the Ninth Circuit's] memorandum dispositions are not only officially nonprecedential but also of little use to district courts or litigants in predicting how [the Ninth Circuit]—which, again, is in no way bound by such dispositions—will view any novel legal issues in the case on appeal." Grimm, 971 F.3d at 1067.

a. <u>Mathews</u> Analysis: Private Interest

The Court begins by weighing the "private interest" at stake. <u>Mathews</u>, 424 U.S. at 335. The Impound Policy deprives vehicle owners of a vehicle for 30 days and thereby implicates the private interest "in the uninterrupted use of an automobile." <u>Stypmann</u>, 557 F.2d at 1342–43. "The private interest in the uninterrupted use of an automobile is substantial. A person's ability to make a living and his access to both the necessities and amenities of life may depend upon the availability of an automobile." <u>Id.</u>; <u>accord</u> <u>Scofield</u>, 862 F.2d at 762 ("The uninterrupted use of one's vehicle is a significant and substantial private interest"); <u>Goichman</u>, 682 F.2d at 1324; <u>Grimm</u>, 971 F.3d at 1063; <u>Lone Star Sec. & Video, Inc. v. City of Los Angeles</u>, 584 F.3d 1232, 1238 (9th Cir. 2009). The Ninth Circuit has previously placed emphasis on the difference in length of vehicle impoundment when weighing the private interests in a <u>Mathews</u> analysis. <u>See</u> <u>Goichman</u>, 682 F.2d at 1324 ("The deprivation of an automobile for forty-eight hours, while a burden, is not of the same magnitude as the five-day deprivation involved in <u>Stypmann</u>"); <u>see also</u> <u>O'Leary v. California Highway Patrol</u>, 34 F.3d 1073 (9th Cir. 1994) ("The private interest in the uninterrupted use of an automobile may be substantial, particularly where an individual has been deprived of the vehicle's use for several days.").

Here, section 14602.6(a)(1) and the Impound Policy enforce a 30-day impound against vehicles meeting certain criteria. <u>See</u> Cal. Veh. Code § 14602.6(a)(1) ("A vehicle so impounded shall be impounded for 30 days."); SO7 § II (A–D). A 30-day impound is fifteen times longer than the 48-hour impound in <u>Goichman</u> and six times longer than the five-day impound invalidated in <u>Stypmann</u>. <u>See</u> Goichman, 682 F.2d at 1323; <u>Stypmann</u>, 557 F.2d at 1341. As noted above, the harm to Plaintiffs and class members is also far greater than that present in <u>Goichman</u>, <u>Stypmann</u> or <u>Scofield</u>, because in those cases the individuals could immediately secure the release of their vehicles upon payment of the towing and storage charges and/or securing current registration. <u>See</u> <u>Stypmann</u>, 557 F.2d at 1341; <u>Goichman</u>, 682 F.3d at 1323; <u>Scofield</u>, 862 F.3d at 761.

But the property deprivations did not end at 30 days: by imposing ever-increasing daily storage fees during that period on vehicle owners, the Impound Policy created a situation in which many individuals who could have afforded to pay the limited fees associated with a tow and initial impound could not afford to pay their debts to Defendants by the time the 30 days had run. For example, when Mr. Arizmendi originally sought the release of his vehicle at his storage hearing, he had enough money to pay the towing and storage charges; after Defendants refused to release the vehicle in violation of his Fourth Amendment rights, by the time the 30-day impound period had concluded, Mr. Arizmendi could not afford to pay the accumulated towing and storage charges, and consequently the OPG that was storing the Sienna sold it a statutory lien sale about 40 days after the storage hearing. (<u>See</u> PCSSUF ¶ 39; 42.)[44] <u>See</u> <u>Smith</u>, 97 Cal. App.

---

[44] This was because, by statute, if a vehicle owner fails to pay administrative fees for the cost of the 30-day impound, the vehicle can be impounded for up to 120 days, while the failure to pay administrative costs can result in the sale of the impounded vehicle to satisfy the fees owed (continued . . . )

4th at 568 (explaining circumstances in which a vehicle impounded for 30 days under Section 14602.6 could create costs that "exceed the value of the impounded vehicle and effect a forfeiture").  As further explained below in the discussion of <u>Monell</u> liability, the Impound Policy trapped individuals like Mr. Arizmendi and members of the Lien Class in a cycle of debt they could not overcome, leading to the forfeiture and *permanent loss* of their vehicles.  <u>See</u> <u>City of Chicago, Illinois v. Fulton</u>, 141 S. Ct. 585, 593–94 (2021) (Sotomayor, J., concurring) ("Drivers in low-income communities across the country face . . . vicious cycles: A driver is assessed a fine she cannot immediately pay; the balance balloons as late fees accrue; the local government seizes the driver's vehicle, adding impounding and storage fees to the growing debt; and the driver, now without reliable transportation to and from work, finds it all but impossible to repay her debt and recover her vehicle. . . . The cycle thus continues, disproportionately burdening communities of color, . . . and interfering not only with debtors' ability to earn an income and pay their creditors but also with their access to childcare, groceries, medical appointments, and other necessities.").  For these individuals, the deprivations are permanent and irreparable, and thus potentially *infinitely* longer in duration than the 48-hour impound in <u>Goichman</u> and five-day impound invalidated in <u>Stypmann</u>.

It is useful to compare and contrast the process afforded individuals in Mr. Arizmendi's shoes with a similarly situated unlicensed driver for whom a municipality sought the forfeiture of his vehicle under Section 14607.6.  As already explained by the history of Section 22852, it is clear beyond cavil that a Section 22852 hearing was never intended to determine if a person's vehicle may be subject to *de facto* forfeiture for failure to pay the towing and storage fees imposed on unlicensed drivers.  California has a different statute, one that includes "[m]otor vehicles subject to forfeiture" in its title: § 14607.6.  Section 14607.6 provides that "a motor vehicle is subject to forfeiture" as a "nuisance" under certain circumstances, e.g., when it is driven by an unlicensed driver, subject to certain exceptions.  <u>Id.</u> (a).  <u>See</u> <u>Sandoval</u>, 72 F. Supp. 3d at 1011 ("It is also important to note that the City had alternative means available under state law to protect the public, if it truly believed that Ruiz was an unsafe driver.  Specifically, the City could initiate forfeiture proceedings under California Vehicle Code section 14607.6.").  In what might be said to be *de jure* forfeiture, the statute results in "[a]ll right, title, and interest in the vehicle . . . vest[ing] in the state upon commission of the act giving rise to the forfeiture."  § 14607.6(e)(6).  Following notice to the registered owner of the vehicle and a claim by the owner contesting the forfeiture, the statute calls for a mandatory judicial process.  <u>See</u> <u>id.</u> e(2)-(5) ("If a claim is timely filed and served, then the district attorney *shall* file a petition of forfeiture with the appropriate juvenile or superior court within 10 days of the receipt of the claim.  The district attorney shall establish an expedited hearing date in accordance with instructions from the court, and the court shall hear the matter without delay.") (emphasis added).  The statute establishes familiar principles for civil court proceedings, e.g., the prosecuting agency bears the burden of proof by a preponderance of the evidence.  <u>See</u> <u>id.</u> (e)(5).  In the Court's view, the procedures established in Section 14607.6 more appropriately weigh the competing interests in the context of a permanent vehicle forfeiture.  An individual subject to forfeiture proceedings might actually get a

---

by the vehicle owner.  <u>See</u> Cal. Veh. Code § 14602.6(i); Cal. Veh. Code § 22851(a)(1); Cal. Civ. Code § 3071.

fair opportunity to argue his case before a California Superior Court judge, a "neutral and detached" figure trained in the law, bound by precedent and a code of ethics, and subject to reversal by appellate courts.  See United States v. Ezell, 6 M.J. 307, 312 (C.M.A. 1979) ("the view of the United States Supreme Court is that . . . a neutral and detached . . . [official] . . . must be completely severed from law-enforcement and prosecutorial functions.").  But individuals like Mr. Arizmendi did not get a Section 14607.6 hearing, even though they faced the same end result as if they had: the permanent loss of their vehicles.  As the Mathews analysis above and below demonstrates, the storage hearings afforded Mr. Arizmendi and others pursuant to Section 22852 were a feeble substitute for court-driven processes like Section 14607.6.

Defendants once again claim that the private interests are limited because certain drivers subjected to impounds could not lawfully drive their vehicles.  (MSJ at 15.)  The Court has previously explained why this argument has limited import:

> It is true that some of the vehicle owners subject to the Impound Policy do not have valid licenses or have licenses that are revoked or suspended at the time of impound.  Even for those vehicle owners without the ability to drive legally, the private interests at stake are still significant: the right to possess their vehicle, the right to rent it, the right to ride as a passenger, the right to lend it to lawful drivers (including family members, spouses, and friends), and the right to sell the vehicle.  Notwithstanding these vehicle owners, other vehicle owners subject to the Impound Policy and 14602.6(b) are vehicle owners with valid or only partially restricted licenses.

(MTD 4AC Order at 7.)  The Ninth Circuit has made much the same observation:

> The City argues that its continued possession was necessary because Ruiz did not have a valid driver's license.  But, even if Ruiz could not have driven his vehicle on California's roads, he could have lent the truck to a friend, sold the truck, used it for storage, or taken any other innumerable possible actions that a property owner can lawfully take with his or her property.  The City has not provided us with any reason that a government may warrantlessly interfere with private possessory interests in this way, beyond its general argument that such impounds are justified as a deterrent or penalty.

Sandoval, 912 F.3d at 517.

In light of the above, the Court finds that Plaintiffs' private interests in uninterrupted automobile use were heavily impaired by the Impound Policy.

    **b.** <u>Mathews</u> **Analysis: Risk of Erroneous Deprivation and Probable Value of Additional Safeguards**

Next, the Court examines "the risk of an erroneous deprivation of . . . [the private] interest through the procedures used, and probable value, if any of additional or substitute procedural safeguards." <u>Mathews</u>, 424 U.S. at 335. The central problem with the "procedures" employed by Defendants at the impound hearings offered to Plaintiffs and class members was this: they explicitly barred hearing examiners from considering the most important, and arguably *only* important, issues. The touchstone of due process is that an individual deprived of property can be heard in a "meaningful manner." <u>Lynwood Unified School Dist.</u>, 149 F.3d at 984. By the strictures Defendants imposed on impound hearings, LAPD ensured the opposite: even an individual who satisfied every lawful prerequisite for the release of her vehicle, and who clearly showed that the ongoing seizure of her vehicle was unlawful, would be guaranteed to lose her hearing as long as the hearing examiners followed LAPD's own rules.

As noted above, LAPD's website clearly stated to the public there were only six circumstances in which a vehicle could be released prior to the expiry of the 30-day hold. (PCSSUF ¶ 59.) And those six circumstances matched, word-for-word, what Order #16 said were the *exclusive* reasons for early release of a vehicle impounded pursuant to Section 14602.6, a framework by which detectives conducting storage hearings were bound. (See PCCSUF ¶ 70; Order #16; PAMF ¶ 38; Fesperson Dep. 90:19-91:17.) Most critically, Order #16 and the Impound Policy as a whole explicitly barred release on what could be called <u>Brewster</u>, 859 F.3d 1194 or <u>Sandoval</u>, 912 F.3d 509 grounds: they did not authorize a vehicle's early release from a Section 14602.6 30-day impound on grounds that there is no Fourth Amendment justification for the continued impound of the vehicle for 30 days. (PAMF ¶ 39.) And for vehicles impounded under Section 14602.6, Order #16 and the Impound Policy writ large did not permit early release merely because (a) the registered owner tenders accrued towing and storage fees and (b) presents a licensed driver, other than the driver when the vehicle was impounded, to take possession. (<u>Id.</u> ¶ 40.) Defendants attempt to muddy the waters by claiming that S07 *did* reference the community caretaking doctrine. But by its plain terms, S07 only provided that officers should be guided by the community caretaking doctrine when determining whether to impound a vehicle *in the first place*. (DSGMF ¶ 11.) However, the Impound Policy never justified the decision to implement a 30-day hold on the vehicle through a community caretaking rationale. The LAPD's justification for imposing a 30-day hold (pursuant to Section 14602.6) as distinguished from removing the vehicle from the street (pursuant to Section 22651(p)) was twofold: (1) Section 14602.6 mandated a 30-day impound; and (2) LAPD sought to deter future unlawful driving of the impounded vehicle by the unlicensed driver. (PCSSUF ¶ 11.) Why was this LAPD's position? The answer is obvious: it failed to anticipate the holdings in <u>Brewster</u>, 859 F.3d 1194 or <u>Sandoval</u>, 912 F.3d 509, and because it did not believe it *needed* a community caretaking interest to continue to impound the vehicles. Then-Assistant Chief Moore's deposition testimony accurately reflects the legal position of LAPD during the relevant period:

        Q:  What community caretaking function is served by keeping the
        car in impound for 30 days?

> A: It's not my understanding that the Community Caretaking
> Doctrine extends through the length of the storage.

(Moore Dep. 129:12-19.)  And this is also why, within days of Defendants' loss at the Ninth Circuit in <u>Brewster</u>, 859 F.3d 1194, once Defendants realized that their longstanding policy was almost certainly illegal because they had no community caretaking rationale for the 30-day impounds, Defendants simply stopped impounding vehicles for 30 days under Section 14602.6 and used Section 22651(p) instead, which does not impose a 30-day hold.  (PAMF ¶ 42.)

The other central problem with Defendants' storage hearing procedures is the one referenced above with regard to constitutionally deficient notice: either based on an erroneous interpretation of law or because they simply wanted to limit hearing examiners' discretion to release vehicles, Defendants crafted an Impound Policy that appears to have limited an inquiry into "mitigating circumstances" to a virtually meaningless exception.  Order #16 stated, as did LAPD's website, that a vehicle could be released if the owner proved that the "vehicle was driven by an unlicensed driver without the registered owner's knowledge or permission."  (Order #16; PCSSUF ¶¶ 59, 70.)  This appears to have been the only kind of "mitigating circumstance" Defendants' Impound Policy said hearing examiners could consider, even though the statutory scheme defined "mitigating circumstances" far more broadly.  <u>See</u> <u>Smith</u>, 97 Cal. App. 4th at 556; <u>Samples v. Brown</u>, 146 Cal. App. 4th 787, 801-02 (2007).  And, as noted below, the undisputed evidence in the record establishes that Defendants appear to have ignored even *that* incredibly narrow exception, for when Ms. Brewster presented exactly that set of facts, Defendants refused to release her vehicle anyway.[45]

Ms. Brewster's story is a perfect illustration of why the storage hearings were fundamentally unfair, for the facts and law were entirely on her side and she *still* lost.  To begin, Ms. Brewster, unlike the overwhelming majority of individuals, was represented by an attorney, Ms. Anderson-Barker, and a skilled one at that.  (<u>See</u> Papietro Declaration ¶ 2.)  Ms. Anderson-Barker argued at the impound hearing that the initial seizure of the Impala was unlawful because there was no community caretaking justification; there were two licensed drivers in the car who could drive it away, and Ms. Brewster was immediately available and nearby at Kaiser Hospital.  (PCSSUF ¶ 28.)  That was almost certainly a winning argument if the hearing examiner, Detective Frus, was following S07's mandate that the *initial* decision to impound must be

---

[45] Though "mitigating circumstances" could include any number of things, one particularly important one, and one that Defendants appear to have ignored, is whether "there is a community property interest in the vehicle . . . and the vehicle is the only vehicle available to the driver's immediate family."  <u>See</u> Cal. Veh. Code § 14607.6(d)(2).  To properly weigh any governmental interest in the impound against the private interest of a vehicle owner, an impounding agency like LAPD could have, and should have, considered the impact of impoundment on a family.  For example, the Impound Policy could have stated that a vehicle would be released if it is the only vehicle available to a driver's immediate family, one necessary to, say, allow the spouse (not at fault for driving unlicensed) to go to work or to take the children to school.

consistent with community caretaking, but Ms. Brewster lost on that matter.  So was this: Ms.
Brewster was not the one driving the car, she did not know that the person who she had let
borrow the vehicle was unlicensed, and so it made little sense to punish *her* with a 30-day
impound for something that was not her fault.  This is a "mitigating circumstance" that
Defendants were required to consider, for Ms. Brewster did not know that the driver to whom
she had loaned the Impala was unlicensed.  See Smith, 97 Cal. App. 4th at 556-50.  Nonetheless,
that argument did not work either.  But she had an even better argument, at least one now
recognized by Ninth Circuit precedent: there was no community caretaking justification for the
30-day impound, because a licensed driver could take the car, the vehicle was registered, and she
would pay the accrued storage and tow charges, even though she feared she could not pay them
once they compounded over 30 days.  (See (PCSSUF ¶ 28.)  Yet Detective Frus responded
essentially by saying his hands were tied: the hearing was just about the "probable cause" to
impound in the first place, and when he upheld the 30-day impound, the only stated reason for
his decision was that Section 14602.6 authorized the 30-day hold.  (Transcription of Audio
Recording of October 31, 2014 Impound Hearing; PCSSUF ¶ 29.)

Apart from some of the nuances discussed above, Mr. Arizmendi's story during and
leading up to the storage hearing was very similar, which makes sense because he was
represented by the same lawyer, Ms. Anderson-Barker.  She told Defendants the vehicle was now
lawfully registered to Mr. Arizmendi, he would pay the towing and storage charges, and a
licensed driver could drive the car from the impound lot.  (PCSSUF ¶¶ 38-40.)  As such, there
was no further justification for the 30-day hold.  (See id.)  A different hearing examiner,
Detective Papietro, refused to release the vehicle.  (Id.)

Doubtless, some of Defendants' procedures simply tracked the statutory scheme.  Like
the Impound Policy itself, Section 14602.6(d)(1), which provides for the immediate release of a
vehicle impounded for 30 days under section 14602.6(a)(1), does not specify a lack of
constitutional authority as one of the grounds for immediate release of a vehicle.  See §
14602.6(d)(1)(A-E).  As noted above, LAPD placed the burden of proof of establishing
"mitigating circumstances" upon the vehicle's owner, to the extent it considered any at all.
(PCSSUF ¶ 71; PSSGD ¶ 30; Fesperson Dep. 90:10-91:4, 93:17-25; Order #16.)  The statutory
scheme appears to have *allowed* for that in the sense that it did not provide the answer one way or
the other.  See Smith, 97 Cal. 4th at 579-70; Cal. Veh. Code § 14602.6(b). But on that basis,
the Court does not conclude that LAPD was *required* to shift the burden to the vehicle owner.
And in doing so, the City's storage hearings increased the risk that LAPD would improperly
deprive vehicle owners of their vehicles.  See Stypmann, 557 F.2d at 1343 ("The only hearing
available . . . [places] the burden of proof . . . upon the owner of the property seized rather than
upon those who have seized it.").  But at least with regard to "mitigating circumstances,"
Defendants appear to have gone beyond the statutory scheme and limited the circumstances for
authorized release even further; as explained in more detail with regard to Monell liability,
Defendants had choices when crafting their enforcement of these statutes, and they can be held
liable for the choices they made.  But there was also nothing stopping Defendants from
considering the constitutional implications of the impounds, and indeed, Defendants had an
*obligation* to consider the Constitution with regard to the 30-day impounds.  Sandoval, 912 F.3d at

516 ("the community caretaking exception does not categorically permit government officials to impound private property simply because state law does."). Defendants acknowledged as much with regard to the *initial* impounds, for S07 begins with the observation that "State and federal court decisions have held that the statutory authority to impound, alone, does not determine the constitutional reasonableness of the seizure under the Fourth Amendment of the United States Constitution." (S07.) The same is true of the reasonableness of the seizures with regard to the decision to continue to impound the vehicle for 30 days.

There is another aspect of the storage hearings that rendered them fundamentally unfair and enhanced the risk of erroneous deprivation: LAPD had its own employees preside over the hearings regarding the validity of the impounds imposed by *other* LAPD employees. The statute allows for, but does not require this feature. See Cal. Veh. Code § 22852(c) ("The public agency [responsible for the impound] *may* authorize its own officer or employee to conduct the hearing if the hearing officer is not the same person who directed the storage of the vehicle.") (emphasis added). In practice, during the relevant period (and to this day), the hearing officer for the storage hearings offered by LAPD was always an LAPD detective, albeit not the same exact individual who directed the vehicle's impound. (PCSSUF ¶ 68; DSGMF ¶ 68.) Defendants argue that there is no direct evidence in the record that the hearing officers were biased, that detectives were "trained to be unbiased," and in fact, one of the hearing examiners, Detective Papietro, released vehicles following a storage hearing over 50 percent of the time. (MSJ at 12.) Plaintiffs respond by observing that the hearing examiners were biased in a structural form: they could not and did not consider the arguments that mattered, including the lack of a community caretaking justification and mitigating circumstances. (See MSJ Opposition at 19.) The Court disagrees with Defendants that all evidence in the record suggests the hearing examiners were fair and impartial; it is difficult to read the hearing transcript regarding the impound of Ms. Brewster's vehicle, and to see the records of decision-making regarding the impound of her vehicle and Mr. Arizmendi's, and conclude that the examiners did not begin and end with the presumption that the impounds were going to be upheld, regardless of what was said during that hearing. But even so, as Plaintiffs observe, the "bias" was far more powerful than the personal feelings of any one hearing examiner; it was structurally pervasive.

Defendants have argued that Detective Jones' training presentation establishes the fairness of the hearings because he taught detectives they should be "impartial and consider the evidence" and that there would be "no kangaroo courts." (Jones Declaration Ex. 8.) One could certainly argue that a statement from the individual training the hearing officers *not* to preside over "kangaroo courts" evinces a kind of consciousness of guilt, an acknowledgment of the absurdity of the idea that an ordinary citizen is going to get a fair shake in front of an LAPD employee judging the conduct of her fellow officer. But the more important issue is that the hearings had one salient feature of a "kangaroo court," or at least that is what the evidence in the record suggests: they came to a predetermined conclusion by explicitly barring the consideration of the vehicle owner's best arguments for release. In other words, the undisputed evidence demonstrates that the hearings were, in at least some instances, a kind of simulation or perfunctory exercise in which Defendants were forced to go through the motions of holding *some* kind of hearing and at the end of them they could say what Detective Frus did in Ms. Brewster's

case: this was just a "probable cause" hearing, there was "probable cause" to impound the vehicle in the first place, so the vehicle would not be released until the 30 days are up. Ms. Papietro's declaration testimony is useless without context: she simply declares that she conducted over 50 storage hearings and "authorized the release of vehicles from the 30-day hold more than half the time following these storage hearings." (Papietro Declaration ¶ 2.) Even if the Court accepted this barebones assertion without independent proof of its veracity, Defendants have offered no evidence as to what circumstances triggered her decision to release the vehicles, or even what arguments she actually thought cognizable for release. Because the primary basis upon which S07, Order #16, and the Guidelines actually call for release is that the initial decision to impound was unlawful in the first place, a reasonable and probably likely inference is that she released the vehicles when the impounding officer's decision was not consistent with S07. Though she appears to have been better than Detective Frus, there is no evidence in the record for the Court to conclude that Detective Papietro actually presided over a single *fair* hearing or conducted one in an impartial manner. And since the only evidence in the record shows that both Ms. Brewster and Mr. Arizmendi's hearings were *unfair*, the Court has been given no evidence of what a legitimate storage hearing may have looked like or that LAPD actually held one.

To prevent "even the probability of unfairness," the Supreme Court and other courts have identified "various situations . . . in which experience teaches that the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." Withrow v. Larkin, 421 U.S. 35, 47 (1975). With the evidence above in mind, there are many reasons to fear that the structures LAPD put in place created a strong incentive for bias. Chief among these is the fact that the detectives had a financial interest in upholding the impounds in order to protect the entity that was paying them. Another is rather obvious: the kinds of individuals who become police officers, and who rise through the ranks of the police department to become detectives, think in a certain way and become immersed in a certain police culture, such that no amount of training telling them to be "impartial" can, in reality, cure their conscious and unconscious biases in favor of the Department's impound decision. See Dahlia v. Rodriguez, 735 F.3d 1060, 1082 (9th Cir. 2013) (Pregerson, J., concurring) (describing operation of "officer code of silence" wherein police officers tolerate and cover up wrongdoing of other officers); Withrow, 421 U.S. at 47 (explaining that allegations of institutional bias require a "realistic appraisal of psychological tendencies and human weakness" in which the "risk of actual bias or prejudgment" is sufficiently significant "that the practice must be forbidden if the guarantee of due process is to be adequately implemented").

It is certainly true that, as Defendants point out, the Supreme Court has rejected the "bald proposition . . . that agency members who participate in an investigation are disqualified from adjudicating" under the Due Process Clause. Withrow, 421 U.S. at 52. But despite rejecting a bright-line rule that agencies who investigate matters cannot adjudicate those same matters, the Supreme Court has also made clear that "an impartial decision maker is essential" to due process. Goldberg v. Kelly, 397 U.S. 254, 271 (1970). Likewise, although a hearing officer's conflicts of interest are not inherently disqualifying, those conflicts "which would offer a possible temptation to the average man . . . to forget the burden of proof required" or "which

might lead him not to hold the balance nice, clear, and true" between two opposing parties are anathema to due process.  Ward v. Vill. of Monroeville, Ohio, 409 U.S. 57, 60 (1972).  The Supreme Court has also deemed process insufficient when hearing officers have a pecuniary or monetary interest — even indirectly — in the outcome of the adjudicated dispute.  See Gibson v. Berryhill, 411 U.S. 564, 579 (1973) ("It is sufficiently clear from our cases that those with substantial pecuniary interest in legal proceedings should not adjudicate these disputes.  And [caselaw] indicates that the financial stake need not be . . . direct.") (internal citations omitted); Tumey v. State of Ohio, 273 U.S. 510, 523 (1927).  Moreover, a "pecuniary interest need not be personal to compromise an adjudicator's neutrality."  Esso Standard Oil Co. v. Cotto, 389 F.3d 212, 219 (1st Cir. 2004).  "This principle of disqualification applies even if the pecuniary interest is only an indirect outgrowth of a public official's desire to protect official funds."  Meyer v. Niles Twp., Ill., 477 F. Supp. 357, 362 (N.D. Ill. 1979).

In the case of a storage hearing, LAPD officers adjudicating the validity of their fellow officers' impounds "would offer a possible temptation" to submit to an officer's biases and forsake the need for impartial balance.  Ward, 409 U.S. at 60.  The temptation for bias in a storage hearing is particularly strong because of the potential pecuniary consequences of a finding adverse to the agency's initial determination: a conclusion that an impound is invalid would definitely trigger administrative costs for the agency and could lead to further costs, such as if an individual filed a civil lawsuit on the basis of the illegality of the seizure.  See Cal. Veh. Code § 22852(e) ("The agency employing the person who directed the storage shall be responsible for the costs incurred for towing and storage if . . . reasonable grounds for the storage are not established."); 42 U.S.C. § 1983 (providing a federal cause of action for civil rights violations).  And, of course, the converse was true for Defendants as well: the City had a financial interest in upholding the 30-day impounds because the fees increased every day the vehicles were in storage.  When procedures already lack avenues for a meaningful hearing, as do the procedures here, a potentially biased hearing officer serves to increase the chances of an erroneous deprivation of property.[46] [47]

---

[46] Defendants argue that Plaintiffs could have filed a writ of mandate in state court under California Code of Civil Procedure section 1094.5 if they desired independent judicial review.  (MSJ at 13.)  But state court review and relief from a potentially erroneous decision by a hearing officer will almost certainly arrive belatedly and after the 30-day impound has concluded.  See Stypmann, 557 F.2d at 1343 (rejecting state causes of action as sufficient process for San Francisco towing ordinance because "[t]he… hearing available under any other state procedure may be long deferred").

[47] Although the possible bias is less severe than the California DMV hearing process to determine whether automatic suspension of a driver's license is warranted after the driver has been arrested for driving under the influence, in which a hearing officer acts both as advocate for the DMV and trier of fact, much of the analysis in a California Court of Appeal decision holding that the process violates due process is also relevant here.  See California DUI Laws. Assn. v. Dep't of Motor Vehicles, 77 Cal. App. 5th 517 (2022) (canvassing precedent holding that "procedural fairness requires some internal separation between advocates and decision makers to (continued . . . )

In <u>Sandoval</u>, 912 F.3d 509, Judge Watford wrote a concurring opinion that addressed this constitutional infirmity:

> Section 14602.6 does suffer from one constitutional deficiency, which I alluded to at the outset.  When the government seeks to obtain property through forfeiture, it must comply not only with the demands of the Fourth Amendment but also with those of the Due Process Clause.  [<u>James Daniel Good Real Property</u>, 510 U.S. at 52].  Section 14602.6 provides the right to a prompt hearing to contest the impoundment, but this hearing may be conducted by an officer or employee of the police department responsible for seizing the vehicle.  Cal. Vehicle Code § 22852(c).  Due process does not demand a full-blown jury trial in this context, but it surely entitles an owner to a hearing before a neutral decision-maker.  <u>See</u> [<u>Goldberg</u>, 397 U.S. at 271].  The plaintiff in <u>Brewster</u> did not receive such a hearing, and neither did the plaintiffs in this case.  That fact alone renders the impoundment of their vehicles unlawful.

912 F.3d at 522 (Watford, J., concurring).  This Court follows Judge Watford's thoughtful analysis.

Finally, the "probable value . . . of additional… safeguards" need not be discussed at length.  <u>Mathews</u>, 424 U.S. at 335.  The Court finds that any number of changes in isolation, or together, to the structures of the storage hearing procedures offered by LAPD would have significantly reduced the risk of erroneous deprivation: allowing an independent agency to adjudicate the dispute; allowing the broad consideration of "mitigating circumstances" and/or reallocating the burden of proof on that issue; and requiring the consideration of the validity of the impounds in light of the Fourth Amendment would have greatly reduced the risk of erroneous deprivation under the Impound Policy.

---

preserve neutrality").  Defendants have provided no evidence that there is the requisite "internal separation" among LAPD employees responsible for presiding over impound hearings.  Unlike, say, employees of an Internal Affairs division, there is no indication that the LAPD detectives who preside over hearings do not also engage in regular policework at all other times, immersing themselves in the culture of the officers tasked with Vehicle Code enforcement and potentially even arresting and/or impounding the vehicles of unlicensed drivers themselves.  LAPD thus appears to have run the risk that a detective may be asked to be a "neutral" arbiter of law on one day and an advocate asked to provide evidence against a citizen on another day.

The procedures employed by Defendants led to a significant risk of erroneous property deprivation. Thus, the second prong of <u>Mathews</u> weighs against the due process sufficiency of the hearings.

### c. <u>Mathews</u> Analysis: Government Interest and Burdens

Last, the Court examines the "the Government's interest, including the function involved and the fiscal and administrative burdens that [] additional or substitute procedural requirement[s] would entail." <u>Mathews</u>, 424 U.S. at 335. Importantly — and unlike in the context of a 48-hour impound of a vehicle parked illegally on public streets — the City cannot justify the 30-day Impound Policy under a community caretaking interest. <u>See</u> <u>Goichman</u>, 682 F.2d at 1324 (weighing the need for "efficient . . . towage of illegally parked automobiles"); <u>see also</u> <u>Stypmann</u>, 557 F.2d at 1343 (acknowledging that the public interest in removing improperly parked vehicles from streets and highways is "substantial"). The imposition of the 30-day impound pursuant to the Impound Policy occurs only after vehicles are removed from public streets. The City cannot claim an urgent interest in impounding vehicles that are out of public roadways, within their possession, and stored "safely and securely." <u>Miranda</u>, 429 F.3d at 867.

Instead, the City's apparent interest in imposing a 30-day impound is to punish and deter drivers without licenses from driving on the public roadways. As already outlined at considerable length, Ninth Circuit precedent establishes that the interest in punishment and deterrence is distinct from a community caretaking interest. <u>See, e.g.</u>, <u>Miranda</u>, 429 F.3d at 866 ("[T]he deterrence rationale is incompatible with the principles of the community caretaking doctrine…. The need to deter a driver's unlawful conduct is by itself insufficient to justify a tow under the 'caretaker' rationale."). <u>Miranda</u> also cast doubt on the value — if any — of the Government's interest of punishment and deterrence in the due process context. <u>Cf.</u> <u>Miranda</u>, 429 F.3d at 867 (remanding case to district court for additional factfinding because punishment and deterrence interest was insufficient to justify lack of due process under impound ordinance). The City is fully capable of affording due process while satisfying its interest in punishing and deterring unlicensed drivers from driving. Thus, like in <u>Miranda</u>, an interest in punishment and deterrence is simply "insufficient justification for [] impoundment[.]" <u>Miranda</u>, 429 F.3d at 868 n.7. As a result, the Court finds that the City lacked a strong interest in maintaining the Impound Policy. This is further evidenced by the City halting it as soon as it lost at the Ninth Circuit; Defendants make no claim that the practices they have employed since 2017 are materially worse at protecting the public from unlicensed drivers. In light of all the alternatives to 30-day impounds, the Court finds they are not.

Furthermore, the "administrative burden" imposed on the City by additional or substitute procedural requirements would not have been particularly significant. Indeed, the City already provides for some form of a hearing for vehicle owners. <u>See</u> <u>Stypmann</u>, 557 F.2d at 1343 ("The fact that [the Government] has undertaken to provide a hearing in some circumstances suggests that it is neither unduly burdensome nor unduly costly to do so."). Admittedly, the most administratively burdensome procedural change for the City would have been providing hearing officers from a neutral agency. However, the impound statute already provides for

storage hearings conducted by agency members from outside the impounding agency.  Cal. Veh.
Code § 22852(c) (providing that the impounding agency may, but need not, assign one of its own
employees as the hearing officer).  Despite the possibility of administrative burdens, the
remaining procedures identified above could have been implemented without significant resource
expenditure.

Weighing all of the Mathews factors, the Court finds that the Impound Policy violated
due process.  The Impound Policy deprived Plaintiffs and applicable members of the certified
classes in their substantial interest in uninterrupted access to their vehicles.  The storage hearing
provided by the City under the Impound Policy failed to provide vehicle owners a "meaningful"
opportunity to be heard.  Mathews, 424 U.S. at 335.  The City's diminished interest in deterring
and punishing citizens for driving without a license failed to justify the lack of process afforded to
vehicle owners under the Impound Policy.  Moreover, providing additional process in a storage
hearing would not have been expensive or overly burdensome.

For the reasons above, the Court holds that Plaintiffs are entitled to judgment as a matter
of law on their claims challenging the adequacy of the notice and procedural protections afforded
them.  The Court DENIES the MSJ and GRANTS the MPSJ as to Plaintiffs' due process
claim.[48] [49]

---

[48] There may be additional reasons that the procedures employed by Defendants violated
due process.  For instance, it is not clear whether or to what extent Defendants provided the
evidence against a registered owner sufficiently in advance of the hearing (or even during it) to
enable her to adequately prepare for it.  The statute itself does not appear to impose such a
requirement.  See Cal. Veh. Code § 22852.  It is also not clear to what extent Defendants allowed
the robust cross-examination of adverse witnesses (such as the impounding officer) at the storage
hearings, which were considered an "informal" process.  The statute also does not appear to
specify whether this is a right of a vehicle owner.  See id.  These issues potentially present
additional due process problems.  See Interstate Com. Comm'n v. Louisville & N.R. Co., 227
U.S. 88, 93 (1913) ("All parties must be fully apprised of the evidence submitted or to be
considered, and must be given opportunity to cross-examine witnesses, to inspect documents,
and to offer evidence in explanation or rebuttal.  In no other way can a party maintain its rights or
make its defense.  In no other way can it test the sufficiency of the facts to support the finding");
Henry Friendly, *Some Kind of Hearing*, 123 U. PA. L. REV. 1267, 1282 (1975) (explaining that "to
know the evidence against one" is an essential element of a fair hearing).  However, the facts in
the record are not well-developed on these issues, and the parties do not brief them; the Court
thus does not reach them.

[49] It is useful to note here that Plaintiffs are not bringing a facial challenge to Section
22852, and the Court has no occasion to consider one.  As such, the authorities cited by
Defendants where individuals raised such claims are inapposite.  See Hupp v. City of Walnut
Creek, 389 F. Supp. 2d 1229, 1233-34 (N.D. Cal. 2005); Alviso v. Sonoma Cnty. Sheriff's Dep't,
186 Cal. App. 4th 198, 209-214 (2010).  Moreover, the facts and arguments raised by the
plaintiffs in those cases are different from those raised here, e.g., the plaintiff in Hupp was not
(continued . . . )

**D.  Requesting a Storage Hearing is Not a Prerequisite to Recovery**

The Court has already explained at some length why Defendants are wrong to state that Mr. Vigil's claims fail because he did not request a Section 22852 storage hearing.  It is not clear whether Defendants are also claiming that each of the tens of thousands of class members must submit *individualized* proof that they requested storage hearings in order to recover damages.  If so, that would undermine the fundamental purpose of class action litigation.  Defendants themselves have acknowledged this very point, albeit in reverse.  Defendants understandably objected to Plaintiffs' request seeking justifications "for the impounds of every single putative class member's vehicle."  (MPSJ Opposition at 9.)  They claim, "Plaintiffs misconstrue these responses, as the responses did not provide that Defendants had no justification for the impounds of these vehicles, but rather, that Defendants were unable to provide a response for each of the approximately 45,000 vehicle impounds then at issue because doing so was unduly burdensome and contrary to the purpose of class action litigation."  (Id.)  Just as it would be unnecessary and inappropriate to demand that Defendants provide an individualized rationale for the impound of every individual's vehicle, it would be "unduly burdensome and contrary to the purpose of class action litigation" for Defendants to impose a parallel obstacle in service of an argument that the impounds *were* justified.  This is certainly true when that is not a required element of either the Fourth Amendment or Fifth Amendment claims.

A request for a Section 22852 storage hearing is also plainly not an element of either class definition.  The Court certified two classes, as defined below.  First, the Legal Owner ("LO") Class with respect to Plaintiffs' Fourth and Fifth Amendment causes of action:

> [V]ehicle owners from November 2, 2012 to July 1, 2017 whose vehicles were i) impounded under the authority of SO7 for a 30-day impound; ii) whose vehicles were not released from impound on the first day of the impound; iii) whose vehicles were released to the vehicle's legal owner who, by operation of law, did not release the vehicle to its owner until after the conclusion of the 30- day impound period; and iv) there exists a Los Angeles City record documenting that the registered owner paid the City the California Government Code § 41612 fee, or, to the extent such records are unavailable, the vehicle remained registered to the RO six months after the impound.

---

subjected to a 30-day impound pursuant to Section 14602.6 and raised none of the issues addressed here, apart from the matter of bias.  See Hupp, 389 F. Supp. 2d at 1233.  And the plaintiff in Alviso simply argued that Section 22852 was unconstitutional because it did not "provide for judicial review of the impoundment."  186 Cal. App. 4th at 209.  That is not Plaintiffs' argument.  Moreover, much of the reasoning of these opinions is inconsistent with later Ninth Circuit precedent.  To the extent either of these nonbinding authorities are relevant here, the Court declines to follow them.

---

**CIVIL MINUTES—GENERAL**   Initials of Deputy Clerk mg

Second, the Lien Sale ("Lien") Class with respect to Plaintiffs' Fourth and Fifth Amendment causes of action:

> [V]ehicle owners from November 2, 2012 to July 1, 2017 whose vehicles were i) impounded under the authority of SO7 for a 30-day impound; ii) whose vehicles were not released from impound on the first day of the impound; iii) had their impounded car sold at a lien sale; and iv) had a valid current California driver's license at any point between the expiration of the 30-day impound and the lien sale or had an available driver to pick up the vehicle as of or before the lien sale date.

(MTD 5AC and MCC Order at 24-25.)  These class definitions already encompass the prerequisites for recovery under Ninth Circuit precedent and the merits holdings elsewhere in this opinion: by the express limitations therein, Plaintiffs and class members recover only when the vehicles were registered, relevant fees were paid, and a licensed driver (either the registered owner or another individual) was available to take possession of the vehicle before the 30 days had run.

Indeed, Defendants' argument that there must be individualized proof that an individual attended a storage hearing rehashes a contention that the Court has twice rejected in ruling on Plaintiffs' motion to certify the classes and Defendants' motion to decertify. (See MTD 5AC and MCC Order; MD; Order Denying MCC and MD.)  To the extent Defendants have suggested the Court's reasoning in denying Plaintiffs' renewed request to certify the Official Police Garage ("OPG") subclasses undermines Plaintiffs' entitlement to relief, the analysis above provides otherwise.  As always, the Court's orders regarding class certification are not final determinations on the merits. See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds, 568 U.S. 455, 466 (2013); Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC, 31 F.4th 651, 666–67 (9th Cir. 2022).  One important reason that is necessarily so is because the Court, when ruling on class certification, has not had an opportunity to see the evidence in the record and rule on what arguments the parties make on the underlying claims.  As it turns out, two such arguments raised by Plaintiffs are particularly important here, because the Court agrees with both of them: Defendants provided constitutionally deficient notice, while the Impound Policy itself would have barred release of the vehicles even if an individual had sought a storage hearing.

At best, the argument that an individual need to have requested a storage hearing does not negate the elements of a Fourth or Fifth Amendment claim.  It would arguably preclude liability *even if* all the elements of a claim are met, and is thus properly viewed as a type of affirmative defense, on which Defendants would bear the burden of proof.  See Barnes v. AT & T Pension Ben. Plan-Nonbargained Program, 718 F. Supp. 2d 1167, 1173-74 (N.D. Cal. 2010).  The first and primary problem with Defendants' argument is that it rests on a mistaken assumption: that if an individual had requested the early release of her vehicle and asserted valid grounds for doing so, Defendants would have released the vehicle.  But that is not true.  As explained elsewhere in this order, Plaintiffs and class members are entitled to relief because of Brewster, 859 F.3d 1194 and

Sandoval, 912 F.3d 509.  As held above, the Impound Policy authorized the impound of their
vehicles for 30 days in violation of Brewster and Sandoval.  Should any individual have requested
a storage hearing and raised the grounds recognized by Brewster or Sandoval, the Impound
Policy would have barred hearing examiners from granting release on those grounds: Defendants
explicitly did not recognize that an individual could obtain release as long as the car registration
was valid and a licensed driver could take the car away from the impound lot.  As the Court has
now repeatedly explained, and further explains below, class members could have made all the
right arguments to LAPD personnel, before, during or after a storage hearing, and it would not
have made a difference.  That is exactly what Ms. Brewster and Mr. Arizmendi did, and they
were unsuccessful.  An analogous body of law provides that plaintiffs can have standing to
challenge unconstitutional laws or policies even if they do not apply for relief, for the Ninth
Circuit has "consistently held that standing does not require exercises in futility."  Taniguchi v.
Schultz, 303 F.3d 950, 957 (9th Cir. 2002), as amended (Sept. 25, 2002); see also Madsen v.
Boise State Univ., 976 F.2d 1219, 1222 (9th Cir. 1992) (per curiam).  That is particularly true
when a court can determine that the legal provision challenged, such as a statute or policy,
"unambiguously precludes" the relief the plaintiff could have sought.  Taniguchi, 303 F.3d at
957.  In Desert Outdoor Advert., Inc. v. City of Moreno Valley, 103 F.3d 814 (9th Cir. 1996), for
example, the Ninth Circuit held that billboard operators had standing to challenge a permit
requirement, "even though they did not apply for permits," reasoning, "[a]pplying for a permit
would have been futile because . . . the ordinance flatly prohibited [their] signs[.]"  Id. at 818.
Finding that "[t]he Ninth Circuit has consistently held that standing does not require exercises
in futility," Dragovich v. U.S. Dep't of the Treasury, 764 F. Supp. 2d 1178, 1185 (N.D. Cal.
2011), the Dragovich court held that same-sex, California public employee plaintiffs challenging
provisions of the Defense of Marriage Act (DOMA) were not required to submit an application
for a California Public Employees' Retirement System (CalPERS) insurance plan when CalPERS
did not furnish an application to one plaintiff, CalPERS "made the exclusion abundantly clear in
its written and oral communications," and applicable law "plainly result in the exclusion of
same-sex spouses and registered domestic partners."  Id. at 1185.  While here the issue is a
determination on the merits, not standing, this same reasoning is compelling: the Impound Policy
"unambiguously precludes"  the "exclusion" of relief now recognized by Brewster and
Sandoval: that a municipality's community caretaking rationale is "discharged" when a
registered owner "was able to provide a licensed driver to take possession" of the vehicle.
Sandoval, 912 F.3d at 516.  Defendants' argument that class members need to have undertaken
"exercises in futility," Taniguchi, 303 F.3d at 957, in order to recover damages lacks merit.

But barring relief to individuals legally entitled to it is not just how the Impound Policy
actually worked in practice; it is equally as important that this is how Defendants *told* the public
and class members it worked.  As held above, Defendants provided constitutionally deficient
notice that misled the public, including class members, via the CHP-180 forms and the LAPD
website.  In sum, Defendants told these individuals that if a 30-day impound was imposed, they
must wait until the 30 days were over to get their cars out, with limited exceptions; none of those
exceptions included the circumstances recognized in Brewster and Sandoval.  Class members
were entitled to rely upon Defendants' representations, for those who did not request early
release and/or storage hearings on the basis that they had a licensed driver available would have

readily concluded that it would have been a waste of their time and money to try.  See Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 365–66 (1977) ("If an employer should announce his policy of discrimination by a sign reading 'Whites Only' on the hiring-office door, his victims would not be limited to the few who ignored the sign and subjected themselves to personal rebuffs. . . . When a person's desire for a job is not translated into a formal application solely because of his unwillingness to engage in a futile gesture he is as much a victim of discrimination as is he who goes through the motions of submitting an application.").  Essentially, Defendants misled class members into believing that they were not entitled to the release of their vehicles before the 30 days were over, even though they would have been.  Now, Defendants seek to profit from their own wrongdoing—providing notice with a misleading and incorrect legal position—by claiming that those who did not request storage hearings cannot recover damages when the City violated their Fourth Amendment rights.  The Court's holdings as to the merits of Plaintiffs' Fourth and Fourteenth Amendment compel the Court to reject this position.  Cf. Platt, 15 F.4th at 906 (holding that vehicle owners stated due process claim challenging forfeiture statutes and "should not be penalized for taking Arizona's statutory scheme at its word").  And as a matter of logic, Defendants' argument "violates [this Court's] chutzpah doctrine."  Phoenix Herpetological Soc'y, Inc. v. United States Fish & Wildlife Serv., 998 F.3d 999, 1005 n.13 (D.C. Cir. 2021); accord United States v. Sar-Avi, 255 F.3d 1163, 1165 (9th Cir. 2001) ("It is fortuitous that 'Yiddish is quickly supplanting Latin as the spice in American legal argot,' otherwise we might be bereft of a satisfactory description of [Defendants'] argument in this case.  Fortunately, 'chutzpah' is available, because our use of it is quite inevitable.") (quoting A. Kozinski & E. Volokh, Lawsuit, Shmawsuit, 103 Yale L.J. 463, 463 (1993).[50]

As an alternate basis for rejecting the argument, the Court would find that Defendants are estopped from raising the defense on grounds of equitable estoppel.  The doctrine "is based on the principle that a party 'should not be allowed to benefit from its own wrongdoing.'"  Est. of Amaro v. City of Oakland, 653 F.3d 808, 813 (9th Cir. 2011) (quoting Collins v. Gee West Seattle LLC, 631 F.3d 1001, 1004 (9th Cir. 2011)).  In the Ninth Circuit, a plaintiff must prove the following elements for the doctrine to apply: "(1) knowledge of the true facts by the party to be estopped, (2) intent to induce reliance or actions giving rise to a belief in that intent, (3) ignorance of the true facts by the relying party, and (4) detrimental reliance."  Id. (citing Bolt v. United States, 944 F.2d 603, 609 (9th Cir. 1991)); see also 31 C.J.S. Estoppel and Waiver § 114 ("A representation generally gives rise to an estoppel when it is false and is knowingly or negligently made by one person to another ignorant of the facts with the intention that such other act thereon and such other does reasonably rely and act thereon to the other's prejudice.").  Where a plaintiff seeks estoppel against the government, she must also show "affirmative misconduct (not mere negligence) and a serious injustice outweighing the damage to the public interest of estopping the government."  Amaro, 631 F.3d at 1004 (citation omitted).  Those elements are present here.  As to "knowledge of the true facts," Defendants' Counsel has claimed that Ms. Brewster "would have received her vehicle back had she presented a licensed

---

[50] See also Jack Achiezer Guggenheim, *The Evolution of Chutzpah as a Legal Term: The Chutzpah Championship, Chutzpah Award, Chutzpah Doctrine, and Now, the Supreme Court*, 87 Ky. L.J. 417 (1999).

**CIVIL MINUTES—GENERAL**          Initials of Deputy Clerk mg

driver." (MPSJ Opposition at 14).  As noted above, that is and is not true: Ms. Brewster's
license suspension is an irrelevant post-hoc rationalization for Defendants' decision to refuse to
release her vehicle, and Ms. Brewster's counsel presented the driver's licenses of both Ms.
Brewster *and* Mr. Johnson (whose license was undisputedly valid) at the storage hearing.  But
even Defendants must acknowledge that they were legally *required* to release Ms. Brewster's
vehicle, and the vehicles of similarly situated individuals, if a licensed driver was available.
However, Defendants provided notice to vehicle owners that said the exact opposite: your
vehicle will *not* be released even if you present a validly licensed driver.  Defendants intended to
reduce reliance upon this position for obvious reasons: LAPD did not want to release the
vehicles, and certainly did not want to go through the time and expense of storage hearings when
they would not have released the vehicles at the end of them anyway.  With the possible
exception of the anomalous individuals represented by a lawyer, Ms. Anderson-Barker, class
members were ignorant of the true factual and legal reality: they were entitled to their vehicles
back before the 30 days were up if a licensed driver was available.  And the class members relied
on Defendants' representations to their detriment.  The statistics bear this out.  By definition,
the class members' vehicles were impounded for the full 30 days (or more).  The average number
of days Defendants held class members' vehicles was 34 days.  (PCSSUF ¶ 103.)  In contrast,
when vehicles were impounded under Section 22651(p) and individuals were informed of their
right to release of the vehicles as long as a licensed driver was available and the fees were paid,
the overwhelming majority of individuals (over 85 percent) reclaimed their vehicles within three
days and virtually all (over 95 percent) reclaimed them within seven days.  (Id. ¶ 104.)  This
clearly shows that class members did not let their vehicles sit in the impound lot for the full 30
days, accruing expenses with every passing day, because they did not want their vehicles released
or because they could not find a licensed driver to take possession.  The reason certain class
members did not request storage hearings or otherwise seek early release of their vehicles before
the 30 days were over is that Defendants told them they could not.  There is simply no reasonable
alternate explanation: individuals would obviously want their valuable property back as soon as
possible and would not want to pay sizeable daily fees if they did not have to; it is not hard to find
*some* individual with a driver's license willing to come pick up the vehicle.  For all the reasons
specified elsewhere in this order, Defendants were not merely negligent in asserting this position,
and it would be a serious injustice if Defendants could escape liability for the constitutional
violations caused by the Impound Policy by claiming that class members were required to do
something Defendants themselves told them would not result in the release of their vehicles.

## E.  Fifth Amendment—Fourth Cause of Action

The parties appear to agree that the legal analysis regarding Plaintiffs' Fifth Amendment
claim is entirely derivative of the Fourth Amendment claim; neither asserts that the Court should
apply a separate test for the takings clause cause of action or suggests what that test would be.
(See MSJ at 16; MPSJ at 26-27.)  As such, the Court assess only the arguments raised by the
parties.

Defendants' sole argument as to Plaintiffs' takings clause claim consists of a single
sentence: that it "fails for all the same reasons that their claim for violation of the Fourth

Amendment fails."  (MSJ at 16.)  Since the Court has now just held that Plaintiffs' Fourth
Amendment claims do *not* fail, and granted them summary judgment on that cause of action, the
Court DENIES the MSJ as to Plaintiffs' fourth cause of action.

Plaintiffs also move for summary judgment on their fourth cause of action.  (See MPSJ at
26-27.)  Once again, Defendants' sole response to Plaintiffs' arguments is that Plaintiffs are not
entitled to summary judgment on their Fourth Amendment claim, "[a]nd because Plaintiffs'
Fourth Amendment claim is the basis for their Fifth Amendment claim, Plaintiffs are not entitled
to summary judgment as to that claim either."  (MPSJ at 9.)  That is likely because the Court has
previously rejected Defendants' other argument as to the merits of Plaintiffs' Fifth Amendment
claim.  Since the Court finds summary judgment appropriate for Plaintiffs on the claim, it is
useful to briefly revisit the Court's prior rulings.

The Takings Clause of the Fifth Amendment, which applies to the States through the
Fourteenth Amendment, provides that "private property [shall not] be taken for public use,
without just compensation."  U.S. Const. Amend. V; Schneider v. California Dep't of Corr., 151
F.3d 1194, 1198 (9th Cir. 1998).  In order to succeed on a takings clause claim, a plaintiff must
show that he possessed a property interest that is constitutionally protected and that the
government deprived him of that interest.  Schneider, 151 F.3d at 1198.  "[T]he paradigm of an
unconstitutional taking is the direct appropriation of property" by the government without just
compensation.  Colony Cove Properties, LLC v. City of Carson, 888 F.3d 445, 450 (9th Cir.
2018).

Defendants have never disputed that Plaintiffs' vehicles were "taken" within the
meaning of the Fifth Amendment or denied that they deprived Plaintiffs of their vehicles without
just compensation.  They have previously asserted two arguments: first, that Plaintiffs' Fifth
Amendment claim fails if their Fourth Amendment claim fails (the same as raised here), and
second, that even if Plaintiffs do prevail on their Fourth Amendment claim, no taking has
occurred because the unlawful seizure of the property would not constitute a "public use."  (See
MTD 4AC at 7-8.)

As the Court held in its MTD 4AC Order, the Court takes no issue with the first part of
Defendants' argument.  (Plaintiffs have never challenged the argument, either.)  It is well-
established that the takings clause does not prohibit takings made lawfully and pursuant to a
power other than the power of eminent domain.  Mugler v. Kansas, 123 U.S. 623, 668 (1887) ("A
prohibition simply upon the use of property for purposes that are declared, by *valid* legislation, to
be injurious to the health, morals, or safety of the community, cannot, in any just sense, be
deemed a taking.") (emphasis added); Bennis v. Michigan, 516 U.S. 442, 452 (1996) ("The
government may not be required to compensate an owner for property which it has already
*lawfully* acquired under the exercise of governmental authority other than the power of eminent
domain.") (emphasis added).  As the Ninth Circuit has affirmed, property seized pursuant to a
valid exercise of the police power does not violate the Takings Clause.  See Am. Sav. & Loan
Ass'n v. Marin Cty., 653 F.2d 364, 368 (9th Cir. 1981) ("If the regulation is a *valid* exercise of the
police power, it is not a taking if a reasonable use of the property remains.") (emphasis added).  It
follows that if Plaintiffs' Fourth Amendment cause of action had failed and the Court held that

the Impound Policy was a valid exercise of police power, Plaintiffs' takings claim would also not prevail.  Since that is not the case, and Defendants used an unconstitutional means to seize Plaintiffs' property without warrants or an exception to the warrant requirement, Plaintiffs' taking clause claim survives this threshold argument.

The Court has also previously rejected Defendants' "public use" argument.  (See MTD 4AC Order at 13-14.)  The public use provision in the takings clause is a limitation on the government's power to seize property.  Takings for a non-public or private use are *per se* unconstitutional, regardless of just compensation.  See Lingle v. Chevron U.S.A. Inc., 544 U.S. 528, 543 (2005) ("[I]f a government action is found to be impermissible — for instance because it fails to meet the 'public use' requirement . . . that is the end of the [Takings Clause] inquiry.  No amount of compensation can authorize such action."); see also Hawaii Hous. Auth. v. Midkiff, 467 U.S. 229, 245 (1984) ("A purely private taking could not withstand the scrutiny of the public use requirement; it would serve no legitimate purpose of government and would thus be void."); Armendariz v. Penman, 75 F.3d 1311, 1320 (9th Cir. 1996) ("It is overwhelmingly clear from more than a century of precedent that the government violates the Constitution when it takes private property for private use . . . [T]he Court's cases have repeatedly stated that one person's property may not be taken… without a justifying public purpose, even though compensation be paid.") (internal citations and quotations omitted).

There is also a disingenuous quality to Defendants' "public use" argument.  For one, no party has suggested that Defendants' real motivation is to impound (and potentially sell off later) the vehicles for a *private* use, say, to enrich the OPGs.  *If that* were so, this would be an entirely different kind of case, one with public corruption implications that made the allegations of unreasonable seizures appear comparatively trivial.  And no party has suggested that Defendants' Impound Policy is utterly pointless, either, implemented without any underlying motivation or purpose.  So if the Impound Policy does not serve a private use, and is not inherently arbitrary, then it seems very likely that Defendants created it to serve *some* kind of public use.  Defendants have been admittedly coy about what that is in the specific context of the Fifth Amendment, but elsewhere, it has become abundantly clear what Defendants' stated public interest is for the Impound Policy: to punish and deter unlicensed driving in order to keep the roads safe.[51]  As the Court has held above, this rationale is inconsistent with the Fourth Amendment's community caretaking doctrine, but that does not somehow deprive it of a "public" character.  To be sure, it is a bit odd to characterize a vehicle sitting in an impound lot as in "use," but the Supreme Court has never construed the provision with excessive literalism, referring to a "public purpose" throughout its jurisprudence.  See, e.g., Hawaii Hous. Auth., 467 U.S. at 240-42.  Substantively, "the 'public use' requirement is . . . coterminous with the scope of a sovereign's police powers."  Id. at 240.  Defendants claim that the acts of towing, impounding and holding vehicles for 30 days, and thereafter selling off at lien sales unclaimed vehicles, advance the public objective of roadway safety.  No one disputes that is a valid interest, but Defendants have

---

[51] As the Supreme Court has long observed, deterrence has "traditionally been viewed as a goal of punishment," while sanctions imposed for the purpose of deterring violations of public laws are "inherently punitive."  See Kokesh v. S.E.C., 581 U.S. 455, 464 (2017) (citations omitted).

exceeded the scope of their police powers by adopting means inconsistent with the Fourth Amendment.  Cf. Lee v. City of Chicago, 330 F.3d 456, 475 (7th Cir. 2003) (Wood, J., concurring) ("[A] physical taking must be for a public use. But that element goes to the legitimacy of the government's taking to begin with; if a taking is not for a public purpose, the government has no right to complete the act of eminent domain. . . . In any event, the City here makes a public use argument both about its need to retain or destroy cars in its pound, and so that element is not likely to be problematic in Lee's case.") (citations omitted); Bennis, 516 U.S. at 452-53 (rejecting takings clause challenge by a woman whose vehicle was abated as a public nuisance when her husband used it for sex with a prostitute because the government had "already lawfully acquired" a vehicle through its abatement power and "the State here sought to deter illegal activity that contributes to neighborhood deterioration and unsafe streets").[52] [53]  As such, both Plaintiffs' Fourth and Fifth Amendment claims are meritorious.

The Court holds that Defendants took Plaintiffs' private property without just compensation.  The Court DENIES the MSJ and GRANTS the MPSJ as to Plaintiffs' fourth cause of action.

**F.  Monell Liability**

As it has claimed throughout this case, even though there is no question that the Impound Policy qualifies as a municipal "policy" for purposes of finding Section 1983 liability, the City

---

[52] Of course, Bennis's reasoning is inapplicable as the validity of forfeiture proceedings, 516 U.S. at 446-462, for those are all conducted pursuant to a judicial process, and here Defendants accomplished the takings without *any* involvement by a court.  See Sandoval, 72 F. Supp. 3d at 1011 ("While the City argues that its greater power to initiate [forfeiture proceedings under California Vehicle Code Section 14607.6 or a criminal prosecution] implies the lesser power of seizing the vehicle for thirty days, that argument misses the crucial distinction that the forfeiture and criminal processes are conducted in the courts.  See Cal. Veh. Code § 14607.6(e)(1)–(5) (owner of vehicle subject to forfeiture may challenge forfeiture in court, where '[t]he burden of proof in the civil case shall be on the prosecuting agency').  Here, by contrast, the thirty day impoundment was warrantless, and therefore without judicial review.")

[53] To the extent Judge Henderson suggest otherwise in ruling on a motion to dismiss early in the Sandoval litigation, see Mateos-Sandoval, 942 F. Supp. 2d at 912, the Court respectfully disagrees.  But it is also not clear that Judge Henderson's reasoning is fundamentally inconsistent with the reasoning here, as he dismissed the takings clause claim *with* leave to amend, whereas a wholesale adoption of Defendants' public use argument would have warranted dismissal *without* leave to amend on futility grounds.  It appears that the plaintiffs in Sandoval elected not to proceed on the Fifth Amendment claim even though they had leave to amend, so Judge Henderson never had an opportunity to rule on the issue again.  As should be obvious from the rest of this order, the Court has found Judge Henderson's opinions enormously persuasive and wholly adopts his analysis as to other issues.

---

asserts that Plaintiffs have no basis to assert Monell[54] liability against it.  The City's argument can be summarized as follows: Section 14602.6 authorized and/or required it to do what it did, and the statute therefore caused Plaintiffs' injuries, not the City.  Defendants know the implications of this argument.  Since damages are not available against the State of California, and any individual state official may be eligible for qualified immunity, Defendants' position is this: even if the impounds violated the constitutional rights of tens of thousands of people, there is nothing Plaintiffs can do about it.  Fortunately, Defendants are wrong: the Impound Policy caused Plaintiffs' injuries and the City of Los Angeles is thus liable for them.

Defendants make five specific arguments.  First, that S07 "played no part" in Ms. Brewster's and Mr. Arizmendi's alleged injury.  (MSJ at 17.)  Second, S07 is "facially constitutional."  (Id.)  Third, that the 30-day hold is "mandated by state law."  (Id. at 18.)  Fourth, "the use of Section 14602.6 rather than Section 22651(p) is irrelevant regarding the City's liability."  (Id. at 21.)  And fifth, Plaintiffs' procedural due process claim fails against the City because S07 "does not speak to how a storage hearing will be conducted."  (Id. at 23.)  Before addressing, and rejecting, each of these arguments, the Court reviews applicable case law, most of which it already outlined when rejecting Defendants' argument to dismiss the Monell claims.  (See MTD TAC Order.)  The Court also addresses, and adopts, some of Plaintiffs' arguments: that the Impound Policy contains discretionary aspects that go well beyond state law authority; Defendants themselves have argued the enforcement of Section 14602.6 is wholly discretionary; Defendants themselves have acknowledged that Section 14602.6 can only be enforced if consistent with the Fourth Amendment; and even though they knew the community caretaking doctrine had to be taken into consideration, Defendants implemented an Impound Policy that compelled LAPD personnel *not* to consider community caretaking considerations to justify a 30-day impound as long the *initial* decision to impound was valid.

"[U]nder § 1983, local governments are responsible only for 'their own illegal acts.'"  Connick v. Thompson, 563 U.S. 51, 60 (2011) (quoting Pembaur v. Cincinnati, 475 U.S. 469, 479 (1986)) (plurality op.).  A local government entity "may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."  Monell, 436 U.S. at 694.  Thus, "[*r*]*espondeat superior* or vicarious liability will not attach under § 1983."  City of Canton v. Harris, 489 U.S. 378, 385 (1989) (citing Monell, 436 U.S. at 694-695).  Rather, municipalities may be liable under § 1983 in "three situations: when the plaintiff was injured pursuant to an expressly adopted official policy; a long-standing practice or custom; or the decision of a final policymaker."  Ellins v. City of Sierra Madre, 710 F.3d 1049, 1066 (9th Cir. 2013) (internal quotations and citation omitted).

An express municipal policy commonly includes an ordinance, regulation, or policy statement, whereas a "practice" must be so "widespread . . . that, although not authorized by written law or express municipal policy, [it] is 'so permanent and well settled as to constitute a

---

[54] v. Dep't of Soc. Servs., 436 U.S. 658 (1978).

custom or usage' with the force of law." <u>City of St Louis v. Praprotnik</u>, 485 U.S. 112, 127 (1988)
(quoting <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 167–68 (1970)); <u>see also</u> <u>Pembaur</u>, 475 U.S.
at 481–83 (1986).  Put another way, a longstanding practice or custom must "constitute[] the
'standard operating procedure of the local governmental entity.'"  <u>Gillette v. Delmore</u>, 979 F.2d
1342, 1346 (9th Cir. 1992) (quoting <u>Jett v. Dallas Indep. Sch. Dist.</u>, 491 U.S. 701, 737 (1989).
"City policy 'need only cause [the] constitutional violation; it need not be unconstitutional per
se.'"  <u>Chew v. Gates</u>, 27 F.3d 1432, 1444 (9th Cir. 1994) (quoting <u>Jackson v. Gates</u>, 975 F.2d 648,
654 (9th Cir. 1992)).  "City policy 'causes' an injury where it is 'the moving force' behind the
constitutional violation . . . or where 'the city itself is the wrongdoer.'"  <u>Id.</u> (quoting <u>Monell</u>, 436
U.S. at 694 and <u>Collins v. City of Harker Heights, Tex.</u>, 503 U.S. 115 (1992)).

 Plaintiffs assert <u>Monell</u> liability against the City on the basis of both a "policy" and
longstanding practice or custom.  (<u>See</u> MPSJ Reply at 12.)  As to the former, Plaintiffs assert that
the Impound Policy is what they say it is: a "policy."  In addition to asking the Court to find that
the Impound Policy is a "policy," Plaintiffs also argue that the Court could just as easily find
<u>Monell</u> liability on the basis of a widespread, longstanding practice or custom: in their view,
"tens of thousands of vehicles were . . . impounded," with "impounds occurring daily," in an
unlawful manner according to a routine, uniform legal position: that the City could impose 30-
day impounds without warrants or any form of judicial review as long as there was a valid basis
for the initial decision to impound the vehicle, even though the City had no community
caretaking justification (or any other Fourth Amendment justification) for the 30-day impound.
(<u>See id.</u>)  The Court agrees with Plaintiffs that the Impound Policy is a "policy"; it has already
made this finding above, and explained its origins and contours. For the same reasons, the Court
agrees with Plaintiffs that Defendants' implementation of the Impound Policy constituted a
practice or custom.  On the facts here, it matters little whether <u>Monell</u> liability is predicated on a
"policy" or practice or custom.  The latter is an equally valid basis for liability: even if the
Impound Policy had not been written down in multiple places, LAPD's practice or custom of
unconstitutional 30-day impounds was so "'persistent and widespread' that it constitutes a
'permanent and well settled city policy.'"  <u>Trevino v. Gates</u>, 99 F.3d 911, 918 (9th Cir. 1996)
(quoting <u>Monell</u>, 463 U.S. at 691).  In other words, the City's practice of authorizing
unconstitutional seizures was the opposite of "isolated or sporadic incidents."  <u>Id.</u>  The tens of
thousands of illegal impounds were "founded upon practices of sufficient duration, frequency
and consistency that the conduct has become a traditional method of carrying out policy."  <u>Id.</u>

 Defendants do not argue, nor have they ever, that the Impound Policy is not a "policy."
It obviously is: it is an express policy, written down in documents, adopted at the highest levels of
policymaking authority within LAPD and the City.  Defendants' first, second and fifth arguments
attempt to artificially limit what the "policy" is, essentially claiming that it can only be S07 itself,
which in their view, provides no guidance as to what happens to a vehicle after it is initially
impounded, which is the primary subject of this lawsuit.  But as the Court has found above, this
makes little sense: S07 was not the only policy document that formed the Impound Policy, and

Plaintiffs do not claim otherwise.[55] True, S07 primarily explains what officers in the field are supposed to do when deciding whether to impound vehicles in the first place; it does not provide detailed guidance as to what other individuals (those in supervisorial functions, such as the detective-level managers at stations who had the authority to release vehicles and the detectives who presided over storage hearings) were supposed to do once a 30-day impound was initiated. That is where the other policy documents underpinning the Impound Policy come in, including Order #16 and LAPD's Post Storage Probable Cause Impound Hearing Guidelines ("the Guidelines"). Those documents, when paired with the training LAPD personnel received on the Impound Policy from individuals like Detective Jones, implemented a few pivotal policies as it relates to this case: once an officer's decision to impound a vehicle for 30 days had been made, the recourse for an aggrieved owner was to request an impound hearing. In theory, those impound hearings were limited two issues: whether there was probable cause to justify the initial impound and the existence of "mitigating circumstances." It was LAPD's burden to justify the former, and the vehicle owner's burden to justify the latter. Once again, S07 referenced the importance of a "community caretaking" rationale to justify an initial impound, but it never embraced the correct application of that constitutional principle: that a constitutional justification needed to apply beyond the *initial* impound and to the 30-day hold as well. As held above, the City does not and has never had a valid constitutional justification for the 30-day impound, as distinguished from the decision to initially impound the vehicle. The Impound Policy clearly demonstrates that the City found that issue irrelevant. So irrelevant, in fact, that the City barred its employees from even considering that as a possible grounds for release of the vehicle. In other words, Defendants crafted the Impound Policy in such a way that it was structurally indifferent to the issue that mattered most: that the City needed to have a constitutional justification to hold the vehicles for 30 days, and that it did not have one. The Impound Policy thus made the City impermeable to meaningful relief for its actions by setting the terms of engagement: by throwing out the Fourth Amendment as a relevant factor once an impound had taken place, it made sure that its 30-day impounds could be upheld as long as there was probable cause to impound the vehicle in the first place. And that meant that it did not matter what an aggrieved vehicle owner said. As noted above, Ms. Brewster and Mr. Arizmendi were represented by an able attorney, Ms. Anderson-Barker, at their storage hearings. She made all the right arguments— the same ones Plaintiffs' Counsel is making now, the same ones this Court has now agreed amount to constitutional violations, and the same ones the Ninth Circuit embraced in <u>Brewster</u>, 859 F.3d 1194 and <u>Sandoval</u>, 912 F.3d 509. Ms. Brewster and Mr. Arizmendi satisfied any prerequisites for the release of their vehicles: they could pay the fees, the car registrations were valid, and they had licensed drivers available to drive the car away from the impound lot. Defendants did not have a constitutional justification to keep the vehicles for 30 days, Ms. Anderson-Barker told them that, and Defendants' agents did not care, because the Impound Policy told them they could not care. As Defendants expressly concede, the hearing officer in Ms. Brewster's case simply said: Section 14602.6 says we can impound your vehicle for 30 days, so we are. (<u>See</u> MSJ

---

[55] As noted above, the Court is not aware of any authority that provides a "policy" must be written down all in one document; common sense dictates that complex policies involving multiple facets and stages, like the Impound Policy, can be memorialized in different places. Moreover, Defendants do not argue this point.

at 17.)  That is why, contrary to Defendants' argument, the Impound Policy *is* facially unconstitutional: it compelled the City's officers to ignore the constitutional implications of the Section 14602.6 30-day holds, and they did.  And that is also why, even if S07 did not directly guide the hearing officers' conduct of the impound hearings, the Impound Policy as a whole did.

Defendants' remaining arguments are that Section 14602.6 is the cause of Plaintiffs' injuries and that the availability of Section 22651(p) has no bearing on the analysis.  Essentially, now that the Ninth Circuit has held that Defendants' longstanding view of their legal authority is wrong, and because they have no real argument that their actions were constitutional under the framework set out in Brewster, 859 F.3d 1194 and Sandoval, 912 F.3d 509, the City has sent its lawyers to convince this Court that they never had a choice in the matter, and thus they cannot be held liable.  But that is not true: the City had choices.  It chose to exercise its policymaking discretion in favor of a particular approach.  Indeed, it has long maintained that the statutory scheme expressly afforded them a choice, at least when that position better suited its litigation needs at the time.  And since all of this is essentially a plea to impermissibly smuggle in good faith or qualified immunity principles into the Monell context, as noted below, the City remains liable even if the Impound Policy was, in part, a means to enforce a particular statute.

As Defendants previously framed the argument, by enforcing Section 14602.6, the City would be held "vicariously liable for the state's legislation."  They argued, "municipal liability for § 1983 requires a plaintiff to show (1) a municipal 'policy' or 'deliberate conduct' that the city 'consciously cho[se]' to engage in 'from among various alternatives'; and (2) a 'direct causal link' between the 'policy' and the harm, such that the action is the 'moving force' behind the constitutional violation."  (MTD TAC Order at 7) (quoting Oklahoma City v. Tuttle, 471 U.S. 808, 823 (1985); Bd. of the Cty. Comm'rs v. Brown, 520 U.S. 397, 404 (1997)).)  Put another way, Defendants say that the "the custom or policy must be a 'deliberate choice' to follow a course of action . . . made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question."  Castro v. Cnty. of Los Angeles, 833 F.3d 1060, 1075 (9th Cir. 2016) (quoting Pembaur, 475 U.S. at 483).  These are accurate statements of law, and they explain why the City is liable: the Impound Policy was the consummation of a "deliberate choice" made by City officials that was the "moving force" behind Plaintiffs' injuries.

The Supreme Court decisions on which Defendants rely – and, indeed, much of the case law on Monell liability – clarifies the line between municipal liability and the liability of individual officers where there is no clearly adopted, generally applicable policy.  But the Supreme Court has not offered much guidance on the key question here: to what extent can a municipality be liable under § 1983 for enacting a policy that, in part, enforces a state statute?  In Tuttle, the Supreme Court considered when a municipality's failure to properly train its employees constitutes an official policy.  471 U.S. at 820.  As Justice Brennan, in concurrence, pointed out, "[t]o infer the existence of a city policy [to inadequately train city officials] from the isolated misconduct of a single, low-level officer, and then to hold the city liable on the basis of that policy, would amount to permitting precisely the theory of strict *respondeat superior* liability rejected in Monell."  Id. at 831.  The majority, differentiating between an officially adopted

policy and a mere failure to train, indicated that "the word 'policy' generally implies a course of action consciously chosen from among various alternatives[.]" Id. at 823.  Thus, the court considered it "difficult in one sense to even accept the submission that someone pursues a 'policy' of 'inadequate training[.]'" Id.  The court distinguished the policy at issue in Monell, adopted by the New York City Department of Social Services, which "compelled pregnant employees to take mandatory leaves of absence[.]" Id. at 822.  There, the policy itself violated the plaintiffs' constitutional rights, such that no evidence beyond the "statement of the policy by the municipal corporation, and its exercise" was needed to establish a constitutional violation. Id. at 822–23.  In contrast, the alleged policy at issue in Tuttle was "far more nebulous, and a good deal further removed from the constitutional violation[.]" Id. at 822.

Likewise, Brown delineated the boundary between municipal liability and individual officer liability.  There, the plaintiff alleged that a county police officer used excessive force in arresting her and that the county was liable based on the sheriff's decision to hire that officer without carefully reviewing his criminal history. Brown, 520 U.S. at 399–400, 401.  The court considered whether "a single hiring decision by a county sheriff [who the parties agreed was a policymaker] can be a 'policy' that triggers municipal liability." Id. at 404.  The court explained that it was "not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality." Id.  Rather, "[t]he plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged.  That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Id.  There, because the sheriff's "hiring decision was itself legal, and [the sheriff] did not authorize [the officer] to use excessive force[,]" the court considered that "the municipality [had] not directly inflicted an injury," and thus that "rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee." Id.  The court distinguished cases in which "no questions of fault or causation arose" because the "the action taken or directed by the municipality or its authorized decisionmaker itself violate[d] federal law[.]" Id. at 405, 406; see also id. at 404 ("Where a plaintiff claims that a particular municipal action itself violates federal law, or directs an employee to do so, resolving these issues of fault and causation is straightforward.").

In addition, Justice Souter's dissent stated that Monell's "policy requirement . . . is certainly met when the appropriate officer or entity promulgates a generally applicable statement of policy and the subsequent act complained of is simply an implementation of that policy." Brown, 520 U.S. 397 at 417 (Souter, J., dissenting) (citing Monell, 436 U.S. at 660-661).  While the majority did not explicitly state that official policies of general applicability do not pose issues of fault and causation, its discussion of when a municipality could be liable for a single decision implied that the same difficulties did not arise in cases involving generally applicable rules. See id. at 406 ("Neither [Owen v. Independence, 445 U.S. 622 (1980), nor Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981),] . . . reflected implementation of a generally applicable rule.  But we did not question that each decision, duly promulgated by city lawmakers, could trigger municipal liability if the decision itself were found to be unconstitutional.").  Moreover, the

CIVIL MINUTES—GENERAL

Ninth Circuit has adopted Justice Souter's statement of the rule regarding generally applicable policies.  See Harper v. City of L.A., 533 F.3d 1010, 1024 (9th Cir. 2008).

While the authorities from lower courts cited below are more helpful in guiding the analysis, it is worth stating that, at a high level of generality, Supreme Court precedent supports a finding of Monell liability on the instant facts.  The Impound Policy is an officially promulgated policy of general applicability that is itself unconstitutional by directing officers to impound vehicles for 30 days without securing a warrant, providing no constitutional justification for the decision to impound vehicles for 30 days, and barring officers from releasing those vehicles before the 30 days have run even when their owners can establish that the initial constitutional justification for the impound has vanished.  The Impound Policy was written down in official policy documents and approved by the Board of Police Commissioners.  The alleged policy is neither "nebulous" nor "removed from the constitutional violation."  See Tuttle, 471 U.S. at 822.  Thus, Plaintiffs clearly establish an official policy, rather than a mere unintentional failure to establish adequate policies, as in Tuttle.  In addition, under Brown, fault and causation here are "straightforward," at least in the sense that there is a clear link between what the written policy says an officer can and cannot do and the injury caused from it.  See Brown, 520 U.S. at 404.  Finally, municipal liability is established here because the Impound Policy is generally applicable and the impoundment of Plaintiffs' vehicles was "simply an implementation of that policy."  See Harper, 533 F.3d at 1024.

Before applying relevant lower court authorities, it is useful to explain why the statutory scheme afforded Defendants' complete discretion to enforce Section 14602.6 at all, and certainly did not require them to apply it in an unconstitutional manner.  Indeed, Defendants have already made this very point for Plaintiffs by virtue of their previous litigation positions.  The statute states that, when a peace officer determines that an individual was driving a vehicle while his license was suspended, revoked or restricted, or is an unlicensed driver, the officer "may either immediately arrest that person and cause the seizure of that vehicle or, if the vehicle is involved in a traffic collision, cause the removal and seizure of the vehicle without the necessity of arresting the person."  Cal. Veh. Code § 14602.6(a)(1).  "A vehicle so impounded shall be impounded for 30 days."  Id.  It is the word "shall" that Defendants focus on here, arguing that it imposes a statutory imperative to hold vehicles for 30 days unless one of the five statutory exceptions apply at Section 14602.6(d)(1).  See Cal. Veh. Code § 14602.6(d)(1).  This argument happens to completely ignore that there is an equally mandatory "shall" provision instructing an impounding agency to afford an individual a storage hearing that will "consider any mitigating circumstances attendant to, the storage, in accordance with Section 22852," a point addressed later.  See Cal. Veh. Code § 14602.6(b)(1).  But for now, assume that Defendants are correct about the mandatory nature of "shall."  In the context of "apparently mandatory arrest statutes" wherein the legislature has stated an officer "shall" make an arrest in certain situations, longstanding Supreme Court precedent establishes that these statutes have never "truly made enforcement" of them "mandatory."  Town of Castle Rock, Colo. v. Gonzales, 545 U.S. 748, 760 (2005).  That is because a "well established tradition of police discretion has long coexisted with apparently mandatory arrest statutes."  Id.  "For a number of reasons, including . . . insufficient resources[] and sheer impossibility, it has been recognized that such statutes cannot

be interpreted literally[.]"  Id. (citation omitted).  And the "deep-rooted nature of law
enforcement discretion, even in the presence of seemingly mandatory legislative commands,"
id., is not just limited to mandatory arrest statutes.  Castle Rock summarized one of the teachings
of an earlier Supreme Court case, Chicago v. Morales, 527 U.S. 41 (1999),

> [W]hich involved an ordinance that said a police officer " 'shall
> order' " persons to disperse in certain circumstances.  This Court
> rejected out of hand the possibility that "the mandatory language
> of the ordinance . . . afford[ed] the police no discretion."  It is, the
> Court proclaimed, simply "common sense that *all* police officers
> must use some discretion in deciding when and where to enforce
> city ordinances."

545 U.S. at 761 (internal citations omitted).

Amidst this backdrop, the California Court of Appeal held in 2008 that Section
14602.6(a)(1) "provides only discretionary authority to impound[.]"  California Highway Patrol
v. Superior Ct., 162 Cal. App. 4th 1144, 1148 (2008).  The appellate court found that the phrase
" 'may either' does no more than apply the 'may' both of the succeeding clauses.  Thus, section
14602.6(a)(1), in effect, says only that an officer 'may . . . immediately arrest th[e] person and
cause the removal and seizure of th[e] vehicle or . . . [*may*] cause the removal and seizure of the
vehicle without the necessity of arresting the person."  Id. at 1151.  As such, "[t]he word 'shall'
describes only the 30-day time period for any vehicle '*so impounded*.' "  If an officer decides not to
impound a car under the discretionary authority provided by section 14602.6(a)(1), it is not 'so
impounded' and therefore the 30-day day provision is inapplicable."  Id. at 1151-52.  As part of its
statutory construction, the court explained the public policy implications of a mandatory
interpretation:

> One cannot overstate the logistical difficulties that would ensue if
> all California police officers arresting an individual for driving with
> a suspended or revoked license were required to impound that
> individual's vehicle for 30 days.  The Legislature has acknowledged
> in section 14607.4 that at any given time an estimated 720,000
> drivers in California have a suspended or revoked driver's license,
> and an additional 1,000,000 persons are driving without ever
> having been licensed at all. (§ 14607.4, subd. (c).)  It is unclear
> whether towing facilities would have the capacity to impound the
> substantial number of vehicles affected by a mandatory regulation,
> let alone for a period of 30 days.

Id. at 1154.

Six years later, the City prevailed in its own case involving S07 by taking the same
position that California Highway Patrol, 162. Cal. App. 4th 1144 clearly established: that

---

enforcement of Section 14602.6 is wholly discretionary.  In <u>Los Angeles Protective League v. City of Los Angeles et al.</u>, L.A. S.C. No. BC3052 ("LAPPL"), the plaintiffs sued to enjoin enforcement of S07.  The trial court granted summary judgment for the plaintiffs, ruling, *inter alia*, that S07 was preempted by California Vehicle Code Section 21 and conflicted with Section 14602.6.  Defendants, the City and Chief Charlie Beck, appealed.  (PAMF ¶ 21.)  <u>See Los Angeles Police Protective League v. City of Los Angeles</u>, 2013 WL 12146161 (Cal. Super. Aug. 12, 2013).  The Court of Appeal reversed and remanded with instructions to grant Defendants' motion for summary judgment.  <u>Los Angeles Police Protective League v. City of Los Angeles</u>, 181 Cal. Rptr. 3d 712 (Ct. App. 2014).

In <u>LAPPL</u>, the City and Chief Beck argued, in sum, that LAPD exercised its discretion when to apply Section 14602.6 and when to apply Section 22651 to impounds.  In their opening brief, the City and Chief Beck argued,

> Two Vehicle Code sections provide California peace officers discretionary authority to impound the vehicles of unlicensed drivers, and those with a suspended license or revoked driver's license, when specified conditions are met.  Section 14602.6 provides that vehicles impounded under its provisions "shall be impounded for 30 days" absent narrow exceptions; section 22651, subdivision (p) also authorizes impoundment of such vehicles, but does not mandate a fixed impoundment period.  Neither section covers how an officer should exercise his discretion in making a determination of which provision to use when either is applicable.

(PAMF ¶ 22.)  They argued that S07 "directs officer to apply Section 22651(p) in less serious circumstances . . . [and] [i]n more serious situations . . . Section 14602.6(a)(12) is to be used." (<u>Id.</u> ¶ 23.)  They also argued that "neither provision 'covers' how an officer should exercise his or her discretion in making a determination of which provision to use when both are applicable.  In other words, both of these statutory authorities provide discretionary authority for an officer to impound a vehicle[.]"  (<u>Id.</u> ¶ 24.)  In their reply brief, they contended that "section 14602.6(a)(1) and 22651(p) are *equally available* options for impoundments of vehicles operated by unlicensed drivers."  (<u>Id.</u> ¶ 27) (emphasis in original).  They acknowledged that Section 22651(p) "is undisputedly a less severe statute than Section 14602.6, which imposes a 30-day hold, in that it has no fixed length of impoundment."  (<u>Id.</u> ¶ 28.)  Thy also stated, "[a]ll parties agree that Section 14602.6 is a discretionary impound statute, meaning that impoundment is not required even if criteria for impoundment can be satisfied."  (<u>Id.</u> ¶ 30.)  The Court of Appeal agreed with these arguments.  Relying in part on <u>California Highway Patrol</u>, 162 Cal. App. 4th 1144, the court found that the "discretion afforded by Section 14602.6" could not be "subject to dispute." <u>LAPPL</u>, 181 Cal. Rptr. 3d at 719.  "In sum, . . . Special Order 7 neither creates new law nor conflicts with existing law.  It simply implements existing law, and as such is a matter within the wide discretion of public officials."  <u>Id.</u> at 720.  Defendants have made no attempt to disavow their previous position taken in <u>LAPPL</u>, which is sensible, because the City's lawyers were correct back then, even if undermines their litigation position today.

California Highway Patrol and LAPPL make clear what Defendants have always known to be true: that Section 14602.6 does not impose a mandatory duty to seize and impound the vehicle for 30 days even if the statute could apply, because every law enforcement agency retains discretion to impound under Section 22651(p) or not to impound the vehicle of an unlicensed driver at all.  See Cal. Veh. Code § 22651, (p) ("a peace officer . . . *may* remove a vehicle . . . if the peace officer issues the driver of a vehicle a notice to appear for a violation of Section 12500, 14601, 14601.1, 14601.2, 14601.3, 14601.4, 14601.5, or 14604, and the vehicle is not impounded pursuant to Section 22655.5"); Posey v. California, 180 Cal. App. 3d 836, 850 (Cal. App. 1986) ("[W]e find the conclusion inescapable that the inspection and removal [under Section 22651] are acts discretionary in nature.  The meaning of the word 'may' in the statute is plain.  It affords the CHP officer the permissive authority, not an obligatory duty, to remove a vehicle."); Bonds v. State of California ex rel. Cal. Highway Patrol, 138 Cal. App. 3d 314, 321 (Ct. App. 1982) ("Nor did the CHP have a mandatory duty to remove the stranded vehicle from the highway.  Indeed, Vehicle Code section 22651, subdivision (b) permits rather than requires removal of vehicles that are obstructing traffic or creating a hazard.").  The California Department of Justice has long made this clear.  See 95 Ops. Cal. Atty. Gen. 1 (2012) ("[A] police department has discretion to establish guidelines that would allow an impounded vehicle to be released in less than 30 days, under Vehicle Code section 22651(p), in situations where a fixed 30-day statutory impoundment period, under Vehicle Code section 14602.6(a)(1), may also potentially apply.").  The Ninth Circuit has also made this clear.  See Brewster, 859 F.3d at 1197-98 ("The police could impound a vehicle under section 22651(p), which authorizes impoundment when the driver doesn't have a valid license.  Section 22651(p) doesn't have a mandatory 30-day hold period, thus avoiding the Fourth Amendment problem presented by section 14602.6(a).") (citations omitted).  And if there was any doubt that Defendants have long had the authority to decline to impose 30-day impounds under Section 14602.6 and instead apply only Section 22651(p), their response to losing at the Ninth Circuit in Brewster, 859 F.3d 1194 eradicates it.  Brewster obviously did not hold that Section 14602.6 was facially unconstitutional; it held that if an agency is going to impound a vehicle for 30 days without a warrant, an exception to the warrant requirement needs to justify the 30-day impound, and that the "exigency" of the community caretaking exception "vanished" after the vehicle was impounded and Ms. Brewster "showed up with proof of ownership and a valid driver's license.  Id. at 1196.  Almost immediately after the Ninth Circuit so ruled, LAPD directed its officers to stop impounding vehicles under Section 14602.6 and instead impound them only under Section 22651(p), "thus avoiding the Fourth Amendment problem presented by Section 14602.6(a)."  Id. at 1198.  (PAMF ¶ 42.)

As to *how* Defendants chose to exercise the complete discretion afforded them by a statutory scheme that never told them how they should "exercise [their] discretion in making a determination of which provision to use, [Section 14602.6 or Section 22651(p)] when either is applicable" (PAMF ¶ 22), they exercised their judgment to punish and deter certain individuals more harshly than others who they thought more deserving of punishment and deterrence.  In certain "less serious" situations, like when an unlicensed driver has not been previously convicted of unlicensed driving, the City did not necessarily impose a 30-day impound; in "more

serious" situations, "as when a driver has a history of violations, is unable to show proof of insurance, has insufficient identification, or is at-fault in a traffic collision," the City applied the more "severe" statute, Section 14602.6.  (PAMF ¶¶ 23, 25.)  Reasonable minds can disagree about whether this was a reasonable exercise of discretion.  It is hard to argue with placing the individual who causes an accident in the "more serious" camp.  Given that the universe of people to whom the policy applies only includes those without valid driver's licenses, it is debatable whether "insufficient identification" is "more serious," especially if that category is used to apply to certain groups such as undocumented immigrants, racial minorities, and young people.  But the question of whether the Impound Policy was a reasonable exercise of discretion is irrelevant for present purposes because that has nothing to do with Plaintiffs' claims.  Fundamentally, Defendants exercised their discretion.  And they did not exercise their discretion just by weighing certain factors that the Legislature provided for them.  Nowhere in the text of the relevant statutory scheme do factors such as "insufficient identification" and a "history of violations" appear.  These are things Defendants came up with on their own.  In doing so, they crafted a policy that went well beyond the express provisions of the statutory codes they sought to enforce.  They made choices, exercised discretion, balanced values, considered the limitations of their resources, evaluated costs and benefits, decided among various alternatives, and so forth—all the hallmarks of policymaking conducted at the municipal level, independent of the bounds set by the State of California.  The solution they arrived at was rooted in rationales fundamentally inconsistent with the Fourth Amendment: punishment and deterrence.  As former LAPD Assistant Chief Michel Moore put it, S07 imposed "harsher consequences" on individuals the agency thought more deserving of such treatment by impounding their vehicles for 30 days, and admitted Defendants "absolutely" were "trying to deter owners from letting unlicensed drivers drive their vehicles."  (PAMF ¶¶ 16; 41.)  And the LAPD ignored the Fourth Amendment implications of its 30-day impound policy because it believed it could.  The following direct exchange with Assistant Chief Moore encapsulates the legal position taken by LAPD as a whole:

> Q:  What community caretaking function is served by keeping the car in impound for 30 days?
> A:  It's not my understanding that the Community Caretaking Doctrine extends through the length of the storage.

(Moore Dep. 129:12-19.)  As noted below, perhaps there is an argument that this was a good faith mistake of law and that an LAPD official like Assistant Chief Moore would be thus entitled to qualified immunity on that basis.  But that is irrelevant to <u>Monell</u> liability, for the City enjoys no such defense.

The City protests that, even if it had complete discretion to enforce Section 14602.6, once the decision to enforce that law has been made, the City was mandated by state law to hold the vehicle for 30 days unless one of the five statutory circumstances codified at Section 14602.6(d)(1) were present.  (MSJ at 19.)  The Court is not persuaded that this is a defense to <u>Monell</u> liability for the reasons already specified, and further set out below.  But it is also not a winning argument because it is not true.  For one, Defendants themselves knew that they must

interpret Section 14602.6 to avoid constitutional problems, because S07 begins with this sound observation:

> Various sections of the California Vehicle Code authorize the impoundment of a motor vehicle driven by an unlicensed driver or a driver with a suspended or revoked driver's license. However, State and federal court decisions have held that the statutory authority to impound, alone, does not determine the constitutional reasonableness of the seizure under the Fourth Amendment of the United States Constitution.

(S07). S07 almost certainly alludes to decisions like Miranda, 429 F.3d at 864 ("the decision to impound pursuant to the authority of a city ordinance and state statute does not, in and of itself, determine the reasonableness of the seizure"), which also declared that "the deterrence rationale is incompatible with the principles of the community caretaking doctrine." Id. at 866. It follows from this observation that, if Section 14602.6 required a 30-day impound in a certain situation but the Fourth Amendment required the City to release the vehicle in that circumstance, the City had to follow the higher authority of the Constitution, not the statute. But even if Defendants should somehow be absolved of responsibility for enforcing a statute in an unconstitutional manner, Section 14602.6 did *not* forbid the City from releasing vehicles only if one of the five statutory exceptions applied. That is because the City was free to release any vehicle if "mitigating circumstances" applied "in accordance with Section 22852." Cal. Veh. Code § 14602.6(b). "Every statute should be construed with reference to the whole system of law of which it is a part so that all may be harmonized and have effect." California Highway Patrol, 162 Cal. App. 4th at 1153 (citations omitted). Section 22852 provides for storage hearings. See Cal. Veh. Code § 22852. The California courts appear to have construed "mitigating circumstances" quite broadly, finding that the term "encompasses equitable considerations such as the good faith of the actor or circumstances lessening his or her culpability." Smith, 97 Cal. App. 4th at 556. That is to say, "the presence of mitigating circumstances does not justify or excuse the wrongful act, but rather reduces the degree of culpability of the actor and arguably warrants a reduction in punishment." Id. at 569. As just one example of mitigating circumstances, the registered owner's "lack of actual knowledge that the driver to whom he loaned his car was not validly licensed constitutes a mitigating circumstance under section 14602.6, subdivision (b), warranting release of the vehicle to the registered owner before expiration of the 30-day storage period set forth in the statute." Id. at 549-550. And that is so even where the owner has not "made a reasonable inquiry as to the licensed status of the driver before lending the vehicle." Id. at 550. As held above, all evidence in the record demonstrates that LAPD limited consideration of "mitigating circumstances" to a single extremely narrow instance: where "the registered owner can establish the vehicle was driven by an unlicensed driver without the registered owner's knowledge or permission." (PCSSUF ¶ 59.) But by statute, any facts that "arguably warrant[] a reduction in punishment" count. Smith, 97 Cal. App. 4th at 569. And that can be a great many things, some of which are presented by this case.

Take, for example, Ms. Brewster's situation. The undisputed facts demonstrate, in sum, that Ms. Brewster's daughter was in the hospital for a medical procedure; she and her family were in Los Angeles to care for and support her daughter; she loaned the vehicle to another person; she did not know that he lacked a valid driver's license; officers subjected the vehicle to a 30-day impound; other drivers were readily available to take the car; Ms. Brewster implored the City to release her car, explaining the situation and that she could not afford to pay for a 30-day impound because she was poor; she was initially rebuffed by the City; she thereafter went through the trouble of retaining a lawyer to represent her at a storage hearing; and her lawyer explained the situation, along with asserting the correct legal arguments raised here regarding the illegality of the continued impound. What did the City do? The hearing examiner, Detective Frus, said that the storage hearing was "strictly a probable cause hearing – whether or not the officers had probable cause." (See Section I.7.) Finding probable cause, the sole explanation given for denying the release of the vehicle was a citation to the statutory authority of Section 14602.6. (Or, as Defendants themselves put it, "Det. Frus denied the release of the vehicle because Section 14602.6 stated the vehicle *shall* be impounded for 30 days." (MSJ at 17.) As to the mitigating circumstances enacted by statute that would also clearly authorize release of the vehicle? See Smith, 97 Cal. App. 4th at 550 (explaining that a mitigating circumstance under Section 14602.6 "warrant[s] release of the vehicle to the registered owner before expiration of the 30-day storage period set forth in the statute"). The City ignored them. It is undisputed that Ms. Brewster did not know the person to whom she had loaned the vehicle was an unlicensed driver, and it is inarguable that years before the City refused to release the vehicle to her the California Court of Appeal squarely held in Smith that that constituted a mitigating circumstance that warranted release of a vehicle. Id. Neither party argues that Detective Frus violated the Impound Policy when he did not even consider the mitigating circumstances exception enacted by the Legislature; every implication from the record is that he was following the Impound Policy. LAPD appears to have made almost exactly the same determination in Mr. Vigil's case, for after four days of coming to the police station to plead his case, he was simply told by an LAPD employee, "It's up to me, and I'm keeping your car" for 30 days. (PCSSUF ¶¶ 44-52; Vigil Dep. 32:16-25.) Moreover, these actions were fully consistent with Order #16, which made the five statutory exceptions the *exclusive* reasons for early release of a vehicle impounded pursuant to Section 14602.6, and barred detectives reviewing an impound decision after one was initially made an officer, or during a storage hearing, from considering factors beyond that list. (PCCSUF ¶ 70; Order #16; PAMF ¶ 38; Fesperson Dep. 90:19-91:17.) Moreover, the Guidelines do not mention "mitigating circumstances" or any other factor to be taken into account when deciding whether to release a vehicle except for the absence of probable cause. (See Jones Declaration Ex. 9.) And, as explained above, to the extent mitigating circumstances were considered at all, the City placed the burden on the vehicle owner to present mitigating circumstances. The bottom line is that the Impound Policy did *not* require its officers to consider mitigating circumstances when evaluating whether to release a vehicle, an element that *is* expressly required by Section 14602.6(b). To the contrary, the most reasonable reading of Order #16 and the Guidelines is that they forbid LAPD personnel from *considering* "mitigating circumstances" at all, at least beyond the narrowest possible exception. And regardless, there is sufficient evidence in the record to find that LAPD had a longstanding practice or custom of refusing to consider valid "mitigating circumstances" arguments for the release of vehicles prior

to the expiration of the 30 days, because the LAPD's detectives took the position that "an
impound hearing is strictly a probable cause hearing – whether or not the officers had probable
cause."  (Donald Cook Declaration Ex. T.)

In this way, the Impound Policy went beyond Section 14602.6 itself, imposing a harsher
scheme with fewer equitable exceptions than those contemplated by the Legislature.  Thus,
Defendants are simply wrong to suggest that Section 14602.6 required them to implement the
Impound Policy as they did, or that if the seizures of Plaintiffs' vehicles were unlawful, then
Section 14602.6 must be facially unconstitutional as well.  See Ordonez, 495 F. Supp. 3d at 868-
69 ("the Complaint alleges the CHP Impound Policy is not coterminous with Section 14602.6.
Rather, under the alleged CHP Impound Policy, Defendants were required to impound Plaintiff's
vehicle for thirty days despite Plaintiff's proof that the exigency warranting the initial impound
had ceased.  By refusing to release Plaintiff's vehicle, Defendants were implementing a policy . .
.").  The Court has not been asked to weigh in on the facial constitutionality of the statute; that
issue is neither necessary nor appropriate to resolve on the facts before it.  The Court can, and
does, hold that the Impound Policy is facially unconstitutional, and that the Impound Policy is
what caused Plaintiffs' injuries.  That is more than sufficient to apply Monell liability.  See Chew,
27 F.3d at 1444 (""City policy 'need only cause [the] constitutional violation; it need not be
unconstitutional per se.'").

Having determined the broad discretion within which Defendants chose to act, the Court
returns to the circuit and district court authority that further establishes the propriety of Monell
liability in this case.  The central Ninth Circuit authority on this question is Evers v. County of
Custer, in which the Ninth Circuit considered the defendant county's argument that it was not
liable "because it was merely acting according to state law, rather than carrying out County
policy."  745 F.2d 1196, 1204 (9th Cir. 1984).  The plaintiff in Evers sued the county for violating
her due process rights after the County Commissioners declared a road that passed through her
property a public road under Idaho Code § 40-103.  Id. at 1198.  Section 40-103 "provide[d] that
a road that ha[d] been used by the public for five years and maintained at public expense [was] a
public highway."  Id.  State law also made it the duty of county commissioners "to record as
public highways roads which have become such by use."  Id. at 1198 n. 1.  However, state law
evidently did not define the process by which counties were to determine whether § 40-103's
requirements had been met.  The Ninth Circuit held that Monell liability attached because the
Commissioners' declaration was an "official decision of . . . the County's governing body" that
"clearly 'implement[ed] or execute[d] a . . . decision officially adopted and promulgated by that
body's officers[.]'"  Id. at 1204 (quoting Monell, 436 U.S. at 690).  The panel found the county's
argument that it was merely carrying out state law went "only to the question of the
Commissioners' good faith in applying the statute."  Id. at 1203.  However, because no good faith
defense is available to municipalities, the county would be liable if Evers proved her case.  Id.
(citing Owen, 445 U.S. 622).  Defendants attempt to distinguish Evers by arguing that Section

14602.6's provisions are mandatory.  (MSJ at 20.)  As explained above, that is not true, so
Evers's framework applies, and compels the outcome here. [56]

Applying Evers, a number of Ninth Circuit district court decisions have found
municipalities could be liable for actions taken pursuant to state statutes.  See, e.g., Platt v.
Moore, 2018 WL 2058136, at *16 (D. Ariz. Mar. 15, 2018) ("The parties dispute whether
Defendants' decisions to enforce Arizona's forfeiture laws in this case constitute a policy for
Monell purposes.  However, because a decision to enforce state law may be considered a
municipal policy, the Court finds that Plaintiffs' allegations that Defendants acted pursuant to a
municipal policy are sufficient to survive a motion to dismiss."); Puente Arizona v. Arpaio, 76 F.
Supp. 3d 833, 867 (D. Ariz. 2015) ("Sheriff Arpaio's decision to enforce the [Arizona] identity
theft laws . . . makes Maricopa County liable for that action."), rev'd in part, vacated in part on
other grounds,  821 F.3d 1098 (9th Cir. 2016); Galassini v. Town of Fountain Hills, 2013 WL
5445483, at *27 (D. Ariz. Sept. 30, 2013) ("[I]f a policymaker deprives a person of their
constitutional rights as a result of the application of a state statute, without regard to the
application's constitutionality, the municipality could be subject to Monell liability because 'a
municipality will be liable for all of its injurious conduct, whether committed in good faith or
not.'") (quoting Evers, 745 F.2d at 1204).

The Second Circuit's framework set out in Vives, 524 F.3d 346 is also instructive.  In
Vives, the defendant city acknowledged that it had a policy of enforcing a penal law but
contended it was the State's enactment of the law that caused the plaintiff's injury.  Id. at 350.
The Second Circuit canvassed the opinions of other circuits on the question, including Evers and
some of the opinions referenced below.  See id. at 351-353.  It framed the overarching inquiry as
to what extent "a municipal policymaker has made a meaningful and conscious choice that
caused a constitutional injury."  Id. at 351.  Because "freedom to act is inherent in the concept of
'choice'," the Second Circuit "agree[d] with all circuits to address state laws mandating

---

[56] Notwithstanding this out-of-circuit authority cited below, the Court is not convinced
that a municipality may not be found liable for enforcing a mandatory state law.  Evers suggests
that the fact that a municipal defendant acted pursuant to state law is not relevant to the Monell
analysis.  See 745 F.2d at 1203.  At least one Ninth Circuit district court has indicated that, "even
if a municipality enforces a mandatory, but unconstitutional, state or federal law, Monell liability
may attach even though the municipality does not know that the statute is unconstitutional."
Miranda-Olivares v. Clackamas Cty., 2014 WL 1414305, at *4 n. 5 (D. Or. Apr. 11, 2014).
Moreover, a rule that a local government cannot be liable for enforcing an unconstitutional but
mandatory state statute would leave plaintiffs who suffer injuries due to the enforcement of such
statutes without redress.  See Vives v. City of N.Y., 524 F.3d 346, 350 (2d. Cir. 2008) ("As a
practical matter, . . . damages are not available against the state because it is not a person within
the meaning of Section 1983.  Moreover, . . . individual employees will often be able to
successfully assert qualified immunity.  Thus, the plaintiff will often be left to assert his damages
claim only against the municipality.") (citations omitted).  However, the Court need not decide
the issue, as it finds the City had discretion in implementing the Impound Policy.

enforcement by municipal police officers that a municipality's decision to honor this obligation is not a conscious choice." Id. at 353. It next held,

> On the other hand, if a municipality decides to enforce a statute that it is authorized, but not required, to enforce, it may have created a municipal policy. However, we do not believe that a mere municipal directive to enforce all state and municipal laws constitutes a city policy to enforce a particular unconstitutional statute. In our view, the "conscious" portion of the "conscious choice" requirement may be lacking in these circumstances. While it is not required that a municipality know that the statute it decides to enforce as a matter of municipal policy is an unconstitutional statute, see Owen, 445 U.S. at 650, it is necessary, at a minimum, that a municipal policymaker have focused on the particular statute in question. We, therefore, hold that there must have been conscious decision making by the City's policymakers before the City can be held to have made a conscious choice. Evidence of a conscious choice may, of course, be direct or circumstantial.

Id. It then found the "controlling issue" as to the "meaningful choice" issue to be "whether the Police Department's policy makers can instruct its officers not to enforce a given section-or-portion thereof-of the penal law." Id. at 354-55. And as to "conscious choice," the Second Circuit looked to how the written policy "instructed officers that they could make arrests for constitutionally protected conduct." Id. at 356. A straightforward application of Vives here makes the City liable: the City made a "meaningful and conscious choice" because it knew it had complete discretion as to how to enforce Section 14602.6 or whether to enforce it all, it exercised that discretion by enforcing it as to some people but not others, and it made that choice based on punishment and deterrence rationales that are inconsistent with the Fourth Amendment.

The Sixth Circuit also applies a framework under which the City would be liable. In Garner v. Memphis Police Dep't, 8 F.3d 358 (6th Cir. 1993), the court addressed a Tennessee statute that authorized a police officer to kill a fleeing felon, along with a Memphis Police Department policy on the use of deadly force that was "slightly more restrictive than the statute, but still allowed the use of deadly force in cases of burglary." Id. at 360-61. Acting under that policy and law, an officer shot and killed a fleeing felony suspect under circumstances that the Supreme Court held violated the Fourth Amendment. Id. at 360. On the Monell issue, the defendants argued that "they had no choice but to follow" the state statute when crafting their fleeing felon policy. Id. at 364. The Sixth Circuit rejected the argument:

> This argument is without merit. The defendants were bound to follow the statute in that they could not adopt a more permissive deadly force policy by, for example, eliminating the requirement that an officer give notice of an intention to arrest before employing

> deadly force.  The statute did not, however, prevent the defendants from adopting a more restrictive deadly force policy.  In fact, defendants did exercise their freedom to choose a more restrictive policy, refusing to authorize use of deadly force to apprehend certain non-violent felony suspects such as embezzlers and frauds.  Defendants' decision to authorize use of deadly force to apprehend nondangerous fleeing burglary suspects was, therefore, a deliberate choice from among various alternatives under Pembaur.

Id.  Here, as in Garner, the City was not obligated to apply a state statute in an unconstitutional manner; at best, the statute set the ceiling for how constitutionally "permissive" the policy could be, or, in layman's terms, how harsh the Impound Policy could be.  But no one contends that the City had an obligation to enforce Section 14602.6 at all, because it easily could have done what it did as soon as it lost at the Ninth Circuit in this case: stop enforcing Section 14602.6 and start applying Section 22651(p) across the board.  And, as in Garner, the City's own actions undermine their argument, because they in fact *did* "exercise their freedom to choose a more restrictive policy," id., choosing to subject some individuals to the harsh (and unconstitutional) consequences of Section 14602.6 and some the less harsh (and constitutional) consequences of Section 22651.  Therefore, they made a "deliberate choice from among various alternatives."  Id.  And though it hardly needs stating yet again, no reasonable lawyer would ever interpret Section 14602.6's "shall" mandate to *require* municipal enforcement when that would run afoul of the Constitution, for all statutes must always give way to the Constitution at all times.  Defendants knew that they could not blindly enforce the impound provisions of the Vehicle Code because the central component of the Impound Policy, S07, admits they could not; Defendants knew that the "courts" had been telling them for years that they must consider the Fourth Amendment, regardless of whether or not a statute authorized an impound.  (See S07.)  Just as the City of Memphis had an obligation to consider whether a statute and its own policy implementing it was valid under the Fourth Amendment, and it was held liable under Monell when it ran afoul of the Constitution, the same is true here.

The Eleventh Circuit's framework is even worse for Defendants' position.  In Cooper v. Dillon, 403 F.3d 1208 (11th Cir. 2005), the Eleventh Circuit held that a statute was unconstitutional and that a police chief's decision to enforce it "constituted a deprivation of constitutional rights sufficient for § 1983 liability" against the city that employed him.  Id. at 1222.  In doing so, it rejected the city's argument that it could not be liable for enforcing the statute, because it found that the city adopted the "unconstitutional proscriptions" of the statute "as its own," and "while the unconstitutional statute authorized [the police chief] to act, it was his deliberate decision to enforce the statute that ultimately deprived Cooper of constitutional rights and therefore triggered municipal liability."  Id. at 1223.  Virtually by definition of enforcing a statute in an unconstitutional manner against an individual, then, the Eleventh Circuit held that a municipality could be liable.

Neither party suggests that Sandoval, 912 F.3d 509 is decisive on the Monell issue, but it probably does lend some support for Plaintiffs' position as well.  The Ninth Circuit affirmed

Judge Henderson's grant of summary judgment for the plaintiffs on the <u>Monell</u> claim, rejecting the defendants' argument that "the 30-day impounds were mandated by state law, and that they cannot be liable under section 1983 for enforcing state law." <u>Id.</u> at 517.  The Ninth Circuit, like the district court, rejected the argument because it found the defendants had misinterpreted the plain meaning of Section 14602.6 as to drivers who have not been issued a California driver's license, and "given the plain meaning of section 14602.6, the County's argument that state law caused the violation of Sandoval's rights is without merit." <u>Id.</u> at 518.  The panel thus found it "need not decide whether the County's and City's policies of towing pursuant to section 14602.6 could have given rise to liability under <u>Monell</u> even if the statute had authorized the impoundment of the plaintiffs' vehicle.  <u>See</u> [<u>Evers</u>, 745 F.2d at 1203] (upholding <u>Monell</u> liability over county's argument that 'it was merely acting according to state law, rather than carrying out County policy,' because policy was discretionary); <u>see also</u> [<u>California Highway Patrol</u>, 162 Cal. App. 4th at 1148 (interpreting section 14602.6 as making impoundment discretionary)."  While here Defendants have not made the same erroneous interpretation of the statute as did the defendants in <u>Sandoval</u>, the Court has explained why authorities such as <u>Evers</u> and <u>California Highway Patrol</u>, cited approvingly by the Ninth Circuit in <u>Sandoval</u>, dictate a finding of <u>Monell</u> liability.  This includes the fact that the City's Impound Policy exercised wholesale discretion afforded by the Legislature as to whether and how to impound an unlicensed driver's vehicle and hold it for 30 days, and that it did so in a manner that barred the release of the vehicles even when Section 14602.6 allowed it and when the Fourth Amendment required it.

The cases Defendants rely upon do not compel a different result.  Defendants cite <u>Galen v. Cnty. of L.A.</u>, 477 F.3d 652, 667-68 (9th Cir. 2007) for the proposition that there is no <u>Monell</u> liability when a challenged policy is "consistent with state bail law," but that dramatically oversimplifies and distorts the Ninth Circuit's analysis.  The defendant officers were not liable for the setting of any purportedly excessive bail because "a judicial officer's exercise of independent judgment in the course of his official duties is a superseding cause that breaks the chain of causation linking law enforcement personnel to the officer's decision," <u>id.</u> at 663, the plaintiff's own theory of <u>Monell</u> liability was that the County of Los Angeles "'knowingly maintained, enforced and applied a policy and practice of regularly departing from the mandates and requirements of' California bail law" and the plaintiff "failed to uncover any evidence indicating that the County had a policy or practice designed to ensure or resulting in the setting of excessive bail.  Nor did he uncover any evidence of failure to train officers in proper bail setting procedures." <u>Id.</u> at 667.  <u>Snyder v. King</u>, 745 F.3d 242 distinguished between situations when "state law unequivocally instructs a municipal entity to produce binary outcome X if condition Y occurs," in which case there would be no <u>Monell</u> liability, <u>id.</u> at 249, from others in which a state law, even if mandatory, is susceptible to "constitutionally or statutorily meaningful" discretion at the local level.  <u>Id.</u> at 249 n.3.  As noted above, the instant situation is akin to the latter.  <u>Doby v. DeCrescenzo</u>, 171 F.3d 858 (3d Cir. 1999) is of no help to Defendants, for there the Third Circuit stated, "[w]hen a county is merely enforcing state law, without adopting any particular policy of its own, it cannot be held liable under the <u>Monell</u> line of cases." <u>Id.</u> at 868.  Obviously, here the County adopted its own policy, the Impound Policy.  And the Third Circuit appears to have accepted a more nebulous theory of <u>Monell</u> liability than the one advocated by Plaintiffs: "The Dobys' suggestion that the enforcement procedures should be considered a municipal or county,

rather than a state, policy has merit; because the statute itself does not specify how the county delegate is to receive information and issue warrants, LVF and the county presumably have some discretion in deciding how to implement the warrant application procedure." Id. at 868-69. Here, Plaintiffs are challenging a robust, written policy that goes well beyond the statutory scheme, not mere "enforcement procedures." Next, Est. of Brooks ex rel. Brooks v. United States, 197 F.3d 1245 (9th Cir. 1999), as amended (Dec. 9, 1999) is inapposite because it was apparent that the county that held a pretrial detainee for 12 days, allegedly unlawfully, could not have been a legal cause of the plaintiff's injury since it had absolutely no choice in the matter: "the County held Brooks only so long as the Marshals Service directed it to, and no longer," it was required to hold Brooks under a California statute as long as the United States told it to, the plaintiff did not allege that the county failed to follow the orders of the Marshals Service or the mandates of the state statute, and the plaintiff did not allege that the statute itself was unconstitutional. Id. at 1248. Here, none of those features are present: the County had choices, exercised its discretion, was not bound by a higher sovereign authority, and Section 14602.6 clearly can be enforced in unconstitutional ways, even if it is not facially unconstitutional. Finally, Defendants quote the sentence in Humphries v. Los Angeles Cnty., 2012 WL 13014632 (C.D. Cal. Oct. 17, 2012) they like: "A municipality cannot be held liable under Monell merely for enforcing a state law." Id. at *3. They omit the next sentence, for obvious reasons: "But where the municipality makes a deliberate choice from among various alternatives to adopt a particular policy, the municipality can be held liable." Id. That is the case here. And it was the case in Humphries, too, for Judge Selna held that the County of Los Angeles "did not merely enforce [a statute] or fail to adopt additional safeguards and process, but rather maintained its own policies regarding [a child abuse index]." Id. at *5. As such, the court granted partial summary judgment for the plaintiffs against the County of Los Angeles and denied the County's motion for summary judgment on the Monell claim. Id.

In summary, the Impound Policy is exactly the type of official, generally applicable policy for which local governments may be held liable pursuant to Monell. The Impound Policy was the but-for and proximate cause of Plaintiffs injuries; the City's Impound Policy was the "moving force" behind the constitutional violations and the City "itself is the wrongdoer." Chew, 27 F.3d at 1444. Ninth Circuit precedent instructs that the fact that a municipal defendant acted pursuant to state law "goes only to the question of [the individual officials'] good faith in applying the statute" and is irrelevant to whether a municipal action is a policy under Monell. See Evers, 745 F.2d at 1203. "Good faith" is simply not a defense to municipal liability. Towards the end of their briefing on Monell liability, Defendants finally say the quiet part out loud when they argue that "S07 could not be a proximate cause because it is not reasonably foreseeable that subjecting a vehicle to a 30-day impound would violate someone's Fourth and Fifth Amendment rights." (MSJ at 21.) If that sounds like a plea for qualified immunity based on the assertion that it did not "foresee" that Brewster, 859 F.3d 1194 would come out the way it did, that is because it is. Or, put another way, it is an improper appeal for "backdoor municipal immunity." See Joanna C. Schwartz, Backdoor Municipal Immunity, 132 YALE L.J. FORUM 136 (2022). It has long been the law that "municipalities do not enjoy immunity from suit -- either absolute or qualified -- under § 1983." Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 166 (1993); see also Owen, 446 U.S. at 650. The City may wish

the law were otherwise, but municipalities cannot escape liability for constitutional violations by arguing that the law was not clearly established at the time of the violations.

For these reasons, the Court DENIES the MSJ and GRANTS the MPSJ as to Plaintiffs' <u>Monell</u> claim.

## G. Qualified Immunity for Defendant Beck

Defendants argue that former LAPD Chief Charlie Beck is entitled to qualified immunity because no authority was clearly established at the time that his alleged conduct was unconstitutional. (MSJ at 23.) In their view, "[a]s to Plaintiffs' alleged unlawful seizure and takings claims, it was not clearly established that once a vehicle was seized it could be considered seized a second time without any further action from the City until the Ninth Circuit reversed this Court's initial dismissal of Brewster's claim."[57] (<u>Id.</u>) Indeed, as Defendants note, <u>Brewster</u> acknowledged that there were no Ninth Circuit "cases on point, but Judge Henderson of the Northern District of California has addressed the matter in a through and well-reasoned opinion, which we find persuasive." 895 F.3d at 1196. Defendants also argue that there is no applicable authority holding that impound hearing procedures implemented by Chief Beck pursuant to Vehicle Code § 22852 were unconstitutional. (<u>See</u> MSJ at 23.)

Plaintiffs do not address Defendants' qualified immunity argument as to Chief Beck in their opposition to the MSJ. (<u>See</u> MSJ Opposition.) Plaintiffs also do not argue that Chief Beck is not entitled to qualified immunity in the MPSJ. (<u>See</u> MPSJ.) As such, the Court must find that Plaintiffs have waived the argument. <u>See Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.</u>, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011) ("[I]n most circumstances, failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue." (citation and quotations omitted); <u>accord Jenkins v. County of Riverside</u>, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005) (plaintiff abandoned claims by not raising them in opposition to motion for summary judgment). As set out elsewhere in this opinion, the Court holds that the Impound Policy violated Plaintiffs' constitutional rights. It also finds that Chief Beck was indisputably instrumental in the development and implementation of the Impound Policy, and that he thus was responsible for those constitutional violations. (<u>See, e.g.</u>, PAMF ¶ 12.) Nonetheless, because Defendants have argued that he is entitled to qualified immunity and Plaintiffs have waived the issue, the Court finds that Chief

---

[57] Though it makes no difference here, Defendants' characterization of <u>Brewster</u>'s holding is misleading: the Ninth Circuit did not state a vehicle is "seized a second time" when it is subjected to a 30-day impound. As Defendants know, the Ninth Circuit observed that "the exigency that justified the seizure vanished" after the initial impound and thus the question was "whether the Fourth Amendment required further authorization for the LAPD to hold the vehicle for 30 days." 859 F.3d at 1196. <u>Brewster</u> answered in the affirmative.

Beck is entitled to qualified immunity.  It therefore GRANTS the MSJ as to Defendant Beck and dismisses him from the action.[58]

## H. Breach of Mandatory Duty—Fifth Cause of Action

Defendants first argue that Plaintiffs' fifth cause of action, for breach of a mandatory duty under California Government Code § 815.6 ("Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty"), fails because it is derivative of their constitutional claims, and since it believes those fail as a matter of law, so, too, does the breach of mandatory claim.  (See MSJ at 24.)  Plaintiffs' fifth cause of action is derivative of their state constitutional claims, in that they allege that Defendants breached mandatory constitutional duties by depriving them of due process of law (Cal. Const., Art. I § 7), subjected their property to unreasonable seizures (Cal. Const., Art. I § 13) and took their private property without payment of just compensation (Cal. Const., Art. I § 19).  (See 5AC ¶ 78.)  As noted below, Plaintiffs' claims under the California Constitution parallel those under the United States Constitution, and as noted above, the Court holds that Defendants violated the Fourth Amendment, Fifth Amendment and Fourteenth Amendment. As such, the Court rejects Defendants' first argument.

Defendants' second argument is that the claim fails because the alleged violations do not give rise to a violation of a mandatory duty under Section 815.6.  (See MSJ at 24.)  While Defendants improperly extend this argument to dismissal of Plaintiffs' sixth cause of action, brought directly under the California Constitution rather than Section 815.6, the Court agrees with Defendants' argument as to Plaintiffs' fifth cause of action.  Courts in the Central District of California have held that "general constitutional provisions" do not give rise to a breach of mandatory duty under Section 815.6.  See, e.g., Hernandez v. Cnty. of Riverside, 2021 WL 6496410, at *5 (C.D. Cal. Nov. 24, 2021) (Bernal, J.) (collecting cases).  "Under article I, section 26, of the California Constitution, all provisions of the state Constitution 'are mandatory and prohibitory, unless by express words they are declared to be otherwise.'"  Clausing v. San Francisco Unified Sch. Dist., 221 Cal. App. 3d 1224, 1236 (Ct. App. 1990).  "Thus, all agencies of government are required to comply with it, and are prohibited from taking official actions which violate it or contravene its provisions."  Id.  But "it is an entirely different matter" to conclude that a constitutional provision "is self-executing in the sense that it establishes an affirmative duty to act[.]"  Id.  That is because, "[f]irst and foremost, application of section 815.6 requires that the enactment at issue be *obligatory*, rather than merely discretionary or permissive, in its directions to the public entity; it must *require*, rather than merely authorize or permit, that a particular action be taken or not taken."  Haggis v. City of Los Angeles, 22 Cal. 4th 490, 498 (2000).  The Court does not find that the state constitutional provisions at issue create an "obligatory" mandate for state officials to undertake a certain action; to the contrary, they

---

[58] The Court expresses no opinion on the merits of Defendants' qualified immunity argument.

establish familiar rights of individuals to be *free from* unlawful government conduct, but do not directly impose specific requirements as to what the government must do to uphold those rights. The Court thus GRANTS Defendants' MSJ as to Plaintiffs' fifth cause of action and DISMISSES it.

Before turning to Plaintiffs' sixth cause of action, it is useful to point out how a plaintiff could have a viable claim (for damages) directly under the California Constitution even though a parallel claim for breach of a mandatory duty may fail under Section 815.6. As noted below, many provisions of the California Constitution create private rights of action for declaratory or injunctive relief, and some create private rights of action for monetary damages. See Katzberg v. Regents of Univ. of California, 29 Cal. 4th 300, 307 (2002). Put another way, a "private plaintiff" can bring an action "against a proper defendant" directly under the California Constitution asserting violations of certain rights enumerated therein, and depending on which section she sues under, she is entitled to certain forms of relief. See id. As relevant here, Section 815.6 creates a separate private right of action for money damages that applies regardless of whether an underlying provision of the California Constitution authorizes a damages remedy. An "enactment" includes a "constitutional provision." Cal. Gov. Code § 810.6. As the California Supreme Court has explained, "it is section 815.6, not the predicate enactment, that creates the private right of action." Haggis, 22 Cal. 4th at 499-500. In other words, "[i]f the predicate enactment is of a type that supplies the elements of liability under section 815.6—if it places the public entity under an obligatory duty to act or refrain from acting, with the purpose of preventing the specific type of injury that occurred—then liability lies against the agency under section 815.6, regardless of whether private recovery liability would have been permitted, in the absence of section 815.6, under the predicate enactment alone." Id. at 500. It follows that Plaintiffs can hold Defendants liable directly under the California Constitution even if Defendants have not breached a "mandatory duty" within the meaning of Section 815.6. Whether they are entitled to money damages for a claim under the California Constitution is a separate issue, one addressed below.

## I.   Violation of the California Constitution—Sixth Cause of Action

Defendants' first argument as to Plaintiffs' sixth cause of action for violations of the California Constitution is that it fails for the same reasons as their Fourth Amendment, Fifth Amendment and Fourteenth Amendment claims fail. (See MSJ at 25.) Plaintiffs' claims for unreasonable seizures, unlawful takings and violations of procedural due process under the California Constitution directly parallel those under the United States Constitution. See, e.g., Sanchez v. Cnty. of San Diego, 464 F.3d 916, 928-29 (9th Cir. 2006) (holding that Fourth Amendment rights parallel those under Article I, section 13 of the California Constitution); Wiese v. Becerra, 306 F. Supp. 3d 1190, 1198 (E.D. Cal. 2018) ("While the Takings Clause of the California Constitution does 'protect[ ] a somewhat broader range of property values than' its federal counterpart, the two clauses have generally been interpreted the same by the California Supreme Court."); Nozzi v. Hous. Auth. of City of Los Angeles, 806 F.3d 1178, 1191 n.15 (9th Cir. 2015), as amended on denial of reh'g and reh'g en banc (Jan. 29, 2016) ("The language of Article I § 7 of the California Constitution is 'virtually identical' to the Due Process Clause of the

United States Constitution, with the caveat that California courts place a higher significance on the dignitary interest inherent in providing proper procedure. Recognizing this difference, we nevertheless address the plaintiffs' federal and state due process claims together, as it is unnecessary to take the additional factor into account in this case.") (citation omitted). The Court holds above that Defendants violated each of these rights under the United States Constitution. As such, the Court rejects Defendants' argument. Because it also rejects Defendants' remaining arguments as to why Plaintiffs' sixth cause of action fails, and since Plaintiffs claims under the California Constitution are substantively identical to those under the United States Constitution, the Court finds that the Impound Policy violates the prohibitions on unreasonable seizures, unlawful takings and procedural due process enumerated in the California Constitution.

Before turning to Defendants' other arguments, it is useful to briefly revisit the Court's previous rulings on Plaintiffs' claim under the California Constitution, for it also explains why Plaintiffs have a viable cause of action notwithstanding the failure of their breach of mandatory claim. To begin, Plaintiffs have always sought injunctive and declaratory relief regarding all their claims under the California Constitution; Plaintiffs' prayer for injunctive and declaratory relief as to their unreasonable seizure, unlawful takings and procedural due process claims remain in the operative 5AC. (See 5AC.) The immunity issues presented here thus only concern the parallel claims for damages under the California Constitution, and since whatever damages Plaintiffs may be entitled to are equally and fully availing under their federal claims, all of this is something of an academic exercise. See Cal. Gov Code § 814 (immunity provisions under California law only relate to a plaintiff's right to obtain money damages against public entities and do not affect other forms of relief). Nonetheless, the Court engages in it.

The Court previously dismissed Plaintiffs' claim for damages under article I, section 7 of the California Constitution (due process) because the California Supreme Court has squarely held that the provision does not provide a private damages remedy. (MTD 4AC Order at 19) (citing Katzberg, 29 Cal. 4th at 328). The Court also held, however, that article I, section 19 of the California Constitution (unlawful takings) did provide a private damages remedy, as the California Supreme Court has also squarely held. (Id.) (citing Katzberg, 29 Cal. 4th at 317-18) ("it is plain that California Constitution article I, section 19 . . . supports an action for money damages, and our cases consistently have so held"). The Court observed that the California Supreme Court has not ruled on the availability of a private damages remedy for unlawful searches and seizures under article I, section 13; noted that federal district courts are split on the issue; applied the framework set forth in Katzberg to determine the existence of a private damages remedy; and then held that Plaintiffs could seek monetary damages under article I, section 13 of the California Constitution. (See id. at 19-21.) Among the relevant pieces of evidence, the Court was persuaded by the common law history of article I, section 13. As noted by the California Supreme Court in Katzberg, the English common law provided a damages remedy for unlawful searches and seizures. See Katzberg, 29 Cal. 4th at 322 ("The prohibition against unlawful searches and seizures originated in the Magna Carta… The civil cause of action was fully developed in England and provided a damage remedy for the victims of unlawful searches at common law.") (quoting Brown v. State, 89 N.Y.2d 172, 188 (1996)). Indeed, the

California Supreme Court in Katzberg appeared to contrast the lack of common law support for an action for damages under article I, section 7, with the existence of common law history providing a damages remedy for unlawful searches and seizures.  Id.  Furthermore, as observed by another court in the Central District, the framers of the California Constitution contemplated the integration and availability of English common law remedies when they drafted the California Constitution.  OSJ PEP Tennessee LLC v. Harris, 2014 WL 4988070, at *7 (C.D. Cal. 2014) ("[S]hortly after the adoption of the Constitution, California affirmed by statute that '[t]he Common Law of England . . . shall be the rule of decision in all the Courts of this State.'") (quoting Cal. Stats. 1850, ch. 95).  Another court in the Central District held the same on a virtually identical claim brought by Plaintiff's Counsel against a different defendant, the California Highway patrol.  See Ordonez, 495 F. Supp. 3d at 866.  As such, only Plaintiffs' damages claims for unlawful takings and unreasonable seizures under the California Constitution remain in the operative complaint, the 5AC.  (See 5AC.)

Defendants' second argument is that "violations of the United States or California constitutions cannot give rise to a mandatory duty."  (MSJ at 25.)  The Court has explained above why that is a successful argument as to Plaintiffs' fifth cause of action and does not apply to Plaintiffs' sixth cause of action.

Defendants' third and final argument is that the City is immune from liability under California Government Code Sections 820.4 and 821.6.  (See id. at 25.)  One might wonder why Defendants are raising a statutory immunity argument on a motion for summary judgment, when such arguments are usually brought at the motion to dismiss stage; they generally little fact-specific analysis, and Defendants' argument is no exception.  Indeed, Defendants already *did* raise governmental immunity arguments in preceding motions to dismiss, and the Court rejected them.  (See MTD 4AC Order at 14-15, 21.)  Defendants previously contended that they were immune from liability under California Government Code sections 820.6 and 815.2.  (See id.)  Defendants' attempt to throw additional immunity arguments at the wall now in the hopes that one might stick is unavailing, for Sections 820.4 and 821.6 do not apply here, as Defendants may have realized when they chose not to raise such arguments in any of their successive motions.  Because the applicable code sections affecting governmental immunity are best read together, the Court restates some of its previous analysis in rejecting Defendants' claims for immunity under Sections 820.6 and 815.2.

The first problem with Defendants' argument is that it misconstrues how the governmental immunity provisions cohere and impermissibly attempts to circumvent this Court's previous holdings.  Essentially, Defendants claim that a plaintiff must run the gauntlet of all the various immunity provisions, in that even if he has a valid argument that one statutory provision applies and imposes liability on the municipal defendant, if the municipality can argue that a *second* provision also might apply and that it is immune under *that* provision, then the municipality is immune.  But that is not how the statutory scheme actually works.  In Bradford v. State of California, 36 Cal. App. 3d 16 (Ct. App. 1973), the California Court of Appeal rejected the "erroneous concept" that a "plaintiff is out of court" because any state employee for whom the State of California would be liable under one Government Code provision, Section 815.2, has

immunity by virtue of a *different* provision, Section 812.6, and therefore direct liability imposed
by yet a third provision, Section 815.6, "may be disregarded." Id. at 20.  That is because, as the
Legislative Committee report explained, "[i]n general, [t]he statutes imposing liability are
cumulative in nature, i.e., if liability cannot be established under the requirements of one section,
liability will nevertheless exist if liability can be established under the provisions of another
section." Id. at 20-21.  Bradford then explained, "[i]f statutes imposing liability are cumulative,
the fact that derivative liability under section 815.2 may be nullified by an employee immunity in
no way affects direct liability based on section 815.6.  Such liability could only be negatived by a
statutory entity immunity." Id. at 21.

Section 815 provides that "a public entity is not liable for an injury, whether such injury
arises out of an act or omission of the public entity or a public employee or any other person"
*except as otherwise provided by statute*."  Cal. Gov. Code § 815 (emphasis added).  Defendants
implicitly argue that no statute "provides otherwise."  But Section 815.2 holds a public entity
"liable for injury proximately caused by an act or omission of an employee of the public entity
within the scope of his employment if the act or omission would, apart from this section, have
given rise to a cause of action against that employee or his personal representative."  Cal. Gov.
Code § 815.2.  While this should not be confused with the mandatory duty issue in Section 815.6,
all provisions of the California Constitution are "self-executing, and that even without any
effectuating legislation, all branches of government are required to comply with its terms."
Katzberg, 29 Cal. 4th 342-43.  Plaintiffs can always sue a "proper defendant" for violations of the
California Constitution for declaratory or injunctive relief, and as the Court has now held,
Plaintiffs are also entitled to a private right of action for money damages to bring a claim for
unreasonable seizures and unlawful takings under the California Constitution.  See id. at 343.
The City is thus liable for its employees' violations of the California Constitution.  The Ninth
Circuit has explained how Section 815.2 works and why this departs from certain principles of
Monell liability for state law claims:

> As to the county, the district court applied the rule set out in
> [Monell].  Under Monell, the county itself may be held liable for a
> violation of federal law under section 1983 only if the county has
> adopted an illegal or unconstitutional policy or custom.  It cannot
> be liable for employees' unconstitutional conduct on a theory of
> respondeat superior.  California, however, has rejected the Monell
> rule and imposes liability on counties under the doctrine of
> respondeat superior for acts of county employees; it grants
> immunity to counties only where the public employee would also
> be immune.  See Cal. Gov't Code § 815.2; see also Scott v. County
> of Los Angeles, 27 Cal.App.4th 125, 139–40 (1994) ("Under
> Government Code section 815.2, subdivision (a), the County is
> liable for acts and omissions of its employees under the doctrine of
> respondeat superior to the same extent as a private employer.
> Under subdivision (b), the County is immune from liability if, and
> only if, [the employee] is immune.") (emphasis omitted); White v.

> County of Orange, 166 Cal.App.3d 566, 570  (1985) ("in governmental tort cases, the rule is liability, immunity is the exception") (citation and internal quotation marks omitted).

Robinson v. Solano Cnty., 278 F.3d 1007, 1016 (9th Cir. 2002).[59]

Defendants almost certainly know the Court would so hold here, because the Court has *already* so held.  As the Court previously indicated in holding that Plaintiffs had stated a claim for violation of the California Constitution, "because the Court finds that the City is not immune under section 815.2(b), and because the City is derivatively liable for the state law claims under 815.2(a), it need not decide whether the City is directly liable under California Government Code section 815.6.  Bradford, 36 Cal. App. 3d at 20–21 ("In general, the statutes imposing liability are cumulative in nature, i.e., if liability cannot be established under the requirements of one section, liability will nevertheless exist if liability can be established under the provisions of another section.") (quoting Cal. Gov. Code § 815)).  (MTD 4AC Order at 23.)  Once again, because the Court has already found a basis for liability, and because the "statutes imposing liability are cumulative in nature," the additional immunity arguments raised now by Defendants must fail.

The second problem with Defendants' argument as to Section 820.4 is that it more or less rehashes an argument previously rejected as to the applicability of Sections 820.6 and 815.2(b).  (See MTD 4AC Order at 15-16.)  Section 820.6 provides for immunity for employees who act in "good faith, without malice, and under the apparent authority of an enactment" that is later declared unconstitutional.  Cal. Gov. Code § 820.6.  This immunity extends to public entities to shield them from derivative liability stemming from the actions of their employees under California Government Code section 815.2(b).  Cal. Gov. Code § 815.2(b).  California Government Code section 810.6 defines "enactment" as used in section 820.6 as "a constitutional provision, statute, charter provision, ordinance or regulation."  Cal. Gov. Code § 810.6.  A "regulation," as used in section 810.6, means a "rule, regulation, order or standard, having the force of law, adopted . . . as a regulation by an agency of the state pursuant to the Administrative Procedure Act."  Cal. Gov. Code § 811.6.  As the Court previously held, a city policy promulgated by law enforcement, like the Impound Policy, cannot be an "enactment" or a "regulation" within the meaning of sections 820.6 or 810.6.  The LAPD is not an "agency of the state," and SO7 was not promulgated "pursuant to the Administrative Procedure Act," but was instead created by LAPD and approved by the Los Angeles Board of Police Commissioners.  As a result, the City is not entitled to section 820.6 immunity.  See Holland v. City of San Francisco, 2013 WL 968295, *9 (N.D. Cal. Mar. 12, 2013) ("[S]ection 820.6 does not provide immunity based on law enforcement agency policies.");  see also Hansen v. California Dep't of Corr., 920 F. Supp. 1480, 1502 (N.D. Cal. 1996) (holding that section 820.6 immunity did not apply to

---

[59] The Court also observes that, in a case cited by Defendants, Alviso, 186 Cal. App. 4th 198, the plaintiff alleged violations of both the state and federal constitutions against the Attorney General, Sonoma County and the Sonoma County Sheriff's Department, seeking damages against the County defendants, and there appears to have been no question of governmental immunity raised at the trial or appellate levels.  See id. at 202-04.

internal policy promulgated by a state agency).  Section 820.4 provides, "[a] public employee is
not liable for his act or omission, exercising due care, in the execution or enforcement of any
law."  Cal. Gov. Code § 820.4.  Defendants now argue they are immune under Section 820.4
because "(1) the impounds and 30-day holds of Plaintiffs' vehicles were done to enforce Cal.
Veh. Code § 14602.6 and (2) the 30-day holds were reasonable as they pre-dated the Ninth
Circuit's reversal in this case."  (MSJ at 25.)  This is a subtle variation on an argument the Court
previously rejected, which is that the Impound Policy is intended to implement Section 14602.6,
which itself is a state "enactment" under Section 820.6.  As the Court has already held twice,
and now holds for a third time,  Defendants' Impound Policy "does not merely 'mirror'
14602.6(b), [but] goes beyond the Vehicle Code by specifying which section should be used as
the impound authority, given a particular combination of present infraction and prior
infractions."  (MTD TAC Order at 16; MTD SAC Order at 11.)  It follows that Defendants were
not merely executing a state law, but deciding which laws to enforce and how to enforce them.

But the larger problem with Defendants' argument is that they cannot show "due care."
Defendants' argument is a kind of quasi-qualified immunity defense in that the 30-day holds
predated the holding in <u>Brewster</u>, 859 F.3d 1194.  The logic is that Defendants were entitled to
rely upon the authority of Section 14602.6 without regard to constitutional implications, namely
the possibility that the lengthy impounds constituted unreasonable seizures and unlawful takings
under the State (and Federal) Constitutions.  But the argument is belied by the acknowledgement
in S07 itself that "state and federal court decisions have held that the statutory authority to
impound, alone, does not determine the constitutional reasonableness of the seizure," and that
there must be a community caretaking rationale to justify the impound.  (<u>See</u> S07; <u>see also</u>
<u>Miranda</u>, 429 F.3d at 864 ("the decision to impound pursuant to the authority of a city ordinance
and state statute does not, in and of itself, determine the reasonableness of the seizure").
<u>Brewster</u>, 859 F.3d 1194 tread new ground to a certain extent, but Defendants' argument only
works if it came completely out of left field, and it did not.  <u>Brewster</u> observed that "it's well
established that 'a seizure lawful at its inception can nevertheless violate the Fourth Amendment
because its manner of execution unreasonably infringes possessory interests.'"  859 F.3d at 1196
(quoting <u>Jacobsen</u>, 466 U.S. at 124 & n.25).  In <u>United States v. Dass</u>, 849 F.2d 414, the Ninth
Circuit held that a warrantless seizure was unreasonable even though it was validly initially seized
because the length of the warrantless seizure, between seven and 23 days.  <u>Id.</u> at 414-15; <u>see also</u>
<u>Brewster</u>, 895 F.3d at 1196 (summarizing <u>Dass</u>).  <u>Dass</u> thus put Defendants on notice that a 30-
day warrantless hold could be constitutionally suspect on the basis of sheer length.  And though
the entire basis for the Impound Policy is a deterrence or punishment rationale, <u>Miranda</u>, 429
F.3d 858 explained why deterrence is incompatible with the community caretaking doctrine:

> While the Supreme Court has accepted a deterrence rationale for
> civil forfeitures of vehicles that were used for criminal activity, <u>see</u>
> <u>Bennis v. Michigan</u>, 516 U.S. 442, 452 (1996), the deterrence
> rationale is incompatible with the principles of the community
> caretaking doctrine.  Unlike in civil forfeitures, where the seizure of
> property penalizes someone who has been convicted of a crime, the
> purpose of the community caretaking function is to remove

> vehicles that are presently impeding traffic or creating a hazard. The need to deter a driver's unlawful conduct is by itself insufficient to justify a tow under the "caretaker" rationale.

429 F.3d at 866. The bottom line is that Defendants cannot show that they demonstrated due care when enacting and implementing the Impound Policy prior to the Ninth Circuit's holding in Brewster, 859 F.3d 1194.[60]

The Court's holdings track those in a parallel action brought against the California Highway Patrol, Ordonez, 495 F. Supp. 3d 855. In Ordonez, the plaintiff challenged a related policy enacted by CHP, which "requires CHP officers to continue impoundment for thirty days even if the vehicle's owner is a validly licensed driver or has a licensed driver available to drive the vehicle, is willing and able to reclaim possession, has vehicle insurance, is willing and able to pay accrued fees and charges, and the vehicle is not posing a danger to public safety." Id. at 867. As explained above, all those features are true of Defendants' Impound Policy. The Ordonez court rejected the argument that CHP's policy was an "enactment" within the meaning of Government Code Section 820.6, explaining that "those requirements of the CHP Impound Policy are not contained in Section 14602.6," therefore the policy "is not identical to Section 14602.6," and that the CHP was not immune pursuant to Section 820.6. Id. Ordonez also rejected an immunity argument under Section 820.2, which Defendants do not raise here, but it parallels their Section 820.4 argument in important respects. Section 820.2 provides that, " "[e]xcept as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused." Cal. Gov. Code § 820.2. Ordonez found that the defendants carried the burden of demonstrating "that they are entitled to § 820.2 immunity for a specific policy decision made by an employee who consciously balanced the decision's risks and benefits." 495 F. Supp. 3d at 868 (citation omitted). It then found that the CHP Impound Policy was not "coterminous with Section 14602.6," since it required officers to impound vehicles for thirty days even when an individual provided proof "that the exigency warranting the initial impound had ceased," and that the defendants' actions were thus "unprotected by Section 820.2." Id. at 868-89. It finally found that the defendants failed to meet its burden to show that they "consciously balanced the decision's risks and benefits." Id. at 869. The same is true here: there is nothing in the record that demonstrates that Defendants considered the risks of implementing the Impound Policy, only evidence that they considered the benefits, namely punishing and deterring unlicensed driving. And Defendants do not make any argument as to how, exactly, any individual exercised "due care," which surely also requires some kind of cost-benefit analysis.

---

[60] Though Defendants do not raise the argument here, perhaps because Plaintiffs have identified at least one individual responsible for the Impound Policy, Chief Beck, it is not a requirement that a plaintiff identify a particular individual responsible for an act or omission to impose liability under Section 815.2. See Perez v. City of Huntington Park, 7 Cal. App. 4th 817, 820–21 (1992).

Finally, Defendants' Section 821.6 argument is frivolous, and arguably sanctionable. That provision states, "[a] public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause." Cal. Gov. Code § 821.6. The Ninth Circuit has squarely held that Section 821.6 is limited to actions for malicious prosecution. Garmon v. County of Los Angeles, 828 F.3d 837, 847 (9th Cir. 2016). "Because [Plaintiffs'] claims under state law are not for malicious prosecution, Section 821.6 does not apply." Ordonez, 495 F. Supp. 3d at 868 (citing Garmon, 828 F.3d at 847).[61]

For the reasons above, the Court rejects Defendants' immunity arguments as to Plaintiffs' claims under the California Constitution. As also held above, since the Impound Policy violates Plaintiffs' federal constitutional rights under the Fourth, Fifth and Fourteenth Amendments, and the relevant analysis is the same under the parallel provisions of the California Constitution, the Court holds that the Impound Policy also violates the prohibitions on unreasonable seizures, unlawful takings and procedural due process enumerated in the California Constitution. As noted below, Plaintiffs are entitled to declaratory relief under these three State Constitution provisions, and as noted above, money damages for the unreasonable seizures and unlawful takings claims as well.

## J.  Mr. Vigil's "Unclean Hands"

Defendants raise the novel and wholly unsupported argument that Mr. Vigil's claims are barred by the doctrine of "unclean hands" because he drove his vehicle without a license after taking it from the impound lot. (MSJ at 26.) According to Defendants, "Vigil's disregard of the law and the safety of others precludes his entitlement to relief." (Id.) The primary authority Defendants cite in support of their argument is Northbay Wellness Grp., Inc. v. Beyries, 789 F.3d 956 (9th Cir. 2015), in which the Ninth Circuit discussed the applicability of the doctrine to bankruptcy actions, and held that the bankruptcy court abused its discretion in concluding that the doctrine applied at that. Northbay Wellness is thus not particularly helpful to Defendants' argument.

---

[61] Since Plaintiffs' Counsel did not cite Garmon, 828 F.3d 837, Defendants' Counsel violated its duty of candor to the tribunal if they "fail[ed] to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the proposition of the client and not disclosing by opposing counsel[.]" Cal. R. Prof'l Conduct 3.3(a)(2). It is obvious that Garmon is directly adverse to Defendants' cited proposition and binding authority on this Court. The only question is whether Defendants' Counsel knew of its existence. It is hard to believe that they did not, for the Court has cited Ordonez, 495 F. Supp. 3d 855 in multiple orders in the related case to this action, Breonnah Fitzpatrick, et al. v. City of Los Angeles, et al., Central District of California Case. No. EDCV-21-6841-JGB, e.g., Dkt. Nos. 48, 71, a case that in turn cited this holding in Garmon, 828 F.3d 837. Defendants' Counsel in this action and Fitzpatrick are the same. Nonetheless, the Court will give Defendants' Counsel the benefit of the doubt that they did not knowingly misrepresent controlling authority to the Court.

But even assuming the doctrine would potentially apply to an action such as this, the Court finds that it would be inappropriate to apply it here as to Mr. Vigil.  Indeed, assuming that Northbay Wellness set out generally applicable principles beyond the bankruptcy context, it called for a balancing test that forecloses Defendants' argument.  "[D]etermining whether the doctrine of unclean hands precludes relief requires balancing the alleged wrongdoing of the plaintiff against that of the defendant, and 'weigh[ing] the substance of the right asserted by [the] plaintiff against the transgression which, it is contended, serves to foreclose that right.'"  Northbay Wellness, 789 F.3d at 960 (quoting Republic Molding Corp. v. B.W. Photo Utils., 319 F.2d 347, 350 (9th Cir. 1963)).  "In addition, 'the clean hands doctrine should not be strictly enforced when to do so would frustrate a substantial public interest.'"  Id. (quoting EEOC v. Recruit U.S.A., Inc., 939 F.2d 746, 753 (9th Cir. 1991)).  On the record before it, the Court finds that any wrongdoing on behalf of Mr. Vigil is outweighed by that of Defendants.  Moreover, the "substance" of Mr. Vigil's claims outweighs any alleged wrongdoing on his past.  And most importantly, a strict application of the unclean hands doctrine would "frustrate a substantial public interest" because Mr. Vigil's claims are far more valuable than whatever money damages he may be entitled to as an individual: he and the other named plaintiffs represent interests far greater than themselves.  Plaintiffs have waged a nine-year battle to vindicate their constitutional rights; if upheld, this Court's holdings in their favor will serve as an important precedent for future cases, and may lead to positive changes in the law across California.

Moreover, "[i]n applying the doctrine, 'what is material is not that the plaintiff's hands are dirty, but that he dirtied them in acquiring the right he now asserts, or that the manner of dirtying renders inequitable the assertion of such rights against the defendants.'"  Ellenburg v. Brockway, Inc., 763 F.2d 1091, 1097 (9th Cir. 1985) (citation and brackets omitted).  "Thus, equity requires that those seeking its protection shall have acted fairly and without fraud or deceit as to the controversy in issue."  Id.; see also Keystone Driller Co. v. Gen. Excavator Co., 290 U.S. 240, 245 (1933) (courts of equity "apply the maxim requiring clean hands only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation").  "Whether the doctrine of unclean hands applies is a question of fact."  Kendall-Jackson Winery, Ltd. v. Superior Ct., 76 Cal. App. 4th 970, 978 (1999), as modified on denial of reh'g (Jan. 3, 2000).  "The unclean hands doctrine protects judicial integrity and promotes justice.  It protects judicial integrity because allowing a plaintiff with unclean hands to recover in an action creates doubts as to the justice provided by the judicial system.  Thus, precluding recovery to the unclean plaintiff protects the court's, rather than the opposing party's, interests."  Id.  "The misconduct that brings the clean hands doctrine into play must relate directly to the cause at issue.  Past improper conduct or prior misconduct that only indirectly affects the problem before the court does not suffice.  The determination of the unclean hands defense cannot be distorted into a proceeding to try the general morals of the parties."  Id. at 979.  "There must be a direct relationship between the misconduct and the claimed injuries so that it would be inequitable to grant the requested relief."  Id. (citations, internal quotations and brackets omitted).  "Whether the particular misconduct is a bar to the alleged claim for relief depends on (1) analogous case law, (2) the nature of the misconduct, and (3) the relationship of the misconduct to the claimed injuries."  Id.

The Court is not persuaded that the doctrine applies to Mr. Vigil on the factual record before it. For one, Defendants exaggerate that record, suggesting that Mr. Vigil acted with the utmost disregard for the rule of law. The reality is far more mundane. Mr. Vigil did not drive his vehicle "with his suspended license as soon as the vehicle left the lot," as Defendants claim (MSJ at 26), but rather Mr. Vigil went to the OPG storage lot accompanied by his friend, Rene Baca, a licensed driver; Mr. Baca drove the Mercedes out of the impound lot, but then had to go to school, and after dropping the friend off at school, Mr. Vigil thereafter got into the driver's seat and drove himself home. (PCSSUF ¶ 53; DSSUF ¶¶ 25-26; Vigil Dep. 38:14-25.) This was illegal, though hardly the kind of fraudulent misrepresentation that Defendants suggest Mr. Vigil might have made: there is no direct evidence that he planned to drive himself home after receiving his car back, and in fact a reasonable inference that he had hoped his friend might take him home but later learned Mr. Baca needed to go to school. As to Defendants' contention that Mr. Vigil continued to drive after receiving his car back, the only evidence in the record is that Mr. Vigil drove the car "rarely, to get food[.]" (Vigil Dep. 18:9-11.) There is no evidence in the record that Mr. Vigil ever drove in an unsafe manner, other than driving without a license. The "nature of the misconduct" is thus rather minimal. Kendall-Jackson Winery, 76 Cal. App. 4th at 979.

But none of the above actually matters much, because Mr. Vigil's claims, and injuries, were *complete* by the time of any purported misconduct. Mr. Vigil need only avoid "fraud or deceit as to the controversy in issue." Ellenburg, 763 F.2d at 1097. The misconduct "must relate directly to the cause at issue," while "there must be a direct relationship between the misconduct and the claimed injuries." Kendall-Jackson Winery, 76 Cal. App. 4th at 979. Critically, all of Mr. Vigil's purported misconduct transpired *after* Defendants unlawfully held his vehicle for 30 days. (See PCSSUF ¶ 53.) As the Court held above, Defendants violated Mr. Vigil's Fourth Amendment rights because they had no continuing justification for the imposition of the 30-day impound of his vehicle. In doing so, Defendants violated his Fifth Amendment rights. The facts also demonstrate the following: Mr. Vigil (1) repeatedly sought the release of his vehicle (going to the station on four occasions); (2) Defendants did not inform him of his right to a storage hearing during those visits; and (3) Defendants evinced disregard for the Fourth Amendment and the rule of law, with a decisionmaker perfectly encapsulating application of the "rule of man" when he informed Mr. Vigil, "It's up to me, and I'm keeping your car" for 30 days. (PCSSUF ¶¶ 44-52; Vigil Dep. 32:16-25.) Because the purported misconduct only happened after all this, there is no "direct relationship between the misconduct and the claimed injuries," Kendall-Jackson Winery, 76 Cal. App. 4th at 979, since Defendants had already inflicted a complete injury on Mr. Vigil by the conclusion of the 30-day impound.

Moreover, Defendants have not cited any "analogous case law," id., nor is the Court aware of a single remotely analogous authority to the instant situation. To a large extent, the unclean hands inquiry is a factbound, discretionary one requiring the careful balancing of competing values. The analysis above demonstrates why it would be wrong to apply the doctrine to bar Mr. Vigil's claims. As such, the Court DENIES the MSJ as to that issue.

//

**K.  Plaintiffs' Damages Calculations**

In the MPSJ, "Plaintiffs seek summary adjudication that the methodology and calculations of their experts, and reliance on the SIPP and ICAR codes[,] are undisputed. Plaintiffs do not seek an order that each class member is entitled to the value of their loss because another layer of proof is required by the class definition." (MPSJ Reply at 11.)  The Court has explained above the two classes it certified, the LO Class and Lien Class, and their particular class definitions.  (See also MTD 5AC and MCC Order at 24-25.)

While the Facts section above explains in greater detail the specific methodological steps Plaintiffs' experts took to arrive at their damages calculations, the following is a summary of Plaintiffs' approach: Plaintiffs first obtained computer data obtained from OPG-LA on the individual OPGs' towing and storage of vehicles, which contained most of the information required to determine the accumulated fees needed to secure the vehicle's release and the cost of renting a comparable vehicle.  (MPSJ at 19-20.)  Plaintiffs' car rental industry expert, Mr. Meyer, grouped the vehicles corresponding to vehicle models and features (in industry parlance, "SIPP" codes), which are standards used in the car rental industry to determine car rental costs.  (Id. at 20.)  Mr. Meyer then used historical data from Rate-Highway's record of the lowest available car rental rates to determine the cost of renting a comparable vehicle.  (Id.)  The car rental industry only rents out newer vehicles, so such vehicles were the best and most comparable means of determining what it would have cost to rent a comparable vehicle during the period it was unavailable to the owner.  (Id.)  Since rental rates vary seasonally and over time, Mr. Meyer determined the fair market rate for the month and year of the impound, applying rental rates grouped by month for an average by vendor and car class, as this is the way the relevant information is maintained over time.  (Id.)  If an impound spanned a period of two months, the relevant number of days were assigned to each such that the cost analysis most closely matched the market.  (Id.)  According to Plaintiffs, with this methodology, "it was feasible to determine the historical, fair market rate to rent a car of comparable size and utility as shown in the VIIC" dat[a]."  (Id.)  Mr. Dwight Cook, Plaintiff's database expert, then applied Mr. Meyer's analysis to the VIIC data on the LO and Lien Classes.  (Id.)

Before turning to Defendants' substantive argument as this methodology, to the extent Defendants offer any, the Court first addresses Defendants' evidentiary objections.  Defendants object to the Dwight Cook Declaration "in its entirety" on the grounds that his opinion rests on unreliable methodology, a "lack of demonstrated qualifications" and "failure to attach documents purportedly relied upon."  (Defendants' Evidentiary Objections at 16.)  Specifically, Defendants claim the following: (1) Mr. Cook's analysis is "fundamentally flawed" because his declaration does not attach the "VIIC data it relies upon," and for the same reason it has not been authenticated; (2) Mr. Cook's methodology is flawed because his "calculations are not based on the make, model, year or condition of each impounded vehicle, which is the industry standard for valuing vehicles," a proposition for which Defendants cite an IRS publication for determining the value of *donated vehicles* and an Edmunds publication involving the *trade-in* value of used cars; (3) Because historical rental car rates are not available for all SIPP codes in the Los Angeles market, Mr. Meyer relied on historical rental data for one of the available codes, ICAR,

and then compared that code's rental data for the other codes, which requires an unexplained assumption that the "relative difference in rental rate between the one code he utilized and the 63 others remained constant for all relative times"; (4) Mr. Cook's analysis relies on "irrelevant" data, namely data purportedly outside the scope of the certified LO and Lien classes; and (5) Mr. Cook's background does not provide him with the requisite expertise on the subject he seeks to opine on, in part because he did not attach a curriculum vitae.  (Id. at 12-16.) The Court fully considers these arguments before rejecting them, though it observes that the avenue through which Defendants have chosen to assert them raises a strong inference that Defendants do not believe they are meritorious either.  In this Court's decade on the bench, it has observed that, in the vast majority of class action cases that make it to the (cross) motions for summary judgment stage, the parties raise objections to a damages expert's methodology through some kind of Daubert[62] motion, i.e., a motion to exclude or strike an adversary's expert report. Very often, the parties disagree about the correct methodology for calculating damages, each side retains one or more experts to provide a given position, and they each ask the Court to determine at the motion for summary judgment stage (or, sometimes thereafter, in the form of a motion in limine) that their methodology is correct (or reliable) and the other methodology is incorrect (or unreliable).  This extremely common paradigm gives rise to the "battle of experts" cliché; much, if not most of the time, a court would decline to exclude either approach, and then the "battle" proceeds at trial in front of a jury, who can pick a methodological approach to damages they prefer, provided they get that far.  Remarkably, despite *years* of notice that Plaintiffs have intended to use this methodology and years of access to its underlying data, Defendants have elected not to retain a damages expert of their own, not to file a motion to exclude Plaintiffs' expert reports, and not to provide *any* semblance of a feasible alternate methodology for the Court to consider.[63]  This approach speaks volumes.  Far from initiating a "battle of experts," Defendants have thrown a few halfhearted jabs and thereafter thrown in the towel.  Even so, the Court will proceed on the assumption that Defendants have properly called into question the reliability of Plaintiffs' methodology and that it must exercise its "gatekeeping" function to reject it if it finds it unreliable.

Federal Rule of Evidence 702 ("FRE 702") allows admission of "scientific, technical, or other specialized knowledge" by a qualified expert if four conditions are met: (a) the testimony will "assist the trier of fact to understand the evidence or to determine a fact in issue"; (b) "the testimony is based on sufficient facts or data"; (c) "the testimony is the product of reliable principles and methods"; and (d) "the expert has reliably applied the principles and methods to the facts of the case."  Fed. Rev. Evid. 702(a)-(d).  The trial court is accorded wide discretion to act as gatekeepers for the admissibility of expert testimony.  Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 151–52 (1999).  A trial court "*may* consider one or more of the specific factors that Daubert mentioned when doing so will help determine that testimony's reliability.  But, as the

---

[62] v. Merrell Dow Pharm., 509 U.S. 579 (1993).

[63] Defendants have been on notice of Plaintiffs' damages methodology at least since July 29, 2019, when Plaintiffs first moved for class certification and provided a virtually identical argument (and evidence in support) as to damages that they do here, including a declaration from Dwight Cook.  (See Dkt. No. 167.)

Court stated in <u>Daubert</u>, the test of reliability is 'flexible,' and <u>Daubert</u>'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case.  Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." <u>Id.</u> at 141-252.  These factors include whether a theory or technique has been tested, has been subjected to peer review and publication, has a high known or potential rate of error, and "enjoys 'general acceptance' within a 'relevant scientific community.'" <u>Id.</u> at 149–50 (quoting <u>Daubert</u>, 509 U.S. at 592–94).  Additionally, the party offering expert opinion must show by a preponderance of the evidence that: (1) the expert is qualified to render their opinions; and (2) the opinions are adequately factually and scientifically supported.  <u>Daubert</u>, 509 U.S. at 592-93.  FRE 702 should be applied consistent with the "liberal thrust" of the Federal Rules and their "general approach of relaxing the traditional barriers to 'opinion testimony.'" <u>Id.</u> at 588.

Defendants' first argument, that Mr. Cook's analysis is flawed and inadmissible because the underlying VIIC data is not attached to the Dwight Cook Declaration, is disingenuous.  First of all, it is undisputed that the VIIC data and Plaintiffs' reliance upon it was provided to Defendants' Counsel in July 2019, when Plaintiffs first moved for class certification, and Plaintiffs re-sent it to Defendants on January 24, 2023.  (PRDSGMF ¶ 79.)  As Defendants surely are aware, there is a good reason that Plaintiffs could not have directly attached the data files to the Dwight Cook Declaration, which was submitted in PDF format: the VIIC data is contained in enormous Microsoft Excel spreadsheets.  As the email exchange between opposing counsel attached to Plaintiffs' MPSJ Reply indicates, Plaintiffs' Counsel could not email the data files directly to Defendants' Counsel because they were so large, which also explains why they could not attach it as an exhibit.  (<u>See</u> MPSJ Reply Ex. CCC.)  Plaintiffs' Counsel did attach the files in a Dropbox link, which the Court was also able to access.  The first file alone was approximately 63 megabytes and runs over 27,000 pages.[64]  As far as the Court is concerned, this situation is exactly what Federal Rule of Evidence 1006 (Summaries to Prove Content) was intended for.  It allows a proponent of evidence to use a summary, chart or calculation "to prove the content of voluminous writings" that "cannot be conveniently examined in court."  Fed. R. Evid. 1006.  To be admissible, the proponent "must make the originals or duplicates available for examination or copy, or both, by other parties at a reasonable time and place."  <u>Id.</u>  It is undisputed that Plaintiffs have done exactly that, making the VIIC data available to Defendants with ample time to review it.  The data is referenced throughout declarations signed under penalty of perjury that discuss its content and application; the Court finds no authentication problem, for it would have been impossible for Plaintiffs to do what Defendants appear to claim was necessary, which is to directly attach tens of thousands of pages of raw data to a PDF declaration.  Plaintiffs have satisfied their burden of providing sufficient evidence for the Court to determine that the data is what Plaintiffs claim it is.  <u>See</u> Fed. R. Evid. 901(a).  Defendants have reviewed the data themselves, and because they make no argument to the contrary, the Court infers that they found

---

[64] Since this Court also requires every party to submit mandatory hard copies of all filings to chambers, the Court appreciates that Plaintiffs had the good sense not to directly attach the data set, sparing in the process the lives of trees and some of the dwindling box-free floor space that remains in this Court's chambers.

no problem with how either of Plaintiffs' experts used the dataset.  Moreover, the Court also reviewed the data, and from its comparison of the VIIC data to Plaintiffs' expert reports, the data was properly applied.

The Court rejects Defendants' argument that Mr. Cook's methodology is flawed because his calculations are not based on the make, model, year or condition of the impounded vehicle. First of all, that is not true; as explained by Mr. Meyer and Mr. Cook, the relevant SIPP and ICAR codes *do* factor those variables in.  Defendants have suggested no alternative framework other than using the SIPP and ICAR codes, setting aside their general objection to the concept of comparable rental car valuations; the Court's review of the available figures suggests that it would be impossible for Plaintiffs to use a methodology any more specific than the SIPP and ICAR codes.  Second, Defendants' suggestion that the make, model year and condition of the vehicle is the "industry standard" is true up to a point, but irrelevant to this litigation. Defendants' cited authorities relate the familiar rule that one can determine the value of a used car, for purposes of donation, trade-in or resale, by determining the book value of the specific value, often referred to as the "Kelley Blue Book" value.  But that makes little sense because Plaintiffs were not giving away, trading or selling their vehicles; Plaintiffs' theory of recovery is that they were either temporarily deprived of their vehicles, or they were temporarily deprived of their vehicles and then unable to pay the fees necessary to release the vehicles from the impound lot, leading to a lien sale and permanent loss.  For the reasons set forth below, equivalent rental car values makes much more sense in this context.

The Court also rejects Defendants' contention that Mr. Meyer relies upon an unexplained assumption that the relative difference in rental rode between one code, ICAR, and the 63 other relevant codes remained constant throughout the relevant time period.  By their own admission, Defendants acknowledge this was a necessary step in the analysis because historical rental car rates were not available for all SIPP codes in the Los Angeles market.  While Defendants appear to suggest that this assumption may be unreliable, they have not offered a single specific reason to believe that is so.  The Court has not discerned any reason to question the fundamental accuracy of the assumption either.  If Defendants wanted to challenge the reliability of the calculation, they could have retained an expert to explain why Plaintiffs' experts are not entitled to make a given assumption, or at least come forward with a single reason that the assumption may be unreliable other than that it is an assumption.  "Cases such as this require that the Court rely on the opinions of qualified experts.  [Defendants] may not sit idly by and merely criticize [Plaintiffs' experts] without gathering evidence to rebut their conclusions." United States v. AMC Ent., Inc., 245 F. Supp. 2d 1094, 1101 (C.D. Cal. 2003).  Substantively, this part of the analysis, like the entirety of Plaintiffs' damages methodology, is undisputed because Defendants have not offered any facts to contradict them.

The Court addresses Defendants' argument that Plaintiffs rely on "irrelevant" data below because it is synonymous with their (false) contention that Plaintiffs' position is inconsistent with ones previously asserted.

Finally, the Court rejects Defendants' argument that Mr. Cook lacks qualifications.
Defendants contend that Mr. Cook's CV is not attached to his expert report; this may have been
an oversight, but it is not a material one given that (1) the underlying data analysis was conducted
largely by Mr. Meyer and Mr. Mitrision, who submit expert reports with authoritative resumes
attached and (2) in lieu of filing of a resume, Mr. Cook has submitted an extensive declaration
that outlines his relevant training and experience.  As Defendants acknowledge, among his
relevant background, Mr. Cook declares that he is a retired Applications Programmer Analyst for
the State of Minnesota Department of Transportation ("MDOT"), the Minnesota State Agency
that manages Minnesota's vehicle registrations and driver's licenses.  (Dwight Cook Declaration
¶ 1.)  Defendants seem to claim Mr. Cook lacks expertise because he "does not appear to have
expertise as a data analyst."  (Defendants' Evidentiary Objections at 15.)  This is false; his
Declaration makes clear that Mr. Cook's entire impressive career has been more or less devoted
to data analysis.  For decades, Mr. Cook "provided systems analysis, database design, software
design, testing and installation, customer service" and other functions for various entities.
(Dwight Cook Declaration ¶ 1.)  Among his achievements, he "designed and piloted the first
Electronic Document Management System (EDMS) for the State of Minnesota."  (Id.)  He has
spent his career programming and managing various "computer data systems."  (Id. ¶ 2.)  "That
is, [he] regularly worked with these databases and . . . wrote code in . . . . to manipulate the data
for collection, storage and reporting purposes."  (Id.)  He has "worked and consulted with
managers and programmers for large datasets managed by the departments of transportation for
other states, and the United States Department of Transportation[.]"  (Id. ¶ 3.)  His academic
background includes taking courses, including "numerous" post-degree classes, to "enhance
[his] expertise in the area of computer program development, data analysis, design, storage,
management and retrieval."  (Id. ¶ 4.)  He goes on to describe his familiarity with the relevant
datasets in this case, including California DMV data, none of which Defendants contest.  (See id.
¶¶ 5-10.)  Mr. Cook's background in computer programming and analysis of large data sets in the
transportation context make him amply qualified to opine on the matters relevant here.

The Court thus OVERRULES all of Defendants' evidentiary objections regarding
Plaintiffs' damages evidence.  It next turns to the substance of Plaintiffs' methodology.

Defendants raise two substantive arguments in opposition to Plaintiffs' proposed
calculations.  The first is that Plaintiffs have previously argued that "all 24,947 class members
would not be entitled to damages," so they "cannot now seek damages for all 24,947 class
members."  (MPSJ Opposition at 22.)  As Defendants relate, Plaintiffs have previously
contended that Defendants have "exaggerated" the amount at issue in this case by referring to
the total number of impounds for the LO and Lien Classes, when only some members of the LO
Class will be entitled to reimbursement by showing they were legally "able to drive the car
away."  (Id. at 21.)  As Plaintiffs clarify in the MPSJ Reply, their current request is fully
consistent with earlier positions, for Plaintiffs only seek "summary adjudication that the
methodology and calculations of their experts, and reliance on the SIPP and ICAR codes[,] are
undisputed.  Plaintiffs do not seek an order that each class member is entitled to the value of their
loss because another layer of proof is required by the class definition."  (MPSJ Reply at 11.)  As
noted above, for a member of the LO Class to recover, she must not only show that her vehicle

was impounded for 30 days pursuant to S07 and that it was not released until after the conclusion of the 30-day period, but that "there exists a Los Angeles City record documenting that the registered owner paid the City the California Government Code § 41612 fee, or, to the extent such records are unavailable, the vehicle remained registered to the RO six months after the impound." (MTD 5AC Order at 24-25.)  As to the Lien Class, to recover, a member must not only show that her vehicle was impounded for 30 days pursuant to S07 and that it was later sold at a lien sale, but also that she "had a valid current California driver's license at any point between the expiration of the 30-day impound and the lien sale or had an available driver to pick up the vehicle as of or before the lien sale date." (Id.)  Plaintiffs are correct that "these limitations ensure that the vehicles were returned to the registered owner, a licensed driver appeared, accrued fees were paid, and the vehicles were held at least 30 days." (MPSJ Reply at 11.)  This is consistent with Plaintiffs' longstanding position.

Defendants' second argument is that Plaintiffs' position is based on a "fundamentally flawed premise: that class members would be driving a replacement car during the period their vehicle was impounded, when the vehicle was impounded due to the class member not having a valid license in the first place." (MPSJ Opposition at 22.)  Beyond that quoted sentence, the argument consists of a single other sentence in support: "None of the Plaintiffs could lawfully drive a vehicle during the 30 days following impound, so it is not reasonable to assume that they, or any other class member, suffered damages in the amount of a reasonable rental value of the impounded vehicle for 30 days." (Id. at 22-23.)  Defendants do not provide a single authority in support of this argument, and never attempt to respond to or distinguish Plaintiffs' cited authorities.  While there is some intuitive appeal to Defendants' argument, those authorities explain why Defendants' position is also incorrect, or at least why Plaintiffs' approach is a viable one that could have been pitted against an alternative supplied by Defendants.  Before turning to the applicable case law and secondary sources, it is important to point out what Defendants do not contest.  Defendants do not reject the notion that they could be liable for the fines and fees that accrued as a result of their implementation of the Impound Policy, a significant component of Plaintiffs' damages calculations.  The corollary to that position is that, whatever may be said for Plaintiffs' replacement vehicle theory, if Plaintiffs prevail on the merits of their claims, they at least had the right not to be subjected to the daily storage fees, which were at all relevant periods at least $37-40 per day and likely exceeded that when factoring in applicable taxes and other values. (See Donald Cook Declaration ¶¶ 36-38.)  Cf. Clement, 518 F.3d at 1094 ("[H]aving one's car towed, even one that's not operational, imposes significant costs and burdens on the car's owner. . . . [T]he owner will normally have to travel to the towing garage to retrieve it, which may involve significant cost for someone who doesn't have an operational vehicle to drive. And, of course, the garage won't release the car unless the owner pays towing, impound and storage fees.").  Even excluding the additional fees (such as tow charges, "release fees," lien processing fees, occupancy taxes and other charges), a 30-day impound would have cost a class member over $1,000 in daily storage fees alone, and factoring in those additional fees, she would have paid out of pocket roughly $1,500 for a 30-day impound. (See Donald Cook Declaration ¶ 37.)

For example, Mr. Vigil paid $1,633.90 for his 30-day impound.  (Id.)  A considerable percentage of Americans, likely more than half, cannot afford to pay an emergency expense of $1,000 or more.  See Ivana Pino, *57% of Americans can't afford a $1,000 emergency expense, says new report.  A look at why Americans are saving less and how you can boost your emergency fund*, FORTUNE (Jan. 25, 2023, 11:58 AM), https://fortune.com/recommends/banking/57-percent-of-americans-cant-afford-a-1000-emergency-expense/.  It follows that many individuals subjected to the Impound Policy, most relevantly those members of the Lien Class, might have been able to pay the comparatively low fees if their vehicles had been towed and impounded for a day or two, but when their vehicles were impounded for 30 days, they could no longer afford to pay the fees necessary to have their vehicles released.  In other words, "the ever-increasing fees created a Sisphyean challenge for cash-strapped middle and low income families."  Jorge Alvarado, Public Law Center, et. al., *Towed Into Debt: How Towing Practices in California Punish Poor People* 9 (2019).  Unable to pay the debts Defendants claimed they owed, and because Defendants refused to release the vehicles until they paid those debts, members of the Lien Class then lost their vehicles to lien sales.  This was a readily foreseeable consequence of the Impound Policy.  And the collateral consequences that flowed from the loss of a vehicle, including access to employment, were foreseeable, too.  That is because "[w]hen a minor offense produces a debt, that debt . . . can lead to loss of employment or shelter, compounding interest . . . and an ever-expanding financial burden—a cycle as predictable and counterproductive as it is intractable."  Rivera v. Orange Cnty. Prob. Dep't, 832 F.3d 1103, 1112 n.7 (9th Cir. 2016).  The Ninth Circuit has recognized that "[t]owing practices disproportionately prejudice low-income populations as towing can permanently deprive low-income individuals of their vehicles (which often serve as their sole source of income or even their home).  For such individuals, municipal tow practices often create a debt trap for the poor, because, without access to one's car, obtaining and maintaining economic security becomes problematic[.]"  Grimm, 971 F.3d at 1063-64 (internal citations and quotations omitted); see also City of Chicago, 141 S. Ct. at 593–94 (Sotomayor, J., concurring) ("Drivers in low-income communities across the country face . . . vicious cycles: A driver is assessed a fine she cannot immediately pay; the balance balloons as late fees accrue; the local government seizes the driver's vehicle, adding impounding and storage fees to the growing debt; and the driver, now without reliable transportation to and from work, finds it all but impossible to repay her debt and recover her vehicle. . . . The cycle thus continues, disproportionately burdening communities of color, . . . and interfering not only with debtors' ability to earn an income and pay their creditors but also with their access to childcare, groceries, medical appointments, and other necessities.").  All of this is to say that there is inherent value in the car *not* sitting in an impound lot for 30 days, even if the owner could not drive it herself, given that it saved her the ever-increasing daily fees and the prospect that they would add up to an amount that would lead to a permanent loss of the vehicle through a lien sale.

Defendants also do not question the reality that, for many members of the certified classes, even if not the named Plaintiffs themselves, the legal owners of the vehicles *could* have driven the cars themselves, because the vehicles were stopped and impounded for 30 days when they were driven by *another* (unlicensed) driver.  Moreover, Defendants do not directly question the property interests at stake for drivers who lacked valid licenses, likely because the Court has already held that these interests are significant:

It is true that some of the vehicle owners subject to the Impound Policy do not have valid licenses or have licenses that are revoked or suspended at the time of impound.  Even for those vehicle owners without the ability to drive legally, the private interests at stake are still significant: the right to possess their vehicle, the right to rent it, the right to ride as a passenger, the right to lend it to lawful drivers (including family members, spouses, and friends), and the right to sell the vehicle.  Notwithstanding these vehicle owners, other vehicle owners subject to the Impound Policy and 14602.6(b) are vehicle owners with valid or only partially restricted licenses.

(MTD 4AC Order at 7.)  The Ninth Circuit made much the same observation in <u>Sandoval</u>:

The City argues that its continued possession was necessary because Ruiz did not have a valid driver's license.  But, even if Ruiz could not have driven his vehicle on California's roads, he could have lent the truck to a friend, sold the truck, used it for storage, or taken any other innumerable possible actions that a property owner can lawfully take with his or her property.  The City has not provided us with any reason that a government may warrantlessly interfere with private possessory interests in this way, beyond its general argument that such impounds are justified as a deterrent or penalty.

912 F.3d at 517.  And again in a later, unpublished decision applying <u>Sandoval</u>:

Here, the broad language of the conditional release agreement encroached on Untalan's possessory interests more than was necessary to prevent unlicensed driving pursuant to the officers' community-caretaking authority.  By requiring that Untalan's counsel ensure she did not "have access to [the car]" for thirty days, even though a licensed driver was available to take possession, the conditional release agreement prevented Untalan from exercising her valid possessory interests unrelated to driving—for example, she would be barred from accessing the car to store her possessions in it or to perform maintenance on it.

<u>Untalan v. Stanley</u>, 2023 WL 2158371, at *2.

Even without the authorities cited below, the Court would be inclined to accept Plaintiffs' premise that the possessory interests in a vehicle are significant enough that the replacement vehicle methodology is appropriate.  Members of the certified classes needed their vehicles to go

to work; if they could not drive themselves, they could have had a family member or friend drive them.  They could have done the same to acquire the basic necessities of life, like groceries, as Mr. Vigil testified.  Whether as a driver or passenger, the use of a vehicle is "a virtual necessity for most Americans."  Wooley v. Maynard, 430 U.S. 705, 715 (1977).  "Automobile travel is a basic, pervasive, and often necessary mode of transportation to and from one's home, workplace, and leisure activities."  Delaware v. Prouse, 440 U.S. 648, 660 (1979).  84 percent of Americans drive to work, while 83 percent of all trips Americans make are made in a car.  U.S. Census Bureau, American Community Survey: Means of Transportation to Work by Place of Work—State and County Level (Table B08130) (2020), https://data.census.gov/cedsci/table?q=b08130 & tid=ACSD T5Y2020.B08130 & moe=false; Fed. Highway Admin., U.S. Dep't Transp., 2017 National Household Travel Survey, Travel Profile: United States 2 (2017), https://nhts.ornl.gov/assets/2017_USTravelProfile.pdf.  This is especially true in places like Los Angeles, because every Angeleno knows that public transportation is not a viable alternative for millions who live and work in the City.  And even if the vehicle would not have been driven during the 30-day period, it almost certainly still had some value, for any number of reasons.  It could have been "used for storage."  Sandoval, 912 F.3d at 517.  Though some find this a strange behavior, many Americans' vehicles sit immobile in their garages or on the street, to be tinkered with on a Sunday afternoon or for aesthetic enjoyment.  This is a paradigm likely more common among Americans with disposable income, but there is another paradigm of immobile use of vehicles utilized by the poorest among us: parking a vehicle where it is free and legal to leave it for extended periods and then sleeping in it at night.  Some have been known to use their cars to take private telephone calls when other spaces are not available, even when they are not driving it.  This list of potential uses of a vehicle for an unlicensed driver could go on far longer (there are "innumerable possible actions" that such a vehicle owner could take, Sandoval, 912 F.3d at 517), but surely the point has been made already: the Impound Policy deprived members of the certified classes of such a substantial component of their possessory interest in the vehicle that the a reasonable way to compensate them for their losses is to consider the value of a replacement, even for those who lacked valid driver's licenses during the 30-day period.

Finally, Defendants do not seriously dispute that Plaintiffs' experts' reliance upon, and application of, valuation principles used in the rental car industry enjoys widespread acceptance and is otherwise reliable.  As noted above, Plaintiffs' experts have carefully explained why it is appropriate to apply contemporaneous, localized valuations for equivalent rental cars as a basis for determining the value of a replacement vehicle during the impound period; applied standard valuation techniques used in that industry; detailed where they acquired the underlying data and how they analyzed it at every step; and outlined the limitations of the available data and where they needed to make assumptions or substitutions if a piece of relevant data did not exist.  Moreover, where an assumption had to be made, at every juncture Plaintiffs' experts chose the most conservative option.  The Court finds that Plaintiffs' experts have applied reliable principles and methods to the facts of this case, that their methodology is generally accepted, and does not appear to have a high known or potential rate of error.  See Fed. R. Evid. 702; Kumho Tire, 526 U.S. at 149-52.

At a higher level of generality, Plaintiffs' cited authorities also reveal that their methodological approach enjoys widespread acceptance in the broader field relevant to instant purposes, the calculation of damages when an individual suffers the temporary or permanent loss of a vehicle.  Though these cases do not discuss this methodology in the context of Daubert, 509 U.S. 579, the Court nonetheless finds them conclusive as to the primary Daubert factor for present purposes, whether the methodology is reliable because it "enjoys 'general acceptance' within a 'relevant scientific community.'" Kumho Tire, 526 U.S. at 149-50.  In Kuwait Airways Corp. v. Ogden Allied Aviation Servs., 726 F. Supp. 1389 (E.D.N.Y. 1989), after setting out the facts involving a "fender bender between two rather extraordinary fenders: one attached to a truck of the type used to hoist meals onto aircraft, the other on a Boeing 747" and canvassing relevant case law, the court adopted the approach pronounced by the Second Circuit in Koninklijke Luchtvaart Maatschaapij, N. V. v. United Techs. Corp., 610 F.2d 1052 (2d Cir. 1979) ("KLM"), wherein "[t]he value of the lost use of a thing for a period of time is . . . estimated by the expense of acquiring the use of that item for that time, i.e., the rental cost of a replacement." Kuwait Airways, 726 F. Supp. at 1391.  That is because the "rental value may provide a measure of loss of use damages even though a substitute vehicle has not actually been hired," since "it would be ridiculous to demand proof of actual financial loss resulting from loss of use of a pleasure vehicle, yet the use of that vehicle nonetheless has value, which may be approximated by the rental cost of a replacement." Id. at 1392 (citation omitted).  Judge Dearie explained this principle as follows:

> [L]oss of use damages exist to compensate for the deprivation of the owner's right to use its chattel as the owner sees fit.  This right has a value, and its deprivation necessarily entails what economists call "opportunity cost."  Any particular allocation of a resource necessarily costs the owner the opportunity to put that resource to other, competing uses.  When a tortfeasor by its negligence forces a thing's owner to allocate that chattel to the singularly unsatisfying use of sitting in a repair shop for a while, that tortfeasor forecloses the owner's opportunity to put the chattel to some productive use.
>
> The opportunity cost exists irrespective of the normal use to which the owner allocates the damaged item.  For example, in the case of a vehicle that is used only for pleasure—say, a privately owned, high-powered sports car—the loss of the car's use deprives the owner of the opportunity to drive the car for pleasure during the repair period.  Again invoking the economist's language, one could say that the owner has lost "utility."  The value of that utility is measurable by the amount the owner is willing or required to spend to obtain it.  There is no controversy, as a matter of tort doctrine, that the sports car owner so deprived is entitled to replace the lost utility directly, by renting an equivalent automobile and recovering the rental cost from the tortfeasor.  No sound reason exists for

> denying that same recovery for the value of lost utility even if the owner does not rent a substitute car.
>
> The result is no different in the case of a driver who owns a second, identical sports car that is kept in reserve for just such contingencies. The reserve sports car might enable the owner to do the same amount of pleasure driving after the tort as before, but the tort still carries with it an opportunity cost. The owner has lost the opportunity to lend the second sports car to a friend, or to keep one car brand-new while using the other, or simply to drive home in one car while smugly knowing that there is another in the garage. This lost opportunity also has a compensable value.

Id. at 1396.

Ferrari v. Cnty. of Suffolk, 2015 WL 3853489 (E.D.N.Y. Feb. 25, 2015) explains why the Kuwait Airways approach applies in the context of an unlawful vehicle impound. In Ferrari, the plaintiff was arrested for driving under the influence, his 2003 Ferrari sports car was seized, and it was impounded pending a post-seizure hearing. Id. at *1. The plaintiff had two prior convictions for driving under the influence, a "host of driver's license suspensions or revocations," and was also in possession of crack cocaine and a pipe when he was driving his Ferrari under the influence. Id. He also owned a second vehicle. Id. He was later convicted of driving under the influence and thereafter surrendered title to the Ferrari. Id. The court held on a motion for summary judgment that the hearing violated procedural due process and granted summary judgment to the plaintiff on that claim. Id. at *2. The court then held a damages trial before a jury, where one witness was called: Robert Ferretti, an expert witness regarding the leasing and rental of high-end vehicles. Id. In relevant part, Mr. Ferretti testified that a Ferrari 360 Coupe could be leased for approximately $25,000 to $30,000 for a three-month period. Id. At closing argument, plaintiff's counsel asked the jury to award his client damages of approximately $25,000 for every three-month period the car was retained by the County that impounded it; the County's lawyer argued that the plaintiff was entitled to only $1. Id. The County filed motions for the entry of judgment as a matter of law and for a new trial, arguing that the record was devoid of evidence that the due process violation caused "actual damages." Id. at *4. The Ferrari court rejected the argument. It first looked to the common law of torts and observed that "the law of torts is well developed in defining the damages sustained by a vehicle owner improperly deprived of use of a vehicle." Id. It found "[t]hat the loss of an automobile for a period of time has a value has been recognized since the beginning of automotive history," citing a 1914 case. Id. It then quoted the portion of Kuwait Airways cited above. Most notably, Ferrari observed this: "State courts have consistently held that: The owner of the subject matter is entitled to recover as damages for the loss of the value of the use, at least the rental value of the chattel or land during the period of deprivation. This is true *even though the owner in fact has suffered no harm through the deprivation, as when he was not using the subject matter at the time or had a substitute that he used without additional expense to him.*" Id. at *6 (quoting PurCo Fleet Servs., Inc. v. Koenig, 240 P.3d 435, 440 (Colo. App. 2010) aff'd on other grounds, 285 P.3d 979 (Colo.

2012) (quoting Restatement (Second) of Torts § 931)) (emphasis added).[65]  It finally rejected the County's argument that nominal damages were appropriate because the only authority it mustered in support of that argument was a case in which the court had found the vehicle was *lawfully* seized, where the facts at hand compelled the "opposite conclusion," as the jury was instructed that the County retained the plaintiff's vehicle in violation of his rights.  Id. at *6-7.[66]  The same is, of course, true here, because the Court has held that the vehicles were impounded unlawfully.

Once again, the Court would not have been inclined to grant the MPSJ had Defendants come forth with a reasonable alternative methodology, one that a jury could have accepted.  Indeed, in Kuwait Airways itself, the court embraced the plaintiff's methodological approach but declined to grant it summary judgment, because "the 'reasonable rental cost' urged by plaintiff as a measure of damages is apparently the output of an economic model devised by plaintiff or by plaintiff's retained expert.  The *evidence presented by defendant* on this motion is sufficient to raise a material issue of fact as to the reliability and suitability of plaintiff's analysis."  726 F. Supp. at 1398 (emphasis added).  Because of the genuine dispute of material fact, the defendant was thus "entitled to the opportunity to suggest, at trial, that an alternative method should be chosen."  Id. at 1399.  Plaintiffs have met their initial burden as the moving party to demonstrate that there is an absence of evidence to support the nonmoving party's case; they have otherwise prevailed on the merits, and their damages methodology is a reasonable and reliable approach.  See Celotex, 477 U.S. at 324; In re Oracle Corp. Sec. Litig., 627 F.3d at 387.  That burden sustained, Defendants must then show that there is a genuine issue of material fact that must be resolved at trial.  Celotex, 477 U.S. at 324.  This is a showing of *fact*, one that requires Defendants to introduce *evidence,* not a showing of attorney argument.  See Carrillo-Gonzalez v. I.N.S., 353 F.3d 1077, 1079 (9th Cir. 2003) (argument of counsel is not evidence).  And even if the argument of counsel were sufficient, Defendants surely had the burden to cite a single case, treatise or legal authority of any kind that suggested Plaintiffs' rental value theory is inappropriate in the instant context.  The Court would have given any such authority serious consideration.  But they did not do that either.

Without offering a single disputed fact or authority in support of their argument or suggesting an alternative approach to damages calculations, the Court has no choice but to

---

[65] PurCo also found, as relevant here, that "[a]uthorities and commentators have generally adopted interest or rental value as the possible measures of damages for loss of use, and failing proof of either, an award of nominal damages," and "numerous courts and commentators have stated that an appropriate measure of loss of use damages is 'rental value.'"  240 P.3d at 442-43.

[66] The Second Circuit reversed the summary judgment order on the merits of the due process claim but declined to address the damages trial or the order denying the County's post-trial motions cited here, which was written by a different judge.  Ferrari v. Cnty. of Suffolk, 845 F.3d 46, 56 fn.13 (2d Cir. 2016), as amended (Jan. 4, 2017).  Since the merits of the underlying constitutional violation in Ferrari have no relevance here, and the Second Circuit did not weigh in on the validity of the damages analysis, the Court continues to rely on it.

GRANT the MPSJ as to Plaintiffs' damages methodology. As noted above and below, there remains an additional layer of proof before judgment may be entered on Plaintiffs' behalf, but the Court now holds as a matter of law that Plaintiffs' approach to damages controls moving forward in this litigation; no damages trial would thus be necessary or appropriate.

## L. Injunctive and Declaratory Relief

Because Plaintiffs have prevailed on the merits and are entitled to judgment as a matter of law, the final question is to assess the relief for which they are entitled. In addition to damages, Plaintiffs pray for declaratory and injunctive relief. (See 5AC.)

The Court first turns to the declaratory relief Plaintiffs seek. Plaintiffs request that the Court "issue a declaration that the Impound Policy, in the respects set forth herein, is unconstitutional on its face and of no force or effect. Specifically, that this Court declare that the Impound Policy is facially unconstitutional to the extent that it directs a 30 day impoundment of a vehicle without a warrant in the absence of consent, exigent circumstances, emergency or community caretaking [justifications]." (5AC Prayer for Relief (2)). The lengthy analysis above explains why such declaratory relief is appropriate. Stated at a high level of generality, the Impound Policy authorizes the impoundment of vehicles for 30 days pursuant to Section 14602.6 even when there is no Fourth Amendment justification for the 30-day impound. Pursuant to the Impound Policy, LAPD commands its personnel to ignore the proper Fourth Amendment inquiry as it relates to the decision to impose a 30-day impound, as opposed to an initial and temporary impound. Even when the initial community caretaking rationale is no longer applicable, and even when an individual presents all that he is lawfully required to do to retrieve his vehicle, the Impound Policy still authorizes LAPD personnel to uphold the decision to impound the car. The Impound Policy is thus facially constitutional as written, in that it authorizes unreasonable seizures in violation of the Fourth Amendment and article I, section 13 of the California Constitution. The Impound Policy also authorizes the unlawful takings of vehicles without lawful authority, leading to either temporary or permanent deprivation of property without just compensation, and thus is also facially unconstitutional under the takings clause of the Fifth Amendment and article I, section 19 of the California Constitution. Finally, the Impound Policy authorizes constitutionally deficient notice procedures and deprives vehicle owners of a meaningful opportunity to be heard, and is thus facially unconstitutional under the procedural due process provisions of the Fourteenth Amendment and article I, section 7 of the California Constitution. For these reasons, this Court GRANTS Plaintiffs' request for declaratory relief and holds that the Impound Policy is facially unconstitutional.[67]

---

[67] Defendants do not argue that Plaintiffs' requests for declaratory and injunctive relief are moot because the City is not currently imposing 30-day impounds. (See MSJ; MPSJ Opposition.) Even though a governmental defendant's burden of demonstrating mootness is a lesser one than a private defendant's, the burden of convincing a court that voluntary cessation moots a case, claim or form of relief remains with the party asserting mootness, and here Defendants have made no attempt whatsoever to meet it. See Friends of the Earth, Inc. v. (continued . . . )

The Court next turns to injunctive relief.  In the 5AC, Plaintiffs request that the Court "issue a preliminary and permanent injunction on behalf of Plaintiff and class members commanding defendants, and each of them, to release immediately to Plaintiff[s] and class members their respective vehicles, upon proof that Plaintiff[s] and class members can lawfully take possession and drive the vehicles."  (5AC Prayer for Relief (3)).  It is undisputed that, in response to the Ninth Circuit's decision in Brewster, 859 F.3d 1194, the LAPD issued a legal update directing officers to cease impounding vehicles under Section 14602.6 and instead use Section 22561(p) as the impound authority.  (PAMF ¶ 42.)  It also appears undisputed that Defendants are no longer in possession of Plaintiffs' vehicles, or members of the classes, at least in so far as the City has stopped impounding vehicles for 30 days.  Defendants argue that Plaintiffs are not entitled to injunctive relief, asserting that "Plaintiffs have no standing to seek injunctive relief for release of vehicles since, as they allege, the City is not in possession of any of their vehicles, and because they have not shown a sufficient likelihood that their vehicles will again be impounded under Section 14602.6 in a similar way."  (MSJ at 26) (cleaned up).  Plaintiffs do not respond to the argument.  (See MSJ Opposition.)  It appears that the vehicles have been released, while Plaintiffs have not specifically requested that the Court award prospective relief (such as enjoining the Impound Policy or a future iteration of it).  As such, the Court GRANTS the MSJ to the extent it seeks a finding that Plaintiffs are not entitled to injunctive relief at this juncture.  If Defendants re-implement some version of the Impound Policy and/or impose 30-day impounds in the future, and this Court retains jurisdiction over the action, some form of injunctive relief might be appropriate, provided Plaintiffs move for it.

## M. Next Steps

Though the instant order almost certainly resolves the vast majority of the issues in this case, there appear to be some outstanding issues for the Court to resolve.  As noted above, "Plaintiffs do not seek an order that each class member is entitled to the value of their loss because another layer of proof is required by the class definition."  (MPSJ Reply at 11.)  As such, there may be remaining issues as to damages that need resolution, and perhaps others as well.

The parties are ORDERED to meet and confer and to file a joint status report with regard to what issues, if any, remain for this Court to resolve by May 22, 2023, along with a detailed plan to resolve them, including applicable future dates and deadlines.  The Court encourages the

---

Laidlaw Env't Servs. (TOC), Inc., 528 U.S. 167, 170 (2000) (burden of demonstrating whether defendant's voluntary cessation of challenged conduct is mooted falls on defendant, the party asserting mootness); Am. Cargo Transp., Inc. v. United States, 625 F.3d 1176, 1180 (9th Cir. 2010) (placing burden on governmental defendant to demonstrate mootness but rejecting plaintiff's argument that this is a "heavy" one because "unlike in the case of a private party, we presume the government is acting in good faith"); Bd. of Trustees of Glazing Health & Welfare Tr. v. Chambers, 941 F.3d 1195, 1198 (9th Cir. 2019) (explaining lower burden of demonstrating mootness by voluntary cessation for governmental actors).  Because no such argument was raised, the Court does not consider it.

parties to work as efficiently as possible toward a final judgment in this matter, just as it will do its best to promptly resolve any outstanding issues.  The Court anticipates that Defendants will seek appellate review of a final judgment.  As this case will have already gone on for a decade or so before the Ninth Circuit is asked to weigh in on the merits, the Court hopes to avoid much further delay in making the case ripe for its review.  <u>Brewster</u>, 859 F.3d 1194, what one day might be referred to as <u>Brewster I</u>, was an important decision affecting the rights of numerous individuals across the State of California.  <u>Brewster II</u> would accomplish the same, serving the many citizens, law enforcement agencies and courts who benefit from the law's clarity and protection of fundamental rights.

## V.    CONCLUSION

For the reasons above, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' MSJ and **GRANTS** Plaintiffs' MPSJ.  The parties are **ORDERED** to file a joint status report by May 22, 2023.

**IT IS SO ORDERED.**